2179-1
Of Counsel:
BURKE McPHEETERS BORDNER & ESTES

WILLIAM A. BORDNER 1371-0
JAMES T. ESTES, JR. 2000-0
DAVID Y. SUZUKI 6761-0
Suite 3100 - Mauka Tower
Pacific Guardian Center
737 Bishop Street
Honolulu, Hawaii 96813
Telephone No. (808) 523-9833
Facsimile (808) 528-1656
jestes@bmbe-law.com
dsuzuki@bmbe-law.com

JOHN L. TATE
SARAH G. CRONAN
Stites & Harbison, PLLC
400 West Market Street, Suite 1800
Louisville, Kentucky 40202-3352
Telephone No. (502) 681-0543
Facsimile (502) 779-8278
scronan@stites.com
jtate@stites.com

Attorneys for Defendant, Third-Party
Defendant and Fourth-Party Plaintiff
JAMES CASH MACHINE CO.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| DENISE GENDROW, Individually and as Personal Representative of THE ESTATE OF CHARLES EUGENE GENDROW, JR.; CHARLES E. GENDROW, III,<br><br>Plaintiffs, | CIVIL NO. CV03-00034 BMK<br>(Other Non-Vehicle Tort)<br><br><br>AMENDED SEPARATE CONCISE STATEMENT OF FACTS IN SUPPORT OF DEFENDANT AND |

|  |  |
|---|---|
| vs.<br><br>SIMON MATTRESS MANUFACTURING COMPANY dba SERTA MATTRESS COMPANY dba COYNE MATTRESS MANUFACTURING COMPANY; JAMES CASH MACHINE CO.,<br><br>       Defendants. | THIRD-PARTY DEFENDANT JAMES CASH MACHINE'S MOTION FOR SUMMARY JUDGMENT FILED DECEMBER 14, 2005; AFFIDAVIT OF DAVID Y. SUZUKI; EXHIBITS "A"-"J"; CERTIFICATE OF SERVICE |
| SIMON MATTRESS MANUFACTURING COMPANY,<br><br>       Defendant and Third-Party Plaintiff,<br><br>vs.<br><br>JAMES CASH MACHINE CO., a Kentucky Corporation,<br><br>       Third-Party Defendant. | Judge:  Mag. Barry M. Kurren<br>Trial:   May 16, 2006 |
| JAMES CASH MACHINE CO., a Kentucky Corporation,<br><br>       Defendant and Fourth-Party Plaintiff,<br><br>vs.<br><br>A & B ELECTRIC CO., INC., a Hawaii Corporation,<br><br>       Fourth-Party Defendant. |  |

## AMENDED SEPARATE CONCISE STATEMENT OF FACTS IN SUPPORT OF DEFENDANT AND THIRD-PARTY DEFENDANT JAMES CASH MACHINE, CO.'S MOTION FOR SUMMARY JUDGMENT FILED DECEMBER 14, 2005.

Defendant James Cash Machine, Co., by and through its undersigned attorneys, hereby submits this Amended Separate Concise Statement of Facts in support of its Motion for Summary Judgment, filed December 14, 2005.

The Separate Concise Statement of Fact, filed December 14, 2005, has been amended for the following reasons: 1) to comply with LR 56.1 by excerpting and highlighting relevant portions of the exhibits; 2) to include certification or authentication pages from depositions upon oral and written examination, identifying the documents attached thereto; 3) to correct erroneous citations to exhibits at Item Nos. 6, 8, 16, 17, 21, 24, 25, 29, 32, 35, 36, and 38; 4) attach as Exhibit "J," the OSHA citation for Defendant Simon Mattress Manufacturing, which was referred to at page 7 of the Motion for Summary Judgment, but inadvertently omitted from Exhibit "I"; and 5) to correctly identify entities at Item Nos. 4, 6, and 30.

