IN THE UNITED STATE DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| DENISE GENDROW, Individually and as Personal Representative of THE ESTATE OF CHARLES EUGENE GENDROW, JR.; CHARLES E. GENDROW, III; and JEANNE SMITH; | CIVIL NO. CV03 00034 DAE/BMK (Other Non-Vehicle Tort) |
| Plaintiffs, | |
| vs. | |
| COYNE MATTRESS MANUFACTURING COMPANY; SERTA MATTRESS CORPORATION; JOHN DOES 1-10; DOE CORPORATIONS 2-10; DOE PARTNERSHIPS 1-10; DOE GOVERNMENTAL ENTITIES 1-10; DOE UNINCORPORATED ASSOCIATIONS 1-10; | |
| Defendants. | Trial Date: 09/07/05 |
| SIMON MATTRESS MANUFACTURING COMPANY, | |
| Defendant and Third-Party Plaintiff, | |
| vs. | |
| DRC CORPORATION, | |
| Third-Party Defendant. | |



COPY

CONDENSED

DEPOSITION OF
DAVID R. CASH

EXHIBIT "C"   January 11, 2005

DISK ENCLOSED

DEBRA E. BOYER, CSR, RPR
COURT REPORTING SERVICES (502) 254-1004

JAN 19 2005

COURT REPORTING SERVICES (502) 254-1004

1
2
3
4
5       DEPOSITION OF DAVID R. CASH
6
7
8
9       DEPOSITION AND ANSWERS of DAVID R. CASH,
10  taken before Debra E. Boyer, CSR, RPR, court reporter
11  and notary public for the State of Kentucky at Large,
12  in the offices of Lynch, Cox, Gilman & Mahan, PSC,
13  400 West Market Street, 2200 Aegon Center, Louisville,
14  Kentucky, 40202, on January 11, 2005, between the hours
15  of 1:05 p.m. and 4:30 p.m., pursuant to notice and in
16  accordance with the Kentucky Rules of Civil Procedure.
17
18
19
20
21
22
23
24

```
 1                    A P P E A R A N C E S

 2

 3    ATTORNEYS FOR THE PLAINTIFFS:

 4         LAW OFFICES OF CHRIS BOUSLOG
           4-480 Waterfront Plaza
 5         500 Ala Moana Boulevard
           Honolulu, Hawaii 96822
 6
           By:  Mr. Chris Bouslog
 7

 8    ATTORNEYS FOR THE DEFENDANT AND THIRD-PARTY PLAINTIFF
      SIMON MATTRESS MANUFACTURING COMPANY MISIDENTIFIED AS
 9    "SERTA MATTRESS CORPORATION":

10         LYNCH, COX, GILMAN & MAHAN, PSC
           400 West Market Street
11         2200 Aegon Center
           Louisville, Kentucky 40202-3352
12
           By:  Mr. Armer H. Mahan
13

14    ATTORNEYS FOR THIRD-PARTY DEFENDANT DRC CORPORATION:

15         YAMAMURA & SHIMAZU
           Suite 1770 Central Pacific Plaza
16         220 South King Street
           Honolulu, Hawaii 96813
17
           By:  Mr. Paul T. Yamamura
18
                - and -
19
           STITES & HARBISON, PLLC
20         400 West Market Street
           Suite 1800
21         Louisville, KY 40202-3352

22         By:  Ms. Sarah Grider Cronan

23

24
```

```
1                        I N D E X
2

3    DAVID R. CASH                                            PAGE
4
         Examination by Mr. Mahan                           5, 102
5
         Examination by Mr. Bouslog                        82, 105
6
         Examination by Ms. Cronan                              98
7
```

```
                         E X H I B I T S

Exhibit No. 1............................................... 13
Exhibit No. 2............................................... 15
Exhibit No. 3............................................... 16
Exhibit No. 4............................................... 31
Collective Exhibit No. 5.................................... 35
Exhibit No. 6............................................... 56
Exhibit No. 7............................................... 68
Exhibit No. 8............................................... 72
Exhibit No. 9............................................... 76
Exhibit No. 10.............................................. 102
```

