1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| DENISE GENDROW, individually and as Personal Representative of THE ESTATE OF CHARLES EUGENE GENDROW, JR.; CHARLES E. GENDROW, III; and JEANNE SMITH, | ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) CIVIL NO. CV03 00034 ) DAE/BMK |
| COYNE MATTRESS MANUFACTURING COMPANY; SERTA MATTRESS CORPORATION; JOHN DOES 1-10; DOE GOVERNMENTAL ENTITIES 1-10; DOE UNINCORPORATED ASSOCIATIONS 1-10, | ) ) ) ) ) ) ) ) ) DEPOSITION OF: |
| Defendants. | ) MALCOLM L. BARCARSE ) ) ) Tuesday |
| SIMON MATTRESS MANUFACTURING COMPANY, Third-Party Plaintiff, | ) ) May 3, 2005 ) ) ) |
| vs. | ) ) |
| DRC CORPORATION, Third-Party Defendant. | ) ) ) ) ) |

EXHIBIT "D"

Page 2

1  DEPOSITION OF MALCOLM L. BARCARSE
2  Taken on behalf of the Third-Party Defendant DRC
3  Corporation, pursuant to Subpoena, on Tuesday,
4  May 3, 2005, commencing at 12:45 p.m., at the
5  offices of Powers & Associates, Pauahi Tower,
6  1001 Bishop Street, Suite 2650, Honolulu, Hawaii
7  96813.
8
9
10
11    REPORTED BY:
12        Don A. Ross, CSR No. 250
13        Notary Public, State of Hawaii

Page 3

1  APPEARANCES:
2     For Plaintiffs:
3        CHRISTOPHER S. BOUSLOG, Esq.
         Four Waterfront Plaza, Suite 480
4        500 Ala Moana Boulevard
         Honolulu, Hawaii  96813-4908
5        (808) 550-4995
6     For Third-Party Defendant DRC Corporation:
7        PAUL T. YAMAMURA, Esq.
         Yamamura & Shimazu
8        Central Pacific Plaza
         220 South King Street, Suite 1770
9        Honolulu, Hawaii  96813
         (808) 523-6969

               -o0o-

Page 4

1                    I N D E X
2
3  EXAMINATION:                          PAGE
4  BY MR. YAMAMURA                       5, 43
5
6  BY MR. BOUSLOG                        36
7
8
9
10 EXHIBITS FOR IDENTIFICATION:
11 Exhibit A                              9
   (Subpoenaed records of
12 A&B Electric Co., Inc.)
13 Exhibit B                              9
   (Notice of taking 30(b)(6)
14 deposition)
15 Exhibit C                             10
   (Business card of
16 Malcolm L. Barcarse)

Page 5

1  (Pursuant to Rule 14, of the Rules Governing
2  Court Reporting in Hawaii, the reporter's
3  disclosure was made and is attached hereto.)
4         MALCOLM L. BARCARSE
5  having been called as a witness and being first
6  duly sworn to tell the truth, the whole truth and
7  nothing but the truth, was examined and testified
8  as follows:
9            EXAMINATION
10 BY MR. YAMAMURA.
11    Q. Please state your full name.
12    A. Malcolm Leslie Barcarse.
13    Q. Can you spell your last name.
14    A. B-a-r-c-a-r-s-e.
15    Q. Mr. Barcarse, we're here for your
16 deposition.
17       And let me briefly go over some of the
18 ground rules of a deposition so we are on the
19 same wavelength.
20       But before we do that, I want to put
21 this on the record.
22       This deposition was duly noticed in
23 federal court for twelve-thirty today. And on
24 the notice, we indicated that service was
25 perfected on Mr. MacDonald's office and on

Page 12

1  A. -- there was no periodic maintenance.
2  Q. Okay. So maybe we can get into that
3  area.
4      What, if anything, did A&B do or
5  perform on the subject cutting table?
6  A. Just repair.
7  Q. Okay.
8  A. Just that one time.
9  Q. Now, our information is that repair was
10 done to that same cutting table five years prior
11 by A&B.
12 A. I don't recall that at all. I checked
13 our records. It's not in our records.
14 Q. And what -- how was it you got
15 contacted to do this one repair?
16 A. We do all their repairs. They call
17 us. They want us to change a light bulb, we'll
18 change a light bulb. They do their own
19 maintenance.
20 Q. That's what I was curious about. My
21 understanding also is that Simon does their own
22 maintenance on the machinery themselves.
23 A. That's correct.
24 Q. And if there's an electrical situation,
25 they'll call you guys?

Page 35

1 the design or manufacturing process of the
2 cutting table?
3   A. I have no idea what the manufacturing
4 process is; I mean, how Serta would use it for
5 manufacturing.
6   Q. Or how the table itself was put
7 together for use by Serta?
8   A. Not -- the only thing I know is what I
9 observed.
10   Q. What is that?
11   A. The motor is what drives the table up
12 and down. The motor keeps the table in whatever
13 position it's in. If you take the motor out, it
14 becomes free-wheeling.
15   Q. From your experience and looking at it,
16 that's pretty obvious to the person working on
17 the table?
18   A. Well, it's obvious to me. I've had
19 experience with a similar situation once before.
20   Q. Tell me what happened.
21   A. I was working on a job in Maui. And
22 another contractor pulled the gearmotor out, and
23 the elevator came falling down while we were
24 underneath. Nobody got hurt. We got out of the
25 way. But -- so I was well aware of the dangers

