1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

DENISE GENDROW,                      )
individually and as                  )
Personal Representative of           )
THE ESTATE OF CHARLES                )
EUGENE GENDROW, JR.;                 )
CHARLES E. GENDROW, III;             )
and JEANNE SMITH,                    )
                                     )
       Plaintiffs,                   )
                                     )
       vs.                           ) CIVIL NO.
                                     ) Cv03-00034 DAE/BMK
                                     ) (Other Non-Vehicle Tort)
SIMON MATTRESS                       )
MANUFACTURING COMPANY; dba           )
SERTA MATTRESS COMPANY dba           )
COYNE MATTRESS                       )
MANUFACTURING COMPANY;               )
JAMES CASH MACHINE CO., a            )
Kentucky Corporation,                )
                                     )
       Defendants.                   )
                                     )
                                     )
SIMON MATTRESS                       )
MANUFACTURING COMPANY,               )
                                     )
       Defendant and                 )
       Third-Party Plaintiff         )
                                     )
       vs.                           )
                                     )
JAMES CASH MACHINE CO., a            )
Kentucky Corporation,                )
                                     )
       Third-Party                   )
       Defendant.                    )
                                     )

DEPOSITION OF DONALD ERWIN LEE

EXHIBIT "E"

JUN 0 2 2005


### Page 2

1  Taken on behalf of the Third-Party Defendant James Cash
2  Machine Company pursuant to Notice, on Wednesday, May
3  25, 2005, commencing at 9:12 a.m., at the office of
4  Powers & Associates, Pauahi Tower, 1001 Bishop Street,
5  Suite 2650, Honolulu, Hawaii 96813.
6
7  APPEARANCES:
8      For Plaintiffs Denise Gendrow, Estate of Charles
       Gendrow, Jr., Charles E. Gendrow, III, and
9      Jeanne Smith:
10         CHRISTOPHER S. BOUSLOG, ESQ.
           Law Offices of Chris Bouslog
11         Four Waterfront Plaza, Suite 480
           500 Ala Moana Boulevard
12         Honolulu, Hawaii 96813
           (808) 550-4995
13
    For Defendant and Third-party Defendant
14  Simon Mattress Manufacturing Company:
15         RALPH J. O'NEILL, ESQ.
           MacDonald Rudy Byrns O'Neill & Yamauchi
16         Suite 2650, American Savings Bank Tower
           1001 Bishop Street
17         Honolulu, Hawaii 96813
           (808) 523-3080
18
    For Third-Party Defendant James Cash Machine
19  Company:
20         PAUL T. YAMAMURA, ESQ.
           Yamamura & Shimazu
21         1770 Central Pacific Plaza
           220 South King Street
22         Honolulu, Hawaii 96813
           (808) 523-6969
23
24  REPORTED BY:
       Marjann Shawler, RPR, CSR 182
25     Notary Public, State of Hawaii

### Page 3

INDEX

EXAMINATION:                              PAGE
    BY MR. YAMAMURA                          4
    BY MR. BOUSLOG                          83
    BY MR. YAMAMURA                         99
    BY MR. BOUSLOG                         100
    BY MR. YAMAMURA                        100

EXHIBITS FOR IDENTIFICATION:
    (No exhibits identified)

### Page 4

1           DONALD ERWIN LEE,
2  having been called as a witness and being first duly
3  sworn to tell the truth, the whole truth and nothing
4  but the truth, was examined and testified as follows:
5               EXAMINATION
6  BY MR. YAMAMURA:
7      Q. Please state your full name.
8      A. Donald Erwin Lee.
9      Q. Mr. Lee, we're here for your deposition, and
10 I appreciate you showing up today. Have you ever had
11 your deposition taken before?
12     A. Yes, I have.
13     Q. In what kind of circumstance?
14     A. One was a product liability case, and one
15 was an accident.
16     Q. The product liability case, what was
17 involved with that?
18     A. It was a mattress that we had manufactured
19 and it was a bunk bed mattress -- we had allegedly
20 manufactured.
21     Q. Caught on fire, burned the --
22     A. Caught on fire, yes.
23     Q. I know that case.
24        What was the accident case?
25     A. The accident was we had a large machine that

