EXHIBIT 2

## LIST OF DEPOSITIONS/TRIALS 1995-2005
### Gary L. Buffington,CSP, CRSP, CSHM, PI
### July 7, 2005

1. Mark Mueller
   James G. Ford
   Vs.
   Gilbert Lopez
   D/B/A Lopez Plastering

   Robert E. Knudsen, Esq.
   January 15, 1995--Trial
   Tel.# (909) 482-1086
   Superior Court of California
   County of Los Angeles

2. William Knapp
   Vs.
   State of California Transportation

   Charles Belenky, Esq.
   August 17, 1998—Deposition

3. Appeal of Tutor Suliba Perini
   Vs.
   State of California
   Depart of Industrial Relations

   David Pies, Esq.
   July 20, 1999

4. Tom Logrecco
   Vs.
   Magnum Enterprises

   John Khoukaz, Esq.
   September 6, 2001—Deposition

5. Deborah Rogers, et al
   Vs.
   Taylor Woodrow Homes, Inc., et al

   Don Fisher, Esq.
   January 28, 2002—Deposition

6. Wilma Duncan, et al
   Vs.
   Reynolds Metal Company, et al

   Lanhon Odom, Esq.
   Fred Marsh, Esq.
   February 25, 2002—Deposition

7. Tabitha Carver Roberts, et al
   Vs.
   Performance Site Management, et al
   Hendrix Manufacturing Co., Inc., et al

   Chris Aluotto, Esq.
   October 17, 2002—Deposition
   Tel.# (513) 381-9269

8. Mark Davis, et al
   Vs.
   WACO Scaffolding & Equipment
   RAS Builders, Inc., et al

   R. Q. Shupe, Esq.
   January 6, 2003—Volume I

List of Depositions/Trials 1995-2005        EXHIBIT 2
Gary L. Buffington

9.  Estate of Daniel A. Dalton
        Vs.
    BGS Construction, Inc., et al

Jeffrey Ray, Esq.
January 9, 2003—Volume I
Tel.# (304) 594-1000

10. Mark Davis, et al
        Vs.
    WACO Scaffolding & Equipment
    RAS Builders, Inc., et al

R. Q. Shupe, Esq.
February 3, 2003—Volume II

11. Gary Toon
        Vs.
    Integrated Building & Design, et al

Susan Willis, Esq.
Lawrence Hanna, Esq.
March 6, 2003—Deposition

12. Estate of Daniel A. Dalton
        Vs.
    BGS Construction, Inc., et al

Jeffrey Ray, Esq.
June 12, 2003—Volume II

13. Kathleen C. Shea
        Vs.
    Cara Necessary, et al

R. Q. Shupe, Esq.
July 31, 2003
Superior Court of California
County of Orange

14. Rudy Lino
        Vs.
    Granite Construction Co., et al

Rick Hardin, Esq.
October 21, 2003--Deposition

15. Alejo Torres
        Vs.
    Fullerton Joint Union High
    School District, et al

Shari Nokes, Esq.
Beau Nokes, Esq.
Tel.# 949) 759-4440
March 31, 2004--Deposition

16. Fielding, et al
        Vs.
    Pacific Gas & Electric Co., et al

Van Longyear, Esq.
Michael Davis, Esq.
Tel.# (916) 974-8500
April 8, 2004--Deposition
Superior Court of California
County of Sacramento

17. St. John, et al
        Vs.
    City of San Francisco, et al

Joseph W. Carcione, Esq.
Judith A. Graziano, Esq.
Tel.# (650) 367-6811
June 23, 2004--Deposition
Superior Court of California
County of San Francisco

List of Depositions/Trials 1995-2005
Gary L. Buffington



EXHIBIT 2

18. Dane Lorenzen
    Vs.
    Occidental of Elk Hills, Inc., et al

Bradley J. Hill, Esq.
Kevin S. Nitzel, Esq.
Tel.# (805) 481-6989
July 8, 2004--Deposition
Superior Court of California
County of Kern

19. Dzenkowski-Castillo, et al
    Vs.
    San Diego Museum of Art, et al

Paul Jackson, Esq.
Tel.# (858) 452-9719
July 19, 2004—Volume I
Superior Court of California
County of San Diego

20. Dzenkowski-Castillo, et al
    Vs.
    San Diego Museum of Art, et al

Paul Jackson, Esq.
Tel.# (858) 452-9719
July 20, 2004—Volume II
Superior Court of California
County of San Diego

21. Robert F. King, et al
    Vs.
    Island Creek Coal Co., et al

Annesley DeGaris, Esq.
Tel.# (205) 271-7104
August 9, 2004--Deposition
US District Court
Western District of Virginia

22. Francisco Aceves, et al
    Vs.
    That Vuong, et al

John D. Freeland, Esq.
Tel.# (209) 521-1800
September 10, 2004—Deposition
Superior Court of California
County of Stanislaus

23. Kathleen C. Shea
    Vs.
    Cara Necessary, et al

R. Q. Shupe, Esq.
November 1, 2004--Trial
Superior Court of California
County of Orange

24. St. Paul Mercury Ins. Co., et al
    Vs.
    Frontier Pacific Ins. Co., et al

Jack Fischer, Esq.
Tel.# (559) 433-1300
January 18, 2005
Superior Court of California
County of San Diego

List of Depositions/Trials 1995-2005                                    EXHIBIT 2
Gary L. Buffington

25. St. Paul Mercury Ins. Co., et al          Jack Fischer, Esq.
    Vs.                                       Tel.# (559) 433-1300
    Frontier Pacific Ins. Co., et al          Febuary 9, 2005—Trial
                                              Superior Court of California
                                              County of San Diego

26. Martinez., et al                          Peter Zell, Esq.
    Vs.                                       July 7, 2005--Deposition
    Ziniz, Inc, et al                         Superior Court of California
                                              County of Los Angeles

EXHIBIT 3

**PUBLICATIONS AUTHORED—1995-2005**
**Gary L. Buffington, CSP, CRSP, CSHM, PI**

2005    "Best Practices for Air Monitoring Underground Work Places"; ASSE 2005 Professional Development Conference; New Orleans, Louisiana.

2004    "Machine Guarding for Mining—The New MSHA DVD Training Program"; ASSE 2004 Professional Development Conference; Las Vegas, Nevada.

2003    "Post 911 Safety and Security Requirements for Bidding and Construction on Airport or Public Transportation Works"; Co-presenter with Randy McBurnett; ASSE 2003 Professional Development Conference; Denver, Colorado.

2003    "National Underground Science Laboratory at Homestake Mine"; ASSE Mining Practice Specialty Newsletter; Spring 2003.

2003    "Mining Practice Specialty Activities Update"; ASSE Mining Practice Specialty Newsletter; Spring 2003.

2003    "Homestake:   End of an Era"; ASSE Mining Practice Specialty Newsletter; Winter 2003.

2003    "Mining Practice Specialty Activities Update"; ASSE Mining Practice Specialty Newsletter; Winter 2003.

2002    "Mining Practice Specialty Strategic Plan 2002 – 2004"; ASSE Mining Practice Specialty; October 25, 2002.

2002    "Mining Practice Specialty Activities Update"; ASSE Mining Practice Specialty Newsletter; Fall 2002.

2002    "Mine Rescue"; ASSE Mining Practice Specialty Newsletter; Fall 2002.

2002    "Mining Practice Specialty Activities Update"; ASSE Mining Practice Specialty Newsletter; Summer 2002.

2002    "Mining Practice Specialty Activities Update"; ASSE Mining Practice Specialty Newsletter; Spring 2002.

2002    "Mining Practice Specialty Activities Update"; ASSE Mining Practice Specialty Newsletter; Winter 2002.

2002    "Alabama Coal Mine Blast Kills 13"; Co-authored with Rennie Heath; ASSE Mining Practice Specialty Newsletter; Winter 2002.

Publications Authored
Gary L. Buffington, CSP, CRSP, CSHM, PI



EXHIBIT 3

2001  "All American Canal Project Report – Response to Dr. Hunter's Comments"; Imperial Irrigation District; Imperial, California.

