Gendrow v. Simon Mattress      Multi-Page™      Donald Erwin Lee
May 25, 2005

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

DENISE GENDROW, )
individually and as )
Personal Representative of )
THE ESTATE OF CHARLES )
EUGENE GENDROW, JR.; )
CHARLES E. GENDROW, III; )
and JEANNE SMITH, )
)
    Plaintiffs, )
)
    vs. ) CIVIL NO.
) Cv03-00034 DAE/BMK
) (Other Non-Vehicle Tort)
SIMON MATTRESS )
MANUFACTURING COMPANY; dba )
SERTA MATTRESS COMPANY dba )
COYNE MATTRESS )
MANUFACTURING COMPANY; )
JAMES CASH MACHINE CO., a )
Kentucky Corporation, )
)
    Defendants. )
)
)
SIMON MATTRESS )
MANUFACTURING COMPANY, )
)
    Defendant and )
    Third-Party Plaintiff)
)
    vs. )
)
JAMES CASH MACHINE CO., a )
Kentucky Corporation, )
)
    Third-Party )
    Defendant. )
)

DEPOSITION OF DONALD ERWIN LEE

**EXHIBIT "D"**

POWERS & ASSOCIATES

Page 2

1  Taken on behalf of the Third-Party Defendant James Cash
2  Machine Company pursuant to Notice, on Wednesday, May
3  25, 2005, commencing at 9:12 a.m., at the office of
4  Powers & Associates, Pauahi Tower, 1001 Bishop Street,
5  Suite 2650, Honolulu, Hawaii 96813.
6
7  APPEARANCES:
8      For Plaintiffs Denise Gendrow, Estate of Charles
       Gendrow, Jr., Charles E. Gendrow, III, and
9      Jeanne Smith:
10         CHRISTOPHER S. BOUSLOG, ESQ.
           Law Offices of Chris Bouslog
11         Four Waterfront Plaza, Suite 480
           500 Ala Moana Boulevard
12         Honolulu, Hawaii 96813
           (808) 550-4995
13
14     For Defendant and Third-party Defendant
       Simon Mattress Manufacturing Company:
15
           RALPH J. O'NEILL, ESQ.
16         MacDonald Rudy Byrns O'Neill & Yamauchi
           Suite 2650, American Savings Bank Tower
           1001 Bishop Street
17         Honolulu, Hawaii 96813
           (808) 523-3080
18
19     For Third-Party Defendant James Cash Machine
       Company:
20
           PAUL T. YAMAMURA, ESQ.
21         Yamamura & Shimazu
           1770 Central Pacific Plaza
22         220 South King Street
           Honolulu, Hawaii 96813
23         (808) 523-6969
24 REPORTED BY:
       Marjann Shawler, RPR, CSR 182
25     Notary Public, State of Hawaii

Page 3

1           I N D E X
2
3 EXAMINATION:                       PAGE
4     BY MR. YAMAMURA              4
5     BY MR. BOUSLOG               83
6     BY MR. YAMAMURA            99
7     BY MR. BOUSLOG              100
8     BY MR. YAMAMURA            100
9
10
11
12 EXHIBITS FOR IDENTIFICATION:
13     (No exhibits identified)

Page 4

1         DONALD ERWIN LEE,
2  having been called as a witness and being first duly
3  sworn to tell the truth, the whole truth and nothing
4  but the truth, was examined and testified as follows:
5          EXAMINATION
6  BY MR. YAMAMURA:
7      Q. Please state your full name.
8      A. Donald Erwin Lee.
9      Q. Mr. Lee, we're here for your deposition, and
10 I appreciate you showing up today. Have you ever had
11 your deposition taken before?
12     A. Yes, I have.
13     Q. In what kind of circumstance?
14     A. One was a product liability case, and one
15 was an accident.
16     Q. The product liability case, what was
17 involved with that?
18     A. It was a mattress that we had manufactured
19 and it was a bunk bed mattress -- we had allegedly
20 manufactured.
21     Q. Caught on fire, burned the --
22     A. Caught on fire, yes.
23     Q. I know that case.
24         What was the accident case?
25     A. The accident was we had a large machine that

Page 5

1  processed cotton, and it was huge, the size of a truck.
2  Actually there were three of them. They were fenced in
3  so people couldn't get into the area. We had an
4  employee who went inside the fence and was closing down
5  the machine while it was still running. The nozzle got
6  caught in the machine and it pulled his hand and he
7  lost his hand.
8      Q. The burning bunk case, though, that was an
9  issue where there was the manufacturer of the bunk bed
10 was either yourself or Simon mattress, right?
11     A. Yes, because it was purchased from the
12 exchange. We both sold to the exchange.
13     Q. I was involved for Simon Mattress on that
14 matter.
15         Let me just briefly go through the ground
16 rules of the deposition so we're in the same
17 understanding.
18         MR. YAMAMURA: I understand, Ralph, and you
19 were kind enough to have him here without subpoena. I
20 just need to know: Are you here as his attorney?
21         MR. O'NEILL: Yes.
22         MR. YAMAMURA: Okay. That's fine.
23     Q. BY MR. YAMAMURA: So, Mr. Lee, I understand
24 that you are here with your attorney and you were
25 formerly employed by Simon Mattress Company, Serta,

Page 6

1  basically; is that correct?
2      A. That's correct.
3      Q. Let me briefly go over the ground rules for
4  a deposition just to refresh you on what's going to
5  happen today.
6          A deposition is a question-and-answer
7  session under oath. While it is informal and in the
8  court reporter's office, it is as if you are giving
9  testimony in court.
10         One purpose of a deposition is to find out
11 what you know about the accident involving Mr. Gendrow.
12 Also, going to ask questions about the specific
13 machinery involved in the accident.
14         Another purpose of a deposition is that if
15 you are unavailable at the hearing of this case that we
16 can read portions of your deposition as actual evidence
17 to the jury or judge.
18         Third purpose of a deposition is that if you
19 testify differently at the hearing of this case than
20 what you do today, we can point out those differences
21 that you testified differently under oath on two
22 separate occasions.
23         Because it is a question-and-answer session
24 and because it is verbal, avoid uh-huhs, huh-uhs, nods
25 of the head, because the court reporter can only take

Page 7

1  the verbal responses. While we do those types of
2  gestures and sounds in everyday conversation, we kind
3  of understand by looking at each other what is meant,
4  she only takes down verbal responses. To keep it clear
5  and so it is unambiguous, try to answer out loud, yes,
6  no, and so forth. Okay?
7      A. I understand.
8      Q. Also, if there is any part of my question
9  you don't understand, please stop and please tell me
10 you don't understand it, and let me attempt to clarify
11 it or demystify it for you. Okay?
12     A. Okay.
13     Q. If you answer my question, I will assume you
14 understood it. Is that fair?
15     A. It is fair.
16     Q. Don't want you to guess or speculate. We
17 want your best recollection. But sometimes a question
18 may ask for an estimate. For example, if I were to ask
19 you a question as to how long was a machine in
20 operation, say, and you may not have a specific how
21 many years but, well, maybe five to ten years, you have
22 a right to give an estimate if that's the best of your
23 recollection. That's what we want. If you have an
24 estimate, you are free to give it, but we just don't
25 want you to guess. Okay?

