# AFFILIATED ENGINEERING LABORATORIES, INC.
*Engineering Consultants*

1101 Amboy Avenue
Edison, NJ 08837-2856

Phone: (732) 225-0360

Fax: (732) 417-0165

December 14, 2005

Yamamura & Shimazu, Esqs.
Suite 1770 Central Pacific Plaza
220 South King Street
Honolulu, Hawaii 96813

Attention: Paul T. Yamamura, Esq.

Re: Gendrow, Denise v. Cash Machine
Our File No. Q-8696

Gentlemen:

Pursuant to your request, the writer has reviewed file material pertinent to the above captioned matter. These materials included the deposition transcripts of Messrs. Lee, Cash & Barcarse, commercial documents related to original sale of machine, various photographs of the machine, police investigation documents, OSHA investigation material, plaintiff's witness disclosure of J. Suyderhaud and G. Buffington, Answers to Interrogatories, Document Production, and engineering drawings of a tilt table. Additionally, on 4/4/05 the writer traveled to the Simon Mattress Facility, formerly known as Coyne Mattress ("Simon"), Waipahu, Hawaii, and inspected the remnants of the equipment reportedly involved in the subject accident. During this inspection, various photographs were taken, copies of which have previously been forwarded to your attention.

It is understood that Simon owned and operated a tilt top table used in the manufacture of mattresses. The tilt top table had been manufactured by a predecessor to James Cash Machine Company, Inc., DRC Corporation and, following its sale in April 1968, had been operated by various entities in Hawaii for many years. The original table was reportedly manufactured before April 1968 and after its original manufacture was neither serviced nor maintained by DRC or Cash Machine.

The purpose of the equipment is to provide a mechanism for the layout and cutting of ticking material that forms a portion of a completed mattress. The machine contains a rectangular shaped table that is designed to tilt or rotate through approximately 90° to assume essentially a vertical or horizontal position. The vertical position is utilized for layout of the ticking material that is effected by the operator repetitively layering ticking material in a repetitive cycle from the lower end of the table to the upper end so as to create a stack or pile of material. The material is held in position on the table by means of pins that extend outward above the plane of the table when it is raised to a vertical

**EXHIBIT "E"**

Re: Gendrow, Denise v. Cash Machine
December 14, 2005
Page 2 of 4

position. After the operator has completed the desired number of material layers, the table is brought to the horizontal position and a pattern is laid over the material after which the ticking is cut by knife or motorized cutter to the pattern outline. The table is designed to accommodate material for different size mattresses and is provided with an extension table that is pivot connected to the outboard end of the main table structure. When material for king-size mattresses is laid out, this extension table is raised and latched to the main table to create a table of greater length to handle the larger material required for that application. In order to assist the operator in accessing the pin system on the extension table, the machine is provided with an elevating step or platform system that extends across the front of the machine. The step is raised and lowered by the operator to elevate him relative to the outboard end of the extension table and allow him to reach the upper pins on the extended table. The raising and lowering movement of the step is obtained by operation of a rack and pinion mechanism powered by an electric motor that is controlled by the operator with the limit of travel of the step controlled automatically via limit switches.

Electric motors are utilized to raise the step unit and move the table structure about its pivot point. In the case of the table a gear head motor fixed to a vertical support at the rear of the machine powers a drive chain that is connected to a sprocket mounted on a jack shaft extending across the rear portion of the machine. The outboard ends of the jackshaft are fitted with spur gears that mesh with semi circular gear racks that are connected to the underside of the table structure. When the table motor is energized, it causes rotation of the jack shaft which, due to its mesh with the curved gear sectors, will cause the table to rotate about its pivot point and move it from the vertical to the horizontal or vice versa. A separate electric motor operates the rack and pinion system to raise and lower the step unit.

