

CHRISTOPHER S. BOUSLOG  3087-0
Law Offices of Chris Bouslog
Four Waterfront Plaza, Suite 480
500 Ala Moana Boulevard
Honolulu, Hawaii  96813-4908
Telephone: (808) 550-4995
Facsimile: (808) 550-4996

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

JAN 20 2006

at __ o'clock and __ min __ M
SUE BEITIA, CLERK

Attorney for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

DENISE GENDROW, Individually and as Personal Representative of THE ESTATE OF CHARLES EUGENE GENDROW, JR.; and CHARLES E. GENDROW III,

        Plaintiffs,

vs.

SIMON MATTRESS MANUFACTURING COMPANY dba SERTA MATTRESS COMPANY dba COYNE MATTRESS MANUFACTURING COMPANY; JAMES CASH MACHINE CO.;

        Defendants.

) CIVIL NO. CV03 00034 BMK
) (Other Non-Vehicle Tort)
)
) **PLAINTIFFS DENISE GENDROW, In-**
) **dividually and as Personal Represen-**
) **tative of THE ESTATE OF CHARLES**
) **EUGENE GENDROW, JR.; and**
) **CHARLES E. GENDROW III'S SEPA-**
) **RATE AND CONCISE STATEMENT OF**
) **FACTS IN OPPOSITION TO DEFEN-**
) **DANT, THIRD-PARTY DEFENDANT**
) **and FOURTH-PARTY PLAINTIFF**
) **JAMES CASH MACHINE CO.'S MO-**
) **TION FOR SUMMARY JUDGMENT**
) **FILED 12/14/05; DECLARATION OF**
) **COUNSEL; DECLARATION OF GARY**
) **L. BUFFINGTON; EXHIBITS "A"-"F";**
) **CERTIFICATE OF SERVICE**
)
) Hearing Date: February 8, 2006
) Time: 10:00 a.m.
)

| | |
|---|---|
| SIMON MATTRESS MANUFAC-<br>TURING COMPANY, | )<br>)<br>) |
| Third-Party Plaintiff, | )<br>) |
| vs. | )<br>)<br>) |
| JAMES CASH MACHINE CO., | )<br>) |
| Third-Party Defendant. | )  **TRIAL WEEK: MAY 16, 2006**<br>) |
| JAMES CASH MACHINE CO., | )<br>) |
| Fourth-Party Plaintiff, | )<br>) |
| vs. | )<br>) |
| A & B ELECTRIC, | )<br>) |
| Fourth-Party Defendant. | )<br>) |

**PLAINTIFFS DENISE GENDROW, Individually and as Personal Representative of THE ESTATE OF CHARLES EUGENE GENDROW, JR.; and CHARLES E. GENDROW III'S SEPARATE AND CONCISE STATEMENT OF FACTS IN OPPOSITION TO DEFENDANT, THIRD-PARTY DEFENDANT and FOURTH-PARTY PLAINTIFF JAMES CASH MACHINE CO.'S**
<u>**MOTION FOR SUMMARY JUDGMENT FILED 12/14/05**</u>

Pursuant to Rule LR 56.1 of the Local Rules of Practice for the United States District Court, District of Hawaii, Plaintiffs DENISE GENDROW, Individually and as Personal Representative of THE ESTATE

2

OF CHARLES EUGENE GENDROW, JR.; and CHARLES E. GENDROW III (hereinafter "Plaintiffs") hereby submit their separate and concise statement of material facts in opposition to Defendant, Third-Party Defendant and Fourth-Party Plaintiff JAMES CASH MACHINE CO.'s (hereinafter "CASH") Motion for Summary Judgment filed December 14, 2005.

Facts 1 - 40 correspond to the facts and supporting evidence presented in Defendant, Third-Party Defendant and Fourth-Party Plaintiff Cash's Separate Concise Statement of the Facts filed December 14, 2005. Where appropriate, Plaintiffs have indicated that the facts relied upon by Defendant, Third-Party Defendant and Fourth-Party Plaintiff Cash are controverted, states the factual bases for such controversion and cites to the appropriate evidentiary support for same. These are followed by additional material facts and supporting evidence that Plaintiffs introduce to demonstrate the existence of the many genuine issues of material fact.

