1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

DENISE GENDROW,                     )
individually and as                 )
Personal Representative of          )
THE ESTATE OF CHARLES               )
EUGENE GENDROW, JR.;                )
CHARLES E. GENDROW, III;            )
and JEANNE SMITH,                   )
                                    )
          Plaintiffs,               )
                                    )
     vs.                            )  CIVIL NO.
                                    )  Cv03-00034 DAE/BMK
                                    )  (Other Non-Vehicle Tort)
SIMON MATTRESS                      )
MANUFACTURING COMPANY; dba          )
SERTA MATTRESS COMPANY dba          )
COYNE MATTRESS                      )
MANUFACTURING COMPANY;              )
JAMES CASH MACHINE CO., a           )
Kentucky Corporation,               )
                                    )
          Defendants.               )
                                    )
                                    )
SIMON MATTRESS                      )
MANUFACTURING COMPANY,              )
                                    )
     Defendant and                  )
     Third-Party Plaintiff)         )
                                    )
     vs.                            )
                                    )
JAMES CASH MACHINE CO., a           )
Kentucky Corporation,               )
                                    )
     Third-Party                    )
     Defendant.                     )
                                    )

DEPOSITION OF DONALD ERWIN LEE

# EXHIBIT "A"

Gendrow v. Simon Mattress              Multi-Page™                     Donald Erwin Lee
May 25, 2005

Page 2

1  Taken on behalf of the Third-Party Defendant James Cash
2  Machine Company pursuant to Notice, on Wednesday, May
3  25, 2005, commencing at 9:12 a.m., at the office of
4  Powers & Associates, Pauahi Tower, 1001 Bishop Street,
5  Suite 2650, Honolulu, Hawaii 96813.
6
7  APPEARANCES:
8      For Plaintiffs Denise Gendrow, Estate of Charles
       Gendrow, Jr., Charles E. Gendrow, III, and
9      Jeanne Smith:
10         CHRISTOPHER S. BOUSLOG, ESQ.
           Law Offices of Chris Bouslog
11         Four Waterfront Plaza, Suite 480
           500 Ala Moana Boulevard
12         Honolulu, Hawaii  96813
           (808) 550-4995
13
       For Defendant and Third-party Defendant
14     Simon Mattress Manufacturing Company:
15         RALPH J. O'NEILL, ESQ.
           MacDonald Rudy Byrns O'Neill & Yamauchi
16         Suite 2650, American Savings Bank Tower
           1001 Bishop Street
17         Honolulu, Hawaii  96813
           (808) 523-3080
18
       For Third-Party Defendant James Cash Machine
19     Company:
20         PAUL T. YAMAMURA, ESQ.
           Yamamura & Shimazu
21         1770 Central Pacific Plaza
           220 South King Street
22         Honolulu, Hawaii  96813
           (808) 523-6969
23
24  REPORTED BY:
25     Marjana Shawler, RPR, CSR 182
       Notary Public, State of Hawaii

Page 3

1                  I N D E X
2
3  EXAMINATION:                        PAGE
4      BY MR. YAMAMURA                    4
5      BY MR. BOUSLOG                    83
6      BY MR. YAMAMURA                   99
7      BY MR. BOUSLOG                   100
8      BY MR. YAMAMURA                  100
9
10
11
12  EXHIBITS FOR IDENTIFICATION:
13      (No exhibits identified)
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1            DONALD ERWIN LEE,
2  having been called as a witness and being first duly
3  sworn to tell the truth, the whole truth and nothing
4  but the truth, was examined and testified as follows:
5            EXAMINATION
6  BY MR. YAMAMURA:
7      Q. Please state your full name.                09:11:56
8      A. Donald Erwin Lee.                            09:11:56
9      Q. Mr. Lee, we're here for your deposition, and 09:11:58
10 I appreciate you showing up today.  Have you ever had 09:12:02
11 your deposition taken before?                        09:12:08
12     A. Yes, I have.                                 09:12:08
13     Q. In what kind of circumstance?                09:12:10
14     A. One was a product liability case, and one    09:12:12
15 was an accident.                                     09:12:18
16     Q. The product liability case, what was         09:12:20
17 involved with that?                                  09:12:22
18     A. It was a mattress that we had manufactured   09:12:22
19 and it was a bunk bed mattress -- we had allegedly   09:12:28
20 manufactured.                                        09:12:34
21     Q. Caught on fire, burned the --                09:12:36
22     A. Caught on fire, yes.                         09:12:38
23     Q. I know that case.                            09:12:38
24        What was the accident case?                  09:12:38
25     A. The accident was we had a large machine that 09:12:40

Page 5

1  processed cotton, and it was huge, the size of a truck. 09:12:44
2  Actually there were three of them.  They were fenced in 09:12:52
3  so people couldn't get into the area.  We had an        09:12:56
4  employee who went inside the fence and was closing down 09:13:04
5  the machine while it was still running.  The nozzle got 09:13:04
6  caught in the machine and it pulled his hand and he     09:13:10
7  lost his hand.                                          09:13:12
8      Q. The burning bunk case, though, that was an    09:13:14
9  issue where there was the manufacturer of the bunk bed 09:13:16
10 was either yourself or Simon mattress, right?           09:13:22
11     A. Yes, because it was purchased from the        09:13:28
12 exchange.  We both sold to the exchange.               09:13:30
13     Q. I was involved for Simon Mattress on that     09:13:34
14 matter.                                               09:13:38
15        Let me just briefly go through the ground     09:13:40
16 rules of the deposition so we're in the same          09:13:42
17 understanding.                                        09:13:44
18        MR. YAMAMURA: I understand, Ralph, and you    09:13:44
19 were kind enough to have him here without subpoena.  I 09:13:46
20 just need to know:  Are you here as his attorney?      09:13:50
21        MR. O'NEILL: Yes.                             09:13:54
22        MR. YAMAMURA: Okay.  That's fine.             09:13:54
23     Q. BY MR. YAMAMURA: So, Mr. Lee, I understand    09:13:56
24 that you are here with your attorney and you were      09:13:58
25 formerly employed by Simon Mattress Company, Serta,    09:14:00

Gendrow v. Simon Mattress | Multi-Page™ | Donald Erwin Lee
May 25, 2005

**Page 6**

1 basically; is that correct?
2     A. That's correct.
3     Q. Let me briefly go over the ground rules for
4 a deposition just to refresh you on what's going to
5 happen today.
6        A deposition is a question-and-answer
7 session under oath. While it is informal and in the
8 court reporter's office, it is as if you are giving
9 testimony in court.
10       One purpose of a deposition is to find out
11 what you know about the accident involving Mr. Gendrow.
12 Also, going to ask questions about the specific
13 machinery involved in the accident.
14       Another purpose of a deposition is that if
15 you are unavailable at the hearing of this case that we
16 can read portions of your deposition as actual evidence
17 to the jury or judge.
18       Third purpose of a deposition is that if you
19 testify differently at the hearing of this case than
20 what you did today, we can point out those differences
21 that you testified differently under oath on two
22 separate occasions.
23       Because it is a question-and-answer session
24 and because it is verbal, avoid uh-huhs, huh-uhs, nods
25 of the head, because the court reporter can only take

**Page 7**

1 the verbal responses. While we do those types of
2 gestures and sounds in everyday conversation, we kind
3 of understand by looking at each other what is meant,
4 she only takes down verbal responses. To keep it clear
5 and so it is unambiguous, try to answer out loud, yes,
6 no, and so forth. Okay?
7     A. I understand.
8     Q. Also, if there is any part of my question
9 you don't understand, please stop and please tell me
10 you don't understand it, and let me attempt to clarify
11 it or demystify it for you. Okay?
12     A. Okay.
13     Q. If you answer my question, I will assume you
14 understood it. Is that fair?
15     A. It is fair.
16     Q. Don't want you to guess or speculate. We
17 want your best recollection. But sometimes a question
18 may ask for an estimate. For example, if I were to ask
19 you a question as to how long was a machine in
20 operation, say, and you may not have a specific how
21 many years but, well, maybe five to ten years, you have
22 a right to give an estimate if that's the best of your
23 recollection. That's what we want. If you have an
24 estimate, you are free to give it, but we just don't
25 want you to guess. Okay?

**Page 8**

1     A. That's fine.
2     Q. Before we get into the deposition itself,
3 just some background information.
4       What is your date of birth?
5     A. April 2nd, 1942.
6     Q. And where were you born?
7     A. Honolulu, Hawaii.
8     Q. Education briefly?
9     A. I had high school, of course, and I had some
10 college.
11     Q. Where did you go to high school?
12     A. Punahou.
13     Q. What year did you graduate Punahou?
14     A. 1960. I didn't actually graduate from
15 Punahou. I graduated from Oxford Academy, but I
16 attended Punahou through my sophomore year.
17     Q. What is the current residence address?
18     A. 2101 Nuuanu Avenue, Apartment PHA4.
19     Q. My understanding is that at one point in
20 time you had been working for -- I'm not fully aware of
21 the corporate setup or the actual name of the company,
22 but it was Simon Mattress. Is Simons Mattress dba
23 Serta, or what is the company name actually?
24     MR. O'NEILL: At what point in time?
25     Q. BY MR. YAMAMURA: I guess when you were

**Page 9**

1 working there.
2     MR. O'NEILL: Well, you probably want to ask
3 him about his different capacities at the company.
4     Q. BY MR. YAMAMURA: I guess what I want to get
5 is just a brief history, because I understand that the
6 last couple of years the company had gone through
7 bankruptcy, had some kind of proceeding happening, and
8 I'm just wondering in terms of the actual corporate
9 name or the actual entity, legal entity, involved. Is
10 it Simon Mattress? Is it Serta? Maybe you can just
11 clarify for me.
12     MR. O'NEILL: I would suggest -- I'm trying
13 to avoid objecting. Why don't you start with as of
14 January 2001.
15     THE WITNESS: I don't remember all the dates
16 when these things happened.
17     MR. O'NEILL: As of the time of this
18 accident.
19     Q. BY MR. YAMAMURA: That's fair. As of the
20 time of this accident, January of 2001, I understand
21 you were still employed at Simon Mattress, or whatever
22 entity it was then?
23     A. I'm not really definite, but I was thinking
24 about this. I think that Simon Mattress had already
25 sold to Sleepmaster, LLC.

Page 6 - Page 9

Gendrow v. Simon Mattress                Multi-Page™                 Donald Erwin Lee
May 25, 2005

---

### Page 10

1   Q. My understanding is there was some basic
2 selling, buying of companies, that kind of stuff.
3   A. Right.
4   Q. What is the location of the business?
5   A. 94-134 Leowaena Street, Waipahu.
6   Q. And when we talk about the business, I'm
7 talking about the entity operating out of that specific
8 location. Okay?
9   A. Okay.
10   Q. We'll call it the Waipahu location. Is
11 there any other location for mattress manufacturing
12 that that entity had besides the Waipahu one?
13   A. In Honolulu or in Hawaii?
14   Q. Honolulu.
15   A. No.
16   Q. We'll focus on by location, then. When did
17 you first start working at that location?
18   A. This is again since 2001?
19   Q. I guess what I'm trying to find out is when
20 did you first start working for the entity that was
21 operating out of the Waipahu location?
22   A. Maybe I better go back and explain.
23   Q. Sure. Why don't you.
24   A. I started working for Coyne Mattress
25 Company.

---

### Page 11

1   Q. C-O-Y-N-E?
2   A. C-O-Y-N-E, in 1962.
3   Q. Okay.
4   A. They were located at 716 Cooke Street. It
5 had been a family business, and we actually when we
6 sold it -- in 1989, we sold it two weeks short of being
7 100 years old.
8   Q. Who did you sell it to in 1989?
9   A. Simon Mattress Manufacturing. We moved to
10 Waipahu in 1973.
11   Q. Okay.
12   A. Simon owned it for a couple years, and then
13 they sold to Sleepmaster, LLC.
14   Q. This would be in the 1970s?
15   A. No. This was after we sold it in 1998.
16   Q. So Coyne Mattress Company on Cooke Street
17 sold a business and the assets and all that stuff --
18   A. Sold the operating business.
19   Q. Operating business to Simon in 1989?
20   A. Yes.
21   Q. In 1989 --
22     MR. O'NEILL: Time out for a second. You've
23 said two dates, you said 1989 and also said 1998.
24 You've used two.
25     THE WITNESS: 1998 is the correct year.

---

### Page 12

1   Q. BY MR. YAMAMURA: I understand and I don't
2 want to trip you up. Just want to be sure I get the
3 dates right.
4     So Coyne Mattress, you had been working
5 there since 1962, so I would assume just out of high
6 school?
7   A. Uh-huh.
8   Q. Family business?
9   A. Uh-huh.
10   Q. Is that "yes"?
11   A. That's a yes.
12   Q. Is that your folks' business, your parents'
13 business?
14   A. It was my parents' and grandparents'.
15   Q. What was your dad's name?
16   A. Benjamin A. Lee.
17   Q. And he started the company?
18   A. It was started in 1898 by my step-great
19 grandfather.
20   Q. 1898 or 1998?
21   A. 1898.
22   Q. So long history back in -- this is a Hawaii
23 company basically?
24   A. Yes, it is.
25   Q. So 1962, you started working at Coyne

---

### Page 13

1 Mattress, which is a family business. So business was
2 -- operating business was sold to Simon in 1989?
3   A. 1998.
4   Q. 1998, okay. But in between then, there was
5 a move to Waipahu in 1973?
6   A. That's correct.
7   Q. So Coyne moved to Waipahu in 1973?
8   A. That's correct.
9   Q. I see. Okay. And then if there operated
10 the company till about 1998, sold it to Simon, and
11 Simon operated it for how many years?
12   A. I think about two.
13   Q. And then sold it to -- you mentioned LLC?
14   A. Sleepmaster, LLC.
15   Q. And maybe you could explain this. Is
16 Sleepmaster the parent company for Serta Mattress?
17   A. Sleepmaster, LLC, was a company that was --
18 it was basically the New Jersey factory, got a whole
19 bunch of investors together and bought up different
20 Serta franchises all around the country.
21   Q. As I understand it, Serta is a franchisor
22 around the country?
23   A. Yes.
24   Q. And how is it that Serta franchise was
25 involved with Simon here?