These amendments are for the purpose of avoiding confusion on the part of the Court, of the parties, and in the record; are for good cause; and do not add any substantive facts or arguments not previously

discussed or disclosed at the time of the filing of the Motion for Summary Judgment.

| No. | Facts | Evidentiary Support |
|---|---|---|
| 1. | "While changing motor on a tilt-top table, table fell from vertical to horizontal position, pinning his head." | Exhibit A, Certificate of Death. |
| 2. | Identification of tilt table parts. | Exhibit B, Post-accident Photographs of Tilt Table. |
| 3. | The tilt table on which Mr. Gendrow was working at the time of the accident was originally designed in 1966 or 1967. | Exhibit C, Deposition of David R. Cash, pp. 23-24. |
| 4. | James Cash Machine sold and shipped the tilt table to ~~Simon Mattress~~ Coyne Mattress Company on or about April 22, 1968. | Exhibit C, Cash Deposition, p. 36; see also attached sales records at Exhibits 5A, 5C - 5H to the Cash Deposition. |
| 5. | The tilt table was manufactured by DRC Corporation, which was merged with JCM in 1970. | Exhibit C, Cash Deposition, pp. 13-14, 33-34 and 44. |
| 6. | JCM ~~shipped the tilt table to Coyne Mattress through an agent, Van Waters & Rogers~~ <u>sales representatives/sales agents Van, Waters & Rogers placed an order for the tilt table in question to JCM. DRC then shipped the tilt table through JCM to Coyne Mattress (with the shipping manifest indicating "to Coyne Mattress from James Cash Machine.")</u> | Exhibit C, Cash Deposition, p. 37-~~38~~ <u>39</u>. |

4

| 7. | Following the sale of the tilt table to Coyne in 1968, Simon conducted its own maintenance on the tilt table and hired A & B for repairs. | Exhibit D, Deposition of Malcolm Barcarse, p. 12; Exhibit E, Deposition of Donald Erwin Lee, pp. 37 - 38. |
|---|---|---|
| 8. | With the exception of this lawsuit, no other personal injury lawsuit or claim was ever made concerning tilt tables designed, manufactured and sold by DRC or JCM. | Exhibit ~~D, Deposition of Malcolm Barcarse~~ C, Cash Deposition, p. 65. |
| 9. | The tilt table is rotated vertically and horizontally by an electric motor mounted on the frame of the machine at the rear. | Exhibit F, Report of Gary Buffington, p. 8; and Exhibit G, Report of Peter J. Schwalje, P.E., p. 2. |
| 10. | A second electric motor is located on the side of the machine and is used to raise and lower the step on which the table operator stands to perform work. | Exhibit G, Schwalje Report, p. 2. |
| 11. | The lift step motor was not working and this is the motor Mr. Gendrow was sent to repair. | Exhibit G, Schwalje Report, p. 2. |
| 12. | The cutting table's major moving parts are readily visible to the casual observer. | Exhibit B, Post-accident Photographs of Tilt Table. |
| 13. | The tilt table's table lift motor and gear assembly are analogous to a garage door and its electric opener in that the motion can be stopped at any point by turning off the power and the mechanical components are self-locking. | Exhibit H, Report of Richard Gill, Ph.D., p. 3. |

| 14. | On January 9, 2001, Mr. Gendrow attempted to repair the motor, by rewinding it, but was unsuccessful. He informed Malcolm Barcarse, the president of A&B Electric, that a new motor was needed. Mr. Barcarse called Mr. Lee at Coyne Mattress and informed him that a new motor was needed. Mr. Lee gave the go ahead to obtain a new motor. Mr. Gendrow called a distributor on the mainland and placed an order for a replacement motor using the identifying numbers on the motor he had removed. He asked that the motor be shipped to the Coyne Mattress address in Waipahu. | Exhibit F, Buffington report, pp. 6-7. |
|---|---|---|
| 15. | On January 15, 2001, at 11:00 a.m., UPS delivered the replacement motor to Coyne Mattress Company. A&B Electric was called and told that the motor had arrived. Mr. Barcarse said he would send Mr. Gendrow after lunch to install it. Mr. Gendrow told Mr. Barcarse it would take about one hour to install the new motor on the table. Mr. Gendrow arrived at Coyne at 1:00 p.m., obtained the new motor, and went into the cutting room to the table. According to Mr. Valdez [a Coyne Mattress employee], the top of the table was in the raised position at this time. | Exhibit F, Buffington report, p. 7. |