13

1    MR. YAMAMURA: We have that. For the
2 record, it's "Third-party Defendant DRC Corporation's
3 Second Amended Response to Defendant and Third-Party
4 Plaintiff Simon Mattress Manufacturing Company's First
5 Request for Answers To Interrogatories to Third-party
6 Defendant DRC Corporation." I believe that's what you
7 are looking at.
8    MR. MAHAN: Correct. We are going to
9 file that as Exhibit A.
10   MR. YAMAMURA: Okay. That's going to be
11 an exhibit.
12   MR. MAHAN: Let's make it Exhibit 1.
13
14   (Deposition Exhibit No. 1 was
15      marked for identification.)
16
17 BY MR. MAHAN:
18   Q. If you will turn to the answer to
19 Question No. 1. In that answer you state that, "The
20 DRC Corporation which manufactured the cutting table
21 involved in this incident has been inactive since
22 1970."
23   A. That's true.
24   Q. Now, you were shown photographs of the

14

1 cutting table involved in this incident?
2   A. I have seen some photographs, yes, sir.
3   Q. Let me show you some -- I am going to mark
4 this Exhibit 2. If you would look at that photograph
5 for me. Are those photographs that you have seen?
6    MR. YAMAMURA: Counsel, for the record,
7 are these the photographs attached to the notice as
8 Exhibit A?
9    MR. MAHAN: That's right.
10   MR. YAMAMURA: Okay.
11 BY MR. MAHAN:
12   Q. Have you seen those photographs?
13   A. Yes.
14   Q. And when you say, "The DRC Corporation which
15 manufactured the cutting table involved in this
16 incident has been inactive since 1970," you are
17 referring to the cutting table referred to in one of
18 the photographs and the plaque referred to in the
19 bottom photograph?
20   A. Yes.
21   MR. MAHAN: We will mark that as
22 Exhibit 2.
23
24

DEBRA E. BOYER, CSR, RPR***COURT R

23

1   it said the cutting table. Any time reference is made
2   to the cutting table, it meant the cutting table
3   involved in the accident. So he was redundant several
4   times.
5          MR. YAMAMURA: Okay. Then he may have
6   to amend that response because he probably
7   misunderstood, but go ahead.
8          He is saying that the interrogatory
9   specifically refers to the cutting table involved in
10  the accident.
11         So you can go on.
12     A.  You are speaking about the table involved in
13  the accident, okay.
14         The table that's involved in the accident, I
15  would have designed it.
16  BY MR. MAHAN:
17     Q.  You designed it?
18     A.  Yes.
19     Q.  Did you design that from a previous model
20  that had been designed by your father?
21     A.  Yes.
22     Q.  When did you design the cutting table that
23  was involved in the accident, Mr. Cash?
24     A.  Well, from what I see in the incorporation

24

1   papers and the date that the table was manufactured, it
2   would have had to have been '66 or '67.
3      Q.  How much formal education have you, Mr. Cash?
4      A.  Well, I didn't finish high school. Tenth
5   grade, I believe.
6      Q.  Did you ever go to any trade school or
7   vocational school or drafting school?
8      A.  Yes, yes.
9      Q.  What trade school did you go to?
10     A.  It was Atherton's Trade School here in
11  Louisville.
12     Q.  What did you study at Atherton's Trade
13  School?
14     A.  Sheet metal, I would think would be the
15  definition of it.
16     Q.  Would that be the equivalent of taking a
17  sheet metal course in high school?
18     A.  I would think it would be.
19     Q.  How many years did you spend in the
20  Atherton's Trade School?
21     A.  I believe it was two.
22     Q.  When you left school, how old were you?
23     A.  That's a good question. I would have had to
24  have been 18, someplace around 18.