Page 36

1 of a gearmotor.
2   Q. A gearmotor. And that's something that
3 happens if you have situations like that, right?
4   A. It's few and far between, but, you
5 know, you do have that.
6   Q. Now, can you think of anyone else in
7 your company that might have knowledge about this
8 accident or how it happened, anybody else?
9   A. No.
10   Q. You say Donald Lee is the best person
11 at Serta, as far as you know?
12   A. As far as I know, him and Darrell.
13     MR. YAMAMURA: Thank you.
14     I have no further questions.
15       EXAMINATION.
16     BY MR. BOUSLOG.
17   Q. Just briefly, you said that Mr. Gendrow
18 was your most experienced and trusted worker?
19   A. Yes. And he's also conducted our
20 safety meetings, yeah.
21   Q. How many employees did your company
22 have back in January of 2001, roughly?
23   A. Oh, my goodness, I don't know. Maybe
24 ten, fifteen electricians. I don't know. Pretty
25 much about the same as we got now.

Page 37

1   Q. Was Mr. Gendrow a supervisor?
2   A. That's correct, of all the commercial --
3 all the commercial work.
4   Q. And in that role, did he have other
5 employees under his supervision?
6   A. That's correct.
7   Q. Approximately how many was he
8 supervising?
9   A. Well, at times, it would be all the
10 workers.
11   Q. Just depends on the job?
12   A. Yeah, depending on the jobs.
13   Q. About how long had Mr. Gendrow been
14 with you?
15   A. He had been with me about ten years.
16   Q. Did you find him to be reliable?
17   A. Yeah. He's the one that had the most
18 experience. Next to me, he had the most
19 experience.
20   Q. How about careful?
21   A. He had -- he was fairly careful. But
22 his main thing was getting the job -- you know,
23 getting the job done whichever way he can.
24   Q. You mentioned earlier that you think
25 that Serta didn't use the machine after this

Page 38

1 incident.
2  A. I don't think they did.
3  Q. And you said it was sort of hearsay.
4     Do you recall who told you that?
5  A. Well, they said they were going to
6 move -- I believe Donald said they wanted to
7 disconnect it, and they were going to put it in
8 storage. Now, you know, that was all verbal.
9 And that was what, quite a few years ago, so I
10 don't recall the exact words. But that was my
11 understanding. And that's why they disconnected
12 it.
13  Q. When you had opportunity to view the
14 machine after this incident, did you see any
15 indication that the machine had any broken parts
16 or sheared-off parts on it at that time?
17  A. No, I didn't.
18  Q. Other than the fact that the gearmotor
19 wasn't in the machine, did it appear to be in
20 appropriate working condition?
21  A. That's hard to say because, you know,
22 we can't see inside the gearbox and all that
23 stuff.
24  Q. Were you present when the machine --
25 tabletop was lifted back up?

Page 39

1  A. I was outside.
2  Q. So you've actually never seen the
3 machine mechanically moving, in other words?
4  A. No.
5  Q. For the purposes of your testimony here
6 today, did you review any documents other than
7 what you've seen here today that have been
8 presented as the exhibits here?
9  A. Pertaining to that job?
10  Q. Or to Mr. Gendrow or to anything having
11 to do with your testimony here today.
12     Did you review any documents before you
13 got here?
14  A. No. I went through what's on this
15 list, and this is pretty cut and dried. I didn't
16 feel it was necessary.
17  Q. Did you ever warn or cite or discipline
18 Mr. Gendrow for anything prior to this incident?
19  A. We didn't always agree. But, you know,
20 he was really a good and loyal employee.
21  Q. Do you recall whether anything was ever
22 put in his employee file?
23  A. No. No, there wasn't anything put in
24 his employee file. He didn't like to accept
25 help. Because of his experience, he thought he

Page 40

1 knew everything. Over the years, I gradually
2 broke him of that because nobody knows
3 everything, especially in our industry. So he
4 started coming to me for things that he didn't
5 quite understand, and we'd work it out together.
6 So, you know, it had gotten really good.
7  Q. So basically the relationship improved
8 over time?
9  A. Yeah. Because, see, you have somebody
10 who's been in the business -- he's been in the
11 business maybe one or two years longer than I
12 have. And I've been in it since 1964. It's hard
13 for him to have somebody telling him this is
14 wrong or that is wrong, you know. But I had a
15 little bit different experiences than he did.
16  Q. Sure.
17  A. I specialized in trouble-shooting and
18 repair almost all my life, where he did a lot of
19 construction work.
20  Q. Okay.
21  A. But, he got to the point where he would
22 ask advice, and we'd work it out together. So
23 when this happened, you know, the relationship
24 was really good. I didn't have to worry so much
25 about he's going to do something that's wrong

Page 41

1 because he used to call me and we used to go over
2 it, which I was surprised I wasn't called.
3  Q. At the time of this occurrence, what
4 was your understanding of the name of the
5 mattress company? Was it Serta or --
6  A. It was Serta, yeah.
7  Q. Serta Mattress Company?
8  A. Right.
9  Q. Do you recall whether this particular
10 machine had two motors in it?
11  A. As far as I know, just one.
12  Q. Do you know whether prior to January
13 15th, 2001, prior to this incident, whether your
14 company ever received any safety manuals or any
15 of the lockout-tagout procedures that were --
16  A. From Serta?
17  Q. -- promulgated by Serta?
18  A. No.
19  Q. And after this incident, did you folks
20 ever receive any of those documents?
21  A. No, we didn't.
22  Q. In terms of your own safety manuals or
23 procedures, were those ever modified after this
24 incident?
25  A. It is constantly modified to meet