### Page 5

1  processed cotton, and it was huge, the size of a truck.
2  Actually there were three of them. They were fenced in
3  so people couldn't get into the area. We had an
4  employee who went inside the fence and was closing down
5  the machine while it was still running. The nozzle got
6  caught in the machine and it pulled his hand and he
7  lost his hand.
8      Q. The burning bunk case, though, that was an
9  issue where there was the manufacturer of the bunk bed
10 was either yourself or Simon mattress, right?
11     A. Yes, because it was purchased from the
12 exchange. We both sold to the exchange.
13     Q. I was involved for Simon Mattress on that
14 matter.
15        Let me just briefly go through the ground
16 rules of the deposition so we're in the same
17 understanding.
18        MR. YAMAMURA: I understand, Ralph, and you
19 were kind enough to have him here without subpoena. I
20 just need to know: Are you here as his attorney?
21        MR. O'NEILL: Yes.
22        MR. YAMAMURA: Okay. That's fine.
23     Q. BY MR. YAMAMURA: So, Mr. Lee, I understand
24 that you are here with your attorney and you were
25 formerly employed by Simon Mattress Company, Serta,

Page 11

1  Q. C-O-Y-N-E?
2  A. C-O-Y-N-E, in 1962.
3  Q. Okay.
4  A. They were located at 716 Cooke Street. It
5  had been a family business, and we actually when we
6  sold it -- in 1989, we sold it two weeks short of being
7  100 years old.
8  Q. Who did you sell it to in 1989?
9  A. Simon Mattress Manufacturing. We moved to
10 Waipahu in 1973.
11 Q. Okay.
12 A. Simon owned it for a couple years, and then
13 they sold to Sleepmaster, LLC.
14 Q. This would be in the 1970s?
15 A. No. This was after we sold it in 1998.
16 Q. So Coyne Mattress Company on Cooke Street
17 sold a business and the assets and all that stuff --
18 A. Sold the operating business.
19 Q. Operating business to Simon in 1989?
20 A. Yes.
21 Q. In 1989 --
22 MR. O'NEILL: Time out for a second. You've
23 said two dates, you said 1989 and also said 1998.
24 You've used two.
   THE WITNESS: 1998 is the correct year.

Page 12

1  Q. BY MR. YAMAMURA: I understand and I don't
2  want to trip you up. Just want to be sure I get the
3  dates right.
4      So Coyne Mattress, you had been working
5  there since 1962, so I would assume just out of high
6  school?
7  A. Uh-huh.
8  Q. Family business?
9  A. Uh-huh.
10 Q. Is that "yes"?
11 A. That's a yes.
12 Q. Is that your folks' business, your parents'
13 business?
14 A. It was my parents' and grandparents'.
15 Q. What was your dad's name?
16 A. Benjamin A. Lee.
17 Q. And he started the company?
18 A. It was started in 1898 by my step-great
19 grandfather.
20 Q. 1898 or 1998?
21 A. 1898.
22 Q. So long history back in -- this is a Hawaii
23 company basically?
24 A. Yes, it is.
25 Q. So 1962, you started working at Coyne

POWERS & ASSOCIATES

Page 20

1  Q. That machine was purchased by Coyne Mattress
2  back in the 1960s?
3  A. That sounds right.
4  Q. And correct me if I'm wrong, but talking
5  with people in the industry, that type of machinery,
6  that type of cutting table back in the 1960s was pretty
7  much a very specific type of machinery used only for
8  that type of work, for mattress manufacturing?
9  A. I can't think of any other industry --
10  Q. That would use it?
11  A. -- well, no, there was some -- I do know
12  there was people here that made slip covers for like
13  rattan furniture. They used a similar type table.
14  Q. And that was just for cutting materials?
15  A. That's correct.
16  Q. Do you recall actually having the table
17  delivered and set up at the premises at Coyne Mattress?
18  A. Yeah, I do.
19  Q. Tell me about that. What do you recall?
20  A. I just remember it came in and we set it up.
21  Q. You assembled it and everything?
22  A. Prior to that, we had a kind of a homemade
23  version. It was much smaller. Mattress material came
24  56-inches wide, which was the width of a basic double
25  bed. In the 1960s and 1970s, queens and king size