2001  "All American Canal Lifeline Project Report"; Imperial Irrigation District; Imperial, California.

2001  "Team Safety Management & the Alameda Corridor"; Co-authored with Randy McBurnett; ASSE Mining Practice Specialty Newsletter; Fall 2001.

2001  "Mining Practice Specialty Activities Update"; ASSE Mining Practice Specialty Newsletter; Fall 2001.

2001  "Construction Safety Management for the Alameda Corridor Project"; Co-presenter with Randy McBurnett; ASSE 2001 Professional Development Conference; Anaheim, California.

2001  "Mining Practice Specialty Activities Update"; ASSE Mining Practice Specialty Newsletter; Summer 2001.

2001  "Global Best Practices in Contractor Safety"; IOSH-ASSE Joint Forum; ASSE Professional Safety Publication; London, England.

2001  "Alcohol on the Highway or Job"; ASSE Mining Practice Specialty Newsletter; Spring 2001.

2001  "Mining Practice Specialty Activities Update"; ASSE Mining Practice Specialty Newsletter; Spring 2001.

2000  "International Construction Safety Forum"; ASSE Mining Practice Specialty Newsletter; Winter 2000.

2000  "An Insider's Look on the International Forum"; ASSE Society Update; November 2000 Edition.

2000  "Mining Practice Specialty Activities Update"; ASSE Mining Practice Specialty Newsletter; Winter 2000.

2000  "The Art of Blasting on Surface Mines and Construction Sites"; ASSE 2000 Professional Development Conference; Orlando, Florida.

2000  "Mining Practice Specialty Activities Update"; ASSE Mining Division Newsletter; Summer 2000.

2000  "Mining Division Plan"; ASSE Mining Division Newsletter; Spring 2000.

Publications Authored
Gary L. Buffington, CSP, CRSP, CSHM, PI                                    EXHIBIT 3

2000    "Mining Practice Specialty Activities Update"; ASSE Mining Division Newsletter; Spring 2000.

1999    "Mining Practice Specialty Activities Update"; ASSE Mining Division Newsletter; Winter 1999.

1999    "Construction Safety & Health Plan"; Newport Chemical Depot; Parsons Constructors, Inc.; Newport, Indiana and Pasadena, California.

1999    "Mining Practice Specialty Activities Update"; ASSE Mining Division Newsletter; Fall 1999.

1999    "Underground Construction – The Los Angeles Subway"; ASSE 1999 Professional Development Conference; Baltimore, Maryland.

1999    "Mining Practice Specialty Activities Update"; ASSE Mining Division Newsletter; Summer 1999.

1999    "Safety on the Job Site"; AEC Systems '99 National Conference; Los Angeles, California; May 25, 1999.

1999    "Safety Aboard the Titanic Filming"; ASSE Mining Division Newsletter; Spring 1999.

1999    "Mining Practice Specialty Activities Update"; ASSE Mining Division Newsletter; Spring 1999.

1998    "Mining Practice Specialty Activities Update"; ASSE Mining Division Newsletter; Winter 1998.

1998    "Safety and Health Program"; ASSE Mining Division Newsletter; Fall 1998.

1998    "Tunnel Gas Testing Requirements"; Co-authored with Randy McBurnett; ASSE Mining Division Newsletter; Fall 1998.

1998    "Mining Practice Specialty Activities Update"; ASSE Mining Division Newsletter; Fall 1998.

1998    "Mask Cleaner Site Installation Report"; Align-Rite Corporation; Burbank, California.

1997    There are a number of safety programs and training modules that I wrote and implemented during this time frame. The documents are in storage and are not
1991    available at this time to be cataloged.

Publications Authored                                                    EXHIBIT 3
Gary L. Buffington, CSP, CRSP, CSHM, PI

1991    HAZ MAT OPERATIONS"; Eleventh Symposium on the Occupational Health
        and Hazards of the Fire Service; International Symposium of Fire Fighters, AFL-
        CIO; Las Vegas, Nevada.

Chris Bouslog, Esquire
November 14, 2005
Page 15 of 15

Denise Gendrow, et al
v
Coyne Mattress Manufacturing Company, et al

10. It is my professional opinion that, from a safety point of view, DRC Corporation and their agents were negligent and fell far below the standard of care in the manufacturing industry with their failure to provide a "WARNING" of the dangerous condition created when the table lift motor was loosened and/or removed which subsequently causes the vertical cutting table to unintentionally drop to a horizontal position creating a dangerous condition that resulted in a fatal injury.

In closing, it is my professional opinion that basic compliance with "Lock Out – Tag Out" and hazard awareness standards and the standard of care in the manufacturing industry by Coyne Mattress Manufacturing Company and DRC Corporation and their respective management and employees would have prevented this accident.

This report is based on the documents received to date. Additional documents are anticipated and upon review of those documents I, if necessary shall provide a supplement report.

Respectfully submitted,

Gary L. Buffington, CSP, CRSP, CSHM, WSO-CSE/CSM/CSS, PI
AMER ICAN SAFETY CONSULTING

Denise Gendrow, et al
V.
Coyne Mattress Manufacturing Company, et al
**Safety Expert Supplemental Report**
**Gary L. Buffington, CSP, CRSP, CSHM, WSO-CSE/CSM/CSS, PI**
**American Safety Consulting**
**January 20, 2006**

## Introduction

The attorney representing Denise Gendrow, et al, retained me as an expert witness in the field of industrial safety and health. I reviewed reports provided by Richard T. Gill and Peter J. Schwalje that summarized their findings and opinions to date. There have been a number of name changes for the various parties of this lawsuit. For the purpose of this report James Cash Machine Company, James Cash Machine Corporation and DRC Corporation shall be used interchangeably and referred to as (DRC), the design manufacturer of the tilt top mattress cutting table. For the purpose of this report Coyne Mattress Manufacturing Company, Coyne Mattress Company, LTD, Simon Mattress Manufacturing and Sleepmaster, LLC shall be used interchangeably and generally referred to as Simon, the owner of the facility and the tilt top mattress cutting table. Based on my education, experience, and training, as well as my research and review of documents in connection with this particular assignment and my personal inspection of the tilt top mattress cutting table, I render the following supplemental opinions.

## Documents Reviewed

1. Richard T. Gill report and attachments.

2. Peter J. Schwalje report and attachments.

3. Defendant and Third-Party Plaintiff Simon Mattress Manufacturing Company's Expert Disclosure; Exhibit "1"; Certificate of Service.

4. CD of photos from Simon.

5. Notice of Hearing of Defendant and Third-Party Plaintiff Simon Mattress Manufacturing Company's Motion For Summary Judgment; Motion For Summary Judgment; Memorandum in Support of Motion; Affidavit of Stephen B. MacDonald; Exhibits "A"-"D"; Certificate of Service.

6. Defendant and Third-Party Plaintiff Simon Mattress Manufacturing Company's Separate Concise Statement of Facts in Support of It's Motion For Summary Judgment; Motion For Summary Judgment; Certificate of Service.

Chris Bouslog, Esquire
January 20, 2006
Page 2 of 15

Rose Gendrow, et al
v
Coyne Mattress Manufacturing Company, et al

7. Defendant, Third-Party Defendant and Fourth-Party Plaintiff James Cash Machine Co.'s Disclosure of Expert Witnesses; Exhibits "A"-"B"; Certificate of Service.

8. Notice of Hearing of Motion; Defendant, Third-Party Defendant and Fourth-Party Plaintiff James Cash Machine Co.'s Motion For Summary Judgment; Memorandum in Support of Motion; Declaration of Counsel; Exhibits "A"-"I"; Certificate of Service.

9. Defendant and Third-Party Defendant James Cash Machine Co.'s Separate Concise Statement of Facts in Support of Its Motion For Summary Judgment; Certificate of Service.

10. American National Standard—ANSI/ASSE Z244.1-2003; Control of Hazardous Energy—Lockout/Tagout and Alternate Methods.

11. When Technology Passes You By: The legal consequences of renting equipment with outdated safety devices by Todd L. Peterson, Esquire.