Page 8

1      A. That's fine.
2      Q. Before we get into the deposition itself,
3  just some background information.
4          What is your date of birth?
5      A. April 2nd, 1942.
6      Q. And where were you born?
7      A. Honolulu, Hawaii.
8      Q. Education briefly?
9      A. I had high school, of course, and I had some
10 college.
11     Q. Where did you go to high school?
12     A. Punahou.
13     Q. What year did you graduate Punahou?
14     A. 1960. I didn't actually graduate from
15 Punahou. I graduated from Oxford Academy, but I
16 attended Punahou through my sophomore year.
17     Q. What is the current residence address?
18     A. 2101 Nuuanu Avenue, Apartment PHA4.
19     Q. My understanding is that at one point in
20 time you had been working for -- I'm not fully aware of
21 the corporate setup or the actual name of the company,
22 but it was Simon Mattress. Is Simons Mattress dba
23 Serta, or what is the company name actually?
24         MR. O'NEILL: At what point in time?
25     Q. BY MR. YAMAMURA: I guess when you were

Page 9

1  working there.
2          MR. O'NEILL: Well, you probably want to ask
3  him about his different capacities at the company.
4      Q. BY MR. YAMAMURA: I guess what I want to get
5  is just a brief history, because I understand that the
6  last couple of years the company had gone through
7  bankruptcy, had some kind of proceeding happening, and
8  I'm just wondering in terms of the actual corporate
9  name or the actual entity, legal entity, involved. Is
10 it Simon Mattress? Is it Serta? Maybe you can just
11 clarify for me.
12         MR. O'NEILL: I would suggest -- I'm trying
13 to avoid objecting. Why don't you start with as of
14 January 2001.
15         THE WITNESS: I don't remember all the dates
16 when these things happened.
17         MR. O'NEILL: As of the time of this
18 accident.
19     Q. BY MR. YAMAMURA: That's fair. As of the
20 time of this accident, January of 2001, I understand
21 you were still employed at Simon Mattress, or whatever
22 entity it was then?
23     A. I'm not really definite, but I was thinking
24 about this. I think that Simon Mattress had already
25 sold to Sleepmaster, LLC.

### Page 10

1   Q. My understanding is there was some basic
2 selling, buying of companies, that kind of stuff.
3   A. Right.
4   Q. What is the location of the business?
5   A. 94-134 Leowaena Street, Waipahu.
6   Q. And when we talk about the business, I'm
7 talking about the entity operating out of that specific
8 location. Okay?
9   A. Okay.
10   Q. We'll call it the Waipahu location. Is
11 there any other location for mattress manufacturing
12 that that entity had besides the Waipahu one?
13   A. In Honolulu or in Hawaii?
14   Q. Honolulu.
15   A. No.
16   Q. We'll focus on by location, then. When did
17 you first start working at that location?
18   A. This is again since 2001?
19   Q. I guess what I'm trying to find out is when
20 did you first start working for the entity that was
21 operating out of the Waipahu location?
22   A. Maybe I better go back and explain.
23   Q. Sure. Why don't you.
24   A. I started working for Coyne Mattress
25 Company.

### Page 11

1   Q. C-O-Y-N-E?
2   A. C-O-Y-N-E, in 1962.
3   Q. Okay.
4   A. They were located at 716 Cooke Street. It
5 had been a family business, and we actually when we
6 sold it -- in 1989, we sold it two weeks short of being
7 100 years old.
8   Q. Who did you sell it to in 1989?
9   A. Simon Mattress Manufacturing. We moved to
10 Waipahu in 1973.
11   Q. Okay.
12   A. Simon owned it for a couple years, and then
13 they sold to Sleepmaster, LLC.
14   Q. This would be in the 1970s?
15   A. No. This was after we sold it in 1998.
16   Q. So Coyne Mattress Company on Cooke Street
17 sold a business and the assets and all that stuff --
18   A. Sold the operating business.
19   Q. Operating business to Simon in 1989?
20   A. Yes.
21   Q. In 1989 --
22     MR. O'NEILL: Time out for a second. You've
23 said two dates, you said 1989 and also said 1998.
24 You've used two.
25     THE WITNESS: 1998 is the correct year.

### Page 12

1   Q. BY MR. YAMAMURA: I understand and I don't
2 want to trip you up. Just want to be sure I get the
3 dates right.
4     So Coyne Mattress, you had been working
5 there since 1962, so I would assume just out of high
6 school?
7   A. Uh-huh.
8   Q. Family business?
9   A. Uh-huh.
10   Q. Is that "yes"?
11   A. That's a yes.
12   Q. Is that your folks' business, your parents'
13 business?
14   A. It was my parents' and grandparents'.
15   Q. What was your dad's name?
16   A. Benjamin A. Lee.
17   Q. And he started the company?
18   A. It was started in 1898 by my step-great
19 grandfather.
20   Q. 1898 or 1998?
21   A. 1898.
22   Q. So long history back in -- this is a Hawaii
23 company basically?
24   A. Yes, it is.
25   Q. So 1962, you started working at Coyne

### Page 13

1 Mattress, which is a family business. So business was
2 -- operating business was sold to Simon in 1989?
3   A. 1998.
4   Q. 1998, okay. But in between then, there was
5 a move to Waipahu in 1973?
6   A. That's correct.
7   Q. So Coyne moved to Waipahu in 1973?
8   A. That's correct.
9   Q. I see. Okay. And then if there operated
10 the company till about 1998, sold it to Simon, and
11 Simon operated it for how many years?
12   A. I think about two.
13   Q. And then sold it to -- you mentioned LLC?
14   A. Sleepmaster, LLC.
15   Q. And maybe you could explain this. Is
16 Sleepmaster the parent company for Serta Mattress?
17   A. Sleepmaster, LLC, was a company that was --
18 it was basically the New Jersey factory, got a whole
19 bunch of investors together and bought up different
20 Serta franchises all around the country.
21   Q. As I understand it, Serta is a franchisor
22 around the country?
23   A. Yes.
24   Q. And how is it that Serta franchise was
25 involved with Simon here?

### Page 14

1  A. Simon was a franchisee in Seattle, San
2 Francisco and Hawaii.
3  Q. Of Serta Mattress?
4  A. After we sold. Right.
5  Q. So after -- if Simon operated for a couple
6 of years, would that be about from 1998 to 2000
7 approximately?
8  A. I'm not sure of the date. I know that it
9 was prior to the accident, though.
10  Q. But in terms of when the accident happened,
11 which was 2001, January of 2001, was it Sleepmaster or
12 Simon who was operating the factory?
13  A. Sleepmaster operated under the name Simon.
14  Q. So Sleepmaster had purchased Simon?
15  A. Right.
16  Q. Here as well as Seattle?
17  A. And San Francisco.
18  Q. And San Francisco, okay. So basically
19 Sleepmaster had purchased Simon. Simon was still
20 operating the factory under the Serta name?
21  A. That's correct.
22  MR. O'NEILL: Under the Serta or Simon name?
23  THE WITNESS: Serta name. Serta was the
24 product that we manufactured.
25  Q. BY MR. YAMAMURA: Just so I understand --

### Page 15

1  A. Serta is a national brand. They franchise
2 certain areas. Simon owned three of those areas after
3 we sold to them, three of the licensees after we sold
4 to them. They sold those three licensees to
5 Sleepmaster.
6  Q. So it is sort of like the product is made
7 locally but you got your national brand on it?
8  A. That's correct. Serta, Inc., was designed
9 to set product specifications, do national advertising,
10 quality control, research and development. It was a
11 nonprofit. Serta, Inc., is a nonprofit. Each
12 shareholder -- each licensee owns a share of Serta.
13  Q. So I would imagine the company being started
14 -- original company, that is Coyne Mattress, started in
15 1898, that your grandfather was involved in the
16 beginning of that; fair to say?
17  A. No. He didn't get involved until around
18 1940.
19  Q. Great grandfather?
20  A. Mr. Coyne got very upset with the state tax
21 laws and amount he had to pay in taxes. So he closed
22 down -- it actually was originally Coyne Furniture
23 Company, and at one time they had half of the ground
24 floor of the Alexander Young Hotel as their showroom.
25 And they did carpets, they did draperies, they did the

### Page 16

1 whole gamut. They imported a lot of furniture from the
2 Orient.
3  Q. I'm curious --
4  A. So in 1940, my grandfather and father bought
5 out just the mattress operation, and the rest of it was
6 closed. At that time it was located down in Iwilei.
7  Q. And that's how the name Coyne Mattress
8 developed?
9  A. That's correct. It was Mr. Coyne.
10  Q. So it was a subsidiary or a part of the
11 Coyne Furniture Company basically, something like that;
12 is that how it worked?
13  A. Well, it was Coyne Furniture, but when my
14 grandfather and father bought it, it became Coyne
15 Mattress Company. The Coyne Furniture went away.
16  Q. I would assume this Mr. Coyne is the same
17 Coyne they named the street after out in Moiliili side?
18  A. I believe it is.
19  Q. Getting back to my question, so back in
20 January of 2001, is it your best recollection that
21 Sleepmaster, LLC, through Simon operated the factory in
22 Waipahu?
23  A. That is correct.
24  Q. So Simon, in terms of the actual operations,
25 was the same people, meaning -- in other words,

### Page 17

1 Sleepmaster didn't go in, bring their own people, get
2 rid of everyone else. What was the situation?
3  A. Sleepmaster came in and they -- Simon
4 Mattress was headed by a fellow named Donald Simon.
5  Q. Locally here?
6  A. No. This is in San Francisco.
7  Q. Okay.
8  A. After Sleepmaster, LLC, bought, he was let
9 go after about six months, and they brought someone in
10 from the East Coast to oversee that operation --
11 actually the person oversaw all three operations
12 basically.
13  Q. I'm trying to get an idea, and maybe you can
14 help because you seem to have a history with the
15 company. In terms of the operational aspects of the
16 factory itself, the actual manufacturing process and
17 that particular operation -- not talking about sales or
18 distribution, those types, but actual manufacturing,
19 use of the machinery -- who would have been the best
20 person to have the most knowledge about that operation?
21  A. I was the operations manager here.
22  Q. How were you operations manager at the
23 location?
24  A. Since 1998.
25  Q. When did you retire -- or did you retire?