It is understood that shortly before the accident the motor that powered the step system became inoperative and that A&B Electric was retained to perform a repair. A&B ordered a replacement motor and after its receipt, their employee, Mr. Gendrow, traveled to the Simon Mattress facility to install it. When Mr. Gendrow began the motor replacement, he discovered that the new motor would not fit into the area previously occupied by the old motor. He subsequently decided to remove the motor that raised and lowered the table and install it in the step motor's position, with the new motor then to be installed at the table motor's position. With the table positioned in its vertical orientation and with the extension table extended, Mr. Gendrow climbed into and beneath the table structure and began to remove the table motor. When Mr. Gendrow loosened the bolts that held the motor in position it caused the motor to loosen or shift in its mount disengaging the drive chain connection to the jackshaft. When the chain disengaged, the jackshaft became free to rotate and the table to move from the vertical position to the horizontal position. This movement of the table trapped Mr. Gendrow's head between a machine cross member and the underside of the table, in turn, resulting in the fatal injuries that serve as the basis of the subject claim.

It is apparent upon visual exam alone that the table with the extension table extended has a weight distribution about its pivot point and the machine frame such that, as a free body, its home or equilibrium state is when the table occupies a horizontal position. When the gear head motor, drive chain and gear system are intact, the gear head motor will hold the table in the vertical condition; however, if the integrity of the system is compromised, the resulting imbalance will cause the table to move from the vertical to the horizontal position. If work is to be done on the equipment where any

Re: Gendrow, Denise v. Cash Machine
December 14, 2005
Page 3 of 4

portion of this connection train is lost or disconnected, it should be obvious to those doing the work that appropriate action must be taken to insure that the table will maintain its position. This can be accomplished by a multitude of methods (e.g., blocks, ties, chains), but regardless of the one chosen the maintenance personnel performing the work must control the stored energy before undertaking the work.

It must be noted that the equilibrium or zero energy position of the table is obvious upon observing the system components. The pivot position of the table is not in the center; but is located closer to the step end of the table, resulting in the table naturally biasing itself to the horizontal position absent application of some outside force. This condition should have been obvious to maintenance person qualified or expected to work on the system. The table could have been secured in the vertical position, or it could have been moved to the static horizontal position, thereby permitting work to proceed without hazard or danger.

Mr. Gendrow was an experienced and trained electrician, and a navy veteran, who had working experience maintaining various types of equipment for many years. It was his responsibility to evaluate the task he was planning to perform and to institute some type of action to provide for his own safety during the repair. Standard texts on conduct of maintenance state that part of a mechanic's role is to ensure his/her own operating personnel safety. Further, the provisions of the OSHA regulations, specifically 29CFR1910:147, provide that activities such as those being conducted by Mr. Gendrow must use established lockout/tagout procedures. These procedures require that:

> "before any employee performs any servicing or maintenance on a machine or equipment where the unexpected energizing, start up or release of stored energy could occur and cause injury, the machine or equipment shall be isolated from the energy source and rendered inoperative."

No one followed this long-standing and well known procedure causing this unfortunate accident.

It is the writer's opinion that Mr. Gendrow's accident arose as the consequence of his attempt to remove the table motor from its secured position without Mr. Gendrow or anyone else first insuring that the table structure would remain in position after loosening the motor from its position. As a third party service provider, initiation of such action was first and foremost Mr. Gendrow's responsibility under accepted maintenance practices as set forth in OSHA regulations and ANSI standards.

It is the writer's further opinion that Mr. Gendrow's accident did not arise through any defect or deficiency in the design of the tilt table itself. The layout table conformed to accepted engineering design as of its date of manufacture and sale; and even thirty years later, it exhibited no hidden dangers or defects. Virtually every aspect of the table's mechanical and electrical systems were open, obvious and readily visible to any observer. Moreover, the equipment sustained no failure or malfunction of any element nor misoperation of any component. The subject accident arose solely as the consequence of the releasing of stored gravitational energy in the system that allowed the table to move from the vertical to horizontal position. Had the table

Re: Gendrow, Denise v. Cash Machine
December 14, 2005
Page 4 of 4

been secured in position or moved to a horizontal position prior to loosening the motor, the subject accident would not have occurred.