**PLAINTIFFS DENISE GENDROW, Individually and as Personal Representative of THE ESTATE OF CHARLES EUGENE GENDROW, JR.; and CHARLES E. GENDROW III'S RESPONSE TO DEFENDANT, THIRD-PARTY DEFENDANT and FOURTH-PARTY PLAINTIFF JAMES CASH MACHINE CO.'S STATEMENT OF FACTS**

| | DEFT, 3ʳᴰ-PTY DEFT & 4ᵀᴴ-PTY PLTF CASH'S ALLEGED FACTS | PLTFS' RESPONSE & EVIDENTIARY SUPPORT |
|---|---|---|
| 1. | "While changing motor on a tilt-top table, table fell from vertical to horizontal position, pinning his head." | |
| 2. | Identification of tilt table parts. | |
| 3. | The tilt table on which Mr. Gendrow was working at the time of the accident was originally designed in 1966 or 1967. | |
| 4. | JCM sold and shipped the tilt table to Simon on or about April 22, 1968. | |
| 5. | The tilt table was manufactured by DRC Corporation, which was merged with JCM in 1970. | |
| 6. | JCM shipped the tilt table to Coyne Mattress through an agent, Van Waters & Rogers | |
| 7. | Following the sale of the tilt table to Coyne in 1968, Simon conducted its own maintenance on the tilt table | |

and hired A&B for repairs.

| | | |
|---|---|---|
| 8. | With the exception of this lawsuit, no other personal injury lawsuit or claim was ever made concerning tilt tables designed, manufactured and sold by DRC or JCM. | ROSARIO vs. JAMES CASH MACHINE COMPANY, Court of Common Pleas of Pennsylvania, Philadelphia County, No. 02-01-1294 (April 1, 2005) See Supplemental Report of Gary L. Buffington dated January 20, 2006 at page 2 and attachment. See Exhibit "B". |
| 9. | The tilt table is rotated vertically and horizontally by an electric motor mounted on the frame of the machine at the rear. | |
| 10. | A second electric motor is located on the side of the machine and is used to raise an lower the step on which the table operator stands to perform work. | |
| 11. | The lift step motor was not working and this is the motor Mr. Gendrow was sent to repair. | |
| 12. | The cutting table's major moving parts are readily visible to the casual observer. | When asked if it was evident that the removal of the chain would make the table freewheeling, Donald Lee testified "That's the one thing that has bothered me the most is how I would ever figure that out looking at the machine. I couldn't. Even after the fact I looked at it and looked at |

it, and I don't know how I would ever figure that out." Deposition of Donald Erwin Lee at 80. Exhibit "A". See also Id. at 98 (When asked if it was self-evident, Mr. Lee testified "It was not.") Exhibit "A".

13. The tilt table's table lift motor and gear assembly are analogous to a garage door and its electric opener in that the motion can be stopped at any point by turning off the power and the mechanical components are self-locking.

14. On January 9, 2001, Mr. Gendrow attempted to repair the motor, by rewinding it, but was unsuccessful. The informed Malcolm Barcarse, the president of A&B Electric, that a new motor was needed. Mr. Barcarse called Mr. Lee at Coyne Mattress and informed him that a new motor was needed. Mr. Lee gave the go ahead to obtain a new motor. Mr. Gendrow called a distributor on the mainland and placed an order for a replacement motor using the identifying numbers on the motor he had removed. He asked that the motor be shipped to Coyne Mattress

3

address in Waipahu.

15. On January 15, 2001, at 11:00 a.m., UPS delivered the replacement motor to Coyne Mattress Company. A&B Electric was called and told that the motor had arrived. Mr. Barcarse said he would send Mr. Gendrow after lunch to install it. Mr. Gendrow told Mr. Barcarse it would take about one hour to install the new motor on the table. Mr. Gendrow arrived at Coyne at 1:00 p.m., obtained the new motor, and went into the cutting room to the table. According to Mr. Valdez [a Coyne Mattress employee], the top of the table was in the raised position at this time.

16. At 2:00 p.m., Mr. Gendrow found Mr. Valdez at the loading dock and told him that the new motor did not fit. Both returned to the cutting table where Mr. Gendrow showed Mr. Valdez that the bolt holes in the motor casing did not match the mounting holes in the frame. Mr. Gendrow said he had measured the mounting holes in the casing of the table lift motor and found that it

would fit. Mr. Gendrow said he was going to remove the table lift motor and use it for the lift step and would use the new motor for the table lift. After this conversation, Mr. Valdez returned to the loading dock. About 2:30 p.m., the employees in the sewing room heard a loud bang. The tilt top table was down and Mr. Gendrow was pinned under it.

17. The tilt top table is used to cut fabric for mattresses according to Donald Lee, the operations' manager for Coyne Mattress Manufacturing Company. The top of the table is raised by an electric motor mounted on a support in the center of the frame. It raises the table through a sprocket and chain assembly, which drives a shaft. The shaft has gears on either end, which mesh the gear bars on the sides of the table, which raise and lower it. According to Mr. Lee the table top is left up to facilitate movement in the area. When the table is down it rests on the frame but when raised it is only held in position by the motor. There is not other system to secure the table when it is up. The lift step in

5

the front of the machine allows an employee to be lifted to work on the fabric being layered for a mattress top.