Gendrow v. Simon Mattress                    Multi-Page™                    Donald Erwin Lee
                                                                            May 25, 2005

| Page 14 | Page 16 |

Page 14

1    A. Simon was a franchisee in Seattle, San
2  Francisco and Hawaii.
3    Q. Of Serta Mattress?
4    A. After we sold. Right.
5    Q. So after -- if Simon operated for a couple
6  of years, would that be about from 1998 to 2000
7  approximately?
8    A. I'm not sure of the date. I know that it
9  was prior to the accident, though.
10   Q. In terms of when the accident happened,
11 which was 2001, January of 2001, was it Sleepmaster or
12 Simon who was operating the factory?
13   A. Sleepmaster operated under the name Simon.
14   Q. So Sleepmaster had purchased Simon?
15   A. Right.
16   Q. Here as well as Seattle?
17   A. And San Francisco.
18   Q. And San Francisco, okay. So basically
19 Sleepmaster had purchased Simon. Simon was still
20 operating the factory under the Serta name?
21   A. That's correct.
22      MR. O'NEILL: Under the Serta or Simon name?
23      THE WITNESS: Serta name. Serta was the
24 product that we manufactured.
25   Q. BY MR. YAMAMURA: Just so I understand --

Page 15

1    A. Serta is a national brand. They franchise
2  certain areas. Simon owned three of those areas after
3  we sold to them, three of the licensees after we sold
4  to them. They sold those three licensees to
5  Sleepmaster.
6    Q. So it is sort of like the product is made
7  locally but you got your national brand on it?
8    A. That's correct. Serta, Inc., was designed
9  to set product specifications, do national advertising,
10 quality control, research and development. It was a
11 nonprofit. Serta, Inc., is a nonprofit. Each
12 shareholder -- each licensee owns a share of Serta.
13   Q. So I would imagine the company being started
14 -- original company, that is Coyne Mattress, started in
15 1898, that your grandfather was involved in the
16 beginning of that; fair to say?
17   A. No. He didn't get involved until around
18 1940.
19   Q. Great grandfather?
20   A. Mr. Coyne got very upset with the state tax
21 laws and amount he had to pay in taxes. So he closed
22 down -- it actually was originally Coyne Furniture
23 Company, and at one time they had half of the ground
24 floor of the Alexander Young Hotel as their showroom.
25 And they did carpets, they did draperies, they did the

Page 16

1  whole gamut. They imported a lot of furniture from the
2  Orient.
3    Q. I'm curious --
4    A. So in 1940, my grandfather and father bought
5  out just the mattress operation, and the rest of it was
6  closed. At that time it was located down in Iwilei.
7    Q. And that's how the name Coyne Mattress
8  developed?
9    A. That's correct. It was Mr. Coyne.
10   Q. So it was a subsidiary or a part of the
11 Coyne Furniture Company basically, something like that;
12 is that how it worked?
13   A. Well, it was Coyne Furniture, but when my
14 grandfather and father bought it, it became Coyne
15 Mattress Company. The Coyne Furniture went away.
16   Q. I would assume this Mr. Coyne is the same
17 Coyne they named the street after out in Moiliili side?
18   A. I believe it is.
19   Q. Getting back to my question, so back in
20 January of 2001, is it your best recollection that
21 Sleepmaster, LLC, through Simon operated the factory in
22 Waipahu?
23   A. That is correct.
24   Q. So Simon, in terms of the actual operations,
25 was the same people, meaning -- in other words,

Page 17

1  Sleepmaster didn't go in, bring their own people, get
2  rid of everyone else. What was the situation?
3    A. Sleepmaster came in and they -- Simon
4  Mattress was headed by a fellow named Donald Simon.
5    Q. Locally here?
6    A. No. This is in San Francisco.
7    Q. Okay.
8    A. After Sleepmaster, LLC, bought, he was let
9  go after about six months, and they brought someone in
10 from the East Coast to oversee that operation --
11 actually the person oversaw all three operations
12 basically.
13   Q. I'm trying to get an idea, and maybe you can
14 help because you seem to have a history with the
15 company. In terms of the operational aspects of the
16 factory itself, the actual manufacturing process and
17 that particular operation -- not talking about sales or
18 distribution, those types, but actual manufacturing,
19 use of the machinery -- who would have been the best
20 person to have the most knowledge about that operation?
21   A. I was the operations manager here.
22   Q. How were you operations manager at the
23 location?
24   A. Since 1998.
25   Q. When did you retire -- or did you retire?

Gendrow v. Simon Mattress          Multi-Page™          Donald Erwin Lee
May 25, 2005

Page 18

1  A. I was downsized about two months before they
2  filed for bankruptcy.
3  Q. When did they file for bankruptcy?
4  A. I don't remember the date.
5  Q. Was it before or after the accident, if you
6  know?
7  A. I think -- well, I believe I was terminated
8  three-and-a-half years ago in October.
9  Q. So --
10 A. I think they filed for bankruptcy that
11 December.
12     MR. O'NEILL: That sounds to me like you
13 were terminated in April 2002.
14 A. It was October.
15 Q. BY MR. YAMAMURA: October?
16 A. October.
17 Q. Approximately October of 2002 is when you
18 were terminated?
19 A. It was October 2nd. The day I made
20 59-and-a-half, I could draw down my retirement.
21 Q. Looking at the simple math here, looks like
22 you were let go in October of 2002?
23 A. Okay.
24 Q. So from 1998 to October 2002, you were the
25 operations manager. Prior to you being operations

Page 19

1  manager, who was the operations manager for that
2  operation? That would have been, I presume, before it
3  was sold.
4  A. Okay. There was -- I was president of the
5  corporation. I wasn't necessarily -- I didn't have the
6  title of operations manager.
7  Q. Because from my understanding Coyne Mattress
8  started in 1962 and was run on its own till 1998 when
9  it was sold?
10 A. Started in 1940.
11 Q. Sorry, 1940. But you were with Coyne
12 Mattress from 1962?
13 A. That's correct.
14 Q. Coyne Mattress stayed in operation until it
15 was sold in 1998. During that period of time, talking
16 about 1962 to 1998 from when you were there, who was
17 operations manager for Coyne Mattress?
18 A. There was no one under that specific title.
19 Q. In this case -- that's why I'm going back to
20 those years. In this case, there is some suggestion or
21 some evidence to suggest that the machine, the cutting
22 table that was involved in the accident -- when I use
23 the term "cutting table," I'm referring to the cutting
24 table involved in the accident, okay, for just brevity.
25 A. All right.

Page 20

1  Q. That machine was purchased by Coyne Mattress
2  back in the 1960s?
3  A. That sounds right.
4  Q. And correct me if I'm wrong, but talking
5  with people in the industry, that type of machinery,
6  that type of cutting table back in the 1960s was pretty
7  much a very specific type of machinery used only for
8  that type of work, for mattress manufacturing?
9  A. I can't think of any other industry --
10 Q. That would use it?
11 A. -- well, no, there was some -- I do know
12 there was people here that made slip covers for like
13 rattan furniture. They used a similar type table.
14 Q. And that was just for cutting materials?
15 A. That's correct.
16 Q. Do you recall actually having the table
17 delivered and set up at the premises at Coyne Mattress?
18 A. Yeah, I do.
19 Q. Tell me about that. What do you recall?
20 A. I just remember it came in and we set it up.
21 Q. You assembled it and everything?
22 A. Prior to that, we had a kind of a homemade
23 version. It was much smaller. Mattress material came
24 56-inches wide, which was the width of a basic double
25 bed. In the 1960s and 1970s, queens and king size

Page 21

1  became more prevalent and we needed a wider table.
2  That particular table was built to handle material
3  86-inches wide, which would be wide enough for a
4  king-sized bed.
5  Q. As I understand it, this was something that
6  within at least the mattress manufacturing industry is
7  a very specific machine or tool used in that industry,
8  correct?
9  A. I would say that's true. Only other
10 industry I would think that might use it would be the
11 bedspread industry.
12 Q. Pune's covers, that type of thing?
13 A. Yes.
14 Q. Still related to very specific industry, not
15 like a machine you can use for anything else beyond
16 covers and mattress making?
17 A. No.
18 Q. And those types of machines are normally
19 sold to the manufactures themselves of the bedding
20 companies?
21 A. That's correct.
22 Q. And manufactures themselves have knowledge
23 of how these machines work because it is a kind of
24 sophisticated machine for the end user, correct?
25     MR. O'NEILL: Let me object. Vague and

Page 18 - Page 21

Gendrow v. Simon Mattress       Multi-Page™                    Donald Erwin Lee
                                                               May 25, 2005

## Page 22

1  ambiguous.
2      Q. BY MR. YAMAMURA: Do you understand what I'm
3  saying?
4      MR. O'NEILL: You can go ahead and answer.
5  I just noted that for the record.
6      A. I wouldn't consider it very sophisticated.
7      Q. BY MR. YAMAMURA: All I'm saying --
8      A. There is a lot of other equipment that's
9  much more sophisticated than that.
10     Q. In terms of the machinery itself and type of
11 design, that has been around the industry for a long
12 time; I understand from the 1940s, correct?
13     MR. O'NEILL: Objection. Found,
14 speculation.
15     Q. BY MR. YAMAMURA: The basic design for a
16 cutting table has been around since the 1940s?
17     MR. O'NEILL: Same objection.
18     Q. BY MR. YAMAMURA: Go ahead.
19     MR. O'NEILL: Go ahead and answer.
20     A. The other one we had was similar.
21     Q. BY MR. YAMAMURA: Similar in operation and
22 similar in design?
23     A. Similar in design.
24     Q. As I understand, I represent James Cash
25 Machine Company, and Mr. Cash, James Cash at least, was

## Page 23

1  one back in the 1930s right after -- he explained --
2  not James Cash but his son explained to me that until
3  the 1940s bedding was made with this kind of wiry
4  material, and box springs didn't come out until after
5  the war, from what I understand, and the whole industry
6  kind of changed because it needed different machinery.
7  In the old days they stuffed it with this wire thing --
8  I don't know what they call it -- and that changed
9  dramatically when the box spring came out.
10         I'm just trying to get a historical type of
11 perspective.
12     A. I don't know what you are referring to.
13     Q. Anyway, in terms of the cutting table
14 itself, those of you at Coyne as well as Simon had
15 exposure and experience with these types of machines
16 before in terms of design and function?
17     MR. O'NEILL: Overly broad.
18     A. I would say that was enough different from
19 the one we had that it would be considered
20 substantially different.
21     Q. BY MR. YAMAMURA: How would it be different?
22     A. One we had, like I said, was much smaller,
23 didn't have any motors, was strictly hand-operated.
24     Q. I see. The ones you had were mechanical,
25 not motorized?

## Page 24

1      A. That's correct.
2      Q. But in terms of how the machine actually
3  functioned in terms of spreading the cloth and pinning
4  and cutting, was it the same?
5      MR. O'NEILL: Overly broad.
6      A. Similar.
7      Q. BY MR. YAMAMURA: You helped set the machine
8  up in 1960-what; do you recall what year?
9      MR. O'NEILL: Misstates testimony. I don't
10 know that he said he helped --
11     MR. YAMAMURA: He said he helped assemble
12 it.
13     A. I didn't say I helped assemble it. I
14 remember when it came. I didn't help set it up.
15     Q. BY MR. YAMAMURA: Oh, I thought you said you
16 helped assemble it.
17     MR. BOUSLOG: I think he used maybe sort of
18 a vague term, he said "we".
19     Q. BY MR. YAMAMURA: That's fine. It is a
20 generic "we." That's fine. Also the generic "you."
21 When you set up the machine, who set it up?
22     MR. O'NEILL: Don't I have to say vague and
23 ambiguous when you say the generic "you"? I've heard
24 of brand name "you," generic "you". They all have the
25 same function.

## Page 25

1      Q. BY MR. YAMAMURA: Who set it up; do you
2  recall?
3      A. No, I don't.
4      Q. And fair to say that it was set up
5  sometime -- about what year was it set up?
6      A. I would say in the late 1960s.
7      Q. And it was in operation?
8      A. Yes.
9      Q. It was in operation, as I understood, from
10 the late 1960s up until the time of the accident?
11     A. That's correct.
12     Q. We'll get into that area a little later.
13 Suffice it to say this was a motorized-powered cutting
14 table?
15     A. That's correct.
16     Q. Are you familiar also with pneumatic-powered
17 cutting tables?
18     A. No.
19     Q. Are you familiar with James Cash Machine
20 Company?
21     A. Yes, I know of them.
22     Q. How do you know about them? Tell me what
23 you know.
24     A. I know they manufacture equipment for the
25 bedding industry, several different types of equipment,

Page 22 - Page 25

Gendrow v. Simon Mattress          Multi-Page™          Donald Erwin Lee
                                                        May 25, 2005

## Page 26

1  and we had bought other equipment from them.
2      Q. What kind of equipment have you bought from
3  them?
4      A. Tape edge machine, the one that puts the
5  tape around the mattress, seals it up. I believe we
6  bought a quilting machine from them.
7      Q. Anything else you can recall, just off the
8  top of your head?
9      A. Those are specific ones.
10     Q. Do you have any familiarity with the name
11 DRC Corporation or David R. Cash Corporation?
12     A. I may have heard of it but not --
13     Q. Your familiarity in terms of the machinery
14 manufacturer is James Cash Machine Company?
15     A. That's correct.
16     Q. These machines that you bought from Cash,
17 would that have been in the 1960s also?
18         MR. O'NEILL: You mean the tape edge and
19 quilting?
20     Q. BY MR. YAMAMURA: Tape edge and quilting.
21     A. Probably after that. Quilting we may have
22 bought in the 1960s, but tape edge, I think we bought
23 after.
24     Q. What is the function of the tape edge
25 machine briefly?