| 16. | At 2:00 p.m., Mr. Gendrow found Mr. Valdez at the loading dock and told him that the new motor did not fit. Both returned to the cutting table where Mr. Gendrow showed Mr. Valdez that the bolt holes in the motor casing did not match the mounting holes in the frame. Mr. Gendrow said he had measured the mounting holes in the casing of the table lift motor and found that it would fit. Mr. Gendrow said he was going to remove the table lift motor and use it for the lift step and would use the new motor for the table lift. After this conversation, Mr. Valdez returned to the loading dock. About 2:30 p.m., the employees in the sewing room heard a loud bang. The tilt top table was down and Mr. Gendrow was pinned under it. | Exhibit F, Buffington report, pp. 7-8. |
|---|---|---|
| 17. | The tilt top table is used to cut fabric for mattresses according to Donald Lee, the operations' manager for Coyne Mattress Manufacturing Company. The top of the table is raised by an electric motor mounted on a support in the center of the frame. It raises the table through a sprocket and chain assembly, which drives a shaft. The shaft has gears on either end, which mesh the gear bars on the sides of the table, which raise and lower it. According to Mr. Lee the table top is left up to | Exhibit F, Buffington report, pp. 6-8. |

|     |     |     |
| --- | --- | --- |
|     | facilitate movement in the area. When the table is down it rests on the frame but when raised it is only held in position by the motor. There is no other system to secure the table when it is up. The lift step in the front of the machine allows an employee to be lifted to work on the fabric being layered for a mattress top. |     |
| 18. | There are four (4) bolts, which secure the lifting motor to the frame. Mr. Gendrow (the victim) had removed the two lower bolts; he then began to loosen the two top bolts. As he did this the restraining ability of the motor mount was compromised. The weight of the table top caused the shaft to try to turn. This caused the loosened motor to shift to the side on which the drive sprocket was mounted. When the motor shifted the chain slipped off the sprocket and the table came down crushing Mr. Gendrow's head between a supporting metal beam on the underside of the table top and the support frame. The table controls and breaker panel are located on the right side of the table, as you face it, within the frame bolts. | Exhibit F, Buffington report, p. 8. |

| | | |
|---|---|---|
| 19. | Buffington's report further states that with an effective lock out/tag out program and training, employees will be protected from stored energy releases. | Exhibit F, Buffington report, p. 9. |
| 20. | In this instance, Mr. Gendrow and the Simon maintenance man should have discussed the potential hazard of removing the table top lift motor. Had this been done, the hazard would have been readily recognized, the table top secured and the accident avoided. | Exhibit F, Buffington report, p. 9. |
| 21. | Hawaii OSHA cited both A & B and Simon for violations of its lock out/tag out regulations at the time of the accident. | Exhibit I, Records of the Department of Labor & Industrial Relations Occupational Safety & Health Administration Division, p. ~~7~~ 13; Exhibit J, Records of the Department of Labor & Industrial Relations Occupational Safety & Health Administration Division, p. 11. |
| 22. | Mr. Barcarse of A & B testified that when he looked at the tilt table it was obvious to him that if the table lift motor was removed, the table top would become free-wheeling. | Exhibit D, Barcarse Deposition, p. 35. |
| 23. | It is apparent upon visual exam alone that the tilt table's home or equilibrium state is when the table occupies a horizontal position. | Exhibit ~~E~~ G, Report of Peter Schwalje, P.E., p. 2. |