DEBRA E. BOYER, CSR, RPR***COURT REPORTING SERVICES (502) 254-1004

**Page 33**

1  the James Cash Machine Company --
2
3          (A short interruption was had.)
4
5  BY MR. MAHAN:
6     Q. Now, Mr. Cash, concerning the Exhibit 4,
7  if you will look at the Page 2, the paragraph titled
8  "Fifth" of the merger agreement, it says there that
9  "All the property and all the debts due on whatever
10 account to DRC Corporation, including subscriptions to
11 shares and other choses in action, are deemed to be
12 transferred to and vested in the James Cash Machine
13 Company, the surviving corporation, without further act
14 or deed," does it not?
15    A. Yes.
16         MR. YAMAMURA: The document speaks for
17 itself.
18 BY MR. MAHAN:
19    Q. And then the sixth paragraph says, "The
20 surviving corporation shall be responsible for all the
21 liabilities of the merged corporation, in the same
22 manner as if such surviving corporation had incurred
23 such liabilities."
24         MR. YAMAMURA: Same objection.

**Page 34**

1  BY MR. MAHAN:
2     Q. Did I read that correctly?
3     A. Yes.
4     Q. Now, the surviving corporation was James Cash
5  Machine Company.
6     A. Yes, sir.
7     Q. Let's go back to the Rule 30 notice.
8  If you will turn to Page 4, it is going to be
9  Question No. 2.
10         Now, for the purpose of this question, in
11 light of your counsel's earlier objection, this
12 question is being asked to you personally and not as a
13 representative of DRC Corporation active, as we have
14 designed that term, all right?
15    A. Okay. You are not asking it as active.
16    Q. I am not asking you as the corporate
17 representative of DRC Corporation formed in 1979, okay?
18    A. Okay.
19    Q. At some point in this case, and I think is
20 attached as an exhibit to the notice, are certain
21 documents pertaining to the cutting table, and I am
22 referring now to invoices and correspondence relating
23 to the purchase of the cutting table. Do you have
24 those there in front of you?

**Page 35**

1     A. Yes.
2          MR. YAMAMURA: They are not marked as
3  exhibits, but there is a bunch of documents.
4          MR. MAHAN: I am going to mark them as a
5  collective exhibit, if that's all right.
6          MR. YAMAMURA: Okay.
7          MR. MAHAN: We will make it Collective
8  Exhibit 5, 5-A through 5-H.
9          MR. YAMAMURA: This would be starting
10 with the document on the top? This is No. 479.
11         MR. MAHAN: Right. Actually, if you can
12 mark it Exhibit 5 and then A, B, C.
13
14         (Deposition Collective Exhibit No. 5,
15          5-A through 5-H, was marked for
16          identification.)
17
18 BY MR. MAHAN:
19    Q. Mr. Cash, we have identified these documents
20 as Exhibits 5-A through H. On the first page that we
21 will call Exhibit 5, which is A, 5-A, can you tell me
22 what that is? Can you identify that, sir?
23    A. Well, it's the name of the mattress factory,
24 Coyne Mattress. I am not sure what you want me to