Page 21

1  became more prevalent and we needed a wider table.
2  That particular table was built to handle material
3  86-inches wide, which would be wide enough for a
4  king-sized bed.
5  Q. As I understand it, this was something that
6  within at least the mattress manufacturing industry is
7  a very specific machine or tool used in that industry,
8  correct?
9  A. I would say that's true. Only other
10  industry I would think that might use it would be the
11  bedspread industry.
12  Q. Pune'e covers, that type of thing?
13  A. Yes.
14  Q. Still related to very specific industry, not
15  like a machine you can use for anything else beyond
16  covers and mattress making?
17  A. No.
18  Q. And those types of machines are normally
19  sold to the manufactures themselves of the bedding
20  companies?
21  A. That's correct.
22  Q. And manufactures themselves have knowledge
23  of how these machines work because it is a kind of
24  sophisticated machine for the end user, correct?
25  MR. O'NEILL: Let me object. Vague and

## Page 22

1  ambiguous.
2     Q. BY MR. YAMAMURA: Do you understand what I'm
3  saying?
4        MR. O'NEILL: You can go ahead and answer.
5  I just noted that for the record.
6     A. I wouldn't consider it very sophisticated.
7     Q. BY MR. YAMAMURA: All I'm saying --
8     A. There is a lot of other equipment that's
9  much more sophisticated than that.
10    Q. In terms of the machinery itself and type of
11 design, that has been around the industry for a long
12 time; I understand from the 1940s, correct?
13       MR. O'NEILL: Objection. Found,
14 speculation.
15    Q. BY MR. YAMAMURA: The basic design for a
16 cutting table has been around since the 1940s?
17       MR. O'NEILL: Same objection.
18    Q. BY MR. YAMAMURA: Go ahead.
19       MR. O'NEILL: Go ahead and answer.
20    A. The other one we had was similar.
21    Q. BY MR. YAMAMURA: Similar in operation and
22 similar in design?
23    A. Similar in design.
24    Q. As I understand, I represent James Cash
25 Machine Company, and Mr. Cash, James Cash at least, was

## Page 23

1  one back in the 1930s right after -- he explained --
2  not James Cash but his son explained to me that until
3  the 1940s bedding was made with this kind of wiry
4  material, and box springs didn't come out until after
5  the war, from what I understand, and the whole industry
6  kind of changed because it needed different machinery.
7  In the old days they stuffed it with this wire thing --
8  I don't know what they call it -- and that changed
9  dramatically when the box spring came out.
10    I'm just trying to get a historical type of
11 perspective.
12    A. I don't know what you are referring to.
13    Q. Anyway, in terms of the cutting table
14 itself, those of you at Coyne as well as Simon had
15 exposure and experience with these types of machines
16 before in terms of design and function?
17       MR. O'NEILL: Overly broad.
18    A. I would say that was enough different from
19 the one we had that it would be considered
20 substantially different.
21    Q. BY MR. YAMAMURA: How would it be different?
22    A. One we had, like I said, was much smaller,
23 didn't have any motors, was strictly hand-operated.
24    Q. I see. The ones you had were mechanical,
25 not motorized?

## Page 24

1     A. That's correct.
2     Q. But in terms of how the machine actually
3  functioned in terms of spreading the cloth and pinning
4  and cutting, was it the same?
5        MR. O'NEILL: Overly broad.
6     A. Similar.
7     Q. BY MR. YAMAMURA: You helped set the machine
8  up in 1960-what; do you recall what year?
9        MR. O'NEILL: Misstates testimony. I don't
10 know that he said he helped --
11       MR. YAMAMURA: He said he helped assemble
12 it.
13    A. I didn't say I helped assemble it. I
14 remember when it came. I didn't help set it up.
15    Q. BY MR. YAMAMURA: Oh, I thought you said you
16 helped assemble it.
17       MR. BOUSLOG: I think he used maybe sort of
18 a vague term, he said "we".
19    Q. BY MR. YAMAMURA: That's fine. It is a
20 generic "we." That's fine. Also the generic "you."
21 When you set up the machine, who set it up?
22       MR. O'NEILL: Don't I have to say vague and
23 ambiguous when you say the generic "you"? I've heard
24 of brand name "you," generic "you". They all have the
25 same function.