12. Accident Prevention Manual for Industrial Operations; National Safety Council; 8th Edition; Chapter 3 entitled "Hazard Control Program Organization"; Chapter 5 entitled "Removing the Hazard from the Job".

13. Accident Prevention Manual for Industrial Operations; Engineering and Technology; National Safety Council; 9th Edition; Chapter 8 entitled "Principals of Guarding"; Chapter 15 entitled "Electricity".

14. Rosario Case; Verdicts and Settlements.

15. Lockout/Tagout, Controlling the Beast; Coastal Safety Environment.

16. Lockout/Tagout, An Open and Shut Case; Coastal Safety Environment.

17. Electrical Safety for the Qualified Worker; Coastal Safety Environment.

18. Hazard Recognition and Control; Coastal Safety Environment.

19. Wayne Dalton garage door Owners Manual.

20. Genie Garage Door Owners Manual. "WARNING" sticker.

**Richard T. Gill Opinion 1:** The subject tilt table was designed and manufactured in a reasonably safe condition; there were no design or manufacturing defects that contributed to this accident.



It is important to note that the subject tilt table was designed in the 1966 to 1967 time frame and actually shipped in April of 1968.  To put this into perspective, in 1968 seat belts were not standard equipment on cars and shoulder straps were only available on a very small subset of automobiles; alternatively, OSHA had not even been created yet.  More to the point, it was not until 1989, over 20 years after the date of manufacture of the subject tilt table that OSHA enacted its first LOTO standard (i.e., CFR 1910.147).

**Peter J. Schwalje Opinion:**  It is the writer's further opinion that Mr. Gendrow's accident did not arise through any defect or deficiency in the design of the tilt table itself.  The layout table conformed to accepted engineering design as of its date of manufacture and sale; and even thirty years later, it exhibited no hidden dangers or defects.  Virtually every aspect of the table's mechanical and electrical systems were open, obvious and readily visible to any observer.  Moreover, the equipment sustained no failure or malfunction of any element nor misoperation of any component.  The subject accident arose solely as the consequences of the releasing of stored gravitational energy in the system that allowed the table to move from the vertical to horizontal position.  Had the table been secured in position or moved to a horizontal position prior to loosening the motor, the subject accident would not have occurred.

**Raymond Merala Opinion:**  As designed and built the table top is supported and is restrained from motion by the table tilt motor and drive assembly.  When the tilt drive components are in place, and the motor is not energized, the table top will not rotate up or down.

As designed and built the table top is supported and is restrained from motion by the table tilt motor and drive assembly.  If drive system components such as the tilt table motor or drive chain are removed or disconnected the table top is free to rotate.  This is a risk that is likely not readily apparent to many.

One can reasonably conclude the OSHA Standard 1910.147 – The control of hazardous energy (lockout/tagout); does not apply to this particular accident mode.

**Gary Buffington Rebuttal Opinion:**  I agree in part with messieurs Gill, Schwalje and Merala opinions.  I will provide the basis for my opinion in addition to my opinions provided in my earlier report.

In March 1973, the Accredited Standards Committee Z244 held its first organizational meeting in New York to develop a standard on lockout/tagout.  The National Safety Council functioned as the secretariat and provided a draft document "Guidelines for a Lockout Program" dated November 1971 that was used as a reference for the committee's deliberations.  By the end of 1975, the standard development work was complete and public review and balloting was finished.  [ANSI/ASSE Z244.1-2003; Control of Hazardous Energy—Lockout/Tagout and Alternative Methods.]

Chris Bouslog, Esquire
January 20, 2006
Page 4 of 15

Gendrow, et al
v
Coyne Mattress Manufacturing Company, et al

Need for a Standard:   A wealth of casualty data exists in the private, public, and governmental sectors related to unexpected release of hazardous energy.   In fact, the issue is of global concern since all of the major industrialized countries of the world are actively addressing the problems in various ways. [ANSI/ASSE Z244.1-2003]

In spite of substantial efforts by employers, unions, trade associations and government during the past 25 years, the annual toll of injury and death related to hazardous energy release incidents remains unacceptable.  We now know that all forms of energy must be addressed, that operational personnel are injured as often as maintenance workers; that often thermal, and **gravitational forces** and trapped materials under pressure are overlooked; that complex equipment and processes frequently demand unique approaches to energy isolation or control, and that employers need to commit resources and substantial effort in planning, training, procedure development, and infrastructure before lockout/tagout application ever occurs.  [ANSI/ASSE Z244.1-2003]

Introduction:  This standard provides guidance regarding:  responsibilities of the principal parties involved in hazardous energy control; design issues that influence the effective application of control methodology; hazardous energy control program elements necessary for employee protection; communication and training requirements for involved personnel; and management review of the total hazardous energy control process to ensure its functioning effectiveness.  [ANSI/ASSE Z244.1-2003]

"Hazardous Energy" is defined as "Any electrical, mechanical, hydraulic, pneumatic, chemical, nuclear, thermal, **gravity** or other energy that could cause injury to personnel." [ANSI/ASSE Z244.1-2003]

Manufacturers, integrators, modifiers, and remanufacturers responsibilities:  Machines, equipment and processes shall be designed, manufactured, supplied, and installed so that the user can comply with the control methodologies of this standard.   Modifications affecting energy isolation shall comply with this standard.   A risk assessment shall be performed during the engineering design stage of development to determine the need for and design sufficiency of appropriate energy isolating devices and systems. [ANSI/ASSE Z244.1-2003]

Energy isolating devices:   Machines, equipment and processes shall be designed, manufactured, supplied, and installed with energy isolating devices to enable compliance with the requirements of this standard.   Consideration shall be given to the intended use of the machine, equipment or process.   Devices shall be capable of controlling or dissipating hazardous energy, or both.   The devices should be an integral part of the machine, equipment or process.

When these devices are not integral to the machine, equipment or process; the manufacturer shall include in the installation instructions recommendations for type and location of energy isolating devices. [ANSI/ASSE Z244.1-2003]


Identification: All energy isolating devices shall be adequately labeled or marked unless they are located and arranged so that their purpose is clearly evident. The identification shall include the following: a) machine, equipment, or process supplied; b) energy type and magnitude. [ANSI/ASSE Z244.1-2003]

Warnings and special instructions: The manufacturer shall determine if warnings and special instructions are necessary for servicing or maintaining the machine, equipment, or process. Appropriate information shall be provided by the manufacturer, integrator, modifier, or remanufacturer in a written manual. In addition, where the manufacturer determines that warnings or special instructions are to be located in the area of the hazard on a label, placard or sign, the manufacturer shall so affix or provide appropriate placard material to the user for later installation. [ANSI/ASSE Z244.1-2003]

Controlling stored energy: All potentially hazardous stored, residual or potential energy shall be relieved, disconnected, restrained, or otherwise controlled. [ANSI/ASSE Z244.1-2003]

Hierarchy of alternative control implementation: A hierarchical process shall be employed in the selection of alternative control methodologies in the following order or preference:
    a) Eliminate the hazard through design;
    b) Use engineering safeguards;
    c) Use warning and alerting techniques;
    d) Use administrative controls (such as safe work procedures, practices, and training);
    e) Use personal protective equipment.
[ANSI/ASSE Z244.1-2003]

Training: The user shall provide initial training that will ensure that all authorized individuals understand the purpose and function of the energy control program. Training shall be such that all authorized individuals have an understanding that is appropriate for the level of hazard exposure they may encounter. [ANSI/ASSE Z244.1-2003]

Scope: This standard establishes requirements for the control of hazardous energy associated with machines, equipment, or processes that could cause injury to personnel. - --Unexpected release of hazardous energy can include any unintended motion, energization, start-up or release of stored energy, deliberate or otherwise, from the perspective of the person(s) at risk. [ANSI/ASSE Z244.1-2003]

It is my opinion that the ANSI/ASSE Z244.1-2003 standard and its previous variations apply to the various parties involved in this case and the standard is considered as part of the standard of care in the manufacturing industry which includes designers and end users. The ANSI/ASSE Z244 standard was drafted (in 1971) and approved (in 1973) and periodically updated up to 2004. As the standard changes the effected parties are required to incorporate the applicable updates into their respective programs.