### Page 18

1  A. I was downsized about two months before they
2  filed for bankruptcy.
3  Q. When did they file for bankruptcy?
4  A. I don't remember the date.
5  Q. Was it before or after the accident, if you
6  know?
7  A. I think -- well, I believe I was terminated
8  three-and-a-half years ago in October.
9  Q. So --
10 A. I think they filed for bankruptcy that
11 December.
12       MR. O'NEILL: That sounds to me like you
13 were terminated in April 2002.
14 A. It was October.
15 Q. BY MR. YAMAMURA: October?
16 A. October.
17 Q. Approximately October of 2002 is when you
18 were terminated?
19 A. It was October 2nd. The day I made
20 59-and-a-half, I could draw down my retirement.
21 Q. Looking at the simple math here, looks like
22 you were let go in October of 2002?
23 A. Okay.
24 Q. So from 1998 to October 2002, you were the
25 operations manager. Prior to you being operations

### Page 19

1  manager, who was the operations manager for that
2  operation? That would have been, I presume, before it
3  was sold.
4  A. Okay. There was -- I was president of the
5  corporation. I wasn't necessarily -- I didn't have the
6  title of operations manager.
7  Q. Because from my understanding Coyne Mattress
8  started in 1962 and was run on its own till 1998 when
9  it was sold?
10 A. Started in 1940.
11 Q. Sorry, 1940. But you were with Coyne
12 Mattress from 1962?
13 A. That's correct.
14 Q. Coyne Mattress stayed in operation until it
15 was sold in 1998. During that period of time, talking
16 about 1962 to 1998 from when you were there, who was
17 operations manager for Coyne Mattress?
18 A. There was no one under that specific title.
19 Q. In this case -- that's why I'm going back to
20 those years. In this case, there is some suggestion or
21 some evidence to suggest that the machine, the cutting
22 table that was involved in the accident -- when I use
23 the term "cutting table," I'm referring to the cutting
24 table involved in the accident, okay, for just brevity.
25 A. All right.

### Page 20

1  Q. That machine was purchased by Coyne Mattress
2  back in the 1960s?
3  A. That sounds right.
4  Q. And correct me if I'm wrong, but talking
5  with people in the industry, that type of machinery,
6  that type of cutting table back in the 1960s was pretty
7  much a very specific type of machinery used only for
8  that type of work, for mattress manufacturing?
9  A. I can't think of any other industry --
10 Q. That would use it?
11 A. -- well, no, there was some -- I do know
12 there was people here that made slip covers for like
13 rattan furniture. They used a similar type table.
14 Q. And that was just for cutting materials?
15 A. That's correct.
16 Q. Do you recall actually having the table
17 delivered and set up at the premises at Coyne Mattress?
18 A. Yeah, I do.
19 Q. Tell me about that. What do you recall?
20 A. I just remember it came in and we set it up.
21 Q. You assembled it and everything?
22 A. Prior to that, we had a kind of a homemade
23 version. It was much smaller. Mattress material came
24 56-inches wide, which was the width of a basic double
25 bed. In the 1960s and 1970s, queens and king size

### Page 21

1  became more prevalent and we needed a wider table.
2  That particular table was built to handle material
3  86-inches wide, which would be wide enough for a
4  king-sized bed.
5  Q. As I understand it, this was something that
6  within at least the mattress manufacturing industry is
7  a very specific machine or tool used in that industry,
8  correct?
9  A. I would say that's true. Only other
10 industry I would think that might use it would be the
11 bedspread industry.
12 Q. Pune'e covers, that type of thing?
13 A. Yes.
14 Q. Still related to very specific industry, not
15 like a machine you can use for anything else beyond
16 covers and mattress making?
17 A. No.
18 Q. And those types of machines are normally
19 sold to the manufactures themselves of the bedding
20 companies?
21 A. That's correct.
22 Q. And manufactures themselves have knowledge
23 of how these machines work because it is a kind of
24 sophisticated machine for the end user, correct?
25       MR. O'NEILL: Let me object. Vague and

Gendrow v. Simon Mattress          Multi-Page™                    Donald Erwin Lee
                                                                   May 25, 2005

### Page 22

1  ambiguous.
2      Q. BY MR. YAMAMURA: Do you understand what I'm
3  saying?
4      MR. O'NEILL: You can go ahead and answer.
5  I just noted that for the record.
6      A. I wouldn't consider it very sophisticated.
7      Q. BY MR. YAMAMURA: All I'm saying --
8      A. There is a lot of other equipment that's
9  much more sophisticated than that.
10     Q. In terms of the machinery itself and type of
11 design, that has been around the industry for a long
12 time; I understand from the 1940s, correct?
13     MR. O'NEILL: Objection. Found,
14 speculation.
15     Q. BY MR. YAMAMURA: The basic design for a
16 cutting table has been around since the 1940s?
17     MR. O'NEILL: Same objection.
18     Q. BY MR. YAMAMURA: Go ahead.
19     MR. O'NEILL: Go ahead and answer.
20     A. The other one we had was similar.
21     Q. BY MR. YAMAMURA: Similar in operation and
22 similar in design?
23     A. Similar in design.
24     Q. As I understand, I represent James Cash
25 Machine Company, and Mr. Cash, James Cash at least, was

### Page 23

1  one back in the 1930s right after -- he explained --
2  not James Cash but his son explained to me that until
3  the 1940s bedding was made with this kind of wiry
4  material, and box springs didn't come out until after
5  the war, from what I understand, and the whole industry
6  kind of changed because it needed different machinery.
7  In the old days they stuffed it with this wire thing --
8  I don't know what they call it -- and that changed
9  dramatically when the box spring came out.
10        I'm just trying to get a historical type of
11 perspective.
12     A. I don't know what you are referring to.
13     Q. Anyway, in terms of the cutting table
14 itself, those of you at Coyne as well as Simon had
15 exposure and experience with these types of machines
16 before in terms of design and function?
17     MR. O'NEILL: Overly broad.
18     A. I would say that was enough different from
19 the one we had that it would be considered
20 substantially different.
21     Q. BY MR. YAMAMURA: How would it be different?
22     A. One we had, like I said, was much smaller,
23 didn't have any motors, was strictly hand-operated.
24     Q. I see. The ones you had were mechanical,
25 not motorized?

### Page 24

1      A. That's correct.
2      Q. But in terms of how the machine actually
3  functioned in terms of spreading the cloth and pinning
4  and cutting, was it the same?
5      MR. O'NEILL: Overly broad.
6      A. Similar.
7      Q. BY MR. YAMAMURA: You helped set the machine
8  up in 1960-what; do you recall what year?
9      MR. O'NEILL: Misstates testimony. I don't
10 know that he said he helped --
11     MR. YAMAMURA: He said he helped assemble
12 it.
13     A. I didn't say I helped assemble it. I
14 remember when it came. I didn't help set it up.
15     Q. BY MR. YAMAMURA: Oh, I thought you said you
16 helped assemble it.
17     MR. BOUSLOG: I think he used maybe sort of
18 a vague term, he said "we".
19     Q. BY MR. YAMAMURA: That's fine. It is a
20 generic "we." That's fine. Also the generic "you."
21 When you set up the machine, who set it up?
22     MR. O'NEILL: Don't I have to say vague and
23 ambiguous when you say the generic "you"? I've heard
24 of brand name "you," generic "you". They all have the
25 same function.