Should you need further information or discussion, kindly feel free to contact the writer.

Very truly yours,

*Peter J. Schwalje*

Peter J. Schwalje, P.E.
Engineering Consultant

PJS/rms

# AFFILIATED ENGINEERING LABORATORIES, INC.
*Engineering Consultants*

1101 Amboy Avenue
Edison, NJ 08837-2856

Phone: (732) 225-0360                                                                   Fax: (732) 417-0165

**Resume:**                    **PETER J. SCHWALJE**

**Education:**      Bachelor of Science - Mechanical Engineering
Rutgers University (1967)

Master of Science - Industrial Health & Safety Engineering
New Jersey Institute of Technology (1977)

Various Continuing Education Programs in Machine Safeguarding, OSHA Regulations and CNC Programming

Various Courses in Biological Sciences & Chemistry

**Professional:**   Professional Engineer License #20906 New Jersey
Professional Engineer License #052132 New York
Professional Engineer License #39321 Florida
Professional Engineer License #M-29183 California
Professional Engineer License #22892 South Carolina
Member American Society of Mechanical Engineers
Member National Safety Council
Member American Society of Safety Engineers
Member National Fire Protection Association
Member The Industrial Advisory Board - Rutgers University
    College of Engineering

**Publications:**   ASME Paper on Design and Construction of Prototype Power Plant

**Professional Experience:**   **Robert D. Bristol, General Contractors**, Brookfield, CT
General construction work (2 years)

**Public Service Electric and Gas Company** (1 year)
Bargaining Unit Technician in Performance Department, Linden
  Generating Station

Assisted Grade I Technicians in evaluation, calibration and services of power plant instrumentation and controls.

PETER J. SCHWALJE                                  2

**Public Service Electric and Gas Company,** Newark, NJ (8 years)
Senior Engineer in Engineering & Construction Department
Design & Construction of Power Plants and Related Equipment,
Equipment Maintenance

**Pratt Institute,** Brooklyn, New York (3 years)
Assistant Professor - Department of Mechanical Engineering

**Engineering Consultant** (30 years)
Representative Work:

Designed machines for cutting and shaping rigid urethane foam
Designed material handling systems
Designed door and seal system for high temperature autoclave
Designed lifting equipment for pleasure craft removal and maintenance
Designed hydraulic and chemical systems for municipal pool
Designed control facilities for process control systems
Designed facilities for storage and removal of chemicals and hazardous wastes
Designed customized mixing and agitation equipment for laboratory sample preparation procedures
Performed independent design reviews of new equipment including operating systems, controls and manuals
Performed independent review of instruction manuals and warning placards of foreign manufactured equipment prior to importation and marketing in the USA
Designed mixing and blending equipment systems for powdered compounds
Prepared site plans and facilities layouts
Designed and constructed models and prototypes of machinery and facilities
Designed customized fixtures for machining operations
Performed stress analysis for high pressure pre-heaters and pressure vessels
Performed kinematic analysis for high speed cut-off knives
Performed evaluations and oversaw rebuilds of sheet and flexographic printing presses
Served as consultant to attorneys and insurance carriers in litigation matters

# AFFILIATED ENGINEERING LABORATORIES, INC.
*Engineering Consultants*

Phone: (732) 225-0360

1101 Amboy Avenue
Edison, NJ 08837-2856
ael@affiliatedinc.net

Fax: (732) 417-0165

### FEE SCHEDULE FOR PROFESSIONAL SERVICES

### FOR PETER J. SCHWALJE, P.E.

TAX I.D. 22-2445853

Effective January 1, 2005

**Professional Services:**

Inspections, Investigative Research, Reports, Office and
Telephone Consultations and any other professional activity:

$240 per hour

Trial Appearances, Depositions, Appearances at Boards, Arbitrations
or other professional activity where testimony is offered:

$240 per hour

All professional services are billed on a portal to portal basis from
our main office in Edison, NJ.