18. There are four (4) bolts, which secure the lifting motor to the frame. Mr. Gendrow (the victim) had removed the two lower bolts; he then began to loosen the two top bolts. As he did this the restraining ability of the motor mount was compromised. The weight of the table top caused the shaft to try to turn. This caused the loosened motor to shift to the side on which the drive sprocket was mounted. When the motor shifted the chain slipped off the sprocket and the table came down crushing Mr. Gendrow's head between a supporting metal beam on the underside of the table top and the support frame. The table controls and breaker panel are located on the right side of the table, as you face it, within the frame bolts.

19. Buffington's report further states that with an effective lock out/tag out program and training, employees will be protected from stored energy

6

| | | |
|---|---|---|
| | releases. | |
| 20. | In this instances, Mr. Gendrow and the Simon maintenance man should have discussed the potential hazard of removing the table top lift motor. Had this been done, the hazard would have been readily recognized, the table top secured and the accident avoided. | Donald Lee testified that the hazardous condition was not self-evident. See Deposition of Donald Erwin Lee at 80, 98. See Exhibit "A". The accident was the result of a design defect that "constituted an unreasonably dangerous condition to end user workers performing maintenance and/or repair work on the table top lift motor." Report of Gary L. Buffington. See Exhibit "B". |
| 21. | Hawaii OSHA cited both A&B and Simon for violations of its lock out/tag out regulations at the time of the accident. | |
| 22. | Mr. Barcarse of A&B testified that when he looked at the tilt table it was obvious to him that if the table lift motor was removed, the table top would become free-wheeling. | Donald Lee testified that the hazardous condition was not self-evident. See Deposition of Donald Erwin Lee at 80, 98. See Exhibit "A". The accident was the result of a design defect that created an unreasonably dangerous condition. Report of Gary L. Buffington. See Exhibit "B". In my opinion this condition is both a hidden danger and a design defect. Supplemental Report of Gary Buffington at page 6. See Exhibit "B". |
| 23. | It is apparent upon visual exam | Donald Lee testified that the |

| | | |
|---|---|---|
| | alone that the tilt table's home or equilibrium state is when the table occupies a horizontal position. | hazardous condition was not self-evident. See Deposition of Donald Erwin Lee at 80, 98. See Exhibit "A".<br>The accident was the result of a design defect that created an unreasonably dangerous condition. Report of Gary L. Buffington. See Exhibit "B". |
| 24. | When the gear head motor, drive chain and gear system are intact, the gear head motor will hold the table in the vertical position however, if the integrity of the system is compromised, the resulting imbalance will cause the table to move from the vertical to the horizontal position. | |
| 25. | The equilibrium or zero energy position of the table is obviously biased to the horizontal position absent application of some outside force because the pivot position of the table is off center and closer to the step end of the table. | Donald Lee testified that the hazardous condition was not self-evident. See Deposition of Donald Erwin Lee at 80, 98. See Exhibit "A".<br>The accident was the result of a design defect that created an unreasonably dangerous condition. Report of Gary L. Buffington. Supplemental Report of Gary Buffington. See Exhibit "B". |
| 26. | The motor could have been replaced with the table in a horizontal position. | It would be much more difficult to do so. Supplemental Report of Gary L. Buffington. See Exhibit "B". |

| | | |
|---|---|---|
| 27. | Mr. Gendrow's employer, Mr. Barcarse of A&B, testified that when he looked at the tilt table it was obvious to him that if the table lift motor was removed, the table top would become free-wheeling. | Donald Lee testified that the hazardous condition was not self-evident. See Deposition of Donald Erwin Lee at 80, 98. See Exhibit "A". <br><br> The accident was the result of a design defect that created an unreasonably dangerous condition. Report of Gary L. Buffington. See Exhibit "B". |
| 28. | A&B's president, Malcolm Barcarse ("Mr. Barcarse") testified that Mr. Gendrow was the most experienced person at A&B other than himself. | |
| 29. | Mr. Gendrow supervised all of A&B's commercial work and sometimes supervised A&B employees. | |
| 30. | He also conducted A&B's safety meetings prior to the accident. | |
| 31. | Simon's former operations manager, Donald Erwin Lee, testified that Mr. Gendrow had done work for Simon for a number of years and was in Simon's factory "probably at least once a month, if not more." | |
| 32. | Mr. Lee stated that Mr. Gendrow was an excellent electrician who was always able | |

9

to figure out Simon's electrical equipment some of which was very complicated.