## Page 27

1      A. Put the tape around the mattress and seal it
2  up.
3      Q. The mattress itself in terms of the
4  materials and all that?
5      A. Mattress is made like a sandwich. There is
6  a spring unit, and then there is layers of upholstery,
7  and then the cover goes on. There is a flange that's
8  hog-ringed to the coils of the mattress all the way
9  around. So you've got the top and the bottom, and
10 there is the border that's put around the mattress, and
11 then tape edge is sewn to seal up the mattress.
12     Q. Is that pretty standard for the industry
13 manufacturing?
14     A. Absolutely.
15     Q. I take it the quilting machines put quilts
16 into the mattress cover itself?
17     A. The quilting machine Cash manufactured
18 wasn't the type that does quilts like for bedspreads.
19 It was one where you put all the ingredients together
20 in a layer and then it sewed the whole works together.
21 So you just laid that on top of the spring unit and
22 then closed it the same way.
23     Q. And from the time it was -- the machine was
24 in operation back in the late 1960s up until the
25 accident, I understand that it was in operation every

## Page 28

1  day, daily use?
2      A. Initially, yes.
3      Q. Was there a period of time when the company
4  -- I'm going to refer to whatever company was operating
5  Waipahu -- bought other types of machinery to do the
6  same function as this cutting table?
7      A. Yes.
8      Q. I assume the cutting table itself that was
9  designed back then and first manufactured back in the
10 1960s was becoming obsolete, basically was too slow?
11     A. That's correct.
12     Q. When did you buy replacement machinery to
13 sort of upgrade the machinery in terms of the cutting
14 table?
15     A. I have no idea on the date.
16     Q. Would it have been before the accident?
17     A. Yes.
18     Q. So by the time of the accident, the cutting
19 table involved in the accident was sort of just used on
20 a partial basis?
21     A. Sporadically.
22     Q. And you had other machines doing the same
23 function, just was more modern?
24     A. That's correct.
25         MR. YAMAMURA: I want to just take a short

## Page 29

1  break, if that's okay with you.
2          THE WITNESS: Fine.
3          (Recess from 9:40 a.m. to 9:54 a.m.)
4          MR. YAMAMURA: Back on the record.
5      Q. BY MR. YAMAMURA: What school did you
6  graduate from?
7      A. Oxford Academy.
8      Q. In England?
9      A. No, New Jersey.
10     Q. Was it that your family had moved away and
11 come back?
12     A. No. I had too much fun surfing here.
13     Q. You were sent away to school?
14     A. I was sent away as far as they could send
15 me.
16     Q. Let's focus back on the time when the
17 machine had been delivered to the premises. This is,
18 as I understand it, on Cooke Street?
19     A. 716 Cooke Street.
20     Q. And let's speak to the time it was being
21 assembled. Do you have a specific recollection of who
22 was involved in assembling the machine?
23     A. No, I don't, but I believe there was almost
24 no assembly required. It came in a crate and just had
25 to uncrate it and get an electrician to wire it in.

Gendrow v. Simon Mattress        Multi-Page™              Donald Erwin Lee
                                                          May 25, 2005

### Page 30

1    Q. As I understand, the original color of the
2  machine was like an olive drab green?
3    A. That's correct.
4    Q. So it was put into operation back in the
5  late 1960s, and from that time until when the company
6  was moved to Waipahu -- before it moved to Waipahu, was
7  the machine operating as per it should?
8    A. Yes, it was.
9    Q. When the operation was sold and moved to
10  Waipahu, how was the machine moved?
11    A. It wasn't sold and moved to Waipahu. We
12  moved to Waipahu. Company wasn't sold at that time.
13    Q. I'm sorry. So Coyne moved to Waipahu, and
14  when it was there that's when it was purchased by
15  Simon?
16    A. No.
17    Q. I'm sorry. Maybe you can explain that to
18  me.
19    A. We moved to Waipahu in 1973. We had 20,000
20  square feet on Cooke Street and the new factory was
21  68,000. Mattresses are very bulky and require a lot of
22  space. The table was moved to Waipahu, but the company
23  wasn't sold until 1998.
24    Q. So, in other words, what you have is you
25  kind of split your operation; manufacturing had moved

### Page 31

1  to Waipahu?
2    A. Everything moved to Waipahu, and we still
3  owned the Cooke Street property but we rented it out.
4    Q. I thought maybe you had one area for
5  manufacturing and other for distribution and that type
6  of thing, storage?
7    A. No. We rented it out.
8    Q. It was moved to Waipahu in 1973, the
9  operation?
10    A. That's correct.
11    Q. And it remained in operation there until --
12  well, through currently, but remained in operation up
13  until when it was sold and operation was sold in 1998?
14    A. That's correct.
15    Q. When the machinery was moved to Waipahu in
16  1973, did it need to be disassembled?
17    A. No.
18    Q. So it was basically just lifted up, put on a
19  truck and moved over?
20    A. Flatbed.
21    Q. I looked at the photographs of the machine.
22  I had a chance to take a quick look at it a couple of
23  weeks ago, maybe a month ago, and I noticed that the
24  machine -- correct me if I'm wrong -- Serta's sort of
25  corporate color for their offices are blue?

### Page 32

1    A. No, not really. When we moved to Waipahu,
2  we just painted all the equipment blue.
3    Q. And so you also painted the cutting table
4  blue?
5    A. That's correct.
6    Q. When I say "you," I'm talking about Coyne
7  Mattress, correct?
8    A. Not me personally.
9    Q. And when it was painted blue, did you have
10  to do any disassembling to paint it?
11    A. No.
12    Q. All your bedding equipment, manufacturing,
13  it was all painted blue just for, what, for company
14  color sake?
15    A. Right.
16    Q. Now, even currently today, year 2005,
17  machinery is all still blue?
18    A. Not necessarily. We did that initially
19  because it was really built as a show place. It was
20  very modern so we wanted it to look good. I guess for
21  maybe the next ten years we did paint things blue.
22  After that, it stopped.
23    Q. Sort of like a manufacturing showcase, so to
24  speak?
25    A. Right.

### Page 33

1    Q. So people would come by and you'd say, "this
2  is how you make it," and you show them machinery and
3  all this stuff, right?
4    A. That's correct.
5    Q. You mentioned that at the time of the
6  accident -- during the time of the accident, back in
7  January of 2001, that that machine was being used
8  sporadically?
9    A. That's correct.
10    Q. Give me an idea, because I understand at
11  that point in time you already had more modern
12  equipment. What was it used for?
13    A. More modern equipment is basically a table
14  that was taken from the garment industry, and it is
15  just a long table and it has a machine that goes back
16  and forth and lays out the material to about this
17  thickness.
18    Q. To about, oh, four inches, five inches?
19    A. Yeah. And then you have -- put a pattern on
20  it, mark it, and then with a cutter go around and cut
21  it. It is a lot more efficient than the other type.
22  The other one, that particular machine was used for
23  smaller jobs where it didn't require laying it out on
24  the table.
25    Q. When you say "smaller jobs," talking smaller

Gendrow v. Simon Mattress                    Multi-Page™                    Donald Erwin Lee
May 25, 2005

| Page 34 | Page 36 |
|---|---|

**Page 34**

1  in terms of amount of items or size?                        10:00:50
2      A. Items.                                               10:00:52
3      Q. You have custom bedding you made, too, also?          10:00:54
4      A. We did do odd-sized bedding.                          10:00:58
5      Q. Is that what the cutting table is used for,           10:01:00
6  odd-sized bedding and smaller type jobs?                    10:01:02
7      A. At the end, pretty much.                              10:01:04
8          The industry had changed prior to maybe             10:01:08
9  1990. Top of the box strings were the same material as      10:01:14
10 rest of the mattress and the boxing that went around.       10:01:20
11 After 1990, they came out with maybe three or four          10:01:22
12 colors that they used just on the box spring top, and       10:01:26
13 it was a nonskid material so that the mattress wouldn't      10:01:30
14 slide around. That's when the other machine became          10:01:36
15 practical because you were dealing with only maybe          10:01:38
16 three or four different colors instead of you have a        10:01:44
17 hundred different patterns of material.                     10:01:44
18     Q. Do you know Rod Saunders?                             10:01:48
19     A. I know of him.                                        10:01:50
20     Q. So we're at the point where -- let me ask             10:01:58
21 you this: When the machinery was delivered back in the      10:02:02
22 1960s, was anyone from James Cash Machine Company there      10:02:06
23 to help?                                                    10:02:10
24     A. Not that I recollect.                                 10:02:10
25     Q. To advise.                                            10:02:12

**Page 35**

1          When you said it didn't take much of                10:02:12
2  assembly, but the setup and running of the machine was      10:02:16
3  done all by Coyne people?                                   10:02:18
4      A. I believe that to be true.                            10:02:20
5      Q. In certain manufacturing operations they             10:02:22
6  have certain people who, for example, are in charge of      10:02:28
7  certain aspects of the operation. Is there anybody at       10:02:32
8  the company who was sort of like that was their machine     10:02:38
9  and that was -- they oversaw the operation of that          10:02:38
10 machine, talking about the cutting table?                   10:02:38
11     A. You mean who operated the table?                      10:02:38
12     Q. Yes, and maybe who -- for example, in car             10:02:42
13 manufacturing you have a painting unit and you have one     10:02:48
14 supervisor who oversees the painting operation, dunking     10:02:52
15 of the cars, that type of stuff.                            10:02:54
16         Do you have a similar type of setup?                 10:02:56
17     A. Well, there was a gal named Zenaida Mendoza           10:03:02
18 that was kind of in charge of the sewing room, sewing       10:03:08
19 area.                                                       10:03:14
20     Q. And this machine, cutting table, would be            10:03:16
21 part of the sewing room, so to speak?                       10:03:16
22     A. That's correct, and she actually was the one         10:03:18
23 that operated that machine. She was also the operator.      10:03:24
24     Q. That's a good subject. Maybe you could              10:03:26
25 break it down for me. You have a sewing room. What          10:03:30

**Page 36**

1  other subfunctions do you have within the manufacturing     10:03:34
2  process of the mattress?                                    10:03:38
3      A. At various times we had all kinds of                 10:03:40
4  different ones. There is a mattress assembly section,       10:03:42
5  delivery section. I mentioned we had cotton                 10:03:48
6  processing.                                                 10:03:52
7      Q. Right.                                               10:03:54
8      A. That had been closed by the time this                10:03:54
9  happened. At one time we made our own spring units and      10:03:58
10 we had a spring operation. We had a lumber operation        10:04:02
11 where we made the wood for the box springs.                 10:04:06
12         That's pretty much it.                               10:04:12
13     Q. Just for the layperson's perspective, the           10:04:14
14 sewing room, what was generally their functions or         10:04:18
15 processes?                                                  10:04:20
16     A. Included in the sewing room would be the            10:04:22
17 quilting machines. Those were like the ones I              10:04:26
18 mentioned we bought from Cash. Those were outdated by      10:04:30
19 that point. Sewing a flange around the edge of the         10:04:34
20 mattress cover, which is what is used to attach to the     10:04:42
21 spring unit after all the layers are put together. The     10:04:44
22 machine that makes the border that goes around the         10:04:48
23 edge.                                                      10:04:50
24     Q. Of the mattress box?                                10:04:50
25     A. The finish mattress.                                10:04:52

**Page 37**

1      Q. Box?                                                10:04:52
2      A. The boxing, right.                                  10:04:54
3      Q. Anything else? I just want a general idea.          10:04:56
4      A. Sewing the top of the box spring covers, put tape   10:05:00
5  around the top of the box spring cover and hem it.         10:05:02
6  That's pretty much it. And cutting.                        10:05:06
7      Q. From the time that the machine was delivered        10:05:12
8  and set up for operation in 1960s up to time of the        10:05:16
9  accident, did you ever make inquiry, "you" meaning your    10:05:20
10 company, whatever entity who owned the cutting table --    10:05:24
11 ever have any contact or make inquiry with James Cash      10:05:30
12 Machine Company or DRC concerning the operation of the     10:05:34
13 machine?                                                   10:05:38
14     A. Not that I know of.                                 10:05:38
15     Q. And would it be fair to say that one of the         10:05:40
16 reasons why is because it is a standard -- operation of    10:05:44
17 the machine is pretty much standard in the industry,       10:05:48
18 cutting table?                                             10:05:50
19     A. It wasn't a real complicated machine.               10:05:52
20     Q. And you, generically you, you guys knew how         10:05:56
21 it worked?                                                 10:06:00
22     A. Right.                                              10:06:00
23     Q. And in fact, if anything needed to be               10:06:02
24 maintained on the machine, you guys could do it            10:06:02
25 yourselves?                                                10:06:06

POWERS & ASSOCIATES

Gendrow v. Simon Mattress                    Multi-Page™                    Donald Erwin Lee
                                                                           May 25, 2005

---

Page 38

1   A. Really wasn't maintenance required other
2 than maybe little oil and grease. That was the extent
3 of it.
4   Q. And the oil and grease and that kind of
5 stuff, you had somebody on the site that just could
6 pretty much do that stuff?
7   A. Right.
8   Q. And the oil and grease would be for the
9 pulleys and the moving parts, joints and all that?
10   A. That's correct.
11   Q. Ms. Mendoza, is she still with the company,
12 if you know?
13   A. No. She passed away last year.
14   Q. At the time of the accident back in 2001,
15 who would have been operating that machine; would it
16 have been her?
17   A. Yes.
18   Q. Who else would know about the operation of
19 the machine back in 2001, other than Ms. Mendoza; who
20 would have had contact with that machine?
21   A. Let me think. Elizabeth Agar, she worked
22 with it occasionally.
23   Q. Is she still with the company or still
24 around?
25   A. I don't know.