| 24. | When the gear head motor, drive chain and gear system are intact, the gear head motor will hold the table in the vertical position however, if the integrity of the system is compromised, the resulting imbalance will cause the table to move from the vertical to the horizontal position. | Exhibit ~~E~~ G, Report of Peter Schwalje, P.E., pp. 2~~-3~~. |
|---|---|---|
| 25. | The equilibrium or zero energy position of the table is obviously biased to the horizontal position absent application of some outside force because the pivot position of the table is off center and closer to the step end of the table. | Exhibit ~~E~~ G, Report of Peter Schwalje, P.E., p. 3. |
| 26. | The motor could have been replaced with the table in a horizontal position. | Exhibit E, Lee Deposition, p. 100. |
| 27. | Mr. Gendrow's employer, Mr. Barcarse of A & B, testified that when he looked at the tilt table it was obvious to him that if the table lift motor was removed, the table top would become free-wheeling. | Exhibit D, Barcarse Deposition, p. 35. |
| 28. | A&B's president, Malcolm Barcarse ("Mr. Barcarse") testified that Mr. Gendrow was the most experienced person at A&B other than himself. | Exhibit D, Barcarse Deposition, pp. 37 and 40. |

| 29. | Mr. Gendrow supervised all of A&B's commercial work and sometimes supervised A&B employees. | Exhibit D, Barcarse Deposition, pp. 37 ~~and 40~~. |
|---|---|---|
| 30. | ~~He~~ Mr. Gendrow also conducted A&B's safety meetings prior to the accident. | Exhibit D, Barcarse Deposition, p. 36. |
| 31. | Simon's former operations manager, Donald Erwin Lee, testified that Mr. Gendrow had done work for Simon for a number of years and was in Simon's factory "probably at least once a month, if not more." | Exhibit E, Lee Deposition, p. 44. |
| 32. | Mr. Lee stated that Mr. Gendrow was an excellent electrician who was always able to figure out Simon's electrical equipment some of which was very complicated. | Exhibit E, Lee Deposition, p. ~~44~~ 45. |
| 33. | Mr. Gendrow knew all the equipment at Simon's premises and was familiar with the operation of all of Simon's machines. He was the individual who A&B usually sent to Simon for repair calls. | Exhibit E, Lee Deposition, p. 52. |
| 34. | Lee agreed that Mr. Gendrow was very familiar with the tilt table  He knew how it worked and had moved the tilt table on several occasions. | Exhibit E, Lee Deposition, p. 50. |
| 35. | Mr. Gendrow had also rewired the tilt table and tested it to make sure the motors were running correctly following his repairs. | Exhibit E, Lee Deposition, pp. ~~90~~ 91, 99-100. |

| 36. | Mr. Lee confirmed that the tilt table was purchased in the 1960's. | Exhibit E, Lee Deposition, pp. 20, ~~25~~. |
| --- | --- | --- |
| 37. | Simon and its predecessors had been in the mattress manufacturing business for over 100 years. Mr. Lee worked there since 1962. | Exhibit E, Lee Deposition, pp. 11-12 |
| 38. | Simon had an earlier version of the tilt table that was smaller and manually operated, not electric. | Exhibit E, Lee Deposition, pp.20-21 and 23-24. |
| 39. | Tilt tables are specific to the mattress and bedding manufacturing industry. He also testified that he would not consider the tilt table to be very sophisticated. | Exhibit E, Lee Deposition, pp. 21, 22 |
| 40. | The tilt table was very simple to operate and did not require special training for operators. | Exhibit E, Lee Deposition, pp. 73-74. |

DATED: Honolulu, Hawai'i, January 20, 2006.

_____
WILLIAM A. BORDNER
JAMES T. ESTES, JR.
DAVID Y. SUZUKI
JOHN L. TATE
SARAH G. CRONAN
Attorneys for Defendant, Third-Party Defendant and Fourth-Party Plaintiff
JAMES CASH MACHINE COMPANY, INC.