**Page 36**

1  identify.
2     Q. Do you know where this came from or to what
3  it was affixed or anything pertaining to it?
4     A. Well, it appears to be the cutting table in
5  question.
6     Q. The number 479, does that mean anything to
7  you? At the top, where it has, quote, "No. 479."
8     A. Okay. For the old company. We are speaking
9  about the older company now.
10         That would be the serial number the DRC
11 Corporation was using on this particular table.
12    Q. Then it says, "Shipped: April 22, 1968."
13 That would mean the date that it was shipped from
14 Louisville, Kentucky?
15    A. I would think so, yes.
16    Q. Then parenthetically below that, it has
17 "James Cash." What does that mean?
18    A. Are you still on 5-A now?
19    Q. Yes, I am.
20    A. It would be James Cash Machine Company.
21    Q. And then Coyne Mattress Company, is that the
22 company to whom the cutting table was sold?
23    A. It appears so, yes.
24    Q. One king size cutting table is referred to at

```
                                          37
 1  the bottom.
 2      A.  Yes.
 3      Q.  Is that how that was identified by the
 4  DRC Corporation formed in 1966?
 5      A.  That's a -- that's the way they were --
 6  that's the terminology used by DRC Corporation, yes.
 7      Q.  Then the 1,480, would that be a selling
 8  price?
 9      A.  Yes, sir.
10      Q.  Can you tell from looking at this that this
11  is a document -- this 5-A a document that was prepared
12  by DRC Corporation formed in 1966?
13          MR. YAMAMURA:  If you know.
14      A.  I don't really know.  There is not enough to
15  tell, actually.
16  BY MR. MAHAN:
17      Q.  Let's turn to Exhibit 5-B, if you will.  Can
18  you identify that exhibit, sir?
19      A.  Well, it's a shipping manifest to Coyne
20  Mattress from James Cash Machine Company.
21      Q.  Going back to the time when this cutting
22  table was sold, Mr. Cash, did DRC Corporation formed in
23  1966 that manufactured the cutting table, did it sell
24  through James Cash Machine Company or sell the table
```

```
                                          38
 1  originally to James Cash Machine Company?
 2      A.  It looks like it may have passed through
 3  James Cash.  That would not have been normal for that
 4  to have happened, no.
 5      Q.  What was normal, sir?
 6      A.  Normally, we would actually just get phone
 7  calls from the customer ordering the machinery direct
 8  from DRC Corporation.
 9      Q.  Do you know in this instance why James Cash
10  Machine Company was the shipper?
11      A.  I have seen the name Van, Waters & Rogers on
12  your exhibits a little farther back.  They were -- I
13  don't know what the word is I am looking for.  They
14  sold machinery for James Cash Machine Company.
15      Q.  Were they sales representatives or selling
16  agents for James Cash Machine Company?
17      A.  They were, yes.  I never remember there being
18  a signed contract, but they were verbal.
19      Q.  Would they, then, get a commission?  Is that
20  how it worked?
21      A.  Yes.
22      Q.  At that time if the order was placed through
23  James Cash Machine Company to DRC Corporation, would
24  James Cash Machine Company then get a small piece of
```

```
                                          39
 1  the commission?
 2      A.  To be honest, I don't know.
 3      Q.  You don't recall.
 4      A.  No.  No, sir.
 5      Q.  Let's go to Exhibit 5-C.  Can you identify
 6  what Exhibit 5-C is, Mr. Cash?
 7      A.  It's an invoice from James Cash Machine
 8  Company to Coyne Mattress.
 9      Q.  Now, would this invoice mean that James Cash
10  Machine Company was a seller of the cutting table?
11      A.  I would have to say yes from what I am
12  reading.
13      Q.  If you will go to the next sheet.  This is
14  Exhibit 5-B.  Can you identify what this is?
15      A.  It appears to be an order from Van, Waters &
16  Rogers, the agents Van, Waters & Rogers.
17      Q.  This appears to be a purchase order from
18  Coyne Manufacturing to Van, Waters & Rogers.
19      A.  That's what it appears to be, yes, sir.
20      Q.  Then we will go to Exhibit 5-E.
21          This is a document, then, from Van, Waters &
22  Rogers to James Cash Machine Company.
23      A.  Yes.                    Ex. 5-F
24      Q.  And then last we have -- it is next to last
```

```
                                          40
 1  here -- a letter dated April 1st, 1968.  Now, if you
 2  will note at the bottom, it says that this letter is
 3  James Cash Machine Company, but it is to be signed by
 4  the secretary to David R. Cash.  Do you see that?
 5      A.  Yes.
 6      Q.  Did you have any sort of official position
 7  with James Cash Machine Company at that time?
 8      A.  I cannot give you an answer to that.
 9      Q.  Do you know who your secretary was in 1968?
10      A.  Secretary for DRC Corporation, yes, the older
11  DRC Corporation.  Actually, I had no secretaries.  I
12  think I better put that straight:  I had no
13  secretaries.
14      Q.  Who was Amy Cash?
15      A.  Amy Cash would have been my mother.
16      Q.  Let's go to Exhibit 5-G.  Who was Ruth
17  Keeton?
18      A.  Ruth Keeton worked for James Cash Machine
19  Company.
20      Q.  Do you remember what her capacity was?
21      A.  She would take machine orders.
22      Q.  Did she ever work --
23      A.  Correspond with customers.
24      Q.  Did she ever work as your secretary?
```