## Page 25

1     Q. BY MR. YAMAMURA: Who set it up; do you
2  recall?
3     A. No, I don't.
4     Q. And fair to say that it was set up
5  sometime -- about what year was it set up?
6     A. I would say in the late 1960s.
7     Q. And it was in operation?
8     A. Yes.
9     Q. It was in operation, as I understood, from
10 the late 1960s up until the time of the accident?
11    A. That's correct.
12    Q. We'll get into that area a little later.
13 Suffice it to say this was a motorized-powered cutting
14 table?
15    A. That's correct.
16    Q. Are you familiar also with pneumatic-powered
17 cutting tables?
18    A. No.
19    Q. Are you familiar with James Cash Machine
20 Company?
21    A. Yes, I know of them.
22    Q. How do you know about them? Tell me what
23 you know.
24    A. I know they manufacture equipment for the
25 bedding industry, several different types of equipment,

Page 37

1   Q. Box?
2   A. The boxing, right.
3   Q. Anything else? I just want a general idea.
4   A. Sewing of the box spring covers, put tape
5 around the top of the box spring cover and hem it.
6 That's pretty much it. And cutting.
7   Q. From the time that the machine was delivered
8 and set up for operation in 1960s up to time of the
9 accident, did you ever make inquiry, "you" meaning your
10 company, whatever entity who owned the cutting table --
11 ever have any contact or make inquiry with James Cash
12 Machine Company or DRC concerning the operation of the
13 machine?
14   A. Not that I know of.
15   Q. And would it be fair to say that one of the
16 reasons why is because it is a standard -- operation of
17 the machine is pretty much standard in the industry,
18 cutting table?
19   A. It wasn't a real complicated machine.
20   Q. And you, generically you, you guys knew how
21 it worked?
22   A. Right.
23   Q. And in fact, if anything needed to be
24 maintained on the machine, you guys could do it
25 yourselves?

Page 38

```
 1    A. Really wasn't maintenance required other           10:06:06
 2 than maybe little oil and grease. That was the extent    10:06:10
 3 of it.                                                   10:06:12
 4    Q. And the oil and grease and that kind of            10:06:18
 5 stuff, you had somebody on the site that just could      10:06:20
 6 pretty much do that stuff?                               10:06:22
 7    A. Right.                                             10:06:24
 8    Q. And the oil and grease would be for the            10:06:24
 9 pulleys and the moving parts, joints and all that?       10:06:28
10    A. That's correct.                                    10:06:30
11    Q. Ms. Mendoza, is she still with the company,        10:06:38
12 if you know?                                             10:06:50
13    A. No. She passed away last year.                     10:06:50
14    Q. At the time of the accident back in 2001,          10:06:54
15 who would have been operating that machine; would it     10:07:00
16 have been her?                                           10:07:02
17    A. Yes.                                               10:07:02
18    Q. Who else would know about the operation of         10:07:02
19 the machine back in 2001, other than Ms. Mendoza; who    10:07:04
20 would have had contact with that machine?                10:07:08
21    A. Let me think. Elizabeth Agar, she worked           10:07:12
22 with it occasionally.                                    10:07:30
23    Q. Is she still with the company or still             10:07:32
24 around?                                                  10:07:34
25    A. I don't know.                                      10:07:34
```

Page 44

1  Q. I understand A&B Electrical during that time
2 was the electrical contractor who did the electrical
3 work for your company?
4  A. That's correct.
5  Q. And as I understand it, is still currently
6 -- they still do your electrical work when needed?
7  A. I have no knowledge of that. I know they
8 did when I was still operations manager after the
9 accident.
10  Q. Did you know Mr. Gendrow?
11  A. Yes.
12  Q. How well did you know him?
13  A. Fairly well.
14  Q. Tell me what did you know about him.
15  A. Well, he had done work for us for a number
16 of years, and he was in our factory probably at least
17 once a month, if not more.
18  Q. Various electrical jobs?
19  A. Various electrical jobs, right.
20  Q. What else; did you have any personal
21 contact, friend, go out?
22  A. I used to talk to him. I didn't know any of
23 his relatives, no, but I used to talk to him when he
24 was in the factory. If I happened to be around there,
25 I would always go by and say hi to him.

Page 45

1  Q. What was your impression of Mr. Gendrow in
2 terms of was he a good electrician or --
3  A. I think he was an excellent electrician. We
4 had some very complicated electrical equipment, and he
5 was always able to figure it out.
6  Q. Mr. Lee, I know that you were there after
7 the accident happened. In your mind, can you tell me
8 what you think or how you think this accident happened
9 or why the accident happened?
10  MR. O'NEILL: Please do go ahead, but I have
11 to note two objections. One is speculation. Second
12 would be improper opinion.
13  Q. BY MR. YAMAMURA: Again, I'm just asking
14 from your perspective because I understand, Mr. Lee,
15 you are familiar how the table operates, I'm not, and
16 you were there onsite, unfortunately, when the accident
17 just had happened.
18  Can you tell me, in your mind, what you
19 think? Again, I'm just asking for your opinion, how
20 you think the accident happened.
21  MR. O'NEILL: Same objections.
22  MR. YAMAMURA: You can have a running
23 objection.
24  MR. O'NEILL: Also, I would add to the
25 extent it calls for a legal conclusion.