Chris Bouslog, Esquire                                          D   e Gendrow, et al
January 20, 2006                                                           v
Page 6 of 15                               Coyne Mattress Manufacturing Company, et al

29 CFR 1910.147 entitled "The Control of hazardous energy (lockout/tagout)"; Section (a) Scope, application and purpose—(1) Scope, (I) reads as follows: "This standard covers the servicing and maintenance of machines and equipment in which the *unexpected* energization or start up of the machines or equipment, or release of stored energy could cause injury to employees.    This standard establishes minimum performance requirements for the control of such hazardous energy."

I totally disagree with Mr. Merala, 29 CFR 1910.147 most definitely applies to this particular accident mode.  OSHA personnel issued the citations relating to this case and this accident therefore confirming that the standard applies to this situation.    The gravitational energy of the tilt table in the horizontal position is stored energy and that energy is released if the motor and/or chain drive is uncoupled.  I agree with Mr. Gill that the first part of the standard was complied with in that the "the *unexpected* energization or start up of the machines or equipment" was addressed and complied with the standard.

I agree in part with Mr. Gill's statement "With respect to the stored energy (i.e., the tilting of the table) the design of the machine itself inherently isolates the energy." But only under the conditions that Mr. Schwalje notes, "When the gear head motor, drive chain and gear system are intact, the gear head motor will hold the table in the vertical condition; however, if the integrity of the system is compromised, the resulting imbalance will cause the table to move from the vertical to the horizontal position."   In my opinion this condition is both a hidden danger and a design defect.

It is my opinion that it is reasonably foreseeable that the table top lift motor would have to be removed, repaired and/or replaced at some point in time by the end user.  To accomplish this work the worker must remove the electric motor (compromise the integrity of the system as Mr. Schwalje puts it), at this time the design does not account for the control of the stored energy and therefore does not comply with the above cited OSHA standard.  In this case the motor controls the lift table in a vertical position, however, when the motor is removed, the lift table unintentionally falls to a horizontal position.  The removal of the lift motor was foreseeable as there was no interlock, which would have prevented the gravitational movement of the lift table from vertical to the horizontal position if the lift motor was removed.  It is my opinion that this a design defect and the tilt top mattress cutting table with the electric motor removed constitutes an unreasonably dangerous condition to the end user workers performing maintenance and/or repair work on the table top lift motor.  A prudent designer is expected to provide safe equipment to the end user and in this particular case the hazard could have been eliminated by one of the following methods:  raising the lift step on the table, blocking the cutting table, or by securing the raised top of the table with a rope or chain, installing a guard that would prevent the vertical tilt top cutting table from unintentionally falling to a horizontal position. DRC (designer) could easily have installed something similar to an emergency release and crank-type mechanism that would allow the end user to lower the lift table to the desired horizontal position.  The above standard applies to DRC as a designer and as an employer who must protect its employees.  It is also my opinion that Coyne Mattress Manufacturing Company (as the owner of the equipment and the

Chris Bouslog, Esquire                                      De    Gendrow, et al
January 20, 2006                                                          v
Page 7 of 15                                    Coyne Mattress Manufacturing Company, et al

controller of the site) was in violation of the above standard for the reasons given in this report and my initial report.

29 CFR 1910. entitled "General requirements for all machines"; Section (a) Machine guarding—(1) Types of guarding, reads as follows: "One or more methods of machine guarding shall be provided to protect the operator and other employees in the machine area from hazards such as those created by point of operation, ingoing nip points, rotating parts, flying chips and sparks. Examples of guarding methods are—barrier guards, two-hand tripping devices, electronic safety devices, etc."

The standard of care in the various industries (including the manufacturing industry) recognizes that during maintenance, it is vital that the machine be put in a zero mechanical state (ZMS) as defined in ANSI Z241.1 standard. The zero mechanical state concept includes not only locking out electrical energy, but also requires that all kinetic and potential energy be isolated, blocked, supported, retained, or controlled so the energy will not be unexpectedly released. This includes potential energy from suspended parts, i.e., lift table in a vertical position when the electric drive motor is removed. It is my opinion that this standard applies to the case in hand.

The standard of care in the industry recognizes that the ultimate goal is to design environments and equipment and to set up job procedures so that employee exposure to injury will be either eliminated or controlled as completely as possible. In the design industry the manufacturer has always been required to conduct a hazard assessment of the equipment to ensure that the end user is not injured during operation and maintenance of the equipment. A basic hazard assessment would have identified the hazard of the tilt table in a vertical position; unintentionally dropping to a horizontal position when the electric tilt table lift drive motor was removed. All the designer had to do was ask the question: What will happen if the drive motor is removed? Designers include a "fail safe" mode for their equipment, i.e., if the motor fails in a vertical position the equipment locks in a vertical position. If the motor fails in a horizontal position the equipment locks in a horizontal position. If the motor fails in a position between the vertical and horizontal position the equipment locks in that position. In this case the motor controls the lift table in a vertical position, however, when the motor is removed, the lift table unintentionally falls to a horizontal position. It is my opinion that this a design defect and the tilt top mattress cutting table with the electric motor removed constitutes an unreasonably dangerous condition to the end user workers performing maintenance and/or repair work on the table top lift motor. DRC (designer) could easily have installed something similar to an emergency release and crank-type mechanism that would allow the end user to lower the lift table to the desired horizontal position. Mr. Gill is correct in his statement that the "mechanical system is self-locking in that at any orientation from horizontal to vertical, if the power is removed, the table will remain mechanically locked in place by the drive system." However, this is only true if the electric motor stays in place. For sake of argument, let's say that the electric motor fails while the lift table is in the vertical position. DRC Corporation and its agents failed to include a procedure where the electric motor can be changed out without the lift table gravitationally falling to a

Chris Bouslog, Esquire                                    D⬚ e Gendrow, et al
January 20, 2006                                                              v
Page 8 of 15                              Coyne Mattress Manufacturing Company, et al

horizontal position or even a "WARNING" that the lift table could unintentionally fall on a worker while changing the electric motor.

Job Safety Analysis (JSA) is a procedure used to review job methods, identify potential hazards, and either eliminate or mitigate the hazards to protect the worker. The four basic steps in making a Job Safety Analysis are as follows:  1. Select the job to be analyzed; 2. Break the job down into successive steps or activities and observe how these actions are performed; 3. Identify the hazards and potential accidents; and 4. develop safe job procedures to eliminate the hazards and prevent the potential accidents.

It is recognized in the manufacturing industry that once the hazard has been identified and evaluated and management has decided to eliminate it, modify it, or cope with it, the basic measures for preventing accidental injury in order of effectiveness and preference, are:

1. Redesign the system to eliminate the hazard from the machine.
2. Control the hazard by guarding, enclosing, safeguarding, or otherwise mitigating it at its source.
3. Warn the employee of the hazard and train personnel to make them aware of the hazard and to follow safe job procedures to avoid it.
4. Provide approved personal protective equipment for personnel to shield them against the hazard.

It is foreseeable that the table top lift motor would have to be removed, repaired and/or replaced at some point in time by the end user. DRC (designer) knows the tilt top mattress cutting table better than anyone else simply because they designed it. A prudent designer is expected to provide safe equipment to the end user and in this particular case the hazard could have been eliminated by one of the previously discussed methods. If the designer can't eliminate or control the hazard then the designer must warn the end user of the hazard.