### Page 25

1      Q. BY MR. YAMAMURA: Who set it up; do you
2  recall?
3      A. No, I don't.
4      Q. And fair to say that it was set up
5  sometime -- about what year was it set up?
6      A. I would say in the late 1960s.
7      Q. And it was in operation?
8      A. Yes.
9      Q. It was in operation, as I understood, from
10 the late 1960s up until the time of the accident?
11     A. That's correct.
12     Q. We'll get into that area a little later.
13 Suffice it to say this was a motorized-powered cutting
14 table?
15     A. That's correct.
16     Q. Are you familiar also with pneumatic-powered
17 cutting tables?
18     A. No.
19     Q. Are you familiar with James Cash Machine
20 Company?
21     A. Yes, I know of them.
22     Q. How do you know about them? Tell me what
23 you know.
24     A. I know they manufacture equipment for the
25 bedding industry, several different types of equipment,

### Page 26

1  and we had bought other equipment from them.
2     Q. What kind of equipment have you bought from
3  them?
4     A. Tape edge machine, the one that puts the
5  tape around the mattress, seals it up. I believe we
6  bought a quilting machine from them.
7     Q. Anything else you can recall, just off the
8  top of your head?
9     A. Those are specific ones.
10    Q. Do you have any familiarity with the name
11 DRC Corporation or David R. Cash Corporation?
12    A. I may have heard of it but not --
13    Q. Your familiarity in terms of the machinery
14 manufacturer is James Cash Machine Company?
15    A. That's correct.
16    Q. These machines that you bought from Cash,
17 would that have been in the 1960s also?
18       MR. O'NEILL: You mean the tape edge and
19 quilting?
20    Q. BY MR. YAMAMURA: Tape edge and quilting.
21    A. Probably after that. Quilting we may have
22 bought in the 1960s, but tape edge, I think we bought
23 after.
24    Q. What is the function of the tape edge
25 machine briefly?

### Page 27

1     A. Put the tape around the mattress and seal it
2  up.
3     Q. The mattress itself in terms of the
4  materials and all that?
5     A. Mattress is made like a sandwich. There is
6  a spring unit, and then there is layers of upholstery,
7  and then the cover goes on. There is a flange that's
8  hog-ringed to the coils of the mattress all the way
9  around. So you've got the top and the bottom, and
10 there is the border that's put around the mattress, and
11 then tape edge is sewn to seal up the mattress.
12    Q. Is that pretty standard for the industry
13 manufacturing?
14    A. Absolutely.
15    Q. I take it the quilting machines put quilts
16 into the mattress cover itself?
17    A. The quilting machine Cash manufactured
18 wasn't the type that does quilts like for bedspreads.
19 It was one where you put all the ingredients together
20 in a layer and then it sewed the whole works together.
21 So you just laid that on top of the spring unit and
22 then closed it the same way.
23    Q. And from the time it was -- the machine was
24 in operation back in the late 1960s up until the
25 accident, I understand that it was in operation every

### Page 28

1  day, daily use?
2     A. Initially, yes.
3     Q. Was there a period of time when the company
4  -- I'm going to refer to whatever company was operating
5  Waipahu -- bought other types of machinery to do the
6  same function as this cutting table?
7     A. Yes.
8     Q. I assume the cutting table itself that was
9  designed back then and first manufactured back in the
10 1960s was becoming obsolete, basically was too slow?
11    A. That's correct.
12    Q. When did you buy replacement machinery to
13 sort of upgrade the machinery in terms of the cutting
14 table?
15    A. I have no idea on the date.
16    Q. Would it have been before the accident?
17    A. Yes.
18    Q. So by the time of the accident, the cutting
19 table involved in the accident was sort of just used on
20 a partial basis?
21    A. Sporadically.
22    Q. And you had other machines doing the same
23 function, just was more modern?
24    A. That's correct.
25       MR. YAMAMURA: I want to just take a short

### Page 29

1  break, if that's okay with you.
2        THE WITNESS: Fine.
3        (Recess from 9:40 a.m. to 9:54 a.m.)
4        MR. YAMAMURA: Back on the record.
5     Q. BY MR. YAMAMURA: What school did you
6  graduate from?
7     A. Oxford Academy.
8     Q. In England?
9     A. No, New Jersey.
10    Q. Was it that your family had moved away and
11 come back?
12    A. No. I had too much fun surfing here.
13    Q. You were sent away to school?
14    A. I was sent away as far as they could send
15 me.
16    Q. Let's focus back on the time when the
17 machine had been delivered to the premises. This is,
18 as I understand it, on Cooke Street?
19    A. 716 Cooke Street.
20    Q. And let's speak to the time it was being
21 assembled. Do you have a specific recollection of who
22 was involved in assembling the machine?
23    A. No, I don't, but I believe there was almost
24 no assembly required. It came in a crate and just had
25 to uncrate it and get an electrician to wire it in.

## Page 30

1  Q. As I understand, the original color of the
2  machine was like an olive drab green?
3  A. That's correct.
4  Q. So it was put into operation back in the
5  late 1960s, and from that time until when the company
6  was moved to Waipahu -- before it moved to Waipahu, was
7  the machine operating as per it should?
8  A. Yes, it was.
9  Q. When the operation was sold and moved to
10 Waipahu, how was the machine moved?
11 A. It wasn't sold and moved to Waipahu. We
12 moved to Waipahu. Company wasn't sold at that time.
13 Q. I'm sorry. So Coyne moved to Waipahu, and
14 when it was there that's when it was purchased by
15 Simon?
16 A. No.
17 Q. I'm sorry. Maybe you can explain that to
18 me.
19 A. We moved to Waipahu in 1973. We had 20,000
20 square feet on Cooke Street and the new factory was
21 68,000. Mattresses are very bulky and require a lot of
22 space. The table was moved to Waipahu, but the company
23 wasn't sold until 1998.
24 Q. So, in other words, what you have is you
25 kind of split your operation; manufacturing had moved

## Page 31

1  to Waipahu?
2  A. Everything moved to Waipahu, and we still
3  owned the Cooke Street property but we rented it out.
4  Q. I thought maybe you had one area for
5  manufacturing and other for distribution and that type
6  of thing, storage?
7  A. No. We rented it out.
8  Q. It was moved to Waipahu in 1973, the
9  operation?
10 A. That's correct.
11 Q. And it remained in operation there until --
12 well, through currently, but remained in operation up
13 until when it was sold and operation was sold in 1998?
14 A. That's correct.
15 Q. When the machinery was moved to Waipahu in
16 1973, did it need to be disassembled?
17 A. No.
18 Q. So it was basically just lifted up, put on a
19 truck and moved over?
20 A. Flatbed.
21 Q. I looked at the photographs of the machine.
22 I had a chance to take a quick look at it a couple of
23 weeks ago, maybe a month ago, and I noticed that the
24 machine -- correct me if I'm wrong -- Serta's sort of
25 corporate color for their offices are blue?

## Page 32

1  A. No, not really. When we moved to Waipahu,
2  we just painted all the equipment blue.
3  Q. And so you also painted the cutting table
4  blue?
5  A. That's correct.
6  Q. When I say "you," I'm talking about Coyne
7  Mattress, correct?
8  A. Not me personally.
9  Q. And when it was painted blue, did you have
10 to do any disassembling to paint it?
11 A. No.
12 Q. All your bedding equipment, manufacturing,
13 it was all painted blue just for, what, for company
14 color sake?
15 A. Right.
16 Q. Now, even currently today, year 2005,
17 machinery is all still blue?
18 A. Not necessarily. We did that initially
19 because it was really built as a show place. It was
20 very modern so we wanted it to look good. I guess for
21 maybe the next ten years we did paint things blue.
22 After that, it stopped.
23 Q. Sort of like a manufacturing showcase, so to
24 speak?
25 A. Right.