**Expenses:**

All travel, lodging and out of pocket expenses relating to an assignment
are billed at cost as incurred.

A retainer may be required on a case-by-case basis and will be based on a reasonable estimate of anticipated professional time and expenses to be incurred. The retainer will be considered to be paid on account and will be applied against subsequent billing. Any excess funds will be returned upon the completion of the assignment. Any additional payment due will be billed less the retainer credit. Additional retainer amounts may be required as an assignment progresses.

## 2005 – TRIALS

| Caption | Venue |
|---|---|
| Perez vs. James Cash Machine | Pennsylvania |
| Center Capital Corp. vs. Optimo Machine | New Jersey |

### DEPOSITIONS

| | |
|---|---|
| Adid vs. Home Properties | Maryland |
| Ramos-Madera vs. APCO Products | New Jersey |
| Gile vs. Bobst | New Hampshire |
| Hare vs. Mertz, Inc. | New Jersey |

## 2004 – TRIALS

| Caption | Venue |
|---|---|
| Forrest vs. Beloit Corporation. | Pennsylvania |
| Kansas City Power & Light v. Allen-Bradley Co., LLC | Missouri |
| Hadden vs. The Port Authority | New York |
| Wright vs. Besser Company | Virginia |

### DEPOSITIONS

| | |
|---|---|
| Henriquez vs. Topps Meat Company | New York |
| Pena vs. Amada America, Inc. | New Jersey |
| Fitzpatrick vs. Chromalloy | Pennsylvania |
| Prada vs. Hobart | New Jersey |
| Griffin vs. Marion Mixers, Inc. | New Jersey |
| Varela vs. Hobart | New Jersey |
| Diaz vs. Biro | New York |
| West vs. Columbia Machine, Inc. | New York |
| Stablewski vs. Bobst | New York |
| Rotshteyn vs. United Container | Pennsylvania |
| Wright vs. Besser Company | Florida |
| Gulick vs. Columbus McKinnon Corp. | New Jersey |

## 2003 – TRIALS

| Caption | Venue |
|---|---|
| Santana vs. Couch & Philippi Sign Co. | California |

### DEPOSITIONS

| Caption | Venue |
|---|---|
| Duffy vs. Kalmar, Inc. | New Jersey |
| Stegall vs. Komori | Alabama |
| Forrest vs. Beloit Corp. | Pennsylvania |
| Campos vs. Columbus McKinnon Corp. | Utah |
| Sweeney vs. Trane | New Jersey |
| Santana vs. Couch & Philippi Sign Co. | California |
| Fisher vs. Marquip, Inc. | Pennsylvania |
| Unicon Concrete, Inc. vs. Besser | South Carolina |
| Long vs. Amada | Georgia |
| Williams vs. Matthews Conveyor | New Jersey |
| Diala vs. Miami Tool & Die, Inc. | New Jersey |
| Dion vs. Boshco & SCM Group USA, Inc. | Vermont |

## 2002 – TRIALS

| Caption | Venue |
|---|---|
| Sookdeo vs. Amada Corp | New York |
| Joaquin vs. Makino, Inc. | New York |
| Delikkaya vs. Amada | New Jersey |
| Gallagher vs. Brave Industries | New Jersey |
| Bryant vs. United Container | Mississippi |

### DEPOSITIONS

| Caption | Venue |
|---|---|
| Davis vs. The Kalamazoo Co., Inc. | South Carolina |
| Green vs. Black Clawson | New Jersey |
| Persaud vs. Biro | New York |
| Cornett-Petersen Loader | Florida |
| Cronce vs. United Pentek | New Jersey |
| Ruiz vs. Rouselle | New Jersey |
| Henderson vs. Hobart | New Jersey |
| Shaffer vs. Amada | New Jersey |



**AEL - No. 1**



**AEL - No. 2**



AEL - No. 3



AEL - No. 4



AEL - No. 5



AEL - No. 6



AEL - No. 7



AEL - No. 8



**AEL - No. 9**



**AEL - No. 10**