| | | |
|---|---|---|
| 33. | Mr. Gendrow knew all the equipment at Simon's premises and was familiar with the operation of all of Simon's machines. He was the individual who A&B usually sent to Simon for repair calls. | |
| 34. | Lee agreed that Mr. Gendrow was very familiar with the tilt table. He knew how it worked and had moved the tilt table on several occasions. | Familiarity with the operation does not equate to knowledge of repair and maintenance safety. Mr. Gendrow had never previously removed the motor holding the table in the vertical position and did not have "specialized experience" with the machine. Supplemental Report of Gary L. Buffington at page 14. See Exhibit "B". |
| 35. | Mr. Gendrow had also reviewed the tilt table and tested it to make sure the motors were running correctly following his repairs. | There is no evidence of this. He died while in the process of removing a motor from the tilt table. Report of Gary L. Buffington. See Exhibit "B". |
| 36. | Mr. Lee confirmed that the tilt table was purchased in the 1960's. | |
| 37. | Simon and its predecessors had been in the mattress manufacturing business for over 100 years. Mr. Lee worked | |

there since 1962.

38. Simon had a earlier version of the tilt table that was smaller and manually operated, not electric.

39. Tilt tables are specific to the mattress and bedding manufacturing industry. He also testified that he would not consider the tilt table to be very sophisticated.

40. The tilt table was very simple to operate and did not require special training for operators.

11



Plaintiffs also contend that the following additional material facts and events are relevant or in dispute.

### **PLAINTIFFS' STATEMENT OF FACTS IN OPPOSITION**

| **FACTS/RELEVANT EVENTS** | **EVIDENTIARY SUPPORT** |
| --- | --- |
| 1. David R. Cash testified that he did not believe that any instruction booklet accompanied the cutting table when it was sold. | Deposition of David R. Cash at 45, 90-92. See Exhibit "C". |
| 2. Lorenzo Valdez was an employee of SMMC who maintained the equipment. | Deposition of Donald Erwin Lee at 67, 72. See Exhibit "A". |
| 3. The cutting table was normally kept in the upright position so that it would take up less space. | Deposition of Donald Erwin Lee at 89. See Exhibit "A". |
| 4. "DRC Corporation did not provide an operator's manual, maintenance manual, or service manual for the tilt top mattress tables that they manufactured, distributed, and sold." | Report and Supplemental Report of Gary L. Buffington. See Exhibit "B". |
| 5. Gary Buffington concluded that "It is my professional opinion that, from a safety point of view, the tilt top mattress cutting table was defectively designed by DRC Corporation and their agents and the tilt top mattress cutting table | Report and Supplemental Report of Gary L. Buffington. See Exhibit "B". |

|   |   |   |
|---|---|---|
|   | constituted an unreasonably dangerous condition to end user workers performing maintenance and/or repair work on the table top." Mr. Buffington further concluded that "DRC Corporation and their agents fell far below the standard of care in the manufacturing industry with their failure to protect Charles E. Gendrow, Jr....." |   |
| 6. | Mr. Buffington concluded that "DRC corporation and their agents fell far below the standard of care in the manufacturing industry with their failure to incorporate a method to prevent the collapse of the tilt top mattress cutting table...." | Report and Supplemental Report of Gary L. Buffington. See Exhibit "B". |
| 7. | Mr. Buffington concluded that "DRC Corporation and their agents were negligent and fell far below the standard of care in the manufacturing industry with their failure to provide a 'WARNING' of the dangerous condition created when the table lift motor was loosened and/or removed which subsequently causes the vertical cutting table to unintentionally drop to a horizontal position | Report and Supplemental Report of Gary L. Buffington. See Exhibit "B". |

13

|     |     |     |
| --- | --- | --- |
|     | creating a dangerous condition that resulted in a fatal injury." |     |
| 8.  | It is Mr. Buffington's opinion that "if either DRC Corp. Or Coyne Mattress had used the required hazard assessment or Job Safety Analysis procedures properly, the gravitational hazard most likely would have been recognized, the lift table most likely would have been secured in some manner or lowered to a horizontal position and this accident would have been prevented." | Supplemental Report of Gary L. Buffington at page 15.  See Exhibit "B". |
| 9.  | Defendant Simon filed a First Amended Third Party Complaint against Defendant JCM on April 5, 2005, which Defendant JCM answered on July 6, 2005. | See Exhibit "D". |
| 10. | Plaintiffs filed their Third Amended Complaint on May 18, 2005. | See Exhibit "E". |
| 11. | Defendant James Cash Machine Co.'s Motion to Dismiss Third Amended Complaint Filed May 18, 2005 based on the statute of limitations argument was denied by Order filed on October 17, 2005. | See Exhibit "F". |

14

DATED: Honolulu, Hawaii, January 20, 2006.

_____
CHRIS BOUSLOG
Attorney for Plaintiffs