---

Page 39

1   Q. Anyone else you can think of who would have
2 had some contact with the machine in its operation?
3   A. Rizilina Mendoza would also probably. That
4 was Zenaida's sister.
5   Q. Do you know if she's still with the company?
6   A. I think she is, but I'm not sure.
7   Q. Anyone else?
8   A. No.
9   Q. A-G-A-R?
10   A. Right, I think that's the spelling.
11   Q. Back in 2001, January -- accident happened
12 in January, but let's go about 2000, year prior to the
13 accident. How much would that machine be used to make
14 the special beds or smaller orders?
15   A. I don't really know.
16   Q. My understanding is that --
17   A. Two or three times a week has been --
18   Q. My understanding is that the accident
19 happened during the process of replacing the motor in
20 the cutting table?
21   A. That's correct.
22   Q. Was this the first time that the motor had
23 to be replaced?
24   A. Yes.
25   Q. So the motor -- that was the original motor

---

Page 40

1 that was being replaced?
2   A. That's correct.
3   Q. From late 1960s up to 2000, it was operating
4 fine?
5   A. The table is not like a normal piece of
6 equipment where a motor runs constantly. During the
7 day, when we used it full time, a motor may run eight,
8 nine times a day, and that's all. So it wasn't like it
9 was heavily used where it would wear out.
10   Q. I'm just curious because I'm not saying the
11 motor is good or bad. I'm just saying that was the
12 original motor that had to be replaced, correct?
13   A. That's correct.
14   Q. At the time of the accident, were you
15 operations manager for Simon?
16   A. Yes, I was.
17   Q. Let me just go back a little bit. I
18 understand that your son also worked for the company?
19   A. Yes, he did.
20   Q. What was your son's name?
21   A. Deral. D-E-R-A-L.
22   Q. And where is he now?
23   A. He is in Honolulu.
24   Q. What is he doing now?
25   A. He is unemployed.

---

Page 41

1   Q. Of?
2   A. Unemployed.
3   Q. Oh, unemployed. What was his position back
4 then, 2001, when the accident happened?
5   A. Foreman.
6   Q. For what part of the operation?
7   A. Overall generally. His main duties were
8 scheduling and just making sure the work was put out.
9   Q. The reason I ask that is because our
10 information was that Deral had made the call to A&B
11 Electrical to have the motor replaced?
12   A. That's probably correct.
13   Q. And then -- but he wasn't there when the
14 accident happened but that you were there when the
15 accident happened, and you called A&B and informed them
16 about the accident?
17   A. That's correct. We were running kind of a
18 split shift, so he started early.
19   MR. YAMAMURA: Off the record for a second.
20   (A discussion was held off record.)
21   MR. YAMAMURA: On the record.
22   Q. BY MR. YAMAMURA: I take it you were there
23 -- how were you informed that the accident happened?
24   A. I don't remember actually. I think someone
25 came up from downstairs and told us.

Gendrow v. Simon Mattress                Multi-Page™                Donald Erwin Lee
                                                                   May 25, 2005

## Page 42

1  Q. Where were you?  10:12:58

2  A. I was up in the office.  10:13:02

3  Q. In the office. And what was told to you?  10:13:02

4  A. I just overheard them telling the girl to  10:13:08

5  call the ambulance.  10:13:10

6  Q. And what did you do -- when you heard that,  10:13:12

7  what did you do?  10:13:16

8  A. I made sure they called the ambulance and  10:13:16

9  also the fire department, which was only two blocks  10:13:20

10  away.  10:13:22

11  Q. Give me like a narrative. What happened in  10:13:24

12  terms of -- you heard about the accident in the office.  10:13:26

13  Tell me what happens all the way through.  10:13:30

14      MR. O'NEILL: Probably a lot of events, but  10:13:36

15  try the best you can.  10:13:38

16      MR. YAMAMURA: Sure.  10:13:40

17  A. I went downstairs. One of the employees  10:13:42

18  wouldn't let me go in the room. "Don't go in there,"  10:13:52

19  he said.  10:13:58

20  Q. BY MR. YAMAMURA: Do you know which employee  10:14:00

21  this was?  10:14:04

22  A. He was the one I was telling you that was  10:14:04

23  off for two weeks after the accident -- or two months,  10:14:10

24  I think. Sheldon Pomikai.  10:14:14

25  Q. Okay.  10:14:28

## Page 43

1  A. He apparently had been in the area and dove  10:14:30

2  under the table to try to help him, but there was  10:14:32

3  nothing he could do.  10:14:38

4  Q. Do you know if Sheldon still works for the  10:14:38

5  company?  10:14:44

6  A. I believe he does, but I haven't been out  10:14:44

7  there for a year or so.  10:14:48

8  Q. So his words to you were: "Don't go in  10:14:50

9  there."  10:14:52

10      Then your understanding was he was in the  10:14:52

11  area. Do you know what he was doing in the area?  10:14:56

12  A. No.  10:15:00

13  Q. When the accident happened, he tried to  10:15:00

14  assist or dove under the table to try to lift it, or  10:15:04

15  what did he try to do?  10:15:04

16  A. I don't know.  10:15:06

17  Q. And then to your knowledge, he was the first  10:15:08

18  person from Simon who knew about the accident  10:15:12

19  happening?  10:15:16

20  A. I'm sure all the other girls in the area all  10:15:16

21  knew what had happened.  10:15:18

22  Q. I'm just wondering do you know if Sheldon  10:15:18

23  actually witnessed the accident happen or just that he  10:15:24

24  heard a noise and turned around and there it was?  10:15:28

25  A. I don't know. I don't know.  10:15:32

## Page 44

1  Q. I understand A&B Electrical during that time  10:15:36

2  was the electrical contractor who did the electrical  10:15:40

3  work for your company?  10:15:42

4  A. That's correct.  10:15:44

5  Q. And as I understand it, is still currently  10:15:44

6  -- they still do your electrical work when needed?  10:15:48

7  A. I have no knowledge of that. I know they  10:15:50

8  did when I was still operations manager after the  10:15:52

9  accident.  10:15:56

10  Q. Did you know Mr. Gendrow?  10:15:56

11  A. Yes.  10:15:56

12  Q. How well did you know him?  10:15:58

13  A. Fairly well.  10:15:58

14  Q. Tell me what did you know about him.  10:16:00

15  A. Well, he had done work for us for a number  10:16:04

16  of years, and he was in our factory probably at least  10:16:06

17  once a month, if not more.  10:16:10

18  Q. Various electrical jobs?  10:16:12

19  A. Various electrical jobs, right.  10:16:14

20  Q. What else; did you have any personal  10:16:16

21  contact, friend, go out?  10:16:20

22  A. I used to talk to him. I didn't know any of  10:16:22

23  his relatives, no, but I used to talk to him when he  10:16:24

24  was in the factory. If I happened to be around there,  10:16:28

25  I would always go by and say hi to him.  10:16:30

## Page 45

1  Q. What was your impression of Mr. Gendrow in  10:16:32

2  terms of was he a good electrician or --  10:16:32

3  A. I think he was an excellent electrician. We  10:16:36

4  had some very complicated electrical equipment, and he  10:16:40

5  was always able to figure it out.  10:16:46

6  Q. Mr. Lee, I know that you were there after  10:16:48

7  the accident happened. In your mind, can you tell me  10:16:52

8  what you think or how you think this accident happened  10:16:56

9  or why the accident happened?  10:17:00

10      MR. O'NEILL: Please do go ahead, but I have  10:17:02

11  to note two objections. One is speculation. Second  10:17:06

12  would be improper opinion.  10:17:10

13  Q. BY MR. YAMAMURA: Again, I'm just asking  10:17:12

14  from your perspective because I understand, Mr. Lee,  10:17:14

15  you are familiar how the table operates, I'm not, and  10:17:18

16  you were there onsite, unfortunately, when the accident  10:17:22

17  just had happened.  10:17:24

18      Can you tell me, in your mind, what you  10:17:24

19  think? Again, I'm just asking for your opinion, how  10:17:28

20  you think the accident happened.  10:17:32

21      MR. O'NEILL: Same objections.  10:17:34

22      MR. YAMAMURA: You can have a running  10:17:34

23  objection.  10:17:36

24      MR. O'NEILL: Also, I would add to the  10:17:36

25  extent it calls for a legal conclusion.  10:17:38

POWERS & ASSOCIATES

Gendrow v. Simon Mattress          Multi-Page™                    Donald Erwin Lee
                                                                  May 25, 2005

| Page 46 | Page 48 |
|---------|---------|

**Page 46**

1    MR. YAMAMURA:  Sure.  I'm not asking for a
2  legal conclusion.
3    A.  What I will tell you is basically hearsay.
4    Q.  BY MR. YAMAMURA:  Sure.
5    A.  There are two motors on that machine.  One
6  motor -- because when the table is in the upright
7  position, it is about 90 inches high.  And Zenaida was
8  five-feet-three.  No way she could lift it.  So there
9  was a step that when the table went in the upright
10 position, this step would raise up about 18 inches off
11 the floor, and she would stand on that.  The top of the
12 table were pins that would come out, and she would hang
13 the material back and forth on these pins from that
14 step.
15    Once the material was all hung up, she would
16 lower the step, and then bring the table down to a flat
17 position and lay her pattern on it and cut the
18 material.  The motor for the step is the one that went
19 bad.
20    So Deral called the electrician, and he came
21 out and he ordered a replacement motor.  A motor came
22 in a few days later, and he was called up to come down
23 and install it.  Apparently when he got there, the
24 motor he had ordered, because of the configuration of
25 the space it went in, would not fit in that area where

**Page 47**

1  the stair motor was.  So he apparently decided to
2  switch because it would fit on the one that tilted the
3  table.
4    Q.  I see.
5    A.  So he was going to take that motor, move it
6  over to the step motor, and put the new motor where the
7  other motor was.
8    Q.  To change -- that makes the table go up and
9  down?
10    A.  They were both identical motors.
11    Q.  But the new motor wouldn't fit on the
12 original to raise the step.  So what he was going to do
13 was use the old motor where the chain would raise and
14 lower the table, use that motor to put into the step
15 motor, and then use the new motor for where the chain
16 motor was; is that correct?
17    A.  That's what I understood.
18    Q.  Go on.
19    A.  It was in that process that the accident
20 happened.
21    Q.  So, in other words, my understanding is once
22 he -- this is my understanding.  Once he had taken off
23 the motor -- the chain motor that raises and lowers the
24 table itself, that table apparatus became freewheeling;
25 is that correct?

**Page 48**

1    MR. O'NEILL:  I have to object as misstating
2  and foundation, because you said taking off the motor.
3    Q.  BY MR. YAMAMURA:  My understanding is that
4  the accident happened in the process of him taking off
5  the motor which runs the table horizontal/vertical,
6  disassembling the chain from it, and that's when the
7  table fell on him; is that a fair statement?
8    A.  Yeah, I believe -- not necessarily changing
9  the motor but disconnecting it.
10    Q.  Because once you take off the chain off of
11 that motor that runs the table vertical/horizontal, the
12 table becomes almost freewheeling; doesn't it, nothing
13 to hold it up or hold it down?
14    A.  That's apparently what happened.
15    Q.  My understanding also is that after the
16 accident the machine was never put back into operation?
17    A.  No.
18    Q.  The job was never finished, and it was never
19 -- the machine was never operational after that?
20    A.  I think if I put it back in operation, all
21 the sewing girls would have quit.
22    Q.  Understood.  I'm just curious because when I
23 went out there to look at the machine, there were
24 several parts missing and one of the motors was
25 missing.  I'm just curious if you know anything about

**Page 49**

1  what happened to the parts with the machine or not.
2    A.  I have no idea.  Like I said, I haven't been
3  out there for three-and-a-half years.  Anything could
4  have happened.
5    Q.  Was anybody there from -- let me strike
6  that.
7      Mr. Gendrow was performing this repair to
8  the subject cutting table by himself?
9    A.  Yeah.  There was no one working with him.
10    Q.  He had no assistant with him?
11    A.  No.
12    Q.  Was anybody there from Simon to assist him
13 with the replacement of the motors or the repair?
14    A.  No, I don't believe so.  I don't know that
15 for a fact, though.  I'm pretty sure there wasn't.
16    Q.  Is it the kind of situation where there is a
17 lot of people around, or was that machine at the time
18 it was being repaired sort of in off-the-side area?
19    A.  It was in the middle of the sewing room.
20    Q.  There were people all around it?
21    A.  There were people around.
22    Q.  I'm curious, because I guess the reason I
23 ask that question is because you had already said at
24 that time you are using the machine sporadically.  I
25 thought maybe it was off in some corner where it is not

POWERS & ASSOCIATES

## Page 50

1 in the way of everything else.
2 A. Actually, we had moved that machine several
3 times and he had always been the one to do it. So he
4 was very familiar with the machine.
5 Q. When you moved the machine, you have to do
6 the electrics and all that?
7 A. Right.
8 Q. You moved it several times. How many times
9 before the accident had you moved it?
10 A. About three or four.
11 Q. And each time, he had to come out and get
12 involved with connecting the electricals and all that?
13 A. Uh-huh.
14 Q. Is that correct?
15 A. That's correct.
16 Q. He was also involved, as I understand --
17 strike that.
18 So during those times that he helped move
19 machines or was involved in moving of the machines --
20 and I think your testimony was, from your knowledge,
21 Mr. Gendrow was quite knowledgeable or knowledgeable
22 about how the machine operated and how it worked?
23 A. Yes, definitely.
24 Q. So in terms of what your hypothesis or
25 opinion is as to how the accident happened, it happened

## Page 51

1 during the time he was trying to disassemble -- I'll
2 call it the table-raising-and-lowering motor?
3 A. The table-tilting motor.
4 Q. Table-tilting motor, that would be better.
5 The reason why he was going to do that was
6 because he had to replace the step-raising motor, and
7 the replacement motor that was ordered did not fit in
8 that position, so he got the motor -- was going to use
9 the motor from the table-tilting motor, put it in a
10 step-raising position and use the new replacement motor
11 in the table-tilting motor position?
12 A. That's correct.
13 Q. Do you know how long he had been working on
14 the machine before the accident happened?
15 MR. O'NEILL: You mean that day?
16 Q. BY MR. YAMAMURA: That day.
17 A. It would just be a guess, maybe an hour, 45
18 minutes.
19 Q. At any time did Mr. Gendrow ask for
20 assistance from anybody in your staff in terms of
21 helping with the repair?
22 A. I have no idea.
23 Q. At any time did anybody in your staff or
24 operations people offer to assist Mr. Gendrow in the
25 repair of the machine?