**Page 41**

1  A. Later on in years she would -- remember, this
2  is a small business. Everybody wore lots of hats. So
3  in that respect, yes.
4  Q. Let's go to the last page. This is
5  Exhibit 5-H.
6     To begin with, what is this conversation
7  about?
8     MR. YAMAMURA: Why don't you read the
9  entire document first?
10    THE WITNESS: That's what I am going to
11 do.
12 A. Well, it's about voltages. This is an
13 add-on. It's about requiring correct voltages.
14 BY MR. MAHAN:
15 Q. You put at the bottom -- or, let me rephrase
16 that question.
17    The bottom of the letter contains a paragraph
18 that appears to be signed by Ruth Keeton; is that
19 correct?
20 A. It appears to be, yes.
21 Q. And she was an employee of James Cash Machine
22 Company?
23 A. Yes.
24 Q. There is the name "David" written across,

**Page 42**

1  right above her signature.
2     Is that David you?
3  A. I would think so, yes.
4  Q. Was this question posed to you and does this
5  paragraph represent your answer to the question?
6     MS. CRONAN: I object. I don't know
7  which statement you are referring to. If you could
8  clarify.
9  BY MR. MAHAN:
10 Q. The question contained in the body of the
11 letter, first paragraph of the letter, signed by
12 Coyne Mattress Company, was that question eventually
13 passed on to you and is the paragraph at the bottom of
14 the letter signed by Ruth Keeton your answer to the
15 question?
16 A. What I see here, I would say that the word
17 "David" is probably written by Ruth Keeton, pointing to
18 the electrical voltage or phases that was finally
19 selected by Coyne Mattress.
20 Q. Would you have been the person at DRC
21 Corporation formed in '66 to answer electrical
22 questions?
23 A. Simple ones like this, yes.
24 Q. Would Ms. Keeton at James Cash Machine

**Page 43**

1  Company undertaken to have answered an electrical
2  question?
3  A. She would have had enough knowledge to have
4  done that. However, this doesn't appear to be the case
5  here.
6  Q. Let me go back to our questions again. And
7  here again, the questions I am going to be posing to
8  you are directed to you personally and not to you as
9  the corporate representative of DRC Corporation formed
10 in 1979.
11    The cutting table that's involved in this
12 accident, do you have any knowledge as to whether it
13 was ever leased to anyone by DRC Corporation formed in
14 1966 or James Cash Machine Company?
15 A. Do I have any knowledge that it might have
16 been leased?
17 Q. Yes, or that it was leased.
18 A. No.
19    MS. CRONAN: Are you asking him whether
20 he has knowledge or whether it was leased?
21    MR. MAHAN: Whether he has knowledge.
22 A. I have no knowledge.
23 BY MR. MAHAN:
24 Q. And Question No. 4 pertains to the

**Page 44**

1  manufacture of the cutting table involved in this
2  accident or any component or part of the cutting table.
3     Let me start, Mr. Cash, by asking you: Did
4  DRC Corporation formed in 1966 manufacture all parts of
5  the cutting table?
6  A. All parts with the exception of
7  over-the-counter items: electrical, sprockets, chains.
8  Gears would have been bought, would have been
9  purchased.
10 Q. Would have been purchased and then
11 incorporated into the cutting table?
12 A. Yes, sir.
13 Q. When the cutting table was manufactured by
14 DRC Corporation formed in 1966 and when it shipped from
15 Louisville, Kentucky, as in this case, to Honolulu,
16 what is to be done insofar as the installation of that
17 cutting table is concerned?
18 A. Well, I will have to go back 30-some-odd
19 years to think about it, but at that time the customer
20 would have been responsible for setting it up and
21 putting it into operation himself.
22 Q. Did any instructions go along with the
23 cutting tables that were sold by either James Cash
24 Machine Company or DRC Corporation concerning setup or

**Page 53**

1  Linda Ferry.
2  Q. That's your daughter?
3  A. Yes.
4  Q. When were you last an officer of James Cash
5  Machine Company?
6  A. Probably 1990.
7  Q. Were you at one time chairman of the board of
8  directors of that company?
9  A. Yes.
10 Q. When were you last chairman of the board of
11 directors of that company?
12        MS. CRONAN: I object to the use of the
13 term "chairman of the board of directors." I think it
14 assumes facts not in evidence.
15        MR. YAMAMURA: Go ahead. You can answer
16 that.
17 A. '88, '89, '90.
18 BY MR. MAHAN:
19 Q. Now, James Cash Machine Company is now
20 located at 100 Outer Loop?
21 A. Yes.
22 Q. What does James Cash Machine Company do?
23 A. Manufactures -- again, if no objection, it
24 manufactures mattress making equipment.