Page 50

1  in the way of everything else.
2      A. Actually, we had moved that machine several
3  times and he had always been the one to do it. So he
4  was very familiar with the machine.
5      Q. When you moved the machine, you have to do
6  the electrics and all that?
7      A. Right.
8      Q. You moved it several times. How many times
9  before the accident had you moved it?
10     A. About three or four.
11     Q. And each time, he had to come out and get
12 involved with connecting the electricals and all that?
13     A. Uh-huh.
14     Q. Is that correct?
15     A. That's correct.
16     Q. He was also involved, as I understand --
17 strike that.
18         So during those times that he helped move
19 machines or was involved in moving of the machines --
20 and I think your testimony was, from your knowledge,
21 Mr. Gendrow was quite knowledgeable or knowledgeable
22 about how the machine operated and how it worked?
23     A. Yes, definitely.
24     Q. So in terms of what your hypothesis or
25 opinion is as to how the accident happened, it happened

Page 52

1      A. I really doubt it because, like I said, he
2  was out there all the time and he knew all the
3  equipment, and he really didn't need any help.
4      Q. Again, like you testified, Mr. Gendrow, as
5  far as your understanding is, would be familiar with
6  the operation and how the machine worked and everything
7  else, correct?
8      A. Yes, basically every machine we had.
9      Q. So you say he worked pretty much on every
10 machine you guys had out there?
11     A. At one time or another, yeah.
12     Q. He had been out there -- how long had he
13 been the electrician, your electrician for that?
14     A. I'm guessing eight or nine years.
15     Q. As I understand it, A&B -- you are one of
16 A&B's larger accounts, and Mr. Gendrow, who was like a
17 senior electrician, was sort of assigned to take care
18 of you guys?
19     A. He usually came out. Occasionally they
20 would send someone else if he was on another job.
21     Q. But he was the main man?
22     A. Most of the time he came.
23     Q. He was the main man from A&B Electrical to
24 do any kind of electrical work that you guys had to
25 have done?

Page 73

1 given to Mr. Gendrow prior to the time of the accident 11:03:44
2 with respect to the cutting table in terms of the 11:03:46
3 operation of the cutting table? 11:03:50
4     MR. O'NEILL: You mean warnings by Mr. Lee's 11:03:50
5 company? 11:03:56
6     MR. YAMAMURA: Yes. 11:03:56
7     A. Not to my knowledge. 11:03:58
8     Q. BY MR. YAMAMURA: In other words, if you are 11:03:58
9 going to work on this thing, you should tie this or do 11:04:00
10 this, anything like that? 11:04:04
11     A. No. 11:04:04
12     Q. Were there any warnings or instructions 11:04:08
13 given to the employees in the operation of the subject 11:04:12
14 cutting table? 11:04:14
15     A. No. 11:04:16
16     Q. How were your employees trained to use the 11:04:16
17 table, or did they need training for that table? 11:04:20
18     A. Really didn't need training. There were two 11:04:22
19 switches. Flip one switch, step would go up. Flip 11:04:24
20 another switch, table would tilt. They had automatic 11:04:28
21 stops on them. They stopped when they were supposed 11:04:32
22 to. So it was really very simple. 11:04:36
23     Q. That's what I was trying to get. Machine 11:04:40
24 and operation was very simple? 11:04:42
25     A. Yes. 11:04:44

Page 70 - Page 73

Page 74

1   Q. In terms of instructions or training on the
2 machines, it really wasn't necessary?
3   A. No.
4   Q. Pretty much anybody off the street could go
5 on and say, okay, I need to show them how it works, and
6 they could do the work?
7   A. That's correct.
8   Q. Had there been any other incidents involving
9 the cutting table in terms of personal injury?
10   A. No.
11   Q. In terms of repairs, the only repair that
12 was done that you know of -- only repair done to the
13 table was when the motor had to be replaced?
14   A. Yeah.
15   Q. So, in other words, the subject table
16 operated in a manner in which it did from the 1960s up
17 to 2000 without need of any kind of repair work on the
18 table itself?
19   A. That's correct.
20   Q. My understanding, it was your son who made
21 the call because, I guess, the step motor had failed
22 somehow?
23   A. I believe that to be the case.
24   Q. Were you in the office when he made the call
25 for maintenance?