Mr. Gill opined that such a design is analogous to a garage door and its electric opener. My present garage door and garage door opener came with separate "Owner's Manuals" that included, but not limited to safety features, parts identification, operational features, installation instructions, maintenance recommendations, and multiple "DANGER", "WARNING" and "CAUTION" literature. My present garage door is designed that if the electric drive motor is disconnected, a person can pull an "Emergency Release Cord" that allows them to raise and/or lower the door with very minimal effort. It is foreseeable that this safety feature would be required if electrical power was lost (due to earthquake, electrical storms, etc.) or if the garage door electric motor failed. The owner could still raise the door to move the vehicle out and close the door to maintain security into the garage. Examples of "WARNINGS" contained in the garage door Owner's Manual included, but are not limited to the following: Read carefully and follow all instructions before attempting installation; several warnings concerning the release of the spring tension, disassembly of springs, removal of brackets or cables and must be done by a qualified and experienced door agency or individual; Attach locking pliers to tracks to

De    Gendrow, et al
v

keep door from raising unexpectedly, otherwise serious injury or death could result; and others. Examples of "WARNINGS" contained in the garage door opener Owner's Manual included, but are not limited to the following: Read and follow all instructions; Never let children operate or play with door controls. Keep remote away from children; Always keep people and objects away from moving door; and others. All of these "WARNINGS" appear to be obvious and "common sense" in nature, however, the manufacturers still felt it was necessary to provide the information to end users. The Garage Door Opener system is equipped with an "electric eye" that automatically stops the garage door in the position it is in should the "electric eye" be obstructed by anything. The system cannot be operated until the obstruction is removed. DRC Corporation failed to provide an "Owner's Manual" for subject mattress tilt table that should have included, but are not limited to the following: installation instructions for the electric motors; "WARNING" that the lift table will unintentionally fall when the electric motor is disconnected; "WARNING" that the worker is not to stand or lean into the lift table fall zone; etc. I will note that Owner's Manuals are provided with small appliances used in the home, i.e., hair dryers, toasters, electric can openers, etc.; it is my opinion that an end user must reasonably expect that an Owner's Manual should accompany equipment such as the subject mattress lift table.

The subject tilt table was reportedly designed and manufactured before 1968. Mr. David R. Cash testified that the unit was shipped on April 22, 1968. Mr. Cash also testified that several lift tilt tables were manufactured and sold over the next thirty-plus years. It is recognized in the manufacturing industry that the design of machinery and equipment is an evolutionary process. It is always changing and dynamic, because design engineers constantly acquire wider experiences in the course of their everyday work. These experiences give them a broader scope and more initiative at the drawing board. This initiative, however, will be disciplined by the practical consideration of designing the most effective means for controlling hazards in the operation of machines or equipment. According to the National Safety Council, "Accident Facts", 1956 edition; machinery is one of the top four sources of compensable work injuries, accounting for ten percent of all such injuries; and struck by falling or moving objects—14 percent. Further pointing to the need for safe design of machines is the fact that the same two categories in more recent editions increase the numbers to 19 percent. Policy in designing should make sure that a machine is so designed that it will meet the requirements promulgated under authority of the OSHAct.

The question is: should manufacturers provide customers with equipment that was at one time, but is no longer, state-of-the-art or consistent with industry standards? The standard of care in the manufacturing industry is that the manufacturer must weigh the feasibility, reasonableness, cost and potential safety benefit of upgrading the product. It is my opinion that in this particular case the hazard could have been eliminated by one of the following methods: raising the lift step on the table, blocking the cutting table, or by securing the raised top of the table with a rope or chain, installing a guard that would prevent the vertical tilt top cutting table from unintentionally falling to a horizontal position. Any one of the methods is feasible, reasonable, cost effective, and greatly increases the safety benefit of upgrading the product.


It is my opinion that such a design is also analogous to a construction elevator that is powered by an electric motor. The construction elevator is designed so that if electric power is lost or the electric motor fails the conveyance motion will stop and remain fixed at that location. The construction motor can then be by-passed and the conveyance can be manually lowered (by a crank mechanism) to the next station to allow the occupants to get out. The failed motor can be removed, repaired, and/or replaced without the conveyance falling to its base.

**Richard T. Gill Opinion 2:** Both A& B Electric and Coyne Mattress should have complied with the minimum OSHA LOTO requirements as set forth in CFR 1910.147; the failure of both companies to do so were underlying root causes of this accident.

**Peter J. Schwalje Opinion:** It is the writer's opinion that Mr. Gendrow's accident arose as the consequences of his attempt to remove the table motor from its secured position without Mr. Gendrow or anyone else first insuring that the table structure would remain in position after loosening the motor from its position. As a third party service provider, initiation of such action was first and foremost Mr. Gendrow's responsibility under accepted maintenance practices as set forth in OSHA regulations and ANSI standards.

**Raymond Merala Opinion:** One can reasonably conclude that OSHA Standard 1910.147 – The control of hazardous energy (lockout/tagout); does not apply to this particular accident mode.

It is unlikely that an exchange or discussion of LOTO programs between principles of Coyne Mattress Co. and A & B Electric would have prevented this accident.

There is no evidence that an audit would have identified Mr. Gendrow's accident mode and that the maintenance man would have been aware of the potential hazard.

It was not readily apparent that the tilt-top table would rotate to a horizontal position if the table tilt motor was disconnected from the chain that drives the shaft.

The situation to which Mr. Gendrow exposed himself was not a recognized hazard.

**Gary Buffington Rebuttal Opinion:** I disagree with Mr. Gill's opinion that these were the underlying root causes of the accident. I disagree with Mr. Schwalje opinion concerning Mr. Gendrow's responsibility. It is my opinion that the root cause of this accident was the failure of DRC, the designer and manufacturer of the lift table, to provide a guard or support method to prevent the lift table (in a vertical position when the electric drive motor is removed) from unexpectedly falling to a horizontal position. The failure of Coyne Mattress (Simon) to comply with the standard was a contributing factor to the accident. Coyne Mattress (Simon) was the owner of the facility and the mattress tilt table involved in this accident. It is Coyne Mattress (Simon) responsibility under OSHA regulations and ANSI standards to develop, implement, and maintain an OSHA LOTO program for their employees and as the onsite employer to inform any outside

D:     : Gendrow, et al
v
Coyne Mattress Manufacturing Company, et al

servicing personnel of the site lockout or tagout procedures effecting the repair work on the DRC tilt top cutting table. It is Coyne Mattress (Simon) responsibility to conduct initial, annual or more frequent inspections of the energy control procedures to ensure that the procedure and requirements of the standard were followed. Again, Coyne Mattress (Simon) owns both the facility and the DRC tilt top cutting table. It is also my opinion that Mr. Gendrow was not properly trained in either the onsite Lockout/Tagout procedures or hazard recognition as required by OSHA standards.

In response to Mr. Merala, the OSHA 1910.147 standard applies as well as the ANSI Z244 standard for the reasons given earlier in this report. Mr. Merala further stated "The situation to which Mr. Gendrow exposed himself was not a recognized hazard" and "It was not readily apparent that the tilt-top table would rotate to a horizontal position if the table tilt motor was disconnected from the chain that drives the shaft." Simon manager Mr. Lee responded "I couldn't. Even after the fact I looked at and looked at it, and I don't know how I would ever figure that out." DRC is of the opinion that the hazard is obvious and open. It is my opinion that a basic Job Safety Analysis would most likely have included the question to the effect that "If the tilt top drive motor is released while the tilt top table is in a horizontal position, will the table fall to a horizontal position or stay in an vertical position?" DRC (designer) appears to be the only one who had the knowledge before hand that the table in a vertical position will drop to a horizontal position. I do agree with Mr. Merala in that "This is a risk that is not readily apparent to many." I disagree with Mr. Merala's broad definition that "A piece of equipment falling out or pushed off a shelf or table while being serviced could be covered under such a broad definition." I would offer the analogy of a motor failing that lifts a truck bed in a raised position, the truck bed remains in the vertical position; however, if the drive motor is removed, the truck bed unintentionally falls to the horizontal position similar to the facts of this case. The designers have used pins, locking devices, and blocking devices to ensure that the truck beds don't fall to a horizontal position. It is my contention that a safety professional would have recognized the stored, gravitational energy hazard as previously discussed. It is also my opinion that if either or both DRC Corporation and/or Coyne Mattress Manufacturing Company had used the JSA procedures properly, the hazard most likely would have been recognized, the lift table most likely would have been secured in some manner or lowered to a horizontal position and this accident would have been prevented.