## Page 33

1  Q. So people would come by and you'd say, "this
2  is how you make it," and you show them machinery and
3  all this stuff, right?
4  A. That's correct.
5  Q. You mentioned that at the time of the
6  accident -- during the time of the accident, back in
7  January of 2001, that that machine was being used
8  sporadically?
9  A. That's correct.
10 Q. Give me an idea, because I understand at
11 that point in time you already had more modern
12 equipment. What was it used for?
13 A. More modern equipment is basically a table
14 that was taken from the garment industry, and it is
15 just a long table and it has a machine that goes back
16 and forth and lays out the material to about this
17 thickness.
18 Q. To about, oh, four inches, five inches?
19 A. Yeah. And then you have -- put a pattern on
20 it, mark it, and then with a cutter go around and cut
21 it. It is a lot more efficient than the other type.
22 The other one, that particular machine was used for
23 smaller jobs where it didn't require laying it out on
24 the table.
25 Q. When you say "smaller jobs," talking smaller

### Page 34

1  in terms of amount of items or size?
2      A. Items.
3      Q. You have custom bedding you made, too, also?
4      A. We did do odd-sized bedding.
5      Q. Is that what the cutting table is used for,
6  odd-sized bedding and smaller type jobs?
7      A. At the end, pretty much.
8          The industry had changed prior to maybe
9  1990. Top of the box strings were the same material as
10 rest of the mattress and the boxing that went around.
11 After 1990, they came out with maybe three or four
12 colors that they used just on the box spring top, and
13 it was a nonskid material so that the mattress wouldn't
14 slide around. That's when the other machine became
15 practical because you were dealing with only maybe
16 three or four different colors instead of you have a
17 hundred different patterns of material.
18      Q. Do you know Rod Saunders?
19      A. I know of him.
20      Q. So we're at the point where -- let me ask
21 you this: When the machinery was delivered back in the
22 1960s, was anyone from James Cash Machine Company there
23 to help?
24      A. Not that I recollect.
25      Q. To advise.

### Page 35

1          When you said it didn't take much of
2  assembly, but the setup and running of the machine was
3  done all by Coyne people?
4      A. I believe that to be true.
5      Q. In certain manufacturing operations they
6  have certain people who, for example, are in charge of
7  certain aspects of the operation. Is there anybody at
8  the company who was sort of like that was their machine
9  and that was -- they oversaw the operation of that
10 machine, talking about the cutting table?
11     A. You mean who operated the table?
12     Q. Yes, and maybe who -- for example, in car
13 manufacturing you have a painting unit and you have one
14 supervisor who oversees the painting operation, dunking
15 of the cars, that type of stuff.
16         Do you have a similar type of setup?
17     A. Well, there was a gal named Zenaida Mendoza
18 that was kind of in charge of the sewing room, sewing
19 area.
20     Q. And this machine, cutting table, would be
21 part of the sewing room, so to speak?
22     A. That's correct, and she actually was the one
23 that operated that machine. She was also the operator.
24     Q. That's a good subject. Maybe you could
25 break it down for me. You have a sewing room. What

### Page 36

1  other subfunctions do you have within the manufacturing
2  process of the mattress?
3      A. At various times we had all kinds of
4  different ones. There is a mattress assembly section,
5  delivery section. I mentioned we had cotton
6  processing.
7      Q. Right.
8      A. That had been closed by the time this
9  happened. At one time we made our own spring units and
10 we had a spring operation. We had a lumber operation
11 where we made the wood for the box springs.
12         That's pretty much it.
13     Q. Just for the layperson's perspective, the
14 sewing room, what was generally their functions or
15 processes?
16     A. Included in the sewing room would be the
17 quilting machines. Those were like the ones I
18 mentioned we bought from Cash. Those were outdated by
19 that point. Sewing a flange around the edge of the
20 mattress cover, which is what is used to attach to the
21 spring unit after all the layers are put together. The
22 machine that makes the border that goes around the
23 edge.
24     Q. Of the mattress box?
25     A. The finish mattress.

### Page 37

1      Q. Box?
2      A. The boxing, right.
3      Q. Anything else? I just want a general idea.
4      A. Sewing of the box spring covers, put tape
5  around the top of the box spring cover and hem it.
6  That's pretty much it. And cutting.
7      Q. From the time that the machine was delivered
8  and set up for operation in 1960s up to time of the
9  accident, did you ever make inquiry, "you" meaning your
10 company, whatever entity who owned the cutting table --
11 ever have any contact or make inquiry with James Cash
12 Machine Company or DRC concerning the operation of the
13 machine?
14     A. Not that I know of.
15     Q. And would it be fair to say that one of the
16 reasons why is because it is a standard -- operation of
17 the machine is pretty much standard in the industry,
18 cutting table?
19     A. It wasn't a real complicated machine.
20     Q. And you, generically you, you guys knew how
21 it worked?
22     A. Right.
23     Q. And in fact, if anything needed to be
24 maintained on the machine, you guys could do it
25 yourselves?

### Page 38

1  A. Really wasn't maintenance required other
2  than maybe little oil and grease. That was the extent
3  of it.
4  Q. And the oil and grease and that kind of
5  stuff, you had somebody on the site that just could
6  pretty much do that stuff?
7  A. Right.
8  Q. And the oil and grease would be for the
9  pulleys and the moving parts, joints and all that?
10  A. That's correct.
11  Q. Ms. Mendoza, is she still with the company,
12  if you know?
13  A. No. She passed away last year.
14  Q. At the time of the accident back in 2001,
15  who would have been operating that machine; would it
16  have been her?
17  A. Yes.
18  Q. Who else would know about the operation of
19  the machine back in 2001, other than Ms. Mendoza; who
20  would have had contact with that machine?
21  A. Let me think. Elizabeth Agar, she worked
22  with it occasionally.
23  Q. Is she still with the company or still
24  around?
25  A. I don't know.

### Page 39

1  Q. Anyone else you can think of who would have
2  had some contact with the machine in its operation?
3  A. Rizilina Mendoza would also probably. That
4  was Zenaida's sister.
5  Q. Do you know if she's still with the company?
6  A. I think she is, but I'm not sure.
7  Q. Anyone else?
8  A. No.
9  Q. A-G-A-R?
10  A. Right, I think that's the spelling.
11  Q. Back in 2001, January -- accident happened
12  in January, but let's go about 2000, year prior to the
13  accident. How much would that machine be used to make
14  the special beds or smaller orders?
15  A. I don't really know.
16  Q. My understanding is that --
17  A. Two or three times a week has been --
18  Q. My understanding is that the accident
19  happened during the process of replacing the motor in
20  the cutting table?
21  A. That's correct.
22  Q. Was this the first time that the motor had
23  to be replaced?
24  A. Yes.
25  Q. So the motor -- that was the original motor

### Page 40

1  that was being replaced?
2  A. That's correct.
3  Q. From late 1960s up to 2000, it was operating
4  fine?
5  A. The table is not like a normal piece of
6  equipment where a motor runs constantly. During the
7  day, when we used it full time, a motor may run eight,
8  nine times a day, and that's all. So it wasn't like it
9  was heavily used where it would wear out.
10  Q. I'm just curious because I'm not saying the
11  motor is good or bad. I'm just saying that was the
12  original motor that had to be replaced, correct?
13  A. That's correct.
14  Q. At the time of the accident, were you
15  operations manager for Simon?
16  A. Yes, I was.
17  Q. Let me just go back a little bit. I
18  understand that your son also worked for the company?
19  A. Yes, he did.
20  Q. What was your son's name?
21  A. Deral. D-E-R-A-L.
22  Q. And where is he now?
23  A. He is in Honolulu.
24  Q. What is he doing now?
25  A. He is unemployed.