## Page 52

1 A. I really doubt it because, like I said, he
2 was out there all the time and he knew all the
3 equipment, and he really didn't need any help.
4 Q. Again, like you testified, Mr. Gendrow, as
5 far as your understanding is, would be familiar with
6 the operation and how the machine worked and everything
7 else, correct?
8 A. Yes, basically every machine we had.
9 Q. So you say he worked pretty much on every
10 machine you guys had out there?
11 A. At one time or another, yeah.
12 Q. He had been out there -- how long had he
13 been the electrician, your electrician for that?
14 A. I'm guessing eight or nine years.
15 Q. As I understand it, A&B -- you are one of
16 A&B's larger accounts, and Mr. Gendrow, who was like a
17 senior electrician, was sort of assigned to take care
18 of you guys?
19 A. He usually came out. Occasionally they
20 would send someone else if he was on another job.
21 Q. But he was the main man?
22 A. Most of the time he came.
23 Q. He was the main man from A&B Electrical to
24 do any kind of electrical work that you guys had to
25 have done?

## Page 53

1 A. Right.
2 Q. Do you know what lockdown tag out is?
3 A. Yes, I do.
4 Q. Explain that to me, what you know about it.
5 What is it?
6 A. If you are working on a machine, you are
7 supposed to tag out the use of electrical power and
8 also other types of energy so that someone doesn't come
9 up and turn a switch and start a machine while you are
10 working on it basically, that type of thing.
11 Q. And when you say -- you are talking about
12 stored energy?
13 A. Right.
14 Q. Stored energy can be, for example, if you
15 have some kind of electrical component and there is
16 some residue electricity in it, and you turn it on
17 thinking it is unplugged and it zaps you or something
18 like that; that's what we're talking about?
19 A. That would probably be one case, yeah.
20 Q. And the other case of stored energy would be
21 where like if, for example, a pendulum in an up
22 position, the stored energy in up position, and
23 releases it as it moves back and forth?
24 A. That would be another.
25 Q. Were there any lockdown tag out procedures

Gendrow v. Simon Mattress                    Multi-Page™                    Donald Erwin Lee
                                                                            May 25, 2005

### Page 54

1 for the use of this cutting table that you guys had?
2     A. Only ones were electrical.
3     Q. In other words, the lockdown tag out was
4 basically to unplug it?
5     A. It was hardwired in.  It had to be tagged
6 out at the switch box.
7     Q. And when, to your knowledge -- this is maybe
8 after the accident -- when Mr. Gendrow was working on
9 that table, was it lockdown tagged out?
10     A. There again, it is hearsay, but I understand
11 it was, and he was pretty good at that.
12     Q. He was an experienced electrician, so he
13 knew that?
14     A. Yes.
15     Q. I understand that A&B Electrical had an OSHA
16 violation cited from this particular incident.  Do you
17 have any understanding of that?
18     A. I don't know anything about that.
19     Q. Did your company have any kind of OSHA
20 investigation conducted?
21     MR. O'NEILL: I would note an objection
22 based on H.R.S. Section 396-14 as to discovery of OSHA.
23 I'm not going to instruct him not to answer, at this
24 point at least, but I do think the statute is pretty
25 clear on the topic.

### Page 55

1     MR. YAMAMURA: I understand what you are
2 saying, Ralph.  But I think that goes to OSHA itself as
3 opposed to people they investigate, that that's
4 discoverable.  In terms of OSHA investigations, I agree
5 there is some protection there.  But that's fine.
6     Q. BY MR. YAMAMURA: Did OSHA investigate any
7 part of your company as a result of this incident?
8     A. One of the things you are required to do as
9 an employer if there is a bad accident, as soon as you
10 call the ambulance and the other, you call OSHA, which
11 I did.
12     Q. Did they actually come down --
13     MR. O'NEILL: Why don't we do this to make
14 it more efficient.  If I could have a running objection
15 on the basis stated.
16     MR. YAMAMURA: Sure.
17     MR. O'NEILL: If I have any additional
18 objections, I'll state them.  Otherwise, the whole area
19 will be covered by 396-14.
20     MR. YAMAMURA: No problem.
21     Q. BY MR. YAMAMURA: What happened when the
22 OSHA people came down?
23     A. It took quite a while.  I got an answering
24 service when I called them.  I guess it was a couple
25 hours later, a young fellow called and came out, and

### Page 56

1 took him a while because he had to come from Aina
2 Haina, and he did an initial investigation, took
3 photographs.  That was it.
4     Q. So in terms of OSHA involvement, you are the
5 one who called OSHA?
6     A. Yes.
7     Q. It wasn't A&B, to your knowledge?
8     A. No.  Well, they may have called, too, but I
9 did call.
10     Q. Was he there before or after the police, if
11 you know?
12     A. I'm not positive, but I imagine the police
13 were there first because he did take quite a while.
14     Q. In sort of the timeline of things, ambulance
15 was called, police were called also?
16     A. No, I didn't call the police.  Well, someone
17 else in the office may have.
18     Q. Do you know who first arrived in terms of
19 follow-up, who arrived first; ambulance, police, OSHA?
20     A. Ambulance and fire.
21     Q. Ambulance and fire came.  We know the police
22 were there eventually?
23     A. Right.
24     Q. Then would it be fair to say maybe the
25 fourth entity to be there for investigative or care

### Page 57

1 purposes was OSHA?
2     A. I'm trying to remember all the people that
3 were there.  I guess so.
4     Q. When the OSHA person was there, was Mr.
5 Gendrow still entangled in the machine?
6     A. Yes.
7     Q. How was he eventually released from the
8 machine?
9     A. He wasn't released until after the medical
10 examiner came.
11     Q. So medical examiner came to the scene and
12 determined that he had expired?
13     A. Yes.
14     Q. And then he was released, physically
15 released?
16     A. Yes.
17     Q. How was he physically released from the
18 machine?
19     A. They lifted the table up.
20     Q. Who is "they"?
21     A. I don't know.  The firemen, whoever was
22 still there.
23     Q. Do you know if it was manual or --
24     A. Manual.
25     Q. Reason why I ask that is because there was

Gendrow v. Simon Mattress          Multi-Page™                    Donald Erwin Lee
                                                                 May 25, 2005

## Page 58

1 some suggestion that A&B had sent out -- subsequent to
2 the accident sent out a person to complete the repair
3 so that the table could be lifted off of Mr. Gendrow;
4 in other words, put the motor back in and start it up
5 so you could lift the table. I don't know if that's
6 exact or not.
7      A. It is possible, but I have no knowledge of
8 that.
9      Q. Police arrive, fire, rescue, and eventually
10 -- is it the same day that he is released from the
11 machine?
12     A. Oh, yeah.
13     Q. And I also note from the OSHA records with
14 A&B Electrical they had to pay for environmental
15 cleanup because there was blood on the machinery area;
16 do you recall that?
17     A. Yes. There was quite a bit of blood.
18     Q. That had to be cleaned up environmentally
19 because it was a blood situation. So A&B Electrical
20 paid for the cleanup of the blood on the machinery?
21     A. That's correct.
22     Q. Machinery, as it sat there, when was it --
23 was it eventually moved to some corner in the
24 warehouse?
25     A. Yes.

## Page 59

1      Q. When was it moved?
2      A. I think it was the next day.
3      Q. And what part of the warehouse was it moved
4 to?
5      A. It was moved into an area in the warehouse
6 section.
7      Q. I'm trying to recall was it moved back to
8 the Diamond Head, makai side of the warehouse?
9      A. You have been out there. You know where the
10 loading doors are?
11     Q. Yes.
12     A. It was moved right next to them.
13     Q. Okay. You are talking about the loading
14 doors that are on sort of the Diamond Head side of the
15 building?
16     A. Yes.
17     Q. And initially that's where it was just moved
18 and stored?
19     A. Right.
20     Q. When I was out there also, I noticed that
21 the table itself had been tied up with rope, chain and
22 rope. Do you know who did that?
23     A. Fire people, I think.
24     Q. Nobody from Simon?
25     A. I don't know. I have no idea.

## Page 60

1      Q. It was secured somehow with some kind of
2 binding. I'm just curious who did that. You think
3 possibly the fire people?
4      A. Could have been anybody.
5      Q. So it was you who called A&B and told them
6 about the accident?
7      A. Yes.
8      Q. What did you tell them?
9      A. I just told them there has been a very bad
10 accident, and they said they would be right out.
11     Q. Who came out?
12     A. The owner.
13     Q. What was his name again?
14     A. I don't remember. I didn't have any dealing
15 with him.
16         MR. BOUSLOG: Malcom Barcarse.
17         THE WITNESS: I believe so. I believe
18 that's his name.
19     Q. BY MR. YAMAMURA: Did he come out to the
20 scene itself?
21     A. That's correct.
22     Q. Was Mr. Gendrow still in the machine when he
23 came out?
24     A. Yes.
25     Q. Did he kind of say, "What happened?" Or

## Page 61

1 what discussion took place during that time?
2      A. I don't remember much of a discussion with
3 him. I know I talked to him, but I don't remember what
4 we talked about.
5      Q. Do you recall any specifics in terms of what
6 he told you; in other words, whether he said --
7      A. "This is terrible," you know, but that's all
8 I remember specifically that he said.
9      Q. Did you have any discussions with police or
10 fire people about the accident?
11     A. No, not particularly.
12     Q. How about any discussions specifically --
13         MR. YAMAMURA: You have a running objection,
14 Ralph.
15     Q. BY MR. YAMAMURA: Any specific discussions
16 with the OSHA investigator?
17     A. No.
18     Q. Other than your attorneys, have you had any
19 other discussions concerning the accident and your
20 knowledge of the accident with anyone else?
21     A. Of course, I discussed it with the people
22 back in San Francisco, my superiors. I can't think of
23 anyone. I told other people about it, but not having
24 anything to do with the accident itself, per se.
25     Q. Have you ever discussed this matter or

Gendrow v. Simon Mattress          Multi-Page™                    Donald Erwin Lee
                                                                 May 25, 2005

## Page 62

1  anything relating to this matter with anyone from DRC
2  or James Cash Machine Company?
3      A. No.  I've had no contact with them.
4      Q. Did you go to the funeral?
5      A. Yes, I did.
6      Q. Do you know who gave the eulogy?
7      A. I don't remember.
8      Q. Any discussions with his wife about the
9  accident, what happened?
10     A. After the funeral was over, I went up and
11 told her how very sorry I was and everything.
12     Q. Condolences?
13     A. Yeah.
14     Q. Did you ever discuss in terms of -- did she
15 ask you or you ask her -- did she ask you or anyone ask
16 you from her family what happened?
17     A. My brother worked at the company as a
18 contract salesman.
19     Q. For?
20     A. For Serta, for the company.
21     Q. Serta, okay.
22     A. I guess -- again, it is basically hearsay,
23 but I believe he told me I think it was either his
24 daughters and maybe his wife came down to the factory
25 and wanted to see the machine, and he talked them out

## Page 63

1  of it.  He said it wouldn't solve anything.  She wanted
2  to see the area.  I think he showed her the area, but
3  it had all been cleaned up then and was nothing.
4      Q. Your brother, what's his name?
5      A. David.
6      Q. Is he still with the company or doing
7  something else?
8      A. He is an outside contractor to the company.
9      Q. Outside sales?
10     A. Yes.
11     MR. YAMAMURA: Off the record.
12     (A discussion was held off record.)
13     MR. YAMAMURA: Another quick break.
14     (Recess from 10:40 a.m. to 10:52 a.m.)
15     MR. YAMAMURA: Back on the record.
16     Mr. O'Neill, you have a running objection to
17 this line of questions.  I know you will have an
18 objection.
19     Q. BY MR. YAMAMURA: Mr. Lee, one of the
20 reasons I'm involved in this case is because Simon
21 Manufacturing/Serta's lawyer brought a claim against
22 James Cash Machine Company, as well as DRC, claiming
23 that the table, the subject cutting table, involved in
24 the incident was somehow defective, just to give you
25 background information as to why I'm particularly in

## Page 64

1  this case.
2      What I would like to ask you, sir, is:
3  Based upon your knowledge of the machine and its
4  operation and the history of the machine, do you, sir,
5  have an opinion as to whether or not that table was in
6  fact defective?
7      MR. O'NEILL: Let me interpose my objection,
8  and then you can go ahead.  Foundation, speculation,
9  improper opinion and legal conclusion.
10     MR. YAMAMURA: Can I have the question read
11 back, or do you understand?
12     THE WITNESS: Why don't you read it back.
13     MR. YAMAMURA: Sure.
14     (The reporter read the record as follows:
15 Question:  Mr. Lee, one of the reasons I'm involved in
16 this case is because Simon Manufacturing/Serta's lawyer
17 brought a claim against James Cash Machine Company, as
18 well as DRC, claiming that the table, the subject
19 cutting table, involved in the incident was somehow
20 defective, just to give you background information as
21 to why I'm particularly in this case.
22     What I would like to ask you, sir, is:
23 Based upon your knowledge of the machine and its
24 operation and the history of the machine, do you, sir,
25 have an opinion as to whether or not that table was in

## Page 65

1  fact defective?)
2      MR. YAMAMURA: You have a running objection
3  to these questions.
4      A. As far as the operation of the machine to do
5  the job for which it was purchased, it was fine.
6      Q. BY MR. YAMAMURA: Answer to my question is:
7  No, you have no opinion as to whether it was defective;
8  in your mind, it wasn't defective, in other words?
9      A. It did the operation for which it was
10 purchased.
11     Q. So the answer to my question would be that:
12 No, from your knowledge of it, the machine was not
13 defective; is that correct?
14     A. It did the job for which it was purchased.
15 That's my answer.
16     Q. Okay.  Have you ever discussed with anyone,
17 whether it be -- except for your lawyers, and with the
18 understanding and knowledge Mr. Gendrow had a working
19 knowledge of how the machine operated mechanically --
20 that's what you testified, that he knew how it operate
21 mechanically, correct?  Is that a "yes"?
22     A. Yes.
23     Q. As well as electrically?
24     MR. O'NEILL: Let me object it misstates his
25 testimony.