**Page 54**

1  Q. And that includes cutting tables similar to
2  the one that was involved in the accident in Hawaii?
3  A. Yes.
4  Q. Does James Cash Machine Company use any of
5  your designs to manufacture cutting tables?
6         MR. YAMAMURA: Currently, you are
7  talking about?
8         MR. MAHAN: Currently.
9  A. Yes.
10 BY MR. MAHAN:
11 Q. Is this the same design that was used to
12 manufacture the cutting table that was involved in the
13 incident in Hawaii?
14 A. The current cutting tables would be similar
15 to the one in Hawaii, powered by air today.
16 Q. Did you obtain a patent on the design of the
17 cutting table that was sold to Coyne Manufacturing
18 Company?
19        MR. YAMAMURA: It assumes facts not in
20 evidence, but go ahead.
21 A. Not to my knowledge.
22 BY MR. MAHAN:
23 Q. Does the James Cash Machine Company pay you
24 any royalty or commission or any type of money anytime

**Page 55**

1  it sells a cutting table that is of your design or
2  similar to your design?
3  A. No.
4  Q. Who is Robert Ferry?
5  A. A son-in-law.
6  Q. Are you currently a shareholder of James Cash
7  Machine Company?
8  A. No.
9  Q. When did you sell your shares of stock in the
10 company?
11 A. I have not been a stockholder for six years.
12 Q. Is T.J. Cash an officer of James Cash Machine
13 Company?
14 A. No.
15 Q. How long has T.J. Cash not been an officer of
16 the company?
17 A. I can't answer that question.
18        MR. MAHAN: Mark that as No. 6.
19
20        (Deposition Exhibit No. 6 was
21        marked for identification.)
22
23 BY MR. MAHAN:
24 Q. I want to show you a document we have marked

**Page 56**

1  as Exhibit No. 6. This is an annual report, a
2  corporate annual report, filed with the Secretary of
3  State for the Commonwealth of Kentucky. This is filed
4  for the year 2004.
5         Does that corporate annual report filed for
6  the year 2004 indicate that T.J. -- or, specify that
7  T.J. Cash is an officer of James Cash Machine Company?
8         MR. YAMAMURA: The document speaks for
9  itself, but go ahead.
10 A. Yes.
11 BY MR. MAHAN:
12 Q. Was T.J. Cash receiving any salary or money
13 from James Cash Machine Company last year for any work
14 or activity on behalf of the corporation?
15 A. To tell you the truth, I don't know.
16 Q. If you don't know, that's fine. We are not
17 here grading your papers or anything. If you don't
18 know, you don't know.
19 A. No.
20 Q. To your knowledge today, Mr. Cash, are any
21 members -- or, let me rephrase that.
22        Are any persons related to you by blood or
23 marriage other than Linda Cash Ferry and Robert Ferry
24 connected with James Cash Machine Company?

65

1  BY MR. MAHAN:
2      Q.  To your knowledge, is this the only claim and
3  lawsuit that's ever been filed pertaining to any
4  cutting table manufactured by DRC Corporation or James
5  Cash Machine Company arising out of any alleged defect
6  in design or manufacturing of a cutting table?
7      A.  Yes, sir.
8      Q.  Let me go to 26.  Has anyone at any time, to
9  your knowledge, called to your attention any alleged
10 defect or problem with a cutting table manufactured by
11 DRC Corporation formed in 1966 or James Cash Machine
12 Company?
13     A.  No.
14     Q.  Let me go to 28.  Are you aware of any
15 maintenance or repair that was performed on the cutting
16 table involved in the incident in Honolulu after the
17 sale of the cutting table other than the incident
18 involved in the lawsuit?
19     A.  No, sir.
20     Q.  Let's talk about No. 29.  Again, I am talking
21 about your personal knowledge.  In the 1980's and at
22 least part of the 1990's, you were an officer of both
23 James Cash Machine Company and DRC Corporation formed
24 in 1979; is that correct?