### Page 90

1 often.
2    Q. When you say -- when it was used on a given
3 day, would this be normally an eight-hour run through
4 it?
5    A. No. Probably just a couple hours or an
6 hour.
7    Q. So on a per-week basis, it might be 3 to 12
8 hours per week, something like that?
9    A. I would think that would be a fair estimate.
10    Q. And this is somewhat based upon your
11 examination of the machine after this incident. I'm
12 not asking you to try to parse out what you might have
13 known before.
14       Given, as you sit here today, what you know
15 about the machine, do you believe that the motor that
16 was holding up the table top and to which the chain
17 drive was attached could have been switched out if the
18 table were in the down position?
19    A. Yes. That's after the accident.
20    Q. That's knowledge you gained after the
21 accident?
22    A. That's correct.
23    Q. And that motor prior to being switched out
24 was in working condition?
25    A. Yes, it was.

### Page 91

1    Q. My understanding of Mr. Gendrow's work with
2 your company was that in reference to this particular
3 machine he helped rewire it on three or four occasions
4 when the machine was moved about the factory?
5    A. That's correct.
6       MR. O'NEILL: Wait until he gets his
7 question out so she can be sure to get you down.
8       THE WITNESS: Sorry. That was a little
9 quick.
10    Q. BY MR. BOUSLOG: Do you know whether -- I
11 take it when he rewired it, he would have occasion to
12 manipulate the position of the stair -- of the step as
13 well as the table to make sure that both motors were
14 working after he had rewired it; would that be fair, or
15 do you know?
16    A. Yes, you would have to do that because you
17 could wire a motor backwards and it would go the wrong
18 direction. So he had to check it to make sure it was
19 running in the forward direction.
20    Q. Did you ever see him checking it, or that's
21 just your knowledge of the way he does his work?
22    A. I just know that was done. I was with him
23 on several occasions after he would finish the job, and
24 he would always check it to make sure it was running in
25 the proper direction.


Page 99

1        FURTHER EXAMINATION
2   BY MR. YAMAMURA:
3        Q. Have you personally ever operated that
4   machine?
5        MR. O'NEILL: Asked and answered, but you
6   can go ahead.
7        A. Have I ever operated it as --
8        Q. BY MR. YAMAMURA: As an operator.
9        A. As an operator, no. I've made it go up and
10  down and made it tilt back and forth, but I never
11  actually ran it as an operator.
12       Q. Just so I have a clear answer to this
13  question, Mr. Gendrow during the time that the machine
14  was moved and rewired, the machine, the cutting table,
15  what did he have to do to rewire it; what was done?
16       A. It was always hardwired. It wasn't a plug
17  you plug into the wall. So he would have to -- in some
18  cases he would have to run new wires from the switch
19  box to the machine.
20       Q. Each time that was done, I think you
21  testified that he had to run the machine to make sure
22  the motors were going the right direction?
23       A. That's correct.
24       Q. So he had actually run the machine himself
25  several times before the accident?

Page 100

1        A. Yes.
2        MR. YAMAMURA: No further questions.
3        MR. BOUSLOG: Real quickly.
4        FURTHER EXAMINATION
5   BY MR. BOUSLOG:
6        Q. Prior to Mr. Gendrow's accident, when did
7   the company last conduct an evaluation of its energy
8   control procedures, to your knowledge?
9        A. I really don't remember. I really don't
10  remember.
11       Q. Had the company done annual or more frequent
12  inspection of its energy control procedures prior to
13  Mr. Gendrow's injury?
14       A. No. It wasn't done that often.
15       MR. BOUSLOG: Thanks. Nothing further.
16       MR. YAMAMURA: Real quick.
17       FURTHER EXAMINATION
18  BY MR. YAMAMURA:
19       Q. I think you testified, but let me make sure
20  I've got my notes right. The motor that ran the
21  position of the cutting table, that particular motor
22  could have been replaced with the table in the down
23  position; is that correct?
24       A. Yes.
25       Q. Any reason or understanding as to why Mr.