**Richard T. Gill Opinion 3:** The lack of and/or defects or deficiencies in any product manual and/or on-product warnings did not contribute to this accident.

Mr. Gill contends that, "Nor is there any reason to warn users not to remove the elevating motor when the table is in the raised position as it is open and obvious that the motor and its associated drive train are what hold the table in its elevated state; if these restraining forces are removed it is open and obvious that the table top will fall. This is particularly true given the likely sophisticated user that would be attempting any such maintenance task. That is, the subject tilt table is clearly a specialized piece of equipment that is industry specific with a single use; it is a "mature" product in that the same basic simplistic design with the sole functional feature of rotating the table top has been in

Dale Gendrow, et al
v
Coyne Mattress Manufacturing Company, et al

existence for roughly half a century. As such, its likely user group will be trained professional knowledgeable of such basic concepts. Lastly, Mr. Gendrow's is the only known accident of its type."

**Peter J. Schwalje Opinion:** "Virtually every aspect of the table's mechanical and electrical systems were open, obvious and readily visible to any observer."

**Gary Buffington Rebuttal Opinion:** As discussed previously in this report and my initial report, I disagree with Mr. Gill's opinion in its entirety. When the motor is removed, the stored energy is not inherently isolated for the reasons I discussed previously.

I have been in a multitude of work environments for over 41 years (more years if you count the teen years spent in the family sawmill and timber businesses) as discussed in my previous report. During this time I have conducted hundreds of assessments of machinery and/or equipment and/or employee work procedures through a Job Safety Analysis process or something similar to identify, eliminate and/or control the hazards. One of the first steps taken is to review the Owners Manual to incorporate the manufacturer's safety guidelines and warnings. If I didn't get the information I needed from the manual I would call the manufacturer and speak to a representative to get my answer. In the subject case I would call the manufacturer and ask, "If the lift table is in a vertical position, what happens if the electric motor is disconnected?" I strongly disagree that the hazard is open and obvious. It is my opinion that it is reasonable to assume that if the motor failed while the table top was in a vertical position, the table top would stay locked in that position and it was reasonable to assume that if the motor was removed the table top would still stay locked in that position. Apparently Mr. Gendrow, with all of his years of experience and training, made that same assumption and the results were fatal. Donald Erwin Lee was asked during his deposition something to the effect that "— table is free wheeling, that's pretty self-evident, isn't it? [Page 79, lines 22-25] Mr. Lee responded, "That's the one thing that has bothered me the most is how I would ever figure that out looking at the machine. I couldn't." [Page 80, lines 4-6] Mr. Lee was asked, "—you mentioned earlier—that you had received warning letters or communications from the manufacturers of machines that were within your company--? [Page 88, lines 1-5] Mr. Lee responded, "Yes, I had." [Page 88, line 6] Question: "Warning a possible danger or chance of injury?" [Page 88, lines 9-10] Answer, later: "Over the years maybe 10, 15 times." [Page 88, line 15] Answer: "Sometimes they would send retrofit parts and guards to eliminate the hazard, warning signs,---." [Page 88, lines 20-21] Mr. Lee related earlier in his deposition that he had worked for Coyne Mattress since 1962. Later in Mr. Lee's deposition he was asked, "—the company never received any notification from James Cash Machine Company about the risks of changing out the motor when the table was in the up position?" Answer: "No." [Page 97, lines 14-18] It is my opinion that Mr. Lee would fall into the category of "likely user group—trained professional knowledgeable of such basic concept." According to the above testimony by Mr. Lee, he could not figure it out and he did not receive any information from the manufacturer of the subject equipment.

Chris Bouslog, Esquire                                          D     e Gendrow, et al
January 20, 2006                                                         v
Page 13 of 15                                   Coyne Mattress Manufacturing Company, et al

Malcolm L. Barcarse was asked during his deposition, "Now, can that motor be removed with the table in a down position?" [Page 21, lines 8-9] Mr. Barcarse responded, "It would be awfully difficult, awfully difficult, because you practically have to lay down and do things to take the motor off." [Page 21, lines 10-11] It is my opinion that it was reasonably foreseeable that an end user maintenance personnel would be tempted to remove the lift table motor while the lift table was in a vertical position simply because he could stand up and access the motor more easily than lowering the table and crawling under the table. It was also reasonably foreseeable that the maintenance personnel would not recognize the dangerous condition of the stored gravitational energy hazard as this hazard was hidden and not obvious.

**Richard T. Gill Opinion 4:** Despite their HOSH citations, both A & B Electric and Coyne Mattress Company have alleged they do have a LOTO program. To the extent that they did, and to the extent the Mr. Gendrow was trained in such procedures yet failed to comply, his act(s) of omission would be another root cause(s) of this accident.

Mr. Gill stated, "---the stored energy hazard associated with the table in the elevated position is an open and obvious hazard, particularly to a trained and sophisticated user such as Mr. Gendrow. It is noteworthy that Mr. Barcarse, President of A & B Electric, testified that Mr. Gendrow was one of his most experienced and most trusted employees. In addition, Mr. Lee testified that Mr. Gendrow had personally operated the table (i.e., raised and lowered it) on several occasions in the past. In other words, given the simplicity of the machine, along with Mr. Gendrow's overall level of experience and mechanical/electrical sophistication, as well as Mr. Gendrow's first hand experience with the subject tilt table it can only be concluded that Mr. Gendrow's decision to remove the bolts holding the restraining motor in place while the table was elevated was nothing less than a careless act and a violation of basic safety protocol."

Mr. Gill continues, "In fact, it appears that Mr. Gendrow's decision to remove the motor that provided the inherent stability of the tilted table, was made impromptu; that is, his initial work plan was to simply change out the step motor, as the table motor was functioning properly. The point to be made is that because Mr. Gendrow made such an impromptu decision/change of work plans, he failed to properly consider the potential consequences and/or hazards associated with such actions."

**Peter J. Schwalje Opinion:** Mr. Gendrow was an experienced and trained electrician, and a navy veteran, who had working experience maintaining various types of equipment for many years. It was his responsibility to evaluate the task he was planning to perform and to institute some type of action to provide for his own safety during the repair. Standard texts on conduct of maintenance state that part of a mechanic's role is to ensure his/her own operating personnel safety. Further, the provisions of the OSHA regulations, specifically 29 CFR 1910.147, provide that activities such as those being conducted by Mr. Gendrow must use established lockout/tagout procedures.

Chris Bouslog, Esquire
January 20, 2006
Page 14 of 15

D... Gendrow, et al
v
Coyne Mattress Manufacturing Company, et al

**Raymond Merala Opinion:**    One can reasonably conclude that OSHA Standard 1910.147 – The control of hazardous energy (lockout/tagout); does not apply to this particular accident mode.

It is unlikely that an exchange or discussion of LOTO programs between principles of Coyne Mattress Co. and A & B Electric would have prevented this accident.

There is no evidence that an audit would have identified Mr. Gendrow's accident mode and that the maintenance man would have been aware of the potential hazard.

It was not readily apparent that the tilt-top table would rotate to a horizontal position if the table tilt motor was disconnected from the chain that drives the shaft.

The situation to which Mr. Gendrow exposed himself was not a recognized hazard.

He was familiar with the operation of the table, had participated in moving it a number of times, which included connecting power to the equipment and operating it.

Had Mr. Gendrow only removed and replaced the platform lift motor this accident would not have happened.