### Page 41

1  Q. Of?
2  A. Unemployed.
3  Q. Oh, unemployed. What was his position back
4  then, 2001, when the accident happened?
5  A. Foreman.
6  Q. For what part of the operation?
7  A. Overall generally. His main duties were
8  scheduling and just making sure the work was put out.
9  Q. The reason I ask that is because our
10  information was that Deral had made the call to A&B
11  Electrical to have the motor replaced?
12  A. That's probably correct.
13  Q. And then -- but he wasn't there when the
14  accident happened but that you were there when the
15  accident happened, and you called A&B and informed them
16  about the accident?
17  A. That's correct. We were running kind of a
18  split shift, so he started early.
19      MR. YAMAMURA: Off the record for a second.
20      (A discussion was held off record.)
21      MR. YAMAMURA: On the record.
22  Q. BY MR. YAMAMURA: I take it you were there
23  -- how were you informed that the accident happened?
24  A. I don't remember actually. I think someone
25  came up from downstairs and told us.

**Page 42**

1    Q. Where were you?
2    A. I was up in the office.
3    Q. In the office. And what was told to you?
4    A. I just overheard them telling the girl to
5 call the ambulance.
6    Q. And what did you do -- when you heard that,
7 what did you do?
8    A. I made sure they called the ambulance and
9 also the fire department, which was only two blocks
10 away.
11    Q. Give me like a narrative. What happened in
12 terms of -- you heard about the accident in the office.
13 Tell me what happens all the way through.
14        MR. O'NEILL: Probably a lot of events, but
15 try the best you can.
16        MR. YAMAMURA: Sure.
17    A. I went downstairs. One of the employees
18 wouldn't let me go in the room. "Don't go in there,"
19 he said.
20    Q. BY MR. YAMAMURA: Do you know which employee
21 this was?
22    A. He was the one I was telling you that was
23 off for two weeks after the accident -- or two months,
24 I think. Sheldon Pomikai.
25    Q. Okay.

**Page 43**

1    A. He apparently had been in the area and dove
2 under the table to try to help him, but there was
3 nothing he could do.
4    Q. Do you know if Sheldon still works for the
5 company?
6    A. I believe he does, but I haven't been out
7 there for a year or so.
8    Q. So his words to you were: "Don't go in
9 there."
10       Then your understanding was he was in the
11 area. Do you know what he was doing in the area?
12    A. No.
13    Q. When the accident happened, he tried to
14 assist or dove under the table to try to lift it, or
15 what did he try to do?
16    A. I don't know.
17    Q. And then to your knowledge, he was the first
18 person from Simon who knew about the accident
19 happening?
20    A. I'm sure all the other girls in the area all
21 knew what had happened.
22    Q. I'm just wondering do you know if Sheldon
23 actually witnessed the accident happen or just that he
24 heard a noise and turned around and there it was?
25    A. I don't know. I don't know.

**Page 44**

1    Q. I understand A&B Electrical during that time
2 was the electrical contractor who did the electrical
3 work for your company?
4    A. That's correct.
5    Q. And as I understand it, is still currently
6 -- they still do your electrical work when needed?
7    A. I have no knowledge of that. I know they
8 did when I was still operations manager after the
9 accident.
10    Q. Did you know Mr. Gendrow?
11    A. Yes.
12    Q. How well did you know him?
13    A. Fairly well.
14    Q. Tell me what did you know about him.
15    A. Well, he had done work for us for a number
16 of years, and he was in our factory probably at least
17 once a month, if not more.
18    Q. Various electrical jobs?
19    A. Various electrical jobs, right.
20    Q. What else; did you have any personal
21 contact, friend, go out?
22    A. I used to talk to him. I didn't know any of
23 his relatives, no, but I used to talk to him when he
24 was in the factory. If I happened to be around there,
25 I would always go by and say hi to him.

**Page 45**

1    Q. What was your impression of Mr. Gendrow in
2 terms of was he a good electrician or --
3    A. I think he was an excellent electrician. We
4 had some very complicated electrical equipment, and he
5 was always able to figure it out.
6    Q. Mr. Lee, I know that you were there after
7 the accident happened. In your mind, can you tell me
8 what you think or how you think this accident happened
9 or why the accident happened?
10        MR. O'NEILL: Please do go ahead, but I have
11 to note two objections. One is speculation. Second
12 would be improper opinion.
13    Q. BY MR. YAMAMURA: Again, I'm just asking
14 from your perspective because I understand, Mr. Lee,
15 you are familiar how the table operates, I'm not, and
16 you were there onsite, unfortunately, when the accident
17 just had happened.
18        Can you tell me, in your mind, what you
19 think? Again, I'm just asking for your opinion, how
20 you think the accident happened.
21        MR. O'NEILL: Same objections.
22        MR. YAMAMURA: You can have a running
23 objection.
24        MR. O'NEILL: Also, I would add to the
25 extent it calls for a legal conclusion.

### Page 46

1        MR. YAMAMURA: Sure. I'm not asking for a
2 legal conclusion.
3        A. What I will tell you is basically hearsay.
4        Q. BY MR. YAMAMURA: Sure.
5        A. There are two motors on that machine. One
6 motor -- because when the table is in the upright
7 position, it is about 90 inches high. And Zenaida was
8 five-feet-three. No way she could lift it. So there
9 was a step that when the table went in the upright
10 position, this step would raise up about 18 inches off
11 the floor, and she would stand on that. The top of the
12 table were pins that would come out, and she would hang
13 the material back and forth on these pins from that
14 step.
15        Once the material was all hung up, she would
16 lower the step, and then bring the table down to a flat
17 position and lay her pattern on it and cut the
18 material. The motor for the step is the one that went
19 bad.
20        So Deral called the electrician, and he came
21 out and he ordered a replacement motor. A motor came
22 in a few days later, and he was called up to come down
23 and install it. Apparently when he got there, the
24 motor he had ordered, because of the configuration of
25 the space it went in, would not fit in that area where

### Page 47

1 the stair motor was. So he apparently decided to
2 switch because it would fit on the one that tilted the
3 table.
4        Q. I see.
5        A. So he was going to take that motor, move it
6 over to the step motor, and put the new motor where the
7 other motor was.
8        Q. To change -- that makes the table go up and
9 down?
10        A. They were both identical motors.
11        Q. But the new motor wouldn't fit on the
12 original to raise the step. So what he was going to do
13 was use the old motor where the chain would raise and
14 lower the table, use that motor to put into the step
15 motor, and then use the new motor for where the chain
16 motor was; is that correct?
17        A. That's what I understood.
18        Q. Go on.
19        A. It was in that process that the accident
20 happened.
21        Q. So, in other words, my understanding is once
22 he -- this is my understanding. Once he had taken off
23 the motor -- the chain motor that raises and lowers the
24 table itself, that table apparatus became freewheeling;
25 is that correct?

### Page 48

1        MR. O'NEILL: I have to object as misstating
2 and foundation, because you said taking off the motor.
3        Q. BY MR. YAMAMURA: My understanding is that
4 the accident happened in the process of him taking off
5 the motor which runs the table horizontal/vertical,
6 disassembling the chain from it, and that's when the
7 table fell on him; is that a fair statement?
8        A. Yeah, I believe -- not necessarily changing
9 the motor but disconnecting it.
10        Q. Because once you take off the chain off of
11 that motor that runs the table vertical/horizontal, the
12 table becomes almost freewheeling; doesn't it, nothing
13 to hold it up or hold it down?
14        A. That's apparently what happened.
15        Q. My understanding also is that after the
16 accident the machine was never put back into operation?
17        A. No.
18        Q. The job was never finished, and it was never
19 -- the machine was never operational after that?
20        A. I think if I put it back in operation, all
21 the sewing girls would have quit.
22        Q. Understood. I'm just curious because when I
23 went out there to look at the machine, there were
24 several parts missing and one of the motors was
25 missing. I'm just curious if you know anything about

### Page 49

1 what happened to the parts with the machine or not.
2        A. I have no idea. Like I said, I haven't been
3 out there for three-and-a-half years. Anything could
4 have happened.
5        Q. Was anybody there from -- let me strike
6 that.
7        Mr. Gendrow was performing this repair to
8 the subject cutting table by himself?
9        A. Yeah. There was no one working with him.
10        Q. He had no assistant with him?
11        A. No.
12        Q. Was anybody there from Simon to assist him
13 with the replacement of the motors or the repair?
14        A. No, I don't believe so. I don't know that
15 for a fact, though. I'm pretty sure there wasn't.
16        Q. Is it the kind of situation where there is a
17 lot of people around, or was that machine at the time
18 it was being repaired sort of in off-the-side area?
19        A. It was in the middle of the sewing room.
20        Q. There were people all around it?
21        A. There were people around.
22        Q. I'm curious, because I guess the reason I
23 ask that question is because you had already said at
24 that time you are using the machine sporadically. I
25 thought maybe it was off in some corner where it is not