Gendrow v. Simon Mattress      Multi-Page™      Donald Erwin Lee
May 25, 2005

---

Page 66

1  You can go ahead.
2  A. Yes.
3  Q. BY MR. YAMAMURA: So understanding how --
4  Mr. Gendrow had an understanding as to how the machine
5  operated mechanically and electrically, do you have an
6  understanding as to how Mr. Gendrow could have allowed
7  this accident to happen?
8  MR. BOUSLOG: I'm going to object. Vague
9  and ambiguous, and assumes facts not in evidence, calls
10  for expert opinions.
11  MR. O'NEILL: Let me add speculation,
12  foundation, legal conclusion, improper opinion. He is
13  not an expert.
14  MR. YAMAMURA: That's fine.
15  MR. BOUSLOG: Join.
16  Q. BY MR. YAMAMURA: I guess I'm just wondering
17  -- you are the hands-on guy, you know the machinery,
18  you know how it works and have had history with that
19  since the 1960s, and I am just wondering what you know
20  of Mr. Gendrow's experiences as mechanically and
21  electrically with the machine, why would he have
22  disassembled the motor that moved the leveling table
23  knowing it would make that table freewheeling?
24  MR. O'NEILL: Same objections. Also
25  foundation and misstates testimony about disassembling

---

Page 67

1  motor.
2  MR. BOUSLOG: Join.
3  A. I have no knowledge of that.
4  Q. BY MR. YAMAMURA: We got into this area a
5  little bit before, and maybe some overlap, but let me
6  just briefly go over some of these areas.
7  You mentioned a little bit about the fact
8  that the only maintenance on that cutting table was
9  greasing and that type of stuff?
10  A. As far as I know, that's correct.
11  Q. Was there any one person particularly
12  responsible for maintaining that particular cutting
13  table?
14  A. Well, we had a mechanic Lorenzo Valdez.
15  Q. That's my next question. Did you have an
16  in-house mechanical guy that would go around and
17  maintain the machinery?
18  A. Yes.
19  Q. Who is that?
20  A. Lorenzo Valdez.
21  Q. Is he still with the company?
22  A. No.
23  Q. Is he still alive?
24  A. Yes, I believe so.
25  Q. Do you know where he is now currently,

---

Page 68

1  generally?
2  A. No idea.
3  Q. Employee records -- would you imagine or
4  would you think that employee records from Simon would
5  have his last known address and that type of stuff?
6  A. I'm sure they do.
7  MR. YAMAMURA: Ralph, I would like that
8  information also, whatever you've got in terms of a
9  contact with Mr. Valdez.
10  MR. O'NEILL: Okay.
11  Q. BY MR. YAMAMURA: So he would be the person
12  that would go around and make sure that machinery was
13  greased, maintained, all that stuff?
14  A. Yeah.
15  Q. So he would be like an in-house mechanic, so
16  to speak?
17  A. He wasn't really a mechanic. Any major
18  things we brought in outside people. He just did the
19  simple, simple things.
20  Q. Like you say, greasing and that kind of
21  stuff?
22  A. Yeah.
23  Q. Maybe loose bolt, just tightened things up?
24  A. Yeah. He wasn't with any stretch of the
25  imagination a mechanic as the common sense of the term

---

Page 69

1  would be.
2  Q. When you had to bring a person from outside,
3  contractor from outside for mechanical work, would you
4  use a particular company?
5  A. It would depend on the equipment. A lot of
6  it, we would bring people from the mainland that worked
7  for the company.
8  Q. Did you ever call on James Cash Machine or
9  DRC to come out and look at your equipment?
10  A. Not to my knowledge.
11  Q. Because would it be fair to say by the time
12  that the 1990s rolled around that the equipment you had
13  purchased from them was pretty much obsolete?
14  A. No. I think they are still using some of
15  their equipment.
16  Q. Then would it be fair to say the reason why
17  you didn't call them out was because the equipment was
18  functioning properly?
19  A. The tape edge machine in particular, I think
20  they are still using, and it is basically a machine
21  that goes around the table and it is a Singer head,
22  Singer sewing machine head.
23  Q. So --
24  A. So if we had problems with that, we would
25  have the Singer guy come in and fix it.

---

POWERS & ASSOCIATES           Page 66 - Page 69

Gendrow v. Simon Mattress                Multi-Page™                        Donald Erwin Lee
                                                                           May 25, 2005

| Page 70 | Page 72 |
|---|---|

**Page 70**

1  Q. Was there, aside from -- let me ask you
2  this: In terms of the greasing and maintenance on the
3  subject cutting table, do you know if there were any
4  kind of maintenance logs on the machinery kept; like,
5  for example, grease and oil every six months and
6  checked off, you've done this and done that?
7  A. Not that I know of.
8  Q. How would you keep track on when the table
9  should be maintained or when they should looked at by
10 somebody?
11 A. That, I didn't have anything to do with.
12 Q. Who would have that type of -- that level of
13 the operation; who would probably have knowledge of
14 that?
15 A. Well, over the years, the foreman would.
16 Q. This would have been your son back then?
17 A. Yeah.
18 Q. How about prior to your son; who was the
19 foreman prior to your son?
20 A. Bill Bowman.
21 Q. Where is he now; do you know?
22 A. No.
23 Q. But he was with the company for a while?
24 A. Yes.
25 Q. How long before your son -- how long was

**Page 72**

1  cutting table --
2       MR. BOUSLOG: Copy me on those things.
3       MR. O'NEILL: Sure.
4       Q. BY MR. YAMAMURA: In terms of subject
5  cutting table, then, any kind of periodic maintenance
6  would have been done in-house by your in-house
7  maintenance guy Lorenzo Valdez?
8       A. Any of the simple maintenance, yes.
9       Q. To your knowledge, was there any major
10 mechanical repairs that needed to be done to the
11 subject cutting table before the accident?
12 A. No.
13 Q. To your knowledge -- this may be
14 self-evident from your prior testimony, but I need to
15 ask you this. To your knowledge, were there any
16 modifications made to the subject cutting table?
17 A. Other than the painting, no.
18 Q. In other words, mechanically and
19 operational-wise, the machine was in the same condition
20 it was when it was first purchased back in the 1960s
21 when the accident happened?
22 A. Yes.
23 Q. Except for the painting?
24 A. Except for the paint.
25 Q. Were there any warnings or instructions

| Page 71 | Page 73 |
|---|---|

**Page 71**

1  your son foreman?
2  A. I don't remember. It wasn't that long.
3  Q. Before him was Bill Bowman?
4  A. Yes.
5  Q. And he has since left the company?
6  A. Yeah. He was discharged. Before him was
7  Harry Calistro.
8  Q. Harry Calistro sounds very familiar. What
9  was his specific position?
10 A. Foreman.
11 Q. And these were all regular full-time
12 employees of Simon?
13 A. Yes.
14     MR. YAMAMURA: Ralph, I would like that
15 information, if you have it. I would like contact
16 information.
17 A. Harry Calistro retired quite some time ago.
18 I don't know if he is still alive.
19     MR. O'NEILL: I'm going to assume for Bowman
20 and Calistro, all we'll have will be fairly
21 out-of-date, last-known addresses.
22     MR. YAMAMURA: I would figure so. At point
23 of discharge or release, there was a last-known
24 address, whatever you've got.
25 Q. BY MR. YAMAMURA: In terms of subject

**Page 73**

1  given to Mr. Gendrow prior to the time of the accident
2  with respect to the cutting table in terms of the
3  operation of the cutting table?
4       MR. O'NEILL: You mean warnings by Mr. Lee's
5  company?
6       MR. YAMAMURA: Yes.
7       A. Not to my knowledge.
8       Q. BY MR. YAMAMURA: In other words, if you are
9  going to work on this thing, you should tie this or do
10 this, anything like that?
11 A. No.
12 Q. Were there any warnings or instructions
13 given to the employees in the operation of the subject
14 cutting table?
15 A. No.
16 Q. How were your employees trained to use the
17 table, or did they need training for that table?
18 A. Really didn't need training. There were two
19 switches. Flip one switch, step would go up. Flip
20 another switch, table would tilt. They had automatic
21 stops on them. They stopped when they were supposed
22 to. So it was really very simple.
23 Q. That's what I was trying to get. Machine
24 and operation was very simple?
25 A. Yes.

## Page 74

1  Q. In terms of instructions or training on the

2 machines, it really wasn't necessary?

3  A. No.

4  Q. Pretty much anybody off the street could go

5 on and say, okay, I need to show them how it works, and

6 they could do the work?

7  A. That's correct.

8  Q. Had there been any other incidents involving

9 the cutting table in terms of personal injury?

10  A. No.

11  Q. In terms of repairs, the only repair that

12 was done that you know of -- only repair done to the

13 table was when the motor had to be replaced?

14  A. Yeah.

15  Q. So, in other words, the subject table

16 operated in a manner in which it did from the 1960s up

17 to 2000 without need of any kind of repair work on the

18 table itself?

19  A. That's correct.

20  Q. My understanding, it was your son who made

21 the call because, I guess, the step motor had failed

22 somehow?

23  A. I believe that to be the case.

24  Q. Were you in the office when he made the call

25 for maintenance?

## Page 75

1  A. I can't remember. I don't know when he made

2 it.

3  Q. In all other respects, though, your son was

4 the foreman for the floor level operation of the

5 factory?

6  A. Yes.

7  Q. And he had been in that position about how

8 long before the accident approximately?

9  A. I don't remember. I really don't.

10  Q. We talked a little bit about the lockdown

11 tag out provisions and talked about stored energy. I

12 guess that's a term of art in terms of the lockdown tag

13 out procedure; is that correct, stored energy?

14  A. I don't understand what you mean by a form

15 of art.

16  Q. It is in the procedure in terms of they

17 mentioned the term "stored energy"; we talked about

18 that?

19  A. Right.

20  Q. In your mind, how do you dissipate stored

21 energy?

22   MR. O'NEILL: Foundation, speculation

23 objection.

24  Q. BY MR. YAMAMURA: If you know. I'm not

25 asking you to guess.

## Page 76

1  A. Harness it, control it.

2  Q. As I advised you earlier in this case, I

3 represent James Cash Machine Company and DRC

4 Corporation in this case. I take it you've never had

5 any direct contact with them, anybody from them, from

6 those companies?

7  A. Not that I remember.

8  Q. And in terms of their involvement in this

9 case, do you in your own mind have any sort of opinion

10 or position with respect to whether they are in any way

11 at fault in this accident?

12   MR. O'NEILL: The same objection as

13 previously stated as to his opinion or conclusion as to

14 whether the machine was defective. Are you asking that

15 same question again, or are you asking something else?

16   MR. YAMAMURA: I'm talking general fault.

17 You can have an objection.

18   MR. O'NEILL: It is beyond objection. I'm

19 going to instruct him not to answer to the extent it

20 addresses whether the machine was defective because

21 we've done that twice.

22    If you have anything else -- I would object

23 on the basis previously stated if you have anything

24 else to say, but we don't want to rehash the topic of

25 whether you have an opinion or conclusion as to whether

## Page 77

1 the machine is defective.

2   MR. YAMAMURA: That's fine, Ralph.

3  Q. BY MR. YAMAMURA: All I'm asking basically

4 is: Based on your operation of the machine, operation,

5 history, in your mind did DRC or James Cash Machine

6 Company do anything wrong in this case?

7   MR. O'NEILL: Same objection and same

8 instruction.

9  A. When the machine came in, I don't believe

10 there was any instructions or any warnings of any type.

11    I've actually just been thinking about this

12 recently, that I would hope that if James Cash, knowing

13 what happened here -- and I assume that's the first

14 time it has ever happened in the company's history.

15  Q. BY MR. YAMAMURA: That's correct.

16  A. So this is the first time it has happened in

17 40 -- 35, 40 years, then I would hope that today they

18 have notified everybody they ever sold one to of this

19 problem, potential problem with a warning letter. I

20 know because I've gotten warning letters from different

21 companies that have had problems like that.

22  Q. Sure.

23  A. Even sent retrofit parts and stuff.

24    I would just hope -- I just hope they have

25 notified everybody.

Gendrow v. Simon Mattress                    Multi-Page™                    Donald Erwin Lee
May 25, 2005

---

Page 78

1  Q. I understand your testimony, but that's
2  talking about something that would occur subsequent to
3  the accident, and I'm just saying prior to the accident
4  --
5      MR. YAMAMURA: Mr. O'Neill, you can have a
6  running objection to this question.
7      Q. BY MR. YAMAMURA: Prior to the accident,
8  given the state of the facts as they were, do you feel
9  or believe James Cash Machine Company or DRC did
10 anything wrong in this case?
11     MR. O'NEILL: Do you have anything else to
12 answer? Because now we're on about the fourth version
13 of this question.
14     MR. YAMAMURA: He talked about subsequent to
15 the accident.
16     MR. O'NEILL: Actually it is not entirely
17 true. He already did make a reference -- not going to
18 try to paraphrase it, but he made a reference to
19 instructions or warnings with the machine, and he also
20 talked earlier about the defective question that you
21 raised.
22     So if you don't have anything else to
23 answer, then I think we're done.
24     A. The machine ran as it was supposed to. As I
25 previously stated.