EXHIBIT CASH-5
5-A

$1480.00

No. 479

Shipped: April 22, 1968

(James Cash)

Coyne Mattress Company
716 Cooke Street
Honolulu, Hawaii

One King Size Cutting Table

**THIS MEMORANDUM** is an acknowledgment that a bill of lading has been issued and is not the Original Bill of Lading nor a copy or duplicate, covering the property named herein, and is intended solely for filing or record.

CARRIER: I M L

Shipper's No. ___
Carrier's No. ___

RECEIVED, subject to the classifications and tariffs in effect on the date of the receipt by the carrier of the property described in the Original Bill of Lading.

At Louisville, Kentucky Apr. 22nx 19 68 from James Cash Machine Co.

Consigned to Coyne Mattress Co.

Destination 716 Cooke Street   St. Address ___   ___ County

Route Honolulu, Hawaii   State ___

Delivery Carrier ___

Car or Vehicle Initials I M L   No. ___

| NO. PACKAGES | DESCRIPTION OF ARTICLES, SPECIAL MARKS AND EXCEPTIONS | *WEIGHT (Subject to Correction) | CLASS or RATE | CHECK COLUMN |
|---|---|---|---|---|
| One crate slab containing set up machinery | | 1400 | | |
| | NOIBN | | | |
| | one only King size cut table | | | |

to be collect

Permanent post-office address of shipper  James Cash Machine Co., 625 W. Hill St. Shippe, Per Louisville, Kentucky

STANDARD FORM 2320

INVOICE

## JAMES CASH MACHINE CO., INC.
625 WEST HILL STREET
LOUISVILLE, KENTUCKY • 40208

No. 17712

PHONES:
Office and Factory
637-8756
637-8757

Coyne Mattress Company Ltd.

716 Cooke Street

Honolulu, Hawaii

DATE April 22, 1968

YOUR ORDER NO. Your 1772 VW&R
Our

TERMS: 2%--30 days

shipped via I H L

| QUANTITY | | | DESCRIPTION | LIST PRICE | DISCOUNT | TOTAL |
|---|---|---|---|---|---|---|
| ORDERED | B.O. | SHIPPED | | | | |
| One | | One | King size cutting table with step and king size k af | | | 1,480.00 |

FILE COPY

City & State  Glendale, California

VW&R Manager and/or Salesman  _____



**DIVISION OF**
**COYNE MATTRESS CO., LTD.**
BOX 1733       HONOLULU, HAWAII 96806       716 COOKE ST.
CABLE ADDRESS
COYNE HONOLULU       PHONE 503-844

**PURCHASE ORDER**

**No.** 1772

SHOW THIS NUMBER ON ALL INVOICES, CORRESPONDENCE, CARTONS AND BILLS OF LADING.

DATE 3/25/68

ACKNOWLEDGMENT: ACKNOWLEDGE THIS ORDER BY PROCESSING AND RETURNING VIA AIRMAIL THE ACKNOWLEDGMENT COPY (PINK) INDICATING SHIPPING DATE.

DO NOT BACK ORDER WITHOUT OUR AUTHORIZATION.

MARK CMF HONOLULU

ALL ORDERS AFTER 25TH OF MONTH MUST HAVE DATING ON BILLS AS OF FIRST OF FOLLOWING MONTH.

VAN WATERS & ROGERS, INC.
P. O. BOX 3200 RINCON ANNEX
SAN FRANCISCO, CALIF. 94119

PLEASE ENTER THE FOLLOWING ORDER:

1 only    Cash King Size Cutting Table with Step and King Size Leaf  @ 1480.00.  FOB Factory

Ship via the most economical method.

**Perfect Sleeper** FINE BEDDING SINCE 1898
MATTRESS

VENDOR'S COPY

FINANCIAL ARRANGEMENTS:  ("Cash" contract or conditional sales contract)
20% down payment plus sales tax

INSURANCE:  Customer or his insurance company must furnish evidence of insurance coverage on the equipment, otherwise the Cash Company will cover insurance at the approximate rate of $1.40 per thousand dollars per month.