**Gary Buffington Rebuttal Opinion:**  It is my opinion that Coyne Mattress Company was not in full compliance with the OSHA and HOSH standards.  The potential energy created when the motor was removed while the lift table was in a vertical position was not identified or controlled.  Therefore, Mr. Gendrow was not properly trained.  This is the first time that the lift table motor was removed by anyone from Coyne Mattress Company or A & B Electric, which includes Mr. Gendrow.  I don't agree with the assessment that Mr. Gendrow had this particular "specialized experience" as he had never changed this particular motor before.  There was testimony that Mr. Gendrow had personally operated the lift table, i.e., raised and lowered it.  Mr. Merala noted that Mr. Gendrow was familiar with the operation of the table, had participated in moving it a number of times, which included connecting power to the equipment and operating it.  It is my understanding that a number of operators also raised and lowered the lift table.  However, in my opinion that alone does not make them "sophisticated users" and qualify them to change out the lift table motor.  No one had ever removed and/or replaced the tilt table lift motor prior to this accident.  Mr. Barcarse testified that Mr. Gendrow was one of his most experienced and most trusted employees.  There is nothing in the evidence that I reviewed to indicate that Mr. Gendrow was an unsafe worker, careless, or deliberately failed to comply with safety rules or regulations.  Mr. Merala also noted that had Mr. Gendrow only removed and replaced the platform lift motor this accident would not have happened.  One could also conclude that had the supplier sent the correct motor, the bolts would have lined up and there would be no reason to switch the tilt table motor to the step lift motor position, therefore, this accident would have been prevented.  According to the evidence Mr. Gendrow attempted to install the new step motor, the bolts would not line up, but he noticed that the lift table motor bolts would line up on the step motor and for some reason the step motor would fit at the lift table motor location.  It is my opinion

that Mr. Gendrow was not careless in doing this work, he simply was not properly trained to recognize the hazard and the lift table design was defective and the tilt top mattress cutting table with the electric motor removed constitutes an unreasonably dangerous condition to the end user workers performing maintenance and/or repair work on the table top lift motor for the reasons previously discussed in this report and my initial report. The product design was a substantial factor in causing harm to Mr. Gendrow.

In response to Mr. Schwalje, it is my opinion that the standard texts of conduct of maintenance require the mechanic to review the Operators Manual as it pertains to manufacturer's recommended procedure to repair and/or maintain the equipment that is to be worked on, along with the applicable safety rules, dangers, warnings, and cautions. DRC provided no Operators Manual or any written materials concerning safety rules, dangers, warnings, and cautions.    Secondly, Simon's LOTO program was not communicated to Mr. Gendrow as is required in standard texts of conduct for maintenance personnel.  Thirdly, Simon failed to provide any hazard recognition training concerning Simon equipment hazards, i.e., when the motor is removed, the lift table unintentionally falls to a horizontal position. Fourthly, Mr. Gendrow was an experienced electrician and a navy veteran who had experience maintaining various types of equipment for many years.   However, the hazard was a gravitational hazard not an electrical hazard and there is no evidence offered to show that Mr. Gendrow ever worked on similar equipment that provided similar gravitational hazard exposures.   It is my opinion that Mr. Gendrow was never properly trained to recognize the gravitational hazard and this hazard was hidden, not obvious, to Mr. Gendrow with all of his years of experience.  The lift table design was defective and the tilt top mattress cutting table with the electric motor removed constitutes an unreasonably dangerous condition to the end user workers performing maintenance and/or repair work on the table top lift motor for the reasons previously discussed in this report and my initial report.

In closing, it is my opinion that if either DRC Corporation or Coyne Mattress Manufacturing Company had used the required hazard assessment or Job Safety Analysis procedures properly, the gravitational hazard most likely would have been recognized, the lift table most likely would have been secured in some manner or lowered to a horizontal position and this accident would have been prevented

This report is based on the documents received to date.  Additional documents are not anticipated, however, if for any reason my opinions change, I shall provide a supplement report of any changes.

Respectfully submitted,

_____
Gary L. Buffington, CSP, CRSP, CSHM, WSO-CSE/CSM/CSS, PI      DATE
AMERICAN SAFETY CONSULTING

Der Gendrow, et al
v
Coyne Mattress Manufacturing Company, et al

that Mr. Gendrow was not careless in doing this work, he simply was not properly trained to recognize the hazard and the lift table design was defective and the tilt top mattress cutting table with the electric motor removed constitutes an unreasonably dangerous condition to the end user workers performing maintenance and/or repair work on the table top lift motor for the reasons previously discussed in this report and my initial report. The product design was a substantial factor in causing harm to Mr. Gendrow.

In response to Mr. Schwalje, it is my opinion that the standard texts of conduct of maintenance require the mechanic to review the Operators Manual as it pertains to manufacturer's recommended procedure to repair and/or maintain the equipment that is to be worked on, along with the applicable safety rules, dangers, warnings, and cautions. DRC provided no Operators Manual or any written materials concerning safety rules, dangers, warnings, and cautions.    Secondly, Simon's LOTO program was not communicated to Mr. Gendrow as is required in standard texts of conduct for maintenance personnel.  Thirdly, Simon failed to provide any hazard recognition training concerning Simon equipment hazards, i.e., when the motor is removed, the lift table unintentionally falls to a horizontal position.  Fourthly, Mr. Gendrow was an experienced electrician and a navy veteran who had experience maintaining various types of equipment for many years.  However, the hazard was a gravitational hazard not an electrical hazard and there is no evidence offered to show that Mr. Gendrow ever worked on similar equipment that provided similar gravitational hazard exposures.  It is my opinion that Mr. Gendrow was never properly trained to recognize the gravitational hazard and this hazard was hidden, not obvious, to Mr. Gendrow with all of his years of experience.  The lift table design was defective and the tilt top mattress cutting table with the electric motor removed constitutes an unreasonably dangerous condition to the end user workers performing maintenance and/or repair work on the table top lift motor for the reasons previously discussed in this report and my initial report.

In closing, it is my opinion that if either DRC Corporation or Coyne Mattress Manufacturing Company had used the required hazard assessment or Job Safety Analysis procedures properly, the gravitational hazard most likely would have been recognized, the lift table most likely would have been secured in some manner or lowered to a horizontal position and this accident would have been prevented

This report is based on the documents received to date.  Additional documents are not anticipated, however, if for any reason my opinions change, I shall provide a supplement report of any changes.

Respectfully submitted,

Gary L. Buffington, CSP, CRSP, CSHM, WSO-CSE/CSM/CSS, PI          DATE
AMERICAN SAFETY CONSULTING

Westlaw.

20 Nat. J.V.R.A. 6:C7                                                      Page 1
2005 WL 2402495 (Pa.Com.Pl.), 20 Nat. J.V.R.A. 6:C7
**(Publication page references are not available for this document.)**


Copyright (C) 2005 National Jury Verdict Review & Analysis

Court of Common Pleas of Pennsylvania, Philadelphia County.
ROSARIO vs. **JAMES CASH MACHINE** COMPANY.
02-01-1294

DATE OF VERDICT/SETTLEMENT: April 1, 2005

TOPIC: PRODUCTS LIABILITY - DEFECTIVELY DESIGNED MATTRESS CUTTING MACHINE - LACK OF
HINGED INTERLOCKING GUARD - FAILURE TO WARN - TRAUMATIC AMPUTATION OF DOMINANT RIGHT
HAND - CHRONIC PAIN - TOTAL DISABILITY FROM EMPLOYMENT CLAIMED.

SUMMARY:
  Result: $2,726,665 Verdict

EXPERT WITNESSES:

  Plaintiff's: Joseph Leane from Illinois.: Plaintiff's engineer.

  Amitabha Mitra from Philadelphia.: Plaintiff's orthopedic/plastic surgeon.

  Donald Jennings from Philadelphia.: Plaintiff's rehabilitation expert.

  Defendant's: Peter Schwalje from New Jersey.: Defendant's engineer.

ATTORNEY:
  Plaintiff's: Mark J. LeWinter and James E. Keating of Anapol Schwartz Weiss Cohan
Feldman & Smalley, P.C., in Philadelphia for plaintiff.
  Defendant's: Mark W. Catanzaro of Law Offices of Mark W. Catanzaro in Moorestown,
New Jersey for defendant.

JUDGE: Gary F. DiVito

RANGE AMOUNT: $2,000,000-4,999,999
INJURIES:
PRODUCTS LIABILITY - DEFECTIVELY DESIGNED MATTRESS CUTTING MACHINE - LACK OF HINGED
INTERLOCKING GUARD - FAILURE TO WARN - TRAUMATIC AMPUTATION OF DOMINANT RIGHT HAND -
CHRONIC PAIN - TOTAL DISABILITY FROM EMPLOYMENT CLAIMED.