### Page 50

1  in the way of everything else.
2     A. Actually, we had moved that machine several
3  times and he had always been the one to do it. So he
4  was very familiar with the machine.
5     Q. When you moved the machine, you have to do
6  the electrics and all that?
7     A. Right.
8     Q. You moved it several times. How many times
9  before the accident had you moved it?
10    A. About three or four.
11    Q. And each time, he had to come out and get
12 involved with connecting the electricals and all that?
13    A. Uh-huh.
14    Q. Is that correct?
15    A. That's correct.
16    Q. He was also involved, as I understand --
17 strike that.
18       So during those times that he helped move
19 machines or was involved in moving of the machines --
20 and I think your testimony was, from your knowledge,
21 Mr. Gendrow was quite knowledgeable or knowledgeable
22 about how the machine operated and how it worked?
23    A. Yes, definitely.
24    Q. So in terms of what your hypothesis or
25 opinion is as to how the accident happened, it happened

### Page 51

1  during the time he was trying to disassemble -- I'll
2  call it the table-raising-and-lowering motor?
3     A. The table-tilting motor.
4     Q. Table-tilting motor, that would be better.
5        The reason why he was going to do that was
6  because he had to replace the step-raising motor, and
7  the replacement motor that was ordered did not fit in
8  that position, so he got the motor -- was going to use
9  the motor from the table-tilting motor, put it in a
10 step-raising position and use the new replacement motor
11 in the table-tilting motor position?
12    A. That's correct.
13    Q. Do you know how long he had been working on
14 the machine before the accident happened?
15       MR. O'NEILL: You mean that day?
16    Q. BY MR. YAMAMURA: That day.
17    A. It would just be a guess, maybe an hour, 45
18 minutes.
19    Q. At any time did Mr. Gendrow ask for
20 assistance from anybody in your staff in terms of
21 helping with the repair?
22    A. I have no idea.
23    Q. At any time did anybody in your staff or
24 operations people offer to assist Mr. Gendrow in the
25 repair of the machine?

### Page 52

1     A. I really doubt it because, like I said, he
2  was out there all the time and he knew all the
3  equipment, and he really didn't need any help.
4     Q. Again, like you testified, Mr. Gendrow, as
5  far as your understanding is, would be familiar with
6  the operation and how the machine worked and everything
7  else, correct?
8     A. Yes, basically every machine we had.
9     Q. So you say he worked pretty much on every
10 machine you guys had out there?
11    A. At one time or another, yeah.
12    Q. He had been out there -- how long had he
13 been the electrician, your electrician for that?
14    A. I'm guessing eight or nine years.
15    Q. As I understand it, A&B -- you are one of
16 A&B's larger accounts, and Mr. Gendrow, who was like a
17 senior electrician, was sort of assigned to take care
18 of you guys?
19    A. He usually came out. Occasionally they
20 would send someone else if he was on another job.
21    Q. But he was the main man?
22    A. Most of the time he came.
23    Q. He was the main man from A&B Electrical to
24 do any kind of electrical work that you guys had to
25 have done?

### Page 53

1     A. Right.
2     Q. Do you know what lockdown tag out is?
3     A. Yes, I do.
4     Q. Explain that to me, what you know about it.
5  What is it?
6     A. If you are working on a machine, you are
7  supposed to tag out the use of electrical power and
8  also other types of energy so that someone doesn't come
9  up and turn a switch and start a machine while you are
10 working on it basically, that type of thing.
11    Q. And when you say -- you are talking about
12 stored energy?
13    A. Right.
14    Q. Stored energy can be, for example, if you
15 have some kind of electrical component and there is
16 some residue electricity in it, and you turn it on
17 thinking it is unplugged and it zaps you or something
18 like that; that's what we're talking about?
19    A. That would probably be one case, yeah.
20    Q. And the other case of stored energy would be
21 where like if, for example, a pendulum in an up
22 position, the stored energy in up position, and
23 releases it as it moves back and forth?
24    A. That would be another.
25    Q. Were there any lockdown tag out procedures

## Page 54

1  for the use of this cutting table that you guys had?
2    A. Only ones were electrical.
3    Q. In other words, the lockdown tag out was
4  basically to unplug it?
5    A. It was hardwired in. It had to be tagged
6  out at the switch box.
7    Q. And when, to your knowledge -- this is maybe
8  after the accident -- when Mr. Gendrow was working on
9  that table, was it lockdown tagged out?
10    A. There again, it is hearsay, but I understand
11  it was, and he was pretty good at that.
12    Q. He was an experienced electrician, so he
13  knew that?
14    A. Yes.
15    Q. I understand that A&B Electrical had an OSHA
16  violation cited from this particular incident. Do you
17  have any understanding of that?
18    A. I don't know anything about that.
19    Q. Did your company have any kind of OSHA
20  investigation conducted?
21    MR. O'NEILL: I would note an objection
22  based on H.R.S. Section 396-14 as to discovery of OSHA.
23  I'm not going to instruct him not to answer, at this
24  point at least, but I do think the statute is pretty
25  clear on the topic.

## Page 55

1    MR. YAMAMURA: I understand what you are
2  saying, Ralph. But I think that goes to OSHA itself as
3  opposed to people they investigate, that that's
4  discoverable. In terms of OSHA investigations, I agree
5  there is some protection there. But that's fine.
6    Q. BY MR. YAMAMURA: Did OSHA investigate any
7  part of your company as a result of this incident?
8    A. One of the things you are required to do as
9  an employer if there is a bad accident, as soon as you
10  call the ambulance and the other, you call OSHA, which
11  I did.
12    Q. Did they actually come down --
13    MR. O'NEILL: Why don't we do this to make
14  it more efficient. If I could have a running objection
15  on the basis stated.
16    MR. YAMAMURA: Sure.
17    MR. O'NEILL: If I have any additional
18  objections, I'll state them. Otherwise, the whole area
19  will be covered by 396-14.
20    MR. YAMAMURA: No problem.
21    Q. BY MR. YAMAMURA: What happened when the
22  OSHA people came down?
23    A. It took quite a while. I got an answering
24  service when I called them. I guess it was a couple
25  hours later, a young fellow called and came out, and

## Page 56

1  took him a while because he had to come from Aina
2  Haina, and he did an initial investigation, took
3  photographs. That was it.
4    Q. So in terms of OSHA involvement, you are the
5  one who called OSHA?
6    A. Yes.
7    Q. It wasn't A&B, to your knowledge?
8    A. No. Well, they may have called, too, but I
9  did call.
10    Q. Was he there before or after the police, if
11  you know?
12    A. I'm not positive, but I imagine the police
13  were there first because he did take quite a while.
14    Q. In sort of the timeline of things, ambulance
15  was called, police were called also?
16    A. No, I didn't call the police. Well, someone
17  else in the office may have.
18    Q. Do you know who first arrived in terms of
19  follow-up, who arrived first; ambulance, police, OSHA?
20    A. Ambulance and fire.
21    Q. Ambulance and fire came. We know the police
22  were there eventually?
23    A. Right.
24    Q. Then would it be fair to say maybe the
25  fourth entity to be there for investigative or care

## Page 57

1  purposes was OSHA?
2    A. I'm trying to remember all the people that
3  were there. I guess so.
4    Q. When the OSHA person was there, was Mr.
5  Gendrow still entangled in the machine?
6    A. Yes.
7    Q. How was he eventually released from the
8  machine?
9    A. He wasn't released until after the medical
10  examiner came.
11    Q. So medical examiner came to the scene and
12  determined that he had expired?
13    A. Yes.
14    Q. And then he was released, physically
15  released?
16    A. Yes.
17    Q. How was he physically released from the
18  machine?
19    A. They lifted the table up.
20    Q. Who is "they"?
21    A. I don't know. The firemen, whoever was
22  still there.
23    Q. Do you know if it was manual or --
24    A. Manual.
25    Q. Reason why I ask that is because there was

Gendrow v. Simon Mattress                Multi-Page™                    Donald Erwin Lee
                                                                        May 25, 2005

Page 58

1  some suggestion that A&B had sent out -- subsequent to
2  the accident sent out a person to complete the repair
3  so that the table could be lifted off of Mr. Gendrow;
4  in other words, put the motor back in and start it up
5  so you could lift the table. I don't know if that's
6  exact or not.
7     A. It is possible, but I have no knowledge of
8  that.
9     Q. Police arrive, fire, rescue, and eventually
10 -- is it the same day that he is released from the
11 machine?
12    A. Oh, yeah.
13    Q. And I also note from the OSHA records with
14 A&B Electrical they had to pay for environmental
15 cleanup because there was blood on the machinery area;
16 do you recall that?
17    A. Yes. There was quite a bit of blood.
18    Q. That had to be cleaned up environmentally
19 because it was a blood situation. So A&B Electrical
20 paid for the cleanup of the blood on the machinery?
21    A. That's correct.
22    Q. Machinery, as it sat there, when was it --
23 was it eventually moved to some corner in the
24 warehouse?
25    A. Yes.