---

Page 79

1      Q. BY MR. YAMAMURA: I think you mentioned this
2  earlier; that is, that in terms of the operation of the
3  machine, how it mechanically operates, the end user
4  being the mattress manufacturer had knowledge of how
5  those machines operate and how they mechanically work,
6  correct?
7      MR. O'NEILL: Objection. Misstates
8  testimony, speculation, foundation.
9      A. It takes flipping two switches to make it
10 work, yeah.
11     Q. BY MR. YAMAMURA: Mechanically speaking, I
12 think you also testified that Mr. Gendrow and people
13 that worked with the machinery pretty much know how the
14 machine works, how to operate it mechanically?
15     A. They knew how it operated, yes.
16     Q. In terms of -- so in terms of instructions
17 on operation, that's something that is sort of
18 self-evident; wouldn't you agree? You said it was
19 pretty easy to figure out how the darn thing operates,
20 so instruction of operation wouldn't be a big issue?
21     A. That's correct.
22     Q. And in terms of knowing that with the chain
23 that raises and lowers the table disconnected that that
24 table is freewheeling, that's pretty self-evident;
25 isn't it?

---

Page 80

1      MR. O'NEILL: Let me object to the extent it
2  calls for speculation, foundation, vague and ambiguous.
3      MR. BOUSLOG: Join in those objections.
4      A. That's the one thing that has bothered me
5  the most is how I would ever figure that out looking at
6  the machine. I couldn't. Even after the fact I looked
7  at it and looked at it and looked at it, and I don't
8  know how I would ever figure that out.
9      Q. BY MR. YAMAMURA: This type of cutting table
10 that we had, was there more than one in the factory or
11 this was the only one there was?
12     A. That's the only one.
13     Q. So from the 1960s up to the present, there
14 was only one cutting table like that?
15     A. Like that one, yes.
16     Q. Do you know of any other companies in Hawaii
17 who had the same type of table?
18     A. No.
19     Q. Any of your competitors that may have had
20 the same type of table?
21     A. They may have. I don't have any knowledge
22 of that.
23     Q. Who else besides Simon/Serta back in the
24 1960s -- besides Coyne in the 1960s was manufacturing
25 mattresses?

---

Page 81

1      A. There was Ushijima Couch Factory, Coyne,
2  Simmons, Sealy, Superior Bedding, Pacific Mattress. I
3  think that's all.
4      Q. Back in year 2000, let's talk about, which
5  companies were manufacturing bedding besides Serta?
6      A. Simmons.
7      Q. Anyone else?
8      A. No.
9      Q. Simmons Manufacturing, you are talking about
10 the one down at Industrial Park, Campbell?
11     A. Yes.
12     Q. And so it was only Serta, Waipahu location,
13 and Simmons, the Industrial Park location, that were
14 manufacturing beddings in Hawaii back then?
15     A. That's correct.
16     Q. One of the reasons was it because lot of it
17 was being shipped in from the mainland; is that what it
18 was?
19     A. Sealy went through a transformation where
20 they switched from a licensee organization to a wholly
21 owned organization and they just closed the plant here.
22 They shipped in from Richmond.
23     Q. I also understand one of the reasons why the
24 downturn in the mattress industry is because of the
25 lack of -- the depletion of military personnel here

---

Gendrow v. Simon Mattress     Multi-Page™     Donald Erwin Lee
May 25, 2005

Page 82

1 through the wars, various wars; is that a fair
2 statement?
3     A. I don't think that's quite correct.
4     Q. What's your --
5     A. Actually they are doing three times the
6 volume now that they did when I retired.
7     Q. When you say -- did you retire or --
8     A. I was downsized. They eventually downsized
9 everybody from the different licensees, anybody in
10 management.
11     MR. YAMAMURA: I have no further questions
12 at this time. Mr. Bouslog may have some questions.
13     MR. BOUSLOG: Do it. It might go a lot
14 smoother if we take a break.
15     MR. O'NEILL: Sure. Why don't we take a
16 five-minute break.
17     (Recess from 11:17 a.m. to 12:25 p.m.)
18     MR. YAMAMURA: Just a couple more questions.
19     Q. Mr. Lee, when the motor for the step failed
20 -- and that's what did fail in terms of the repair
21 asked for by A&B?
22     A. That's correct.
23     Q. Did anyone from your company attempt to
24 contact James Cash Machine or DRC about what to do in
25 replacing the motor?

Page 83

1     A. Not that I know of.
2     Q. As I understand it, specifically what Mr.
3 Gendrow did was look at the motor, get the serial
4 number and model number, and then go order it?
5     A. That's what I believe happened, yes.
6     Q. And then the motor came directly to your
7 premises, and then he came down to replace it?
8     A. That's correct.
9     MR. YAMAMURA: Thank you.
10     EXAMINATION
11 BY MR. BOUSLOG:
12     Q. Mr. Lee, as you are aware from prior
13 introductions, I represent the plaintiffs in this case,
14 and I'll try to avoid skipping around, but forgive me
15 if I do a little bit.
16     You had earlier today during the morning
17 session discussed the various evolutions of the
18 mattress manufacturing company throughout its history,
19 and I think what I would like to do is kind of come at
20 that from a different angle and just have you tell me
21 what your work and educational history was after high
22 school.
23     A. I went to UH for, I think, about a year and
24 a half, and I was involved in a surfing accident and
25 had to drop out. I intended to go back, but I went to

Page 84

1 work, and I was learning more working and enjoying it a
2 lot more. So I just never went back.
3     Q. So you went to work for your family's
4 company?
5     A. Yes, I did.
6     Q. What was your initial position when you
7 started work there?
8     A. I went to sales first. I was in sales for
9 probably about four years, five years. Then I got
10 involved in purchasing, inventory control, that aspect
11 of it.
12     My father was still working then, and he
13 became ill. He had -- what's that smoking disease?
14     Q. Emphysema?
15     A. Emphysema. So he became unable to work that
16 much anymore.
17     Q. About how old were you when that happened?
18     A. This would have been in the early 1980s.
19     Q. How long were you involved in purchasing and
20 inventory control?
21     A. I did most of the purchasing up until the
22 end. I handled inventory. I did most of the
23 scheduling.
24     Q. When you say "scheduling" --
25     A. Scheduling production, scheduling

Page 85

1 deliveries.
2     Q. Did you have a title when you were doing
3 these things?
4     A. Well, I did it as president. We had kind of
5 a -- the company consisted of myself, I have two other
6 brothers and Herbert Lee, who is Chinese. We used to
7 confuse the heck out of people.
8     Actually my brother Allen left the company
9 in the early 1990s. David and Herbert and I ran it in
10 a team fashion. Herbert handled the financial end.
11     Q. When did you become president, just roughly?
12     A. Around 1980.
13     Q. About the time your father became ill?
14     A. Right.
15     Q. At any time during your association with the
16 company, did you ever engage in any aspect of the
17 actual manufacturing of the mattresses?
18     A. I had done that when I was -- actually
19 before I started working full time, as a summer
20 employee.
21     Q. When you were in high school?
22     A. Yeah.
23     Q. Did you ever personally use the mattress
24 cutting table before?
25     A. No.

Gendrow v. Simon Mattress          Multi-Page™                    Donald Erwin Lee
                                                                   May 25, 2005

---

**Page 86**

1    Q. You mentioned the competitors of your                    12:30:46
2  company throughout kind of long-term history and also         12:30:56
3  on the date of the incident. Given that your                  12:31:12
4  estimation was that Mr. Gendrow was coming in and out         12:31:14
5  of your facility to work on your machines for about           12:31:14
6  eight or nine years prior to his death --                     12:31:14
7    A. Uh-huh.                                                   12:31:18
8    Q. -- do you know who the competitors for                   12:31:18
9  mattress manufacturing were in Honolulu during that           12:31:22
10 eight or nine-year period?                                    12:31:22
11   A. Primarily Simmons. Sealy may have still                  12:31:28
12 been -- I don't remember what year they closed up.            12:31:32
13 They had a factory at Halawa, but they were fairly            12:31:34
14 small at that point.                                          12:31:38
15   Q. This might be one of those questions where               12:31:44
16 you want to pay particular attention to the instruction       12:31:52
17 if you don't know the answer, you know, you can just          12:31:56
18 say you don't know.                                           12:31:58
19       Do you know whether A&B Electric or Mr.                 12:32:00
20 Gendrow serviced any of the competitors during the            12:32:04
21 eight or nine years you knew him?                             12:32:08
22   A. I don't know, but I would doubt it.                      12:32:10
23   Q. What leads you to say you would doubt it?                12:32:14
24   A. I think -- like I said, I used to talk to                12:32:18
25 him all the time. I would imagine he would have               12:32:22

---

**Page 87**

1  mentioned it.                                                 12:32:24
2    Q. In reference to your -- this is sort of                  12:32:26
3  skipping around, and I apologize.                             12:32:32
4        In reference to your speaking to him,                   12:32:34
5  basically other than your description of him as an            12:32:38
6  excellent electrician and able to figure problems out,       12:32:46
7  what other kind of attributes did you feel he had?           12:32:54
8    A. Well, he was a very friendly person. I                   12:32:58
9  really enjoyed conversations I did have with him.            12:33:00
10   Q. Had he had any -- before this incident for              12:33:08
11 which we're here today, had he had any prior accidents        12:33:14
12 or incidents within your factory?                            12:33:16
13   A. No.                                                     12:33:18
14   Q. So you had no reason to believe that he was             12:33:18
15 not a safe person?                                            12:33:22
16   A. I think on the contrary. I think he was a               12:33:26
17 very safe person.                                             12:33:26
18   Q. And did you feel -- I take it you felt                   12:33:30
19 comfortable having him physically in your premises,          12:33:36
20 then?                                                         12:33:38
21   A. Yes.                                                    12:33:38
22   Q. And in terms of the level of trust, did you            12:33:38
23 feel that he was an honest person in terms of your          12:33:44
24 assets and just other than the safety of your machines?     12:33:44
25   A. Yes.                                                    12:33:54

---

**Page 88**

1    Q. I think you mentioned earlier during the               12:33:56
2  morning session of this proceeding that you had             12:34:24
3  received warning letters or communications from the         12:34:30
4  manufacturers of machines that were within your company    12:34:38
5  from other companies prior to Mr. Gendrow's incident?      12:34:44
6    A. Yes, I had.                                            12:34:48
7    Q. If you recall, what were the nature, just             12:34:50
8  the general nature, of those communications?               12:34:52
9    A. Warning a possible danger or chance of                12:34:56
10 injury. That was primarily it.                             12:35:00
11   Q. Approximately how many times -- if you can't          12:35:06
12 come up with a number, if you can come up with a range     12:35:12
13 of numbers -- did you get these kinds of communications    12:35:16
14 for other pieces of equipment?                             12:35:18
15   A. Over the years maybe 10, 15 times.                    12:35:20
16   Q. In addition to getting notification of               12:35:26
17 problems and warnings, would these companies do           12:35:34
18 anything other than just give you a written              12:35:36
19 notification?                                              12:35:40
20   A. Sometimes they would send retrofit parts and         12:35:42
21 guards to eliminate the hazard, warning signs, that       12:35:50
22 sort of thing.                                             12:35:58
23   Q. In reference to this incident, basically it          12:36:04
24 is my understanding from your prior testimony that your   12:36:44
25 son had asked A&B to send Mr. Gendrow out to replace a    12:36:46

---

**Page 89**

1  burned-out motor; is that correct?                          12:36:54
2    A. That's correct.                                        12:36:56
3    Q. You've told us that at the time Mr. Gendrow           12:37:02
4  came to the factory that the table was in the up           12:37:08
5  position; is that correct?                                  12:37:10
6    A. I believe that's the way it was. That's the           12:37:12
7  way it was normally kept because it took up a lot less     12:37:16
8  space.                                                      12:37:18
9    Q. When it took up less space, did that permit          12:37:20
10 more room for operations in the general vicinity of the    12:37:24
11 machine's location?                                         12:37:28
12   A. Yeah. We had a lot of carts and racks with           12:37:30
13 finished covers, and like we weren't using the machine     12:37:34
14 all the time, so we could use the space around it, just    12:37:38
15 temporarily store stuff waiting for production and         12:37:42
16 things like that.                                           12:37:44
17   Q. It is my understanding from your prior               12:37:44
18 testimony that the machine was used perhaps two or        12:37:50
19 three times per week. Would it be fair to say that        12:37:54
20 that was over the several years prior to this accident?   12:37:58
21   A. Yeah, probably. It might have been used a           12:38:04
22 little more than that, you know.                           12:38:08
23   Q. Right, we understand that.                           12:38:08
24   A. I didn't spend a lot of time down there             12:38:10
25 watching how often it was used, but it wasn't used that  12:38:14

Gendrow v. Simon Mattress          Multi-Page™                    Donald Erwin Lee
                                                                  May 25, 2005

### Page 90

1 often.

2    Q. When you say -- when it was used on a given

3 day, would this be normally an eight-hour run through

4 it?

5    A. No. Probably just a couple hours or an

6 hour.

7    Q. So on a per-week basis, it might be 3 to 12

8 hours per week, something like that?

9    A. I would think that would be a fair estimate.

10    Q. And this is somewhat based upon your

11 examination of the machine after this incident. I'm

12 not asking you to try to parse out what you might have

13 known before.