V W & R   O F F I C E:  (To be notified at time of shipment)

Branch _____SAN FRANCISCO, BRANCH_____

Street Address __3745 BAYSHORE BLVD__

City & State __BRISBANE, CALIFORNIA__

VW&R Manager and/or Salesman __FRANK ZARI__

Form 927

VAN WATERS & ROGERS

ORDER TRANSMITTAL MEMORANDUM

ORDER TO THE — JAMES CASH MACHINE CO.  DATE: 3-29-68
625 West Hill Street
Louisville, Kentucky 40208

FROM:   Company Name   COYNE MATTRESS   SHIP TO   COYNE MATTRESS CO.
        Street Address  716 COOKE ST                716 COOKE ST
        City & State    HONOLULU, HAWAII             HONOLULU, HAWAII
        Authorized Officer
        or Owner        MR. GENE ADAMSON

(NOTE: A signed customer order must be attached.)

PRICING: Model  KING SIZE CUTTING TABLE
                WITH STEP AND KING SIZE LEAF                     1480.00

Indicate wiring (#110, #220 Single or 3 phase) _____

Extras: _____

                                      Complete Machine Price    1480.00

SALES TAX: (State sales tax to apply unless to be resold)

                                                        TOTAL

FINANCIAL ARRANGEMENTS: ("Cash" contract or conditional sales contract)
                         20% down payment plus sales tax

INSURANCE: Customer or his insurance company must furnish evidence
of insurance coverage on the equipment, otherwise the Cash
Company will cover insurance at the approximate rate of
$1.40 per thousand dollars per month.

VW&R OFFICE: (To be notified at time of shipment)
    Branch          SAN FRANCISCO BRANCH
    Street Address  3745 BAYSHORE BLVD
    City & State    BRISBANE, CALIFORNIA

VW&R Manager and/or Salesman   FRANK ZARI

Form #37

April 1st, 1968

Coyne Mattress Company Ltd.
Box 1733   716 Cooke Street
Honolulu, Hawaii  96806

Gentlemen:

Thank you for your purchase order No. 1772.

Please advise your voltage, phase and cycle for the wiring of your motors.

We can use I M L container service for this machine and eliminate the export crate, thus giving you the advantage of the f.o.b. Louisville price.

With kindest regards, we remain

Very truly yours,

JAMES CASH MACHINE COMPANY, Inc.

Per: _____

Secretary to: David R. Cash

DRC/rk

cc to:  Van Waters Rogers Co.
        3745 Bayshore Blvd.
        Brisbane California

# VAN WATERS & ROGERS

P. O. BOX 3200
RINCON ANNEX

SAN FRANCISCO, CALIFORNIA 94119
(415) 467-2600

April 1, 1968

Mrs. Ruth Keeton
James Cash Machine Co.
625 W. Hill
Louisville, Kentucky

Dear Ruth,

Coyne Mattress Co. of Honolulu would like their cutting table shipped Via IML Freight Inc. out of San Francisco, this is on their PO #1772. Thank you.

Very Sincerely,

Frank

Frank Zari

FZ/sr

**Serta**

# SERTA MATTRESS CO.
DIVISION OF
## COYNE MATTRESS CO., LTD.
BOX 1733  HONOLULU, HAWAII  96806  716 COOKE ST.

CABLE ADDRESS,
COYNE HONOLULU

April 3, 1968

James Cash Machine Co., Inc.
625 West Hill Street
Louisville, Kentucky 40208

Gentlemen:

In answer to your letter of 4/1/68, we can use either 110-115, Single Phase, 60 cycle or 220-3 Phase, 60 cycle. Because of the wiring in our plant and the location of the new machine, we would prefer 110-115, Single Phase, 60 cycle.

Very truly yours,

COYNE MATTRESS CO., LTD.

E. R. Adamson
Assistant Manager

ERA:dw

cc: Van Waters & Rogers, Inc.

We do not recommend the single phase for this machine and would prefer if you could make some arrangement for the 220 - 3 phase 60 cycle for efficiency.
Please confirm.

Thanks,

IF 220 - 3 PHASE  60 CYCLE WILL BE MORE EFFICIENT, THIS WILL BE O.K. WITH US.



FINE BEDDING SINCE 1898

**Perfect Sleeper**
MATTRESS