FACTS:
  The 45-year-old male plaintiff was in the course and scope of his employment in a
mattress factory when he suffered a traumatic amputation of his right hand while
working on a machine manufactured by the defendant. The plaintiff claimed that the
machine was defectively designed in that it allowed the foreseeable removal of a
fixed outfeed barrier guard which would have prevented the injury. The plaintiff
also contended that the defendant failed to provide an operator's manual or
otherwise warn of the danger associated with removal of the outfeed guard. The
defendant argued that the machine was safe as originally designed and manufactured
and the accident resulted from the removal of the outfeed guard by the plaintiff's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

20 Nat. J.V.R.A. 6:C7                                                    Page 2
2005 WL 2402495 (Pa.Com.Pl.), 20 Nat. J.V.R.A. 6:C7
(Publication page references are not available for this document.)

employer. The case was tried under strict liability theory.

The machine at issue was manufactured in 1990 to cut panels of foam mattress material to a predetermined length and width. It included rollers and 7.5' rotating slitter blades on the infeed end to cut the material to a predetermined width. The outfeed end of the machine was comprised of a cross-cut blade which traversed the width of a table to cut the material to a specified length. The cross-cut blade at the outfeed end of the machine was controlled by a photo-electric eye activated by the exiting material. The cross-cut blade traversed the table top in 1.5 seconds and its motor would cut off to wait for the next cycle, which would then move the cutting blade to the other side of the table.

The infeed side of the machine was equipped with a hinged interlocking guard which, when raised, disengaged the width- cutting slitter blades. However, an eight-foot fixed barrier guard which had been designed for the outfeed end of the machine had been removed by the plaintiff's employer.

The plaintiff testified that he was working on the panel cutter when material became wrapped around its rollers and it jammed. The plaintiff testified he turned off the machine, lifted the hinged interlocking guard at the infeed and cut the material off the rollers. Because he could not clear the material, the plaintiff closed the hinged interlocking guard on the infeed end of the machine, turned the machine on and went to the outfeed end in an attempt to pull the jammed material out of the machine. The plaintiff testified that he was attempting to use the rotation of the rollers to help clear the material.

As the plaintiff was pulling on the jammed material, he slipped and thrust his right hand onto the table top in an attempt to brace himself. The electric eye of the crosscutting blade was activated, traversed the table and traumatically amputated the plaintiff's right hand.

The plaintiff's engineer testified that the mattress cutting machine was defective in that the fixed barrier guard on the outfeed end was not hinged nor interlocked (as the guard on the other end) making it foreseeable that the guard would be removed for a number of reasons. The fixed barrier guard was only 1.75 inches from the table top and the foam material being cut was also 1.75 inches thick, making it inevitable that jams would occur while the fixed guard was in place, according to the plaintiff's claims. Evidence established that the eight-foot fixed barrier guard, originally designed for the outfeed end of the machine, required removal for maintenance and that its removal facilitated the removal of jammed material from the outfeed side. Because the guard was large and bolted to the table top, the plaintiff argued that it was unlikely that the guard would be replaced after it was removed.

The plaintiff's expert also testified that the machine was defective because there was no operator's manual supplied and neither the machine nor barrier guard contained warnings such as 'DO NOT REMOVE GUARD.' Thus, there were no instructions regarding how to operate, unjam or maintain the machine. The plaintiff contended that the barrier guard was not listed nor identified in the parts manual nor set-up instructions supplied by the defendant.

The plaintiff testified he had been working on the panel cutting machine for approximately a year before the date of the accident and had never seen the original barrier guard for the outfeed end of the machine. The plaintiff sustained a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

20 Nat. J.V.R.A. 6:C7                                              Page 3
2005 WL 2402495 (Pa.Com.Pl.), 20 Nat. J.V.R.A. 6:C7
(Publication page references are not available for this document.)

traumatic amputation of his right hand at mid-palm. His hand was reattached with
poor results. The plaintiff's orthopedic/plastic surgeon testified that the hand is
non-functional and can be used as a 'helper' hand only. The plaintiff underwent at
least four surgeries including reattachment surgery, two procedures to remove
orthopedic pins, and a fusion with installation of orthopedic plates over the
knuckles. The plaintiff's physician testified the plaintiff also developed chronic
pain syndrome and RSD as a result of the pulling, stretching and then retraction of
a number of tendons and nerves which could not be reattached. The plaintiff
introduced medical illustrations depicting the injury.

   The plaintiff is an immigrant from Puerto Rico who has the equivalent of a ninth
grade education. He worked as a machine operator for some 17 years before the date
of the accident. The plaintiff's vocational rehabilitation expert testified that the
plaintiff is totally disabled from employment as a result of his hand injury. The
plaintiff's economist estimated the plaintiff's loss of future earnings to be
between $480,000 and $508,000.

   The plaintiff testified he is no longer able to enjoy his hobby of carpentry and
as a results, suffers depression and a change in personality. The plaintiff
contended that the injury caused the break-up of his ten-year live-in relationship
with the woman he considered his common law wife.

   The defendant's expert engineer testified that the machine was safe as designed
and that the original fixed barrier guard would have prevented the plaintiff's
injury. The defendant maintained that it did not expect nor foresee that the
plaintiff's employer would remove the safety guard and allow its employees to
operate the machine without the safety guard in place. The defense stressed that the
plaintiff's employer testified he was aware of the purpose of the fixed guard on the
outfeed end of the machine.

   The plaintiff's employer contended he was unaware the guard had been removed. The
defendant argued that warnings were not required since it was clearly understood by
the plaintiff's employer that the outfeed barrier guard was designed to prevent
injury.

   The jury found the machine was defective and awarded the plaintiff $2,726,665 in
damages, of which $2 million was delineated for pain and suffering. Post-trial
motions are pending.

COMMENTARY:

   This products liability action involved an extremely graphic and painful hand
amputation to a relatively young plaintiff while using an industrial mattress
cutting machine. The focal point of the defense centered on the removal of the
original fixed barrier guard from the outfeed end of the machine by the plaintiff's
employer. Thus, it became the plaintiff's goal to establish that the removal of the
fixed guard was foreseeable. Plaintiff's counsel enumerated several reasons that the
fixed guard would be unbolted, removed and not replaced on the machine, including
constant material jamming and routine maintenance. It was unknown exactly when the
guard had been removed, but the plaintiff testified he had been working on the
machine for a year and had never seen it.

   In addition, the design of the machine was such that it afforded a perfect example

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

20 Nat. J.V.R.A. 6:C7                                            Page 4
2005 WL 2402495 (Pa.Com.Pl.), 20 Nat. J.V.R.A. 6:C7
(Publication page references are not available for this document.)

of a safe, hinged interlocking guard which had been designed for the opposite (infeed) end of the machine. Plaintiff's counsel introduced many photographs of the machine itself. However, because the machine was so large, it was difficult for the jury to visualize its operation. Plaintiff's counsel utilized cardboard tubes taken from paper towel rolls and paper to construct a simple model of the machine's mechanisms. This model proved to be an effective and inexpensive method to demonstrate the basic mechanisms of the machine in terms readily understandable to the lay jury.

On damages, the plaintiff introduced medical illustrations rendered from x-rays by an artist for medical textbooks. The illustrations, depicting nerves and tendons hanging from the severed hand, were used by the plaintiff's physicians to describe the injury, multiple surgeries and resulting chronic pain syndrome. The plaintiff testified that the woman he considered to be his common law wife attempted to care for him following the injury, but his personality change and depression caused a break- up of the relationship.

The jury found that the machine was defective, but was not asked to specify under which of the plaintiff's theories it found liability. The defendant has filed post-trial motions for a remitter as well as new trial.

Jury Verdicts Review Publications, Inc.

PUBLISHED IN: National Jury Verdict Review & Analysis, Vol. 20, Issue 6

2005 WL 2402495 (Pa.Com.Pl.), 20 Nat. J.V.R.A. 6:C7

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.