Page 59

1     Q. When was it moved?
2     A. I think it was the next day.
3     Q. And what part of the warehouse was it moved
4  to?
5     A. It was moved into an area in the warehouse
6  section.
7     Q. I'm trying to recall was it moved back to
8  the Diamond Head, makai side of the warehouse?
9     A. You have been out there. You know where the
10 loading doors are?
11    Q. Yes.
12    A. It was moved right next to them.
13    Q. Okay. You are talking about the loading
14 doors that are on sort of the Diamond Head side of the
15 building?
16    A. Yes.
17    Q. And initially that's where it was just moved
18 and stored?
19    A. Right.
20    Q. When I was out there also, I noticed that
21 the table itself had been tied up with rope, chain and
22 rope. Do you know who did that?
23    A. Fire people, I think.
24    Q. Nobody from Simon?
25    A. I don't know. I have no idea.

Page 60

1     Q. It was secured somehow with some kind of
2  binding. I'm just curious who did that. You think
3  possibly the fire people?
4     A. Could have been anybody.
5     Q. So it was you who called A&B and told them
6  about the accident?
7     A. Yes.
8     Q. What did you tell them?
9     A. I just told them there has been a very bad
10 accident, and they said they would be right out.
11    Q. Who came out?
12    A. The owner.
13    Q. What was his name again?
14    A. I don't remember. I didn't have any dealing
15 with him.
16       MR. BOUSLOG: Malcom Barcarse.
17       THE WITNESS: I believe so. I believe
18 that's his name.
19    Q. BY MR. YAMAMURA: Did he come out to the
20 scene itself?
21    A. That's correct.
22    Q. Was Mr. Gendrow still in the machine when he
23 came out?
24    A. Yes.
25    Q. Did he kind of say, "What happened?" Or

Page 61

1  what discussion took place during that time?
2     A. I don't remember much of a discussion with
3  him. I know I talked to him, but I don't remember what
4  we talked about.
5     Q. Do you recall any specifics in terms of what
6  he told you; in other words, whether he said --
7     A. "This is terrible," you know, but that's all
8  I remember specifically that he said.
9     Q. Did you have any discussions with police or
10 fire people about the accident?
11    A. No, not particularly.
12    Q. How about any discussions specifically --
13       MR. YAMAMURA: You have a running objection,
14 Ralph.
15    Q. BY MR. YAMAMURA: Any specific discussions
16 with the OSHA investigator?
17    A. No.
18    Q. Other than your attorneys, have you had any
19 other discussions concerning the accident and your
20 knowledge of the accident with anyone else?
21    A. Of course, I discussed it with the people
22 back in San Francisco, my superiors. I can't think of
23 anyone. I told other people about it, but not having
24 anything to do with the accident itself, per se.
25    Q. Have you ever discussed this matter or

POWERS & ASSOCIATES                                     Page 58 - Page 61

## Page 62

1  anything relating to this matter with anyone from DRC
2  or James Cash Machine Company?
3     A. No. I've had no contact with them.
4     Q. Did you go to the funeral?
5     A. Yes, I did.
6     Q. Do you know who gave the eulogy?
7     A. I don't remember.
8     Q. Any discussions with his wife about the
9  accident, what happened?
10    A. After the funeral was over, I went up and
11 told her how very sorry I was and everything.
12    Q. Condolences?
13    A. Yeah.
14    Q. Did you ever discuss in terms of -- did she
15 ask you or you ask her -- did she ask you or anyone ask
16 you from her family what happened?
17    A. My brother worked at the company as a
18 contract salesman.
19    Q. For?
20    A. For Serta, for the company.
21    Q. Serta, okay.
22    A. I guess -- again, it is basically hearsay,
23 but I believe he told me I think it was either his
24 daughters and maybe his wife came down to the factory
25 and wanted to see the machine, and he talked them out

## Page 63

1  of it. He said it wouldn't solve anything. She wanted
2  to see the area. I think he showed her the area, but
3  it had all been cleaned up then and was nothing.
4     Q. Your brother, what's his name?
5     A. David.
6     Q. Is he still with the company or doing
7  something else?
8     A. He is an outside contractor to the company.
9     Q. Outside sales?
10    A. Yes.
11    MR. YAMAMURA: Off the record.
12    (A discussion was held off record.)
13    MR. YAMAMURA: Another quick break.
14    (Recess from 10:40 a.m. to 10:52 a.m.)
15    MR. YAMAMURA: Back on the record.
16    Mr. O'Neill, you have a running objection to
17 this line of questions. I know you will have an
18 objection.
19    Q. BY MR. YAMAMURA: Mr. Lee, one of the
20 reasons I'm involved in this case is because Simon
21 Manufacturing/Serta's lawyer brought a claim against
22 James Cash Machine Company, as well as DRC, claiming
23 that the table, the subject cutting table, involved in
24 the incident was somehow defective, just to give you
25 background information as to why I'm particularly in

## Page 64

1  this case.
2        What I would like to ask you, sir, is:
3  Based upon your knowledge of the machine and its
4  operation and the history of the machine, do you, sir,
5  have an opinion as to whether or not that table was in
6  fact defective?
7        MR. O'NEILL: Let me interpose my objection,
8  and then you can go ahead. Foundation, speculation,
9  improper opinion and legal conclusion.
10       MR. YAMAMURA: Can I have the question read
11 back, or do you understand?
12       THE WITNESS: Why don't you read it back.
13       MR. YAMAMURA: Sure.
14       (The reporter read the record as follows:
15 Question: Mr. Lee, one of the reasons I'm involved in
16 this case is because Simon Manufacturing/Serta's lawyer
17 brought a claim against James Cash Machine Company, as
18 well as DRC, claiming that the table, the subject
19 cutting table, involved in the incident was somehow
20 defective, just to give you background information as
21 to why I'm particularly in this case.
22       What I would like to ask you, sir, is:
23 Based upon your knowledge of the machine and its
24 operation and the history of the machine, do you, sir,
25 have an opinion as to whether or not that table was in

## Page 65

1  fact defective?)
2        MR. YAMAMURA: You have a running objection
3  to these questions.
4     A. As far as the operation of the machine to do
5  the job for which it was purchased, it was fine.
6     Q. BY MR. YAMAMURA: Answer to my question is:
7  No, you have no opinion as to whether it was defective;
8  in your mind, it wasn't defective, in other words?
9     A. It did the operation for which it was
10 purchased.
11    Q. So the answer to my question would be that:
12 No, from your knowledge of it, the machine was not
13 defective; is that correct?
14    A. It did the job for which it was purchased.
15 That's my answer.
16    Q. Okay. Have you ever discussed with anyone,
17 whether it be -- except for your lawyers, and with the
18 understanding and knowledge Mr. Gendrow had a working
19 knowledge of how the machine operated mechanically --
20 that's what you testified, that he knew how it operate
21 mechanically, correct? Is that a "yes"?
22    A. Yes.
23    Q. As well as electrically?
24       MR. O'NEILL: Let me object it misstates his
25 testimony.