14        Given, as you sit here today, what you know

15 about the machine, do you believe that the motor that

16 was holding up the table top and to which the chain

17 drive was attached could have been switched out if the

18 table were in the down position?

19    A. Yes. That's after the accident.

20    Q. That's knowledge you gained after the

21 accident?

22    A. That's correct.

23    Q. And that motor prior to being switched out

24 was in working condition?

25    A. Yes, it was.

### Page 91

1    Q. My understanding of Mr. Gendrow's work with

2 your company was that in reference to this particular

3 machine he helped rewire it on three or four occasions

4 when the machine was moved about the factory?

5    A. That's correct.

6        MR. O'NEILL: Wait until he gets his

7 question out so she can be sure to get you down.

8        THE WITNESS: Sorry. That was a little

9 quick.

10    Q. BY MR. BOUSLOG: Do you know whether -- I

11 take it when he rewired it, he would have occasion to

12 manipulate the position of the stair -- of the step as

13 well as the table to make sure that both motors were

14 working after he had rewired it; would that be fair, or

15 do you know?

16    A. Yes, you would have to do that because you

17 could wire a motor backward and it would go the wrong

18 direction. So he had to check it to make sure it was

19 running in the forward direction.

20    Q. Did you ever see him checking it, or that's

21 just your knowledge of the way he does his work?

22    A. I just know that was done. I was with him

23 on several occasions after he would finish the job, and

24 he would always check it to make sure it was running in

25 the proper direction.

### Page 92

1    Q. I take it this is the first time -- I guess

2 based upon your testimony this morning, this was the

3 first time that Mr. Gendrow had -- this particular

4 problem with this machine was the first time he had

5 ever removed a motor from this machine?

6    A. That's correct.

7    Q. Other than rewiring the machine, did he do

8 any other work on this particular mattress-cutting

9 table machine?

10    A. No. That was really the only electrical

11 parts there were.

12    Q. Really early one of the first things that

13 you were asked about this morning was a prior incident

14 in which someone was injured in the cotton processing

15 machine.

16    A. Yes.

17    Q. Roughly when did that incident occur?

18    A. Early 1980s. I'm just really roughly

19 guessing.

20    Q. Basically what was -- in your estimation

21 what was the cause of the injury?

22    A. The fellow shouldn't have been inside of

23 where he was, inside of the fenced area.

24    Q. I take it from your description that he was

25 hosing the area?

### Page 93

1    A. When you process the cotton, a lot of dust

2 built up and he was in there blowing the dust.

3    Q. With air?

4    A. With air, compressed air.

5    Q. Basically this is something he was supposed

6 to do outside of the fenced area?

7    A. It wasn't really a need to do it until the

8 machine was turned off. So during the operation, there

9 was no need to do it.

10    Q. So he was actually doing it when the machine

11 was actually in operation?

12    A. Yes.

13    Q. So I gather -- was he inside the fenced

14 area?

15    A. Yes.

16    Q. I guess there are a couple problems; one,

17 the machine was on?

18    A. He shouldn't have been inside when the

19 machine was on.

20        MR. O'NEILL: Let him get his whole question

21 out. We'll end up going faster.

22    Q. BY MR. BOUSLOG: Was the company --

23 following this incident, was the company supposed to

24 adopt written lockout tag out rules or regulations?

25        MR. O'NEILL: Which incident, cotton

Gendrow v. Simon Mattress                Multi-Page™                Donald Erwin Lee
                                                                    May 25, 2005

---

Page 94

1  machine?                                        12:44:44
2      Q. BY MR. BOUSLOG: Cotton machine.          12:44:46
3      A. Yes. We had a lot of lockdown tag out    12:44:46
4  regulations.                                    12:44:50
5      Q. You folks did that?                      12:44:52
6      A. Yes.                                      12:44:56
7      Q. This was for both electrical and stored  12:44:56
8  energy?                                          12:45:00
9      A. Yes. We had two other pieces of equipment 12:45:00
10 -- three other pieces of equipment that had the stored 12:45:04
11 energy.                                          12:45:10
12     Q. I take it the mattress-cutting table is one 12:45:10
13 of those pieces of equipment?                    12:45:14
14     A. That was not one of them.                 12:45:16
15     Q. That wasn't one that the company had      12:45:20
16 identified?                                      12:45:22
17     A. That's correct.                           12:45:22
18     Q. That was sort of getting into my next     12:45:30
19 question. Following this incident, I take it the 12:45:32
20 company made efforts to kind of identify and evaluate 12:45:36
21 the risks posed by the various pieces of equipment in 12:45:40
22 the company's premises?                          12:45:44
23     A. That's correct.                           12:45:44
24     Q. And a number of machines that had a       12:45:44
25 potential risk of stored energy were identified and put 12:45:52

Page 95

1  in with the lockout tag out procedures for the company? 12:45:56
2      A. Yes. They weren't actually put in the    12:46:00
3  procedures but they were identified.            12:46:04
4      Q. For whatever reasons, the mattress-cutting 12:46:08
5  table was not amongst those that was identified as 12:46:12
6  posing a risk of stored energy?                  12:46:16
7      A. That's correct.                           12:46:18
8      Q. Were the lockout tag out procedures that 12:46:20
9  were developed by the company following the cotton 12:46:34
10 processing machine ever provided to Mr. Gendrow? 12:46:36
11     A. He knew of them because he had worked on all 12:46:42
12 the machines that had that.                      12:46:44
13     Q. And how did he come to know of it?        12:46:44
14     A. They were verbally told to him.           12:46:50
15     Q. Do you know who communicated those        12:46:54
16 statements?                                      12:47:00
17     A. Not really, because it would depend on when 12:47:02
18 he was there.                                    12:47:04
19     Q. Who he was dealing with?                  12:47:04
20     A. Who he was dealing with.                  12:47:06
21     Q. And the communications were based upon the 12:47:06
22 written guidelines developed by the company?     12:47:10
23     A. Right.                                    12:47:12
24     Q. On the kind of odd lot jobs that you had  12:47:16
25 following this incident, given that this particular 12:48:00

Page 96

1  piece of machinery was no longer used, what equipment 12:48:04
2  was used for those jobs, if any?                 12:48:08
3      A. You mean after the accident?              12:48:12
4      Q. Yes.                                       12:48:14
5      A. I think we just used the flat table and   12:48:14
6  worked with it that way.                         12:48:22
7      Q. Do you have any knowledge as to whether Mr. 12:48:30
8  Gendrow ordered a motor with the wrong mountings for 12:48:44
9  the stair motor, or it just came with the wrong  12:48:44
10 mountings that didn't fit?                        12:48:52
11     A. I have no knowledge of that. I believe what 12:48:54
12 happened was he came out and took the specs off the 12:48:58
13 motor, and went back to his office and ordered it from 12:49:02
14 there.                                           12:49:06
15     Q. I guess a couple days or week later it came 12:49:06
16 and you guys called him --                       12:49:08
17     A. Right.                                    12:49:10
18     Q. So it came to your company?               12:49:12
19     A. Right.                                    12:49:14
20     Q. You mentioned earlier for some of the more 12:49:20
21 major mechanical work you would from time to time bring 12:49:40
22 in staff from the mainland to work on your equipment? 12:49:46
23     A. That's right.                             12:49:50
24     Q. Would that be from an affiliated mainland 12:49:50
25 company or from the producers of the machines?   12:49:54

Page 97

1      A. Usually it was from the producers of the 12:49:58
2  machines.                                        12:50:00
3      Q. I guess I used a bad word. The            12:50:00
4  manufacturers of the machines?                   12:50:04
5      A. Yes. Occasionally we had, like with the  12:50:06
6  cotton processing equipment -- there were people that 12:50:08
7  specialized in refurbishing those. They had to be 12:50:12
8  redone every ten years, roughly, and there were people 12:50:16
9  that weren't connected with the manufacturers that 12:50:22
10 actually did that type of work.                  12:50:24
11     Q. And you may have testified to this, and I 12:50:32
12 apologize if you have. I take it at least from the 12:50:34
13 gist of your earlier testimony today, at least while 12:50:38
14 you were affiliated with your former company, the 12:50:44
15 company never received any notification from James Cash 12:50:50
16 Machine Company about the risks of changing out the 12:50:56
17 motor when the table was in the up position?     12:50:58
18     A. No.                                       12:51:00
19        MR. YAMAMURA: Objection to form.          12:51:02
20     Q. BY MR. BOUSLOG: One of the last questions 12:51:06
21 you answered was -- I think the question was sort of 12:51:10
22 posed as the fact that the table was freewheeling, isn't 12:51:12
23 itself evidence, and I really didn't catch your answer, 12:51:20
24 and I apologize for that. I believe you said: I've 12:51:28
25 looked at it and looked at it, and I didn't --   12:51:30

POWERS & ASSOCIATES                                Page 94 - Page 97

`Gendrow v. Simon Mattress`     **Multi-Page™**     Donald Erwin Lee
May 25, 2005

---

### Page 98

1     MR. O'NEILL: Wait. If you are just asking    12:51:34
2 him to try to remember exactly what he said, then I    12:51:36
3 would much rather go back and take a look at the    12:51:42
4 transcript --    12:51:42
5     MR. BOUSLOG: That's fine.
6     MR. O'NEILL: -- than have him try to repeat    12:51:46
7 that whole area, especially because we had quite a bit    12:51:46
8 of objection about that.    12:51:50
9     MR. BOUSLOG: Yeah, that's fine.
10     MR. O'NEILL: But was there a follow-up    12:51:52
11 question you were leading into by asking?    12:51:54
12     MR. BOUSLOG: Possibly, but I don't know    12:51:56
13 what the answer was.    12:51:58
14     MR. O'NEILL: Let's avoid -- I would really    12:51:58
15 like to avoid that, and then I don't have to object and    12:52:00
16 all that.    12:52:04
17     MR. BOUSLOG: Why don't we go off the record    12:52:06
18 and see if we can find it.    12:52:08
19     (^ Check read .    12:52:10
20    Q. BY MR. BOUSLOG: I take it from that answer    12:54:14
21 to you it was not self-evident?    12:54:16
22    A. It was not.    12:54:16
23     MR. BOUSLOG: Thanks. I have no further    12:54:20
24 questions.    12:54:22
25     MR. O'NEILL: I have no questions.    12:54:28

---

### Page 99

1     FURTHER EXAMINATION
2 BY MR. YAMAMURA:
3    Q. Have you personally ever operated that    12:54:40
4 machine?    12:54:42
5     MR. O'NEILL: Asked and answered, but you    12:54:44
6 can go ahead.    12:54:46
7    A. Have I ever operated it as --    12:54:48
8    Q. BY MR. YAMAMURA: As an operator.    12:54:54
9    A. As an operator, no. I've made it go up and    12:54:54
10 down and made it tilt back and forth, but I never    12:54:56
11 actually ran it as an operator.    12:55:00
12    Q. Just so I have a clear answer to this    12:55:02
13 question, Mr. Gendrow during the time that the machine    12:55:02
14 was moved and rewired, the machine, the cutting table,    12:55:04
15 what did he have to do to rewire it; what was done?    12:55:14
16    A. It was always hardwired. It wasn't a plug    12:55:16
17 you plug into the wall. So he would have to -- in some    12:55:18
18 cases he would have to run new wires from the switch    12:55:24
19 box to the machine.    12:55:28
20    Q. Each time that was done, I think you    12:55:30
21 testified that he had to run the machine to make sure    12:55:32
22 the motors were going the right direction?    12:55:34
23    A. That's correct.    12:55:36
24    Q. So he had actually run the machine himself    12:55:36
25 several times before the accident?    12:55:40

---

### Page 100

1    A. Yes.    12:55:40
2     MR. YAMAMURA: No further questions.    12:55:42
3     MR. BOUSLOG: Real quickly.    12:55:46
4     FURTHER EXAMINATION
5 BY MR. BOUSLOG:
6    Q. Prior to Mr. Gendrow's accident, when did    12:55:48
7 the company last conduct an evaluation of its energy    12:55:52
8 control procedures, to your knowledge?    12:55:58
9    A. I really don't remember. I really don't    12:56:06
10 remember.    12:56:10
11    Q. Had the company done annual or more frequent    12:56:14
12 inspection of its energy control procedures prior to    12:56:24
13 Mr. Gendrow's injury?    12:56:28
14    A. No. It wasn't done that often.    12:56:30
15     MR. BOUSLOG: Thanks. Nothing further.    12:56:48
16     MR. YAMAMURA: Real quick.    12:56:52
17     FURTHER EXAMINATION
18 BY MR. YAMAMURA:
19    Q. I think you testified, but let me make sure    12:56:56
20 I've got my notes right. The motor that ran the    12:56:58
21 position of the cutting table, that particular motor    12:57:02
22 could have been replaced with the table in the down    12:57:10
23 position; is that correct?    12:57:12
24    A. Yes.    12:57:16
25    Q. Any reason or understanding as to why Mr.    12:57:16

---

### Page 101

1 Gendrow chose to take that motor off while the table    12:57:20
2 was in the up position?    12:57:24
3     MR. BOUSLOG: Speculation.    12:57:24
4     MR. O'NEILL: Calls for speculation.    12:57:26
5     MR. BOUSLOG: Foundation.    12:57:28
6    A. Yeah, I would only be guessing.    12:57:28
7    Q. BY MR. YAMAMURA: What's your guess?    12:57:32
8     MR. O'NEILL: Same objection, foundation as    12:57:32
9 well.    12:57:36
10    A. One was that it was probably in the upright    12:57:36
11 position when he went to work on it. The other was it    12:57:40
12 was probably more convenient not having to crawl under    12:57:42
13 it.    12:57:46
14     MR. YAMAMURA: Thank you.    12:57:54
15     MR. BOUSLOG: Thank you. Sorry you had to    12:57:54
16 relive this thing.    12:57:56
17     (The deposition adjourned at 12:58 p.m.)    12:58:00

---