1

IN THE UNITED STATE DISTRICT COURT

FOR THE DISTRICT OF HAWAII

DENISE GENDROW, Individually ) CIVIL NO. CV03 00034
and as Personal Representative) DAE/BMK
of THE ESTATE OF CHARLES ) (Other Non-Vehicle Tort)
EUGENE GENDROW, JR.; )
CHARLES E. GENDROW, III; )
and JEANNE SMITH; )
)
              Plaintiffs, )
)
     vs. )
)
COYNE MATTRESS MANUFACTURING )
COMPANY; SERTA MATTRESS )
CORPORATION; JOHN DOES 1-10; )
DOE CORPORATIONS 2-10; )
DOE PARTNERSHIPS 1-10; )
DOE GOVERNMENTAL )
ENTITIES 1-10; )
DOE UNINCORPORATED )
ASSOCIATIONS 1-10; )
)
              Defendants. ) Trial Date: 09/07/05
------------------------------)
SIMON MATTRESS MANUFACTURING )
COMPANY, )
              Defendant and )
              Third-Party )
              Plaintiff, )
)
     vs. )
)
DRC CORPORATION, )
)
              Third-Party )
              Defendant. )

**COPY**

**CONDENSED**

DEPOSITION OF
DAVID R. CASH

January 11, 2005

**DISK
ENCLOSED**

EXHIBIT "C"

DEANA BOYER, CSR, RPR
COURT REPORTING SERVICES (502) 254-1004

DEPOSITION OF DAVID R. CASH

DEPOSITION AND ANSWERS of DAVID R. CASH, taken before Debra E. Boyer, CSR, RPR, court reporter and notary public for the State of Kentucky at Large, in the offices of Lynch, Cox, Gilman & Mahan, PSC, 400 West Market Street, 2200 Aegon Center, Louisville, Kentucky, 40202, on January 11, 2005, between the hours of 1:05 p.m. and 4:30 p.m., pursuant to notice and in accordance with the Kentucky Rules of Civil Procedure.

3

```
 1              A P P E A R A N C E S

 2

 3    ATTORNEYS FOR THE PLAINTIFFS:

 4              LAW OFFICES OF CHRIS BOUSLOG
                4-480 Waterfront Plaza
 5              500 Ala Moana Boulevard
                Honolulu, Hawaii 96822
 6

 7              By:  Mr. Chris Bouslog

 8    ATTORNEYS FOR THE DEFENDANT AND THIRD-PARTY PLAINTIFF
      SIMON MATTRESS MANUFACTURING COMPANY MISIDENTIFIED AS
 9    "SERTA MATTRESS CORPORATION":

10              LYNCH, COX, GILMAN & MAHAN, PSC
                400 West Market Street
11              2200 Aegon Center
                Louisville, Kentucky 40202-3352
12
                By:  Mr. Armer H. Mahan
13

14    ATTORNEYS FOR THIRD-PARTY DEFENDANT DRC CORPORATION:

15              YAMAMURA & SHIMAZU
                Suite 1770 Central Pacific Plaza
16              220 South King Street
                Honolulu, Hawaii 96813
17
                By:  Mr. Paul T. Yamamura
18
                    - and -
19
                STITES & HARBISON, PLLC
20              400 West Market Street
                Suite 1800
21              Louisville, KY 40202-3352

22              By:  Ms. Sarah Grider Cronan

23

24
```

4

```
1                    I N D E X

2

3   DAVID R. CASH                            PAGE

4

5       Examination by Mr. Mahan           5, 102

6       Examination by Mr. Bouslog        82, 105

7       Examination by Ms. Cronan             98

8

9

10

11

12                   E X H I B I T S

13

14  Exhibit No. 1.................................. 13

15  Exhibit No. 2.................................. 15

16  Exhibit No. 3.................................. 16

17  Exhibit No. 4.................................. 31

18  Collective Exhibit No. 5....................... 35

19  Exhibit No. 6.................................. 56

20  Exhibit No. 7.................................. 68

21  Exhibit No. 8.................................. 72

22  Exhibit No. 9.................................. 76

23  Exhibit No. 10................................ 102

24
```



5

1                    DAVID R. CASH
2   was called as a witness and, being first duly sworn by
3   the notary, testified as follows:
4
5                   DIRECT EXAMINATION
6   BY MR. MAHAN:
7        Q.  Would you state your name, please, sir?
8        A.  David R. Cash.
9        Q.  Mr. Cash, let me tell you that my name is
10  Armer Mahan, and I am an attorney with offices in
11  Louisville, Kentucky, and I am here to take your
12  deposition on behalf of Mr. Steve MacDonald in an
13  action that I am sure your counsel has talked to you
14  about before this deposition.
15       If at any time you want to take a break
16  during the course of this proceeding, tell me so and
17  we will take a break.
18       A.  Okay.
19       Q.  If I ask you any question that you don't
20  understand, then please tell me that and I will
21  rephrase or repeat the question for you.
22       Can you tell me what your date of birth is,
23  sir?
24       A.  August 15th, 1929.

7

1   of any corporation?
2        A.  No.
3        Q.  We are here today to take your deposition
4   pursuant to a Rule 30(b)(6) notice that was served.
5   Have you looked at that notice before this deposition?
6   Let me show it to you.
7
8                (A document was tendered
9                to the witness.)
10
11       A.  I have seen that.
12            MR. YAMAMURA:  This is the first amended
13  notice, correct?
14            MR. MAHAN:  Yes.
15            MR. YAMAMURA:  Okay.  Yeah.
16       A.  I have seen it.  Okay.
17  BY MR. MAHAN:
18       Q.  If you will just keep that in front of you.
19       A DRC Corporation is a party to this
20  litigation for which that notice has been served; is
21  that correct?  Do you know that, Mr. Cash?
22       A.  Yes, deactive DRC Corporation.
23       Q.  Now, the DRC Corporation that's a party in
24  this lawsuit, do you know when that corporation was

6

1        Q.  And where do you live?
2        A.  Louisville, Kentucky.
3        Q.  At what address?
4        A.  102 Outer Loop, 40214.
5        Q.  And is that your home address, sir?
6        A.  Yeah.
7        Q.  Are you currently employed?
8        A.  No.
9        Q.  Are you currently the officer of any
10  corporation?
11       A.  Of LLC, a real estate corporation.
12       Q.  What corporation is that?
13       A.  5559 National Turnpike.
14       Q.  What's the name of the corporation?
15       A.  That is the name of it.
16       Q.  5559 National Turnpike?
17       A.  Yes.
18       Q.  LLC?
19       A.  Yeah.
20       Q.  And what does this corporation do?
21       A.  Just holds real estate.
22       Q.  Are you an officer of any other corporation?
23       A.  No.
24       Q.  Are you currently on the board of directors

8

1   incorporated?
2        A.  The active one?  I know there is two of them,
3   so I will refer to the older one as time goes by as
4   one, and I will probably refer -- or, inactive and
5   I will refer to the second one as either the second one
6   or active.
7        Q.  Okay.
8        A.  The second one was incorporated in '79, or
9   the active.
10       Q.  And were you an incorporator of that
11  corporation?
12       A.  Yes, I was.
13       Q.  Now, as I understand, that corporation is no
14  longer in existence today.
15       A.  The second or active one is no longer in
16  existence.
17       Q.  And Articles of Dissolution were filed as of
18  July 1, 2004?
19       A.  Or June or July.  I was thinking it was June.
20       Q.  When DRC was incorporated in 1979, who were
21  the officers?
22       A.  I would have been the first officer when it
23  was incorporated.  I imagine at that time I was the
24  only one.

9

1    Q. You were the president?

2    A. Yeah.

3    Q. What did DRC, Incorporated, do?

4    A. I incorporated it to -- the long outlook was

5 to get the real estate. In the beginning, we

6 refurbished some used equipment.

7    Q. How long did DRC, Incorporated -- we are

8 going to refer to this as the active corporation as you

9 have described it. How long did it refurbish

10 equipment?

11    A. Oh, several years. Mostly, I would think

12 between '79 and it acquired its first piece of real

13 estate in '84, so most of the activity would have been

14 between those years.

15    Q. What type of equipment did it refurbish, sir?

16    A. Mattress making.

17    Q. When it refurbished mattress making

18 equipment, did it do that by going to the location

19 where the equipment was or did it have the equipment

20 sent to Louisville, Kentucky?

21    A. It would have been in Louisville, Kentucky.

22    Q. So the mattress making equipment would have

23 to be shipped to Louisville to be refurbished by

24 DRC, Incorporated?

10

1    A. Yes, if it were -- if a customer were sending

2 it in, it would be brought to Louisville, Kentucky.

3    Q. Now, when DRC was incorporated in 1979, its

4 address was 525 West Hill Street?

5    A. 625.

6    Q. I am sorry, 625 West Hill Street; is that

7 correct?

8    A. Yeah.

9    Q. How long did it stay at that address?

10    A. Until 1987 or 1988.

11    Q. And to what address did it move?

12    A. 102 Outer Loop. Excuse me, that's wrong.

13 100 Outer Loop.

14    Q. Now, obviously 100 Outer Loop is adjacent to

15 102 Outer Loop.

16    A. Yes. I have my home there.

17    Q. 100 Outer Loop, can you describe that

18 property for me? Is this a factory?

19    A. It's a factory. It's industrial property.

20    Q. Who owns 100 Outer Loop?

21    A. I do.

22    Q. Since 1984 or 1985, the active DRC

23 Corporation, has that done anything other than real

24 estate holding?

11

1    A. Real estate holding and refurbishing.

2 Probably even after '85 we probably refurbished a few

3 machines, but it would have been mostly real estate at

4 that time, I believe.

5    Q. The machines that were being refurbished, can

6 you describe them for me?

7    A. Well, it would have just been mattress

8 manufacturing machinery.

9    Q. Would it have been --

10    A. It could have been tape-edge machines. It

11 could have been border machines, which is what they

12 sound like they are.

13    Q. And could it have been the type of cutting

14 table that's described in the notice for your

15 deposition?

16    A. It could have been most any type of

17 machinery. However, I don't remember what types they

18 were.

19    Q. Well, is the answer to my question yes, it

20 could have been a cutting table as well that would have

21 been refurbished?

22    A. It could have been.

23    Q. How long were you president of the active

24 DRC Corporation?

12

1    A. Until its dissolution.

2    Q. Do you know if DRC Corporation, the active

3 corporation, ever refurbished the cutting table that

4 was located with Simon Manufacturing or any of its

5 other businesses in Hawaii?

6    A. It was not a refurbished table.

7    Q. And how do you know that?

8    A. Because the old DRC, it's a 1960 table, as I

9 remember, and that would have been built by the old DRC

10 Corporation new, not refurbished.

11    Q. Did DRC Corporation -- and I am talking now

12 about the active corporation -- ever refurbish mattress

13 making equipment that had been earlier manufactured by

14 the former DRC Corporation, or the inactive?

15    A. Anything is possible. I would say no.

16    Q. Who maintains the corporate records for

17 DRC, Inc., corporation, the active corporation?

18    A. We do. My wife does.

19    Q. And where are they located now?

20    A. 102 Outer Loop.

21    Q. Before we go further, let me show you an

22 answer to interrogatories that I believe was signed by

23 you on January 5 of this year. This is the second

24 amended response to the first set of interrogatories.

13

1    MR. YAMAMURA: We have that. For the
2 record, it's "Third-party Defendant DRC Corporation's
3 Second Amended Response to Defendant and Third-Party
4 Plaintiff Simon Mattress Manufacturing Company's First
5 Request for Answers To Interrogatories to Third-party
6 Defendant DRC Corporation." I believe that's what you
7 are looking at.
8    MR. MAHAN: Correct. We are going to
9 file that as Exhibit A.
10    MR. YAMAMURA: Okay. That's going to be
11 an exhibit.
12    MR. MAHAN: Let's make it Exhibit 1.
13
14    (Deposition Exhibit No. 1 was
15    marked for identification.)
16
17 BY MR. MAHAN:
18    Q. If you will turn to the answer to
19 Question No. 1. In that answer you state that, "The
20 DRC Corporation which manufactured the cutting table
21 involved in this incident has been inactive since
22 1970."
23    A. That's true.
24    Q. Now, you were shown photographs of the

14

1 cutting table involved in this incident?
2    A. I have seen some photographs, yes, sir.
3    Q. Let me show you some -- I am going to mark
4 this Exhibit 2. If you would look at that photograph
5 for me. Are those photographs that you have seen?
6    MR. YAMAMURA: Counsel, for the record,
7 are these the photographs attached to the notice as
8 Exhibit A?
9    MR. MAHAN: That's right.
10    MR. YAMAMURA: Okay.
11 BY MR. MAHAN:
12    Q. Have you seen those photographs?
13    A. Yes.
14    Q. And when you say, "The DRC Corporation which
15 manufactured the cutting table involved in this
16 incident has been inactive since 1970," you are
17 referring to the cutting table referred to in one of
18 the photographs and the plaque referred to in the
19 bottom photograph?
20    A. Yes.
21    MR. MAHAN: We will mark that as
22 Exhibit 2.
23
24

15

1    (Deposition Exhibit No. 2 was
2    marked for identification.)
3
4 BY MR. MAHAN:
5    Q. Now, Mr. Cash, let me speak a moment for the
6 DRC Corporation that's referred to in answer to
7 Interrogatory No. 1, all right?
8    THE WITNESS: You are speaking of the
9 old DRC?
10    MR. YAMAMURA: Yeah.
11    At this point of questioning, just for the
12 record, let's put it on the record, that we did send a
13 letter to Mr. MacDonald indicating, for the record,
14 that he is here as a 30(b)(6) representative of DRC,
15 the second corporation or the active corporation. We
16 will allow him to testify as a fact witness as to the
17 prior DRC Corporation, but he is not a 30(b)(6)
18 representative of that entity. So he can testify as a
19 fact witness of what he knows; but as far as binding on
20 the old corporation, the first DRC, we will make that
21 very specifically understood.
22 BY MR. MAHAN:
23    Q. Mr. Cash, concerning the DRC Corporation that
24 was incorporated in -- I think it was in 1966; is that

16

1 correct?
2    A. Close. '65 or '66, yes. I don't really
3 know. I haven't looked at none of those records in
4 years.
5    MR. MAHAN: Mark these as Exhibit 3.
6
7    (Deposition Exhibit No. 3 was
8    marked for identification.)
9
10 BY MR. MAHAN:
11    Q. I am going to show you a series of documents,
12 Mr. Cash.
13    MS. CRONAN: Counsel, do you have other
14 copies of your exhibits?
15    Did you answer my question or are you
16 looking?
17    MR. MAHAN: I have one other.
18    MS. CRONAN: Okay.
19    Will the exhibits be attached?
20    MR. MAHAN: Yes.
21    MS. CRONAN: You are going to attach
22 them to the transcript?
23    MR. MAHAN: Yes.
24



17

BY MR. MAHAN:

Q.  You see there that DRC Corporation is identified as the Articles of Incorporation having been certified as duly signed and acknowledged by the Kentucky Secretary of State on January 17, 1966?

A.  January.  I don't see any -- there is no -- there it is, yes.

MR. YAMAMURA:  That's January 17th, right?

THE WITNESS:  Yeah.

BY MR. MAHAN:

Q.  And were you an incorporator of that corporation?

A.  Yes, sir.

Q.  And did you become the president of that corporation?

A.  Yes.

Q.  Did you remain the president of that corporation to the date that it merged with another corporation?

A.  Yes.

Q.  Now, also listed as an officer of DRC Corporation that was formed in 1966 is T.J. Cash.  Can you tell me who T.J. Cash is?

18

A.  That's my wife.

Q.  I have also seen the name T. Jeanne Cash.  Is that the same person?

A.  I would think so.

Q.  Is her middle name Jeanne?

A.  Yes.

Q.  And are you and T.J. Cash still married?

A.  Yes.

Q.  And I take it that she resides at 102 Outer Loop.

A.  Yes.

Q.  What did the DRC Corporation that was formed in 1966 do?

A.  It built new equipment, two pieces of new equipment.  One was called a vertical border machine and one was called a cutting table.

Q.  Did DRC Corporation that was formed in 1966 have any president other than you?

A.  No.

Q.  Getting back to the answer to interrogatory that we talked about, would it be fair to state that since you were president of DRC Corporation, that you would be familiar with its products and that's why you can recognize and identify for us the cutting machine

19

that is in Exhibit No. 2?

MS. CRONAN:  I am going to object.  I think the question is vague as to which DRC you are referring to.

MR. YAMAMURA:  I would agree because we have got -- I think, counsel, the thing is, if you are asking him as corporate officer of DRC or 30(b)(6) of DRC, that's vague and ambiguous.  As to his factual knowledge of the prior DRC, in that capacity as a factual witness, that's fine.

BY MR. MAHAN:

Q.  Well, my question is addressed to you and your factual knowledge as the former president of DRC Corporation incorporated in 1966 and as a manufacturer of cutting tables.  Because you were connected with DRC Corporation formed in 1966, is that why you are able to identify the cutting table depicted in Exhibit No. 2?

A.  Yes.

Q.  How many employees did DRC Corporation form in 1966 and have, on average, between 1966 and 1970?

A.  Two or three.

Q.  Now, its offices were at 625 West Hill Street as well, was it not?

20

A.  Yes.

Q.  Did any other corporations when DRC Corporation, formed in 1966, came into existence have offices at 625 West Hill Street?

A.  James Cash -- 625 West Hill Street would have been James Cash Machine Company.

Q.  Any other corporations?

A.  No, not to my knowledge.

Q.  James Cash Machine Company is the company into which DRC Corporation formed in 1966 was merged?

A.  Yes.

Q.  And is James Cash Machine Company in existence today?

A.  Yes.

Q.  Is it located at 100 Outer Loop, Louisville, Kentucky?

A.  Yes.  Yes, it is.

Q.  Has it been in continuous existence since 1947?

A.  It's been in continuous existence since its incorporation.

Q.  Do you know who formed James Cash Machine Company?

MR. YAMAMURA:  At this point, counsel,

21

1  I will let him answer the question; but, again, he is
2  going to be speaking as a fact witness --
3          MR. MAHAN:  I understand.
4          MR. YAMAMURA:  -- because he doesn't
5  represent James Cash Machine Company.
6          MR. MAHAN:  I understand.
7          MR. YAMAMURA:  Okay.
8      A.  James Cash, Sr., would have been the one to
9  have formed the corporation.
10 BY MR. MAHAN:
11     Q.  Now, I have seen the name James Cash, Sr.,
12 and I have seen James A. Cash.  Are they the same
13 person or two different persons?
14     A.  Should be the same person.
15     Q.  Now, James Cash, Sr., was your father?
16     A.  Yes.
17     Q.  If you will look at the Answers To
18 Interrogatories, and in particular No. 21 that's there
19 in front of you, you have identified a James A. Cash,
20 deceased, as the person who may have designed the
21 cutting table?
22         MR. YAMAMURA:  I think it is James
23 Arnold Cash.
24         MR. MAHAN:  I am sorry.

22

1  BY MR. MAHAN:
2      Q.  James Arnold Cash.
3      A.  Yeah.
4      Q.  Is James Cash, James Cash, Sr., and James
5  Arnold Cash the same person?
6      A.  I would think so, yes, sir.
7      Q.  Was your father's middle name Arnold?
8      A.  Yes.
9      Q.  Upon what information did you base your
10 answer that he may have been the person who designed
11 the cutting table that you now tell us was manufactured
12 by DRC Corporation formed in 1966?
13         MS. CRONAN:  Objection.  I don't believe
14 that's what the interrogatory states.
15         Okay.  I will withdraw that objection.
16     A.  Why don't you just ask it again?  It might
17 sit better.
18         MR. YAMAMURA:  Yeah.  And I think,
19 counsel, just so you have an understanding, I am not
20 trying to delay this any further, and you can ask him
21 questions about this, the interrogatories specifically
22 talk about the cutting table and in some instances the
23 cutting table involved in the accident.
24         MR. MAHAN:  I think in the definitions

23

1  it said the cutting table.  Any time reference is made
2  to the cutting table, it meant the cutting table
3  involved in the accident.  So he was redundant several
4  times.
5          MR. YAMAMURA:  Okay.  Then he may have
6  to amend that response because he probably
7  misunderstood, but go ahead.
8          He is saying that the interrogatory
9  specifically refers to the cutting table involved in
10 the accident.
11         So you can go on.
12     A.  You are speaking about the table involved in
13 the accident, okay.
14         The table that's involved in the accident, I
15 would have designed it.
16 BY MR. MAHAN:
17     Q.  You designed it?
18     A.  Yes.
19     Q.  Did you design that from a previous model
20 that had been designed by your father?
21     A.  Yes.
22     Q.  When did you design the cutting table that
23 was involved in the accident, Mr. Cash?
24     A.  Well, from what I see in the incorporation

24

1  papers and the date that the table was manufactured, it
2  would have had to have been '66 or '67.
3      Q.  How much formal education have you, Mr. Cash?
4      A.  Well, I didn't finish high school.  Tenth
5  grade, I believe.
6      Q.  Did you ever go to any trade school or
7  vocational school or drafting school?
8      A.  Yes, yes.
9      Q.  What trade school did you go to?
10     A.  It was Atherton's Trade School here in
11 Louisville.
12     Q.  What did you study at Atherton's Trade
13 School?
14     A.  Sheet metal, I would think would be the
15 definition of it.
16     Q.  Would that be the equivalent of taking a
17 sheet metal course in high school?
18     A.  I would think it would be.
19     Q.  How many years did you spend in the
20 Atherton's Trade School?
21     A.  I believe it was two.
22     Q.  When you left school, how old were you?
23     A.  That's a good question.  I would have had to
24 have been 18, someplace around 18.

25

1     Q.  I believe at that time we had mandatory
2  attendance in school in Kentucky to age 16.
3     A.  Yes.
4     Q.  So did you quit when you were 16?
5     A.  I don't think so.  I think I went on to 17 or
6  18.
7     Q.  Now, when you told me you went to school
8  through the tenth grade, did you complete the tenth
9  grade and then go to trade school?
10    A.  I was -- that was trade school.  Trade school
11 at Atherton's I believe started in the ninth.
12    Q.  So you took trade school for the ninth and
13 tenth grades.
14    A.  As I remember, yes.
15    Q.  When you were in trade school, did you
16 perform work as a part of the trade school education at
17 any plants or other places in the city, somewhat like a
18 co-op program?
19    A.  I believe that the last year or the beginning
20 of it was a co-op at James Cash Machine Company for
21 half days.
22    Q.  That would be part of your credit; is that
23 correct?
24    A.  That's what I remember.

26

1     Q.  Then after you finished the tenth grade, did
2  you then go to work for the James Cash Machine Company?
3     A.  Yes.
4     Q.  And in what capacity, sir?
5     A.  About everything.
6     Q.  Give me some idea.
7     A.  Bench machinist would probably be a good
8  definition.
9     Q.  A bench machinist?
10    A.  Um-huh.
11    Q.  Did you do anything to further your education
12 in the sense of going to any night schools or taking
13 any engineering courses or design courses?
14    A.  No.
15    Q.  Were you ever in the military?
16    A.  No.
17    Q.  Before 1966, what else did you do at the
18 James Cash Machine Company?
19    A.  I am sure I would have welded, done a lot of
20 welding, machine work.  Bench machinist would have been
21 drilling and tabbing, that sort of thing.
22    Q.  Anything else, sir?
23    A.  I guess I could go on and on and elaborate.
24 You know, machine work would mean I ran lathes, I ran

27

1  horizontal fillers, I ran vertical fillers.  I would
2  have ran cutting machines.  It was for a form of
3  miller.
4     Q.  Did the James Cash Machine Company, when you
5  worked for it, manufacture a type of cutting table that
6  is in some way similar to the cutting table that's
7  involved in this accident?
8     A.  I believe that James Cash, having stated that
9  my father designed the original one, built a few of the
10 cutting tables in earlier years.  James Cash did build
11 cutting tables, I would say, in the fifties.
12    Q.  When you worked for James Cash Machine
13 Company, did you work in the building of any cutting
14 tables for that company?
15    A.  Never did.
16    Q.  Before you formed the DRC Corporation in
17 1966, did you ever hold a position as an officer of
18 James Cash Machine Company?
19    A.  No.
20    Q.  Before 1966, did you ever design any
21 equipment to perform any manufacturing function of any
22 nature?
23    A.  Yes.
24    Q.  What kind of equipment did you design before

28

1  1966?
2     A.  Panel quilting machines.
3     Q.  Panel, P-A-N-E-L?
4     A.  Yeah.
5     Q.  Anything else?
6     A.  They were big into sewing, so quilting
7  machines.  There would have been a variety of those;
8  two heads, single heads.
9     Q.  I am sorry.
10    A.  I redesigned would probably be more the word
11 for it, redesigned.  Helped design the first tape-edge
12 machine I believe that was built or built it.  My
13 brother designed the tape edge, and I helped him build
14 it.
15    Q.  What is your brother's name?
16    A.  James Cash, Jr.
17    Q.  I didn't see his name in any corporate
18 documents anywhere.
19    A.  He probably wasn't in them.  I don't really
20 know.  I am not knowledgeable as to how he fit into the
21 company.
22    Q.  Is your brother alive today?
23    A.  No.
24    Q.  When did he die, sir?

29

1    A.  I believe the year was '76.

2    Q.  Let me talk about your father a moment.  Do

3  you know how much formal education he had?

4    A.  I would think about like mine, I believe.  As

5  I remember, and I can only use vague memories, that he

6  probably went as far as he could in school because at

7  that time they were living in the country, and I don't

8  know what a grade might be if you were a farmer.  Maybe

9  equal to the ninth grade or seventh grade.

10   Q.  Was he an engineer?

11   A.  Self made.

12   Q.  But did he have a degree --

13   A.  No.

14   Q.  -- or license as an engineer?

15   A.  No.

16   Q.  In your career, did you ever buy and study

17 any engineering books?

18   A.  No, I did not.

19   Q.  Why did you form DRC Corporation in 1966,

20 Mr. Cash?

21   A.  Well, there were several brothers in the

22 business.  James Cash, Jr., which you noticed, had not

23 been working for the company for years.  He had a

24 business of his own called American Bedding.  And he

30

1  was building vertical border machines.  James Cash was

2  not building them.  The family wasn't getting along

3  real great at the time, and he asked me if I wanted to

4  buy it, and I decided that I would.

5    Q.  Now, when you say "buy it," what are we

6  talking about?

7    A.  Buy the assets of bedding -- American

8  Bedding, I believe is the name of it.

9    Q.  So you bought the assets of your brother's

10 corporation?

11   A.  Yeah.

12   Q.  Which was American Bedding.

13   A.  Yes.

14   Q.  Now, American Bedding, was it manufacturing

15 machines to be used in the manufacture of mattresses?

16   A.  Yes.  Actually, the word would be machine,

17 not machines.

18   Q.  Machine.

19   A.  Just one.

20   Q.  So you purchased the assets of that

21 corporation and formed DRC Corporation.

22   A.  Yes, sir.

23   Q.  And they had offices at the same location as

24 James Cash Machine Company.

31

1    (A short interruption was had.)

2

3    THE REPORTER:  What was your answer,

4  sir?

5    THE WITNESS:  I am still debating that.

6    A.  When I purchased the assets, the offices of

7  American Bedding were in La Grange, Kentucky, or

8  someplace out of Louisville, and I may have left them

9  there.  My feeling is rather said -- I either asked

10 him or he said, "Just bring them into Louisville," and

11 I brought them into 625 West Hill Street.

12 BY MR. MAHAN:

13   Q.  Now, in 1970, DRC Corporation formed in 1966

14 merged with James Cash Machine Company?

15   A.  Yes, sir.

16   MR. MAHAN:  Let's mark this as

17 Exhibit 4.

18

19   (Deposition Exhibit No. 4 was

20   marked for identification.)

21

22   MR. YAMAMURA:  Chris, do you want to

23 look at this?

24   MR. BOUSLOG:  No thanks.

32

1  BY MR. MAHAN:

2    Q.  We have marked as Exhibit No. 4 a statement

3  from the Secretary of State for the Commonwealth of

4  Kentucky concerning the merger of DRC Corporation and

5  James Cash Machine Company in 1970.

6    Is that when the merger occurred, Mr. Cash?

7    A.  Yes, sir.

8    Q.  If you will look on the last page of the

9  document there in front of you, did you sign the merger

10 agreement?

11   I think it is the next to the last page, I am

12 sorry.

13   Did you sign the merger agreement as

14 president of DRC Corporation?

15   A.  Yes, sir.

16   Q.  And your wife signed as secretary?

17   A.  Yes, sir.

18   Q.  And then who signed on behalf of the James

19 Cash Machine Company?

20   A.  James A. Cash signed and Curtis L. Weedman.

21   Q.  Now, who is Curtis Weedman?

22   A.  Curtis was in relation to my -- Curtis was my

23 brother-in-law, Mr. Cash's son-in-law.

24   Q.  Now, after the merger of DRC Corporation with

**33**

1 the James Cash Machine Company --

2

3 (A short interruption was had.)

4

5 BY MR. MAHAN:

6 Q. Now, Mr. Cash, concerning the Exhibit 4,

7 if you will look at the Page 2, the paragraph titled

8 "Fifth" of the merger agreement, it says there that

9 "All the property and all the debts due on whatever

10 account to DRC Corporation, including subscriptions to

11 shares and other choses in action, are deemed to be

12 transferred to and vested in the James Cash Machine

13 Company, the surviving corporation, without further act

14 or deed," does it not?

15 A. Yes.

16 MR. YAMAMURA: The document speaks for

17 itself.

18 BY MR. MAHAN:

19 Q. And then the sixth paragraph says, "The

20 surviving corporation shall be responsible for all the

21 liabilities of the merged corporation, in the same

22 manner as if such surviving corporation had incurred

23 such liabilities."

24 MR. YAMAMURA: Same objection.

**34**

1 BY MR. MAHAN:

2 Q. Did I read that correctly?

3 A. Yes.

4 Q. Now, the surviving corporation was James Cash

5 Machine Company.

6 A. Yes, sir.

7 Q. Let's go back to the Rule 30 notice.

8 If you will turn to Page 4, it is going to be

9 Question No. 2.

10 Now, for the purpose of this question, in

11 light of your counsel's earlier objection, this

12 question is being asked to you personally and not as a

13 representative of DRC Corporation active, as we have

14 designed that term, all right?

15 A. Okay. You are not asking it as active.

16 Q. I am not asking you as the corporate

17 representative of DRC Corporation formed in 1979, okay?

18 A. Okay.

19 Q. At some point in this case, and I think is

20 attached as an exhibit to the notice, are certain

21 documents pertaining to the cutting table, and I am

22 referring now to invoices and correspondence relating

23 to the purchase of the cutting table. Do you have

24 those there in front of you?

**35**

1 A. Yes.

2 MR. YAMAMURA: They are not marked as

3 exhibits, but there is a bunch of documents.

4 MR. MAHAN: I am going to mark them as a

5 collective exhibit, if that's all right.

6 MR. YAMAMURA: Okay.

7 MR. MAHAN: We will make it Collective

8 Exhibit 5, 5-A through 5-H.

9 MR. YAMAMURA: This would be starting

10 with the document on the top? This is No. 479.

11 MR. MAHAN: Right. Actually, if you can

12 mark it Exhibit 5 and then A, B, C.

13

14 (Deposition Collective Exhibit No. 5,

15 5-A through 5-H, was marked for

16 identification.)

17

18 BY MR. MAHAN:

19 Q. Mr. Cash, we have identified these documents

20 as Exhibits 5-A through H. On the first page that we

21 will call Exhibit 5, which is A, 5-A, can you tell me

22 what that is? Can you identify that, sir?

23 A. Well, it's the name of the mattress factory,

24 Coyne Mattress. I am not sure what you want me to

**36**

1 identify.

2 Q. Do you know where this came from or to what

3 it was affixed or anything pertaining to it?

4 A. Well, it appears to be the cutting table in

5 question.

6 Q. The number 479, does that mean anything to

7 you? At the top, where it has, quote, "No. 479."

8 A. Okay. For the old company. We are speaking

9 about the older company now.

10 That would be the serial number the DRC

11 Corporation was using on this particular table.

12 Q. Then it says, "Shipped: April 22, 1968."

13 That would mean the date that it was shipped from

14 Louisville, Kentucky?

15 A. I would think so, yes.

16 Q. Then parenthetically below that, it has

17 "James Cash." What does that mean?

18 A. Are you still on 5-A now?

19 Q. Yes, I am.

20 A. It would be James Cash Machine Company.

21 Q. And then Coyne Mattress Company, is that the

22 company to whom the cutting table was sold?

23 A. It appears so, yes.

24 Q. One king size cutting table is referred to at



37

1    the bottom.

2        A.  Yes.

3        Q.  Is that how that was identified by the

4    DRC Corporation formed in 1966?

5        A.  That's a -- that's the way they were --

6    that's the terminology used by DRC Corporation, yes.

7        Q.  Then the 1,480, would that be a selling

8    price?

9        A.  Yes, sir.

10        Q.  Can you tell from looking at this that this

11    is a document -- this 5-A a document that was prepared

12    by DRC Corporation formed in 1966?

13            MR. YAMAMURA:  If you know.

14        A.  I don't really know.  There is not enough to

15    tell, actually.

16    BY MR. MAHAN:

17        Q.  Let's turn to Exhibit 5-B, if you will.  Can

18    you identify that exhibit, sir?

19        A.  Well, it's a shipping manifest to Coyne

20    Mattress from James Cash Machine Company.

21        Q.  Going back to the time when this cutting

22    table was sold, Mr. Cash, did DRC Corporation formed in

23    1966 that manufactured the cutting table, did it sell

24    through James Cash Machine Company or sell the table

---

38

1    originally to James Cash Machine Company?

2        A.  It looks like it may have passed through

3    James Cash.  That would not have been normal for that

4    to have happened, no.

5        Q.  What was normal, sir?

6        A.  Normally, we would actually just get phone

7    calls from the customer ordering the machinery direct

8    from DRC Corporation.

9        Q.  Do you know in this instance why James Cash

10    Machine Company was the shipper?

11        A.  I have seen the name Van, Waters & Rogers on

12    your exhibits a little farther back.  They were -- I

13    don't know what the word is I am looking for.  They

14    sold machinery for James Cash Machine Company.

15        Q.  Were they sales representatives or selling

16    agents for James Cash Machine Company?

17        A.  They were, yes.  I never remember there being

18    a signed contract, but they were verbal.

19        Q.  Would they, then, get a commission?  Is that

20    how it worked?

21        A.  Yes.

22        Q.  At that time if the order was placed through

23    James Cash Machine Company to DRC Corporation, would

24    James Cash Machine Company then get a small piece of

---

39

1    the commission?

2        A.  To be honest, I don't know.

3        Q.  You don't recall.

4        A.  No.  No, sir.

5        Q.  Let's go to Exhibit 5-C.  Can you identify

6    what Exhibit 5-C is, Mr. Cash?

7        A.  It's an invoice from James Cash Machine

8    Company to Coyne Mattress.

9        Q.  Now, would this invoice mean that James Cash

10    Machine Company was a seller of the cutting table?

11        A.  I would have to say yes from what I am

12    reading.

13        Q.  If you will go to the next sheet.  This is

14    Exhibit 5-B.  Can you identify what this is?

15        A.  It appears to be an order from Van, Waters &

16    Rogers, the agents Van, Waters & Rogers.

17        Q.  This appears to be a purchase order from

18    Coyne Manufacturing to Van, Waters & Rogers.

19        A.  That's what it appears to be, yes, sir.

20        Q.  Then we will go to Exhibit 5-E.

21            This is a document, then, from Van, Waters &

22    Rogers to James Cash Machine Company.

23        A.  Yes.

24        Q.  And then last we have -- it is next to last

---

40

1    here -- a letter dated April 1st, 1968.  Now, if you

2    will note at the bottom, it says that this letter is

3    James Cash Machine Company, but it is to be signed by

4    the secretary to David R. Cash.  Do you see that?

5        A.  Yes.

6        Q.  Did you have any sort of official position

7    with James Cash Machine Company at that time?

8        A.  I cannot give you an answer to that.

9        Q.  Do you know who your secretary was in 1968?

10        A.  Secretary for DRC Corporation, yes, the older

11    DRC Corporation.  Actually, I had no secretaries.  I

12    think I better put that straight:  I had no

13    secretaries.

14        Q.  Who was Amy Cash?

15        A.  Amy Cash would have been my mother.

16        Q.  Let's go to Exhibit 5-G.  Who was Ruth

17    Keeton?

18        A.  Ruth Keeton worked for James Cash Machine

19    Company.

20        Q.  Do you remember what her capacity was?

21        A.  She would take machine orders.

22        Q.  Did she ever work --

23        A.  Correspond with customers.

24        Q.  Did she ever work as your secretary?

---

41

1    A.  Later on in years she would -- remember, this
2    is a small business.  Everybody wore lots of hats.  So
3    in that respect, yes.
4    Q.  Let's go to the last page.  This is
5    Exhibit 5-H.
6         To begin with, what is this conversation
7    about?
8         MR. YAMAMURA:  Why don't you read the
9    entire document first?
10        THE WITNESS:  That's what I am going to
11   do.
12   A.  Well, it's about voltages.  This is an
13   add-on.  It's about requiring correct voltages.
14   BY MR. MAHAN:
15   Q.  You put at the bottom -- or, let me rephrase
16   that question.
17        The bottom of the letter contains a paragraph
18   that appears to be signed by Ruth Keeton; is that
19   correct?
20   A.  It appears to be, yes.
21   Q.  And she was an employee of James Cash Machine
22   Company?
23   A.  Yes.
24   Q.  There is the name "David" written across,

42

1    right above her signature.
2         Is that David you?
3    A.  I would think so, yes.
4    Q.  Was this question posed to you and does this
5    paragraph represent your answer to the question?
6         MS. CRONAN:  I object.  I don't know
7    which statement you are referring to.  If you could
8    clarify.
9    BY MR. MAHAN:
10   Q.  The question contained in the body of the
11   letter, first paragraph of the letter, signed by
12   Coyne Mattress Company, was that question eventually
13   passed on to you and is the paragraph at the bottom of
14   the letter signed by Ruth Keeton your answer to the
15   question?
16   A.  What I see here, I would say that the word
17   "David" is probably written by Ruth Keeton, pointing to
18   the electrical voltage or phases that was finally
19   selected by Coyne Mattress.
20   Q.  Would you have been the person at DRC
21   Corporation formed in '66 to answer electrical
22   questions?
23   A.  Simple ones like this, yes.
24   Q.  Would Ms. Keeton at James Cash Machine

43

1    Company undertaken to have answered an electrical
2    question?
3    A.  She would have had enough knowledge to have
4    done that.  However, this doesn't appear to be the case
5    here.
6    Q.  Let me go back to our questions again.  And
7    here again, the questions I am going to be posing to
8    you are directed to you personally and not to you as
9    the corporate representative of DRC Corporation formed
10   in 1979.
11        The cutting table that's involved in this
12   accident, do you have any knowledge as to whether it
13   was ever leased to anyone by DRC Corporation formed in
14   1966 or James Cash Machine Company?
15   A.  Do I have any knowledge that it might have
16   been leased?
17   Q.  Yes, or that it was leased.
18   A.  No.
19        MS. CRONAN:  Are you asking him whether
20   he has knowledge or whether it was leased?
21        MR. MAHAN:  Whether he has knowledge.
22   A.  I have no knowledge.
23   BY MR. MAHAN:
24   Q.  And Question No. 4 pertains to the

44

1    manufacture of the cutting table involved in this
2    accident or any component or part of the cutting table.
3         Let me start, Mr. Cash, by asking you:  Did
4    DRC Corporation formed in 1966 manufacture all parts of
5    the cutting table?
6    A.  All parts with the exception of
7    over-the-counter items:  electrical, sprockets, chains.
8    Gears would have been bought, would have been
9    purchased.
10   Q.  Would have been purchased and then
11   incorporated into the cutting table?
12   A.  Yes, sir.
13   Q.  When the cutting table was manufactured by
14   DRC Corporation formed in 1966 and when it shipped from
15   Louisville, Kentucky, as in this case, to Honolulu,
16   what is to be done insofar as the installation of that
17   cutting table is concerned?
18   A.  Well, I will have to go back 30-some-odd
19   years to think about it, but at that time the customer
20   would have been responsible for setting it up and
21   putting it into operation himself.
22   Q.  Did any instructions go along with the
23   cutting tables that were sold by either James Cash
24   Machine Company or DRC Corporation concerning setup or

45

1  installation?

2         MR. YAMAMURA:  Objection.  Assumes facts

3  not in evidence.

4         But go ahead, you can answer.

5      A.  I really don't know.

6  BY MR. MAHAN:

7      Q.  Did you prepare any installation instructions

8  or setup instructions generally for inclusion with any

9  cutting tables sold by DRC Corporation?

10     A.  I don't remember as to ever doing that, no.

11     Q.  Did any written material, aside from packing,

12 shipping and sales information, accompany the cutting

13 tables when they were sold by DRC Corporation?

14     A.  There may have been some.  To be honest, I

15 don't remember, but I believe there was.

16     Q.  Did DRC Corporation prepare any sort of

17 instruction booklet on the operation of the cutting

18 table?

19     A.  Not to my knowledge.

20     Q.  How did DRC Corporation formed in 1966 market

21 its cutting table?

22         MR. YAMAMURA:  Objection.  Assumes facts

23 not in evidence.

24         Go ahead, you can answer.

46

1      A.  We would have -- I am sure we had brochures

2  that were made up that would be sent out to different

3  customers.  It was probably advertised in the mattress

4  journal or bedding journal of the times.  I don't

5  remember what the name at that time might have been.

6  They have changed several times.  The name has changed

7  several times since then.

8      Q.  Did you at that time have the ability to

9  identify all or most of the mattress manufacturers in

10 the United States?

11     A.  I would think so, yes.  Most of the active

12 ones.

13     Q.  Was there an association that mattress

14 manufacturers belonged to?

15     A.  Yes.

16     Q.  Did DRC Corporation also belong to that

17 association?

18     A.  I believe they did.

19     Q.  Do you remember the name of it?

20     A.  I believe it was a magazine called The

21 Bedding Journal, but I am not sure about the industrial

22 name of the institution.  It was Bedding something.  I

23 don't know what at that time it was.  Nowadays, it goes

24 under the auspices of the ISPA would be the -- I

47

1  believe is the newer innovation of it.  International

2  Sleep Products I believe it is known as today.

3      Q.  Now, I have already earlier asked you about

4  No. 5, so let's go to No. 6.

5         I believe we have covered most of this.  What

6  I do want to ask you is, with regard to the cutting

7  table, did James Cash Machine Company at any time after

8  1970 send out any instruction manual or instruction

9  materials on the operation of the cutting table or

10 installation or repair of the cutting table?

11         MS. CRONAN:  I am going to object

12 because I don't know what you are referring to.  Are

13 you talking about the cutting table involved in the

14 accident?  Are you talking about cutting tables in

15 general?  And so that objection being said --

16         MR. MAHAN:  I will rephrase the

17 question.

18 BY MR. MAHAN:

19     Q.  After 1970, did James Cash Machine Company

20 send out any written material in the form of

21 installation instructions, repair instructions,

22 operation instructions, concerning cutting tables that

23 had been manufactured by DRC Corporation between 1966

24 and 1970?

48

1         MR. YAMAMURA:  Assumes facts not in

2  evidence, but go ahead.

3      A.  I can't tell you that with any certainty.  A

4  general answer to your question:  I would think not.

5         MR. YAMAMURA:  Can we take a short

6  break?

7         MR. MAHAN:  Of course.  We will take a

8  break.

9

10        (A recess was had.)

11

12        (The record was read by the

13         reporter.)

14

15        MR. YAMAMURA:  Are we on this page?

16        MR. MAHAN:  We are on Page 5.  We just

17 turned to Page 5.

18 BY MR. MAHAN:

19     Q.  With regard to Question No. 7, here again,

20 Mr. Cash, this is directed to your personal knowledge

21 concerning the DRC Corporation formed in 1966.

22         As I understand, you were the president of

23 that corporation from date of inception to the date of

24 the merger?



**49**

1    A.  Yes.

2    Q.  And your wife was the secretary?

3    A.  Yes.

4    Q.  Were there any other officers for that

5  corporation?

6    A.  Not that I know of.

7    Q.  And who were the shareholders of the DRC

8  Corporation formed in 1966?

9    A.  I would have been the only shareholder.  The

10  wife could have had several shares.

11    Q.  But you would have been the only two

12  shareholders if she was a shareholder?

13    A.  Yes.  Yes, sir.

14    Q.  Let's go to No. 8.  I am talking about DRC

15  Corporation formed in 1979.  Why was this corporation

16  dissolved this year?  I am sorry, last year.

17        MS. CRONAN:   Are we talking about the

18  second DRC?

19        MR. MAHAN:  Yeah, the DRC formed in

20  1979.

21    A.  You are saying why was the active DRC

22  resolved?

23  BY MR. MAHAN:

24    Q.  Yes.

---

**50**

1    A.  Because I need to retire.

2  BY MR. MAHAN:

3    Q.  Now, at one time Amy Cash Johnson is listed

4  as a vice president of DRC Corporation formed in 1979.

5  Can you tell me who she was or is?

6    A.  My daughter.

7    Q.  I have also seen another name, Amy Titus.

8  Who is that?

9    A.  The same.

10    Q.  Is she divorced and remarried?

11    A.  Yes.

12    Q.  So she formerly was married to a Mr. Johnson.

13  Do you know what his first name was?

14    A.  Daniel.

15    Q.  And now she is married to a Mr. Titus?

16    A.  Yes.

17    Q.  And what's his first name?

18    A.  Gary.

19    Q.  And another time Linda Cash Ferry is listed

20  as a vice president of DRC Corporation formed in 1979.

21  Who is that?

22    A.  Yes (sic).

23    Q.  Is she your daughter?

24    A.  Yes.

---

**51**

1    Q.  Was she an officer of the corporation or a

2  shareholder in the corporation when it was dissolved

3  effective July 1, 2004?

4    A.  No.

5    Q.  Who were the officers of the corporation on

6  the date of dissolution?

7    A.  I would have been the only officer.  The wife

8  probably was secretary or treasurer.

9    Q.  What happened to the assets of DRC

10  Corporation that was dissolved in 2004?

11    A.  What assets?  It would have just been

12  disbursed to myself.

13    Q.  Were you the only shareholder of the

14  corporation?

15    A.  Yes.

16    Q.  When was the last time, to your -- well, when

17  was the last time that DRC Corporation formed in 1979

18  actually refurbished any equipment?

19        MR. YAMAMURA:  That's asked and

20  answered, but go ahead.

21    A.  It would have been a long time ago, and I

22  can't give you an answer on that.

23  BY MR. MAHAN:

24    Q.  A long time would have been more than

---

**52**

1  15 years ago?

2    A.  Probably.

3    Q.  Between 1990 and date of dissolution, did it

4  do anything other than real estate holdings?

5    A.  Not as I remember.

6    Q.  Did it get involved in the sale and purchase

7  of real estate for others?

8    A.  No.

9    Q.  This was only the sale and purchase of real

10  estate, then, for itself?

11    A.  Yes.

12    Q.  Did DRC Corporation formed in 1979 ever own

13  the property of 100 Outer Loop?

14    A.  No.

15    Q.  Let me go to Question No. 12.  This, again,

16  is being asked to you for your memory, not as a

17  representative of DRC Corporation formed in 1979.

18        MR. YAMAMURA:  Nor as a representative

19  of James Cash Machine, correct; just based on his

20  personal knowledge.  That's fine.

21  BY MR. MAHAN:

22    Q.  As to the James Cash Machine Company, who are

23  the officers today?

24    A.  I believe the only officer I know of would be

---

53

1  Linda Ferry.
2      Q.  That's your daughter?
3      A.  Yes.
4      Q.  When were you last an officer of James Cash
5  Machine Company?
6      A.  Probably 1990.
7      Q.  Were you at one time chairman of the board of
8  directors of that company?
9      A.  Yes.
10     Q.  When were you last chairman of the board of
11 directors of that company?
12         MS. CRONAN:  I object to the use of the
13 term "chairman of the board of directors."  I think it
14 assumes facts not in evidence.
15         MR. YAMAMURA:  Go ahead.  You can answer
16 that.
17     A.  '88, '89, '90.
18 BY MR. MAHAN:
19     Q.  Now, James Cash Machine Company is now
20 located at 100 Outer Loop?
21     A.  Yes.
22     Q.  What does James Cash Machine Company do?
23     A.  Manufactures -- again, if no objection, it
24 manufactures mattress making equipment.

54

1      Q.  And that includes cutting tables similar to
2  the one that was involved in the accident in Hawaii?
3      A.  Yes.
4      Q.  Does James Cash Machine Company use any of
5  your designs to manufacture cutting tables?
6         MR. YAMAMURA:  Currently, you are
7  talking about?
8         MR. MAHAN:  Currently.
9      A.  Yes.
10 BY MR. MAHAN:
11     Q.  Is this the same design that was used to
12 manufacture the cutting table that was involved in the
13 incident in Hawaii?
14     A.  The current cutting tables would be similar
15 to the one in Hawaii, powered by air today.
16     Q.  Did you obtain a patent on the design of the
17 cutting table that was sold to Coyne Manufacturing
18 Company?
19         MR. YAMAMURA:  It assumes facts not in
20 evidence, but go ahead.
21     A.  Not to my knowledge.
22 BY MR. MAHAN:
23     Q.  Does the James Cash Machine Company pay you
24 any royalty or commission or any type of money anytime

55

1  it sells a cutting table that is of your design or
2  similar to your design?
3      A.  No.
4      Q.  Who is Robert Ferry?
5      A.  A son-in-law.
6      Q.  Are you currently a shareholder of James Cash
7  Machine Company?
8      A.  No.
9      Q.  When did you sell your shares of stock in the
10 company?
11     A.  I have not been a stockholder for six years.
12     Q.  Is T.J. Cash an officer of James Cash Machine
13 Company?
14     A.  No.
15     Q.  How long has T.J. Cash not been an officer of
16 the company?
17     A.  I can't answer that question.
18         MR. MAHAN:  Mark that as No. 6.
19
20         (Deposition Exhibit No. 6 was
21          marked for identification.)
22
23 BY MR. MAHAN:
24     Q.  I want to show you a document we have marked

56

1  as Exhibit No. 6.  This is an annual report, a
2  corporate annual report, filed with the Secretary of
3  State for the Commonwealth of Kentucky.  This is filed
4  for the year 2004.
5         Does that corporate annual report filed for
6  the year 2004 indicate that T.J. -- or, specify that
7  T.J. Cash is an officer of James Cash Machine Company?
8         MR. YAMAMURA:  The document speaks for
9  itself, but go ahead.
10     A.  Yes.
11 BY MR. MAHAN:
12     Q.  Was T.J. Cash receiving any salary or money
13 from James Cash Machine Company last year for any work
14 or activity on behalf of the corporation?
15     A.  To tell you the truth, I don't know.
16     Q.  If you don't know, that's fine.  We are not
17 here grading your papers or anything.  If you don't
18 know, you don't know.
19     A.  No.
20     Q.  To your knowledge today, Mr. Cash, are any
21 members -- or, let me rephrase that.
22         Are any persons related to you by blood or
23 marriage other than Linda Cash Ferry and Robert Ferry
24 connected with James Cash Machine Company?

57

1    A.  No, sir.

2    Q.  Let me go to No. 14 on Page 5 of the Rule 30

3  notice.

4         MR. MAHAN:  Off the record a second.

5

6         (Discussion was had off the record.)

7

8  BY MR. MAHAN:

9    Q.  No. 14 is how the active DRC was formed and

10  obtained its name DRC Corporation.  I am going to refer

11  to DRC Corporation formed in 1979.  Why was that

12  corporation formed?

13         MR. YAMAMURA:  Asked and answered, but

14  go ahead.  You can answer again.

15    A.  Why was it formed?

16  BY MR. MAHAN:

17    Q.  Uh-huh.

18    A.  Well, it was formed to -- it was formed to

19  get into -- it was formed to get into real estate.  It

20  was formed -- well, I wanted to form a corporation to

21  generate enough funds to get into real estate.  In the

22  beginning, we refurbished used equipment, and the funds

23  that were generated from the used equipment were used

24  to purchase real estate.

58

1    Q.  Now, at the time that DRC Corporation was

2  formed in 1979, you were president of the James Cash

3  Machine Company?

4    A.  That's right.

5    Q.  Did James Cash Machine Company refurbish the

6  same type of equipment as DRC Corporation?

7         MR. YAMAMURA:  Again, this is his

8  personal knowledge.

9         MR. MAHAN:  His personal knowledge.

10    A.  It's possible.

11  BY MR. MAHAN:

12    Q.  In 1979, who were the other officers, if you

13  know, of James Cash Machine Company?

14    A.  You probably just need to look at the

15  Secretary of State on that one because I know that I

16  was.  '79?

17         MR. YAMAMURA:  If you don't know, don't

18  guess.

19    A.  I would be guessing.  I just know that I was.

20  BY MR. MAHAN:

21    Q.  Did DRC Corporation formed in 1979 go into

22  competition with James Cash Machine Company?

23    A.  Neither one of them -- the '79 DRC

24  Corporation could refurbish used machinery, would have

59

1  refurbished used machinery.  It is possible that like

2  kind machinery could have been refurbished by either

3  one.  I don't know if you would use the word

4  "competition."

5    Q.  Well, did they have the same shareholders in

6  the two corporations in 1979?

7    A.  I would think not.

8    Q.  Did you at some point in time become the

9  majority shareholder of James Cash Machine Company?

10    A.  Yes.

11    Q.  Do you remember when?

12    A.  There were considerable deaths in the family

13  and people leaving.  I would have to think the -- past

14  the middle seventies, in that area.

15    Q.  Let me go to Page 6, Mr. Cash, specifically

16  No. 19.

17         When DRC Corporation was formed in 1979, was

18  that corporation formed from any of the assets of the

19  James Cash Machine Company?

20    A.  No.

21    Q.  Let me go to No. 22.  This has to do with

22  your personal memory and knowledge.

23         MR. YAMAMURA:  Counsel, can we go off

24  the record for a second real quick?

60

1         MR. MAHAN:  Sure.

2

3         (Discussion was had off the record.)

4

5  BY MR. MAHAN:

6    Q.  No. 22, we are going to talk about the

7  cutting table that was manufactured by DRC Corporation

8  formed in 1966.  It was designed by you.  This has to

9  do with any reports, studies, tests regarding the

10  safety and defects in this table.  Are you aware of any

11  reports, studies or tests pertaining to the safety of

12  the table?

13         MR. YAMAMURA:  Objection.  Assumes facts

14  not in evidence, but go ahead.

15    A.  No.

16  BY MR. MAHAN:

17    Q.  Did you ever commission anyone to do any

18  studies or testing concerning the safety of the cutting

19  table?

20         MR. YAMAMURA:  Same objection.

21    A.  No.

22  BY MR. MAHAN:

23    Q.  Let's go to No. 23.  Did you prepare any

24  drawings or plans concerning the manufacture of the

61

1  cutting table that was manufactured by DRC Corporation
2  that was formed in 1966 and was designed by you?
3          MR. YAMAMURA:  Could I have that
4  question read back?
5
6          (The record was read by the
7          reporter as requested.)
8
9          MS. CRONAN:  And, again, that prior
10  question and this question are based on his personal
11  knowledge and not as corporate representative.
12          MR. YAMAMURA:  And it is actually more
13  specific than 23.  It talks about specific drawings and
14  plans.  Okay.
15      A.  Not that I remember.
16  BY MR. MAHAN:
17      Q.  Well, Mr. Cash, when you told us earlier that
18  you designed the cutting table, how did you design it
19  without plans or drawings?
20      A.  I would have built it in its entirety
21  without -- I am sorry.  I would have built it without
22  drawings.  I would have built it from out of my head.
23      Q.  Now, after you did that, you had what I will
24  refer to as a prototype cutting table.  Did you then

62

1  prepare any drawings or plans for others to build or
2  manufacture the same table that you built?
3      A.  I am sure there must have been some drawings
4  for it.
5      Q.  Do you know where those drawings are?
6      A.  No.
7      Q.  Do you know where they could possibly be?
8      A.  No, sir.
9      Q.  Did you deliver those drawings to anyone?
10          MR. YAMAMURA:  If you know.
11      A.  I don't remember delivering them to anyone.
12  BY MR. MAHAN:
13      Q.  The records of DRC Corporation formed in
14  1966, were those records all delivered to the James
15  Cash Machine Company when the merger occurred?
16      A.  I really don't have any recollection of it.
17      Q.  Would the answer to that question be better
18  known by T.J. Cash, who was the corporate secretary,
19  than by you?
20      A.  No.
21      Q.  No. 24, we have covered this, I believe, but
22  I am going to ask specifically:  Did you ever obtain
23  any patent, license, or trademark on any of the design
24  work or manufacturing work that was done on the cutting

63

1  table?
2      A.  Not to my knowledge, I did not.
3      Q.  Did any of the corporations with which you
4  held any positions obtain any patents or licenses?
5          MR. YAMAMURA:  Asked and answered, but
6  go ahead.
7      A.  On the cutting table?
8      Q.  On the cutting table.
9      A.  Not to my knowledge, no.
10      Q.  Let's go to No. 25.
11          MR. MAHAN:  Do you want to take your
12  break?
13          MR. YAMAMURA:  No.  Until 3:00, I think
14  we said, right?  We have a lot more to go.
15  BY MR. MAHAN:
16      Q.  On No. 25, to your knowledge, have any other
17  claims other than the claim involved in this litigation
18  ever been made concerning an injury arising out of the
19  operation of a cutting table manufactured by DRC
20  Corporation formed in 1966?
21      A.  No, sir.
22      Q.  To your knowledge, have any claims or
23  lawsuits been filed as a result of any injury
24  pertaining to a cutting table that was manufactured by

64

1  James Cash Machine Company?
2      A.  No, sir.
3      Q.  To your knowledge, Mr. Cash, is this the
4  first injury claim and lawsuit that's been made by
5  anyone arising out of an alleged defect or problem with
6  any cutting table manufactured by DRC Corporation or
7  James Cash Machine Company?
8          MS. CRONAN:  I am going to object to the
9  question and use of the term "defect."  It assumes that
10  the table is defective when there has been no evidence
11  of that.  You know, if you are asking him if he has
12  knowledge of any lawsuits --
13          MR. MAHAN:   I am using the word
14  "alleged."
15          MR. YAMAMURA:  Yeah, alleged claim.  In
16  other words, he is asking you:  Is it the first alleged
17  claim of defect?
18          MR. MAHAN:  Let me rephrase the
19  question.
20          MR. YAMAMURA:  Yeah.
21          MS. CRONAN:  I didn't hear the word
22  "alleged."
23          MR. YAMAMURA:  I heard "alleged," sorry.
24  Otherwise, I would be jumping up and down, too.

65

BY MR. MAHAN:

Q. To your knowledge, is this the only claim and lawsuit that's ever been filed pertaining to any cutting table manufactured by DRC Corporation or James Cash Machine Company arising out of any alleged defect in design or manufacturing of a cutting table?

A. Yes, sir.

Q. Let me go to 26. Has anyone at any time, to your knowledge, called to your attention any alleged defect or problem with a cutting table manufactured by DRC Corporation formed in 1966 or James Cash Machine Company?

A. No.

Q. Let me go to 28. Are you aware of any maintenance or repair that was performed on the cutting table involved in the incident in Honolulu after the sale of the cutting table other than the incident involved in the lawsuit?

A. No, sir.

Q. Let's talk about No. 29. Again, I am talking about your personal knowledge. In the 1980's and at least part of the 1990's, you were an officer of both James Cash Machine Company and DRC Corporation formed in 1979; is that correct?

66

A. In the eighties?

Q. Right.

A. Yes.

Q. And part of the nineties.

A. Yes, sir.

Q. And T.J. Cash was an officer of both DRC Corporation formed in 1979 and James Cash Machine Company in the 1980's and part of the '90's.

MR. YAMAMURA: If you know.

A. Yes.

BY MR. MAHAN:

Q. And were you and T.J. Cash also shareholders in both of these corporations?

MR. YAMAMURA: If you know. Are you talking shareholders at the time they were both officers?

MR. MAHAN: Right.

MR. YAMAMURA: I assumed that.

A. You are saying officers and/or shareholders?

MR. YAMAMURA: No.

BY MR. MAHAN:

Q. If at the time you were both officers of these two corporations, DRC Corporation formed in '79 and James Cash Machine Company, were you also

67

shareholders of those two corporations?

A. No. Are you asking am I a shareholder or are you asking if she is a shareholder?

Q. Both of you. Were both of you shareholders, each of you.

A. Well, that is going to require two answers.

Q. If there are two --

A. I would have been a shareholder. She would not have been a shareholder, to my knowledge.

Q. Were you on the board of directors of both corporations in the 1980's and '90's?

A. To the question, I'd have to say no or maybe I could ask you.

Q. Well, let me rephrase the question.

A. You are putting two decades in there.

Q. Yeah, 1980's and 1990's.

A. I would think no on my part.

Q. And in what way would it be no?

A. Well, the board of directors --

Q. For which corporation?

A. I believe I gave up most of that around 1990.

Q. Are you sometimes listed as D.R. Cash?

A. Yeah.

68

(Deposition Exhibit No. 7 was
marked for identification.)

BY MR. MAHAN:

Q. I am showing you an annual report filed with the Kentucky Secretary of State for the year 2000.

A. What am I listed as?

Q. Are you listed on there as a director?

A. Up until -- yes, I am.

Q. Looking at that, is it your memory that you were director to the year 2000?

MR. YAMAMURA: If you know you were. If you weren't --

A. I didn't realize I was, no, sir.

MR. MAHAN: It is five after 3:00.

MR. YAMAMURA: Okay.

(A recess was had from 3:05 p.m.
until 3:30 p.m.)

BY MR. MAHAN:

Q. Mr. Cash, there are some questions here about -- I am looking on Page 7 -- concerning any other persons or entities related to, and it is talking about

69

1  James Cash Machine Company and DRC Corporation, both
2  the one formed in '66 and '79.
3      MR. YAMAMURA:  Are you talking about
4  Questions 31 --
5      MR. MAHAN:  31 through 34.
6      MR. YAMAMURA:  Yeah, okay.  It is rather
7  broad, but --
8  BY MR. MAHAN:
9      Q.  There is a company known as D.R. Cash, Inc.,
10 listing an address of 100 Outer Loop.  Do you know
11 anything about that company?
12     A.  D.R. Cash, Inc., listed at 100 Outer Loop?
13     Q.  Right, that's his address.
14     A.  The active DRC Corporation.
15     Q.  D.R. Cash, Inc., is at 100 Outer Loop.
16     A.  Okay.
17     Q.  And Amy Titus is listed as president and
18 Gary Titus is listed as vice president.  I assume that
19 D.R. Cash is the use of your name; is that correct?
20     A.  Oh, I understand what you are saying now.
21 Yes.
22     Q.  Do you know what that corporation does?
23     A.  You are talking about D.R. Cash?
24     Q.  D.R. Cash, Inc.

70

1      A.  Okay.  The address is wrong.
2      MR. YAMAMURA:  Okay.
3      A.  Okay?
4      Would you like the correct address?
5  BY MR. MAHAN:
6      Q.  Wait a minute.
7      Was it at any time at 100 Outer Loop?
8      A.  It was at a building that -- no, it was not.
9  102 Outer Loop was the address it used.
10     Q.  Let me show you two reports.  I will show
11 them to counsel first.  These are for D.R. Cash, Inc.
12 One does list 102 Outer Loop, and then the next year it
13 lists 100 Outer Loop as the address of this
14 corporation.
15     A.  102 would have been correct.
16     MR. YAMAMURA:  Hang on.
17     For the record, these are dated September 18,
18 2002, and May 19, 2003, I believe.
19     MR. MAHAN:  Correct.  That's correct.
20 BY MR. MAHAN:
21     Q.  My question is again directed to you
22 personally.  Do you know what D.R. Cash, Inc., is?
23     A.  D.R. Cash is a manufacturing company that
24 manufactures -- that was -- manufactures machinery

71

1  other than what James Cash Machine Company
2  manufactures.
3      Q.  Can you give me an example of what that would
4  be?
5      A.  It manufactures filling machines, which are
6  futon fillers; filling futons.
7      Q.  Okay.
8      A.  And some very, very simple tables that are
9  called built-up tables.
10     MR. YAMAMURA:  Can you spell that?
11     THE WITNESS:  Built-up tables.
12     MR. YAMAMURA:  Oh, built-up tables.
13 BY MR. MAHAN:
14     Q.  Is that corporation still in existence today,
15 to your knowledge?
16     A.  That corporation is in existence today, yes.
17     Q.  And do you know where it is located today?
18     A.  5559 National Turnpike.
19     Q.  Does it have a factory building that it
20 operates out of?
21     A.  Yes.
22     Q.  Was it for a time using as its corporate
23 headquarters your home?
24     A.  It was using that number for a short period

72

1  of time, yes.
2      Q.  And the officers of that corporation are your
3  daughter, Amy Cash Titus, and her husband?
4      A.  I assume it is.  My daughter is.  I don't
5  know what her other designations might be.
6      Q.  Do you know of any other family members that
7  would be involved in that corporation?
8      A.  No.
9      MR. MAHAN:  Let me go ahead and file
10 that since we have been talking about that.  We will
11 make this No. 8.
12
13     (Deposition Exhibit No. 8 was
14         marked for identification.)
15
16 BY MR. MAHAN:
17     Q.  Mr. Cash, there is another company identified
18 as James Cash Machine Company International, Inc.  Do
19 you know anything about that company?
20     A.  Yes, I do.
21     Q.  Can you tell me, is that company still in
22 existence today?
23     A.  No.
24     Q.  According to the records that I have, that



73

1  company was formed in 1972.
2      A.  It would have to be much later than that, I
3  would think.  That couldn't be correct.
4          MR. YAMAMURA:  You are asking for his
5  personal knowledge?
6          MR. MAHAN:  I understand.
7  BY MR. MAHAN:
8      Q.  Let me show you something.  This is from
9  records from the Kentucky Secretary of State's office.
10
11          (Documents were tendered
12          to the witness.)
13
14      A.  I have no knowledge of this.
15          MR. YAMAMURA:  You can answer his
16  question if you have any knowledge.
17  BY MR. MAHAN:
18      Q.  If you will turn to the Articles of
19  Incorporation behind the Secretary of State
20  certificate, and if you will look to see who signed the
21  Articles of Incorporation.
22          MR. YAMAMURA:  What page are we talking
23  about, counsel?
24          Oh, here.

74

1  BY MR. MAHAN:
2      Q.  Did you sign the Articles of Incorporation?
3      A.  It looks like I did.
4      Q.  And when are those articles dated, Mr. Cash?
5      A.  Those are 1972.
6      Q.  Do you recall why James Cash Machine Company
7  International was formed?
8      A.  Honestly, I have no idea about that.  I
9  really do not.
10      Q.  I take it you do not have much personal
11  involvement in that corporation.
12      A.  No.  I assume it is something my father was
13  doing.
14      Q.  When did your father pass away?
15      A.  '76, I believe, sir.
16      Q.  There is another corporation here, James Cash
17  International, Inc.
18          Is that corporation still in existence, sir?
19          MR. YAMAMURA:  Is it the same one?
20          MR. MAHAN:  No.  One is James Cash
21  Machine Company International, Inc., and that's
22  James Cash International, Inc.
23
24

75

1          (A document was tendered
2          to counsel.)
3
4      A.  No, it is not in existence.  It was
5  dissolutioned probably several years after we started.
6  BY MR. MAHAN:
7      Q.  You were the incorporator of that
8  corporation?
9      A.  D.R. Cash and -- I was trying to remember the
10  other gentleman's name -- Joyce, Anthony Joyce,
11  presided, yes, that's right.
12      Q.  Why was that corporation started?
13      A.  At the time I suppose -- you are asking from
14  memory.
15          MR. YAMAMURA:  Yeah, from memory.
16      A.  From memory, he was a -- Anthony Joyce was an
17  agent selling in England and he was selling quite a bit
18  of machinery, and I suppose we sold some machinery
19  through the international corporation through all of
20  Europe.
21      Q.  This would have been machinery manufactured
22  by James Cash Machine Company?
23      A.  Right.
24          MR. MAHAN:  Go ahead and mark that

76

1  No. 9.
2
3          (Deposition Exhibit No. 9 was
4          marked for identification.)
5
6  BY MR. MAHAN:
7      Q.  Let me go to Page 9 and Questions 44, 45.
8  When we talk about DRC, both -- well, let's talk about
9  DRC, the corporation formed in 1979.  The DRC in that
10  corporation are for your initials; is that correct?
11      A.  That's correct.
12      Q.  And for the corporation formed in 1966, the
13  DRC in that corporation is for your initials?
14      A.  Yes.
15      Q.  When DRC Corporation moved from 625 West Hill
16  to 100 Outer Loop in Louisville --
17          MR. YAMAMURA:  This is DRC inactive
18  or active?
19          MR. MAHAN:  No, DRC active.
20          Let me rephrase the question.
21          MR. YAMAMURA:  Sure.
22  BY MR. MAHAN:
23      Q.  When the DRC Corporation formed in 1979 moved
24  its offices from 625 West Hill to 100 Outer Loop in

77

```
1    Louisville, did James Cash Machine Company also move
2    its offices from 625 West Hill to 100 Outer Loop?
3         A.   Yes.
4         Q.   Did these two entities operate out of the
5    same building?
6         A.   They would have operated out of the same
7    building, probably in different -- but in different
8    areas.
9         Q.   Did they share any of the same office
10   personnel?
11        A.   No.
12        Q.   Did they share any employees other than you
13   as president of each?
14        A.   It had its own employees.
15        Q.   I want you to go back to January 15 of 2001
16   when, as I understand it, this accident involving this
17   cutting table occurred.  Can you tell me if DRC
18   Corporation formed in 1979 had liability insurance in
19   effect on that day?
20             MR. YAMAMURA:  Counsel, for the
21   record -- off the record for a second.
22
23             (Discussion was had off the record.)
24
```

78

```
1    BY MR. MAHAN:
2         Q.   Did they have insurance coverage on that day?
3         A.   Yes.
4         Q.   Now, for James Cash Machine Company, again
5    with regard to January 15th of 2001, did it have
6    liability insurance coverage on that day?
7             MS. CRONAN:  Are you asking him based on
8    his personal knowledge?
9             MR. MAHAN:  Yes.
10        A.   To my knowledge personal?  Yes.
11   BY MR. MAHAN:
12        Q.   Was the insurance coverage with the same
13   insurance company?
14        A.   Yes.
15        Q.   Through the same insurance agent?
16        A.   Yes.
17             MR. YAMAMURA:  Also, for the record,
18   I will reserve my right to move to strike any
19   references to insurance as inappropriate.  Just for the
20   record.
21   BY MR. MAHAN:
22        Q.   Were they listed on the same policy as
23   insureds, to your knowledge?
24             MR. YAMAMURA:  Whatever it is you know.
```

79

```
1    If you don't know, don't guess.
2         A.   I would think.
3    BY MR. MAHAN:
4         Q.   Were there any indemnity agreements between
5    DRC Corporation formed in 1979 and James Cash Machine
6    Company that were in existence on January 15th of 2001?
7             MR. YAMAMURA:  Objection.  Calls for a
8    legal conclusion.  I understand, counsel, what you are
9    talking about:  Were there any contracts of indemnity
10   between the two entities.
11             MR. MAHAN:  Right.
12             MR. YAMAMURA:  Because there was an
13   insurance contract which involves indemnity.  But you
14   are talking about contracts of indemnity.
15             MR. MAHAN:  Right.
16   BY MR. MAHAN:
17        Q.   Let me rephrase the question for you.
18             Were there any contracts of indemnity between
19   DRC Corporation formed in 1979 and James Cash Machine
20   Company that were in existence on January 15th of 2001?
21             MS. CRONAN:  And, again, subject --
22   other than insurance policies?
23             MR. MAHAN:  Yes, other than insurance
24   policies.
```

80

```
1         A.   I don't know of any.
2             MR. BOUSLOG:  What was the answer?
3             MR. MAHAN:  He did not know of any.
4    BY MR. MAHAN:
5         Q.   Did DRC Corporation formed in 1979 and James
6    Cash Machine Company have separate bank accounts?
7         A.   Yes.
8         Q.   Did they maintain separate financial records?
9         A.   Yes.
10        Q.   I am going to go to No. 11, Question 65.
11             Do you have any personal knowledge concerning
12   the incident involved in this --
13             MR. YAMAMURA:  Wait.  No. 11 of No. 65.
14   BY MR. MAHAN:
15        Q.   Do you have any personal knowledge concerning
16   the incident involved in this accident in Honolulu,
17   Hawaii?
18             MS. CRONAN:  Other than what his
19   attorneys have told him?
20             MR. MAHAN:  I don't want to know that,
21   right.
22        A.   No.
23   BY MR. MAHAN:
24        Q.   Now, this is being asked of you as
```



81

1  representative for DRC Corporation formed in 1979.
2  Does DRC Corporation formed in 1979 have any knowledge
3  of the accident that occurred in Honolulu that's the
4  subject of this action other than what you have been
5  told by attorneys?
6      A.  No.
7      Q.  This is to you with regard to your personal
8  knowledge.  With regard to DRC Corporation formed in
9  1966 and DRC Corporation formed in 1979, James Cash
10  Machine Company, has there ever been an officer of
11  those corporations who was not related to you by blood
12  or marriage?
13      A.  Not as I know of.
14      Q.  Has there ever been a shareholder of those
15  corporations not related to you by blood or marriage?
16      A.  Not as I understand, no.
17      Q.  Has there ever been a member of the board of
18  directors of those corporations not related to you by
19  blood or marriage?
20          MR. YAMAMURA:  Okay.  Those three
21  corporations only.
22          MR. MAHAN:  That's right.
23      A.  Not as I know of.
24          MR. MAHAN:  I believe that's all the

82

1  questions I have, sir.
2
3              CROSS-EXAMINATION
4  BY MR. BOUSLOG:
5      Q.  Sir, my name is Chris Bouslog, and I am
6  representing the plaintiff in this action.
7          Do you know who Symphony or what kind of
8  company Symphony, Incorporated, is?
9      A.  Yes.
10      Q.  What is it?
11      A.  It was an incorporation that never went any
12  farther than an incorporation.  Never used.
13      Q.  What was its intended use?
14      A.  To manufacture sewing machines.
15      Q.  But it never engaged in that business?
16      A.  No.
17      Q.  In the course of your experience in
18  manufacturing equipment for the bed making business, on
19  any of the machines that you use, are there any lockout
20  or tag-out procedures for those machines?
21          MS. CRONAN:  I just object to the
22  question as being vague and overbroad.  I mean, you are
23  talking about a lot of different kinds of machines and
24  not limiting it.

83

1  BY MR. BOUSLOG:
2      Q.  If you know, sir.
3          During the course of your career in
4  manufacturing, on any of the machines that you have
5  used, have there been any lockout or tag-out machines
6  and procedures guidelines?
7      A.  Well, you may have terminology and I may have
8  another terminology.  I would assume by "lockout," you
9  mean have a lock to keep from using it.  Is that the
10  terminology?  Is that literally --
11      Q.  Let me ask you this:  Were there any
12  mechanisms on any of the machines to prevent them from
13  operating accidentally or to prevent the release of
14  potential energy such as when a weight is up in the
15  air?
16          MS. CRONAN:  I need to object again.
17  You are talking about a lot of different kinds of
18  machines, and I would object to the question to the
19  extent the question is overbroad and vague.
20          You can answer.
21          MR. YAMAMURA:  Yeah, I agree.
22          Chris, they make all kinds of machines.  If
23  you can focus on the one that's involved in the
24  accident.

84

1          MR. BOUSLOG:  I will get to that.
2  BY MR. BOUSLOG:
3      Q.  But just basically during your career, have
4  any of the machines you have used had procedures or
5  mechanisms for preventing the release of potential
6  energy or preventing the release of electrical energy?
7          MS. CRONAN:  Same objection.
8      A.  I am sure they have, yes, sir.
9  BY MR. BOUSLOG:
10      Q.  Were there any such kind of procedures or
11  mechanisms on the king size cutting table which was
12  sold to Coyne Mattress, Serta Mattress Company?
13      A.  The cutting table by Coyne had -- I assume
14  you are familiar with it.
15      Q.  Basically, you shouldn't assume anything.
16      A.  Okay.  The king size cutting table, when it
17  is tilted vertically -- let me -- I am almost going to
18  have to --
19          MR. YAMAMURA:  As best you can describe
20  it.
21      A.  To describe perhaps the procedure, the way
22  the machine works, it's misleading to call it a cutting
23  table.  It is a layout table, is what it is.  You tilt
24  it vertically and then there are pins that are



85

1  withdrawn, that are out of sight, but when you tilt it
2  vertically, there are pins that come out. And those
3  pins come out because you desire to unroll ticking for
4  the mattress ticking, and you pin that ticking onto
5  those pins.
6          And then when you pin down so far, it's like
7  -- and then you pin back, and then you keep pinning it
8  up in ruffled layers. And after you get the desired
9  amount of material that you want to cut, be it one
10 layer or a dozen layers of material, the machine is in
11 a vertical position at that time.
12         The machine can then be brought down
13 horizontally and a pattern laid up on it and marked
14 like you would if you were making a blouse or a coat,
15 the same method as that, and they would mark the
16 configuration they wanted on that ticking.
17         Then there is a knife, a handheld knife, a
18 rotary knife, a rotary blade knife, that they used to
19 cut that pattern out. When the machine comes down
20 vertically, they retract the pins so that the pins are
21 out of the way and then they lay the pattern up, mark
22 it, and then they cut the material.
23         Now, that works fine if you are doing twin
24 size mattresses. In this case they are doing

86

1  mattresses or four-six mattresses. If you are familiar
2  with the terminology, it just means four-foot, six-inch
3  mattresses or queen mattresses.
4          You can stand on the floor and there is a
5  double set of pins on the king size cutting table. The
6  king size cutting table has a hinge that folds down
7  when you are only going -- which you have probably seen
8  the pictures of. The leaf folds down out of the way
9  and you stand on the floor and you pin the material up
10 to do just like I described to you.
11         But if you are going to do king size
12 material, you have a leaf that folds horizontally with
13 the rest of the table and locks in with the table so
14 that when the table tilts, you can bring out another
15 set of pins and pin king size material up on the
16 cutting table.
17         The problem is when you do that, you can't
18 reach -- you can't reach the pins. Now, in order to
19 reach the pins, there was a step that was added onto
20 that table. And in order to reach the pins, that step
21 was electrified, it had its own motor, and you could
22 raise it up, I am guessing, 14 to 16 inches off of the
23 floor and you could stand up on that leaf or step,
24 whichever you want to call it. You could then reach

87

1  those pins that pin that king size material up.
2          And then when you got through doing that, you
3  could let the step down, tilt the machine down
4  horizontally, retract the pins, and then you had king
5  size material you could cut out patterns for king size
6  ticking.
7          Now, when that cutting table is in the
8  vertical position and that step is up, there is no way
9  that the tabletop could ever fall.
10 Q.   And why is that?
11 A.   Because it literally gets in the way of the
12 table, will not let it tilt.
13 Q.   What happens if the step isn't up and it is
14 in the vertical position?
15 A.   If the step was already down, then you can
16 turn the electric motor on and let it down.
17 Q.   When the table is in the vertical position
18 and the step isn't up --
19 A.   Then you can operate the machine from the
20 vertical or horizontal position.
21 Q.   What is preventing the vertical portion of
22 the table from falling down?
23 A.   The question again? When the step is down?
24 Q.   When the step is down and the table is in the

88

1  vertical position.
2  A.   Well, there is a very heavy gear head motor
3  with a heavy chain drive. I believe it was a No. 50
4  chain. This probably has a 5,000 pound rating or more
5  on it. The machine head motor would be a double back
6  ear motor, the terminology that I use, which means it
7  has a tremendous amount of drag on it. It won't -- it
8  won't let the table fall.
9  Q.   So does the presence of that No. 50 chain and
10 the double back ear motor, which is holding that piece
11 of equipment in a vertical position --
12 A.   Yes, it would hold it in a vertical position.
13 Q.   Are there any other mechanisms on the king
14 size cutting table sold to Coyne Mattress to prevent
15 the table in the vertical position from falling when
16 the step is down?
17      MR. YAMAMURA:  Objection. It assumes
18 facts not in evidence.
19      Other than what he described?
20      MR. BOUSLOG:  Yeah, other than what he
21 described.
22 A.   The only -- when the step is down, you are
23 dependent upon that back ear motor and the chain to
24 hold that table.

89

1    BY MR. BOUSLOG:

2        Q.   The king size cutting table that was sold to

3    Coyne Mattress, did it go through any modification --

4    after it was sold to Coyne Mattress, did that

5    particular design go through any modifications or

6    changes over the years?

7            MR. YAMAMURA:  That particular design,

8    you are talking about?

9            MR. BOUSLOG:  Yeah.

10           MR. YAMAMURA:  You are not talking about

11   that particular table.

12           MR. BOUSLOG:  That's correct.

13           MS. CRONAN:  And these questions are

14   directed to him in his capacity and based on his

15   personal knowledge.

16           MR. BOUSLOG:  That's correct, just

17   personal knowledge.

18       A.   Okay.  In later years, it went from electric

19   to air.  It was more of a cost mechanism than anything

20   else.

21   BY MR. BOUSLOG:

22       Q.   Were any procedures or mechanisms put in

23   place on subsequent models of the cutting table to

24   prevent the table in the vertical position from falling

90

1    other than the presence of the motor or the raising

2    stair?

3            MR. YAMAMURA:  It assumes facts not in

4    evidence.

5        A.   No, the function of the machine basically

6    stayed the same.

7    BY MR. BOUSLOG:

8        Q.   I think you have answered that the king size

9    cutting table sold to Coyne Mattress Company in this

10   particular instance was not accompanied by any manuals

11   or instructional materials.  After the sale of that --

12   is that correct, sir?

13       A.   Just my personal knowledge?

14           MR. YAMAMURA:  Yes, right.

15   BY MR. BOUSLOG:

16       Q.   Yeah.

17           MS. CRONAN:   And I will object to the

18   form of the question.

19   BY MR. BOUSLOG:

20       Q.   Subsequent to that sale, were there any

21   instructional manuals or operator manuals that

22   accompanied the subsequent cutting table sales?

23           MR. YAMAMURA:  Objection.  Assumes facts

24   not in evidence.

91

1            Go ahead.

2        A.   Not to my knowledge.

3    BY MR. BOUSLOG:

4        Q.   Do you know roughly how many cutting tables

5    were manufactured per year at the time of the sale of

6    this particular piece of equipment, Mr. Coyne?

7        A.   My best guess and only a guess is there were

8    probably 25 of them.

9        Q.   All together?

10       A.   All together.  And that's just a figure.

11       Q.   In addition to producing the king size

12   cutting table, did the original DRC Corporation also

13   supply parts to the purchasers of this equipment?

14           MR. YAMAMURA:  Again, this is in terms

15   of personal knowledge and not in any capacity as a

16   DRC 30(b)(6)?

17           MR. BOUSLOG:  That's fine.

18       A.   You mean '66.  The old DRC manufacturing that

19   cutting table would sell parts; and, yes, it would

20   have.

21   BY MR. BOUSLOG:

22       Q.   And did it also provide technical services or

23   support to the purchasers of its equipment?

24       A.   It would have.

92

1        Q.   Do you recall whether the DRC 1966 ever

2    provided any product advisories or warnings concerning

3    the cutting table to any of its past customers?

4            MR. YAMAMURA:  Okay.  Assumes facts not

5    in evidence.  Assumes the necessity to do so.

6        A.   I know of none.

7    BY MR. BOUSLOG:

8        Q.   Do you know whether the new or the more

9    recent DRC Corporation participated in any recent

10   International Sleep Products Association conventions?

11       A.   You are speaking of the DR --

12           MR. YAMAMURA:  DRC, the second DRC, the

13   active one, which would actively participate in trade

14   fairs.

15           MR. BOUSLOG:  That's correct.

16           MS. CRONAN:  And I am going to object on

17   the grounds of are you referring to the corporation,

18   are you referring to individuals in the corporation?  I

19   think your question is vague.  Maybe you could clarify

20   it.

21   BY MR. BOUSLOG:

22       Q.   You can answer the question, sir.

23       A.   Just reask the question again, please.

24       Q.   Did the DRC Corporation in 1979, you know,

93

1  the new DRC Corporation, participate in any
2  International Sleep Products Association conventions in
3  recent history?
4      A.  No.
5      Q.  Do you know whether the -- do you know
6  whether the James Cash Machine Company participated in
7  any recent International Sleep Products Association
8  conventions?
9          MR. YAMAMURA:  Based on personal
10  knowledge.
11     A.  Personal knowledge would be yes.
12  BY MR. BOUSLOG:
13     Q.  Do you know which ones?
14         For instance, are you aware of any in 2004?
15     A.  You are asking if James Cash Machine Company
16  participated in any international shows?
17     Q.  Any ISPA conventions or shows.
18     A.  I would think they would have, yes, sir.
19     Q.  Are you aware of whether the James Cash
20  Machine Company, Inc., or DRC Corporation -- well, let
21  me ask you this:  Are you aware of a convention that
22  occurred in Indianapolis in 2004?
23     A.  Yes.
24     Q.  Who went in your family or representing

94

1  James Cash Machine Company?  Who went to that
2  convention, if you know?
3          MR. YAMAMURA:  That's two questions, who
4  represented James Cash and family is another.  So it is
5  two different questions.
6          MS. CRONAN:  Maybe you should split it
7  up.
8  BY MR. BOUSLOG:
9      Q.  Who attended that convention?
10         MR. YAMAMURA:  On behalf of James Cash.
11     A.  On behalf of James Cash, is that what you are
12  asking?
13  BY MR. BOUSLOG:
14     Q.  Yes.
15     A.  I can give you several names, but Bob Ferry
16  would have been the gentleman that would have set the
17  convention up or set the machinery up at the
18  convention.  Linda Ferry may or may not have been
19  there.  And as to the other people, you would have
20  to -- whoever might have went with him, you would have
21  to ask.  I did not attend it.
22     Q.  And the DRC Corporation did not participate
23  in that convention?
24     A.  No.

95

1      Q.  That's no?
2      A.  No, it did not.
3      Q.  Is it something within your understanding of
4  the continuation of the business over the years that
5  the James Cash Machine Company would represent or might
6  represent that it had been in business since 1947 for
7  the manufacture of this kind of equipment?
8          MR. YAMAMURA:  Are you asking in his
9  individual capacity?  He is not representing James
10  Cash.
11         MR. BOUSLOG:  That's correct.
12     A.  Even now, I am not quite sure I understand
13  the question.  I think it is a very simple question,
14  but would you repeat it?
15  BY MR. BOUSLOG:
16     Q.  Given the sort of continuation of the
17  business through several corporate changes in the
18  corporate identities --
19     A.  Yes.
20     Q.  -- would it be in keeping with those -- that
21  continuation that it wouldn't surprise you if the James
22  Cash Machine Company, Inc., represented that it had
23  been in the business of producing and supplying bed
24  making equipment since 1947?

96

1      A.  That would be correct, I would think.
2      Q.  Did either of the DRC corporations ever issue
3  any maintenance or repair instructions to any of the
4  purchasers of bed making equipment?
5          MR. YAMAMURA:  That's two separate
6  questions.  You are asking in the capacity of personal
7  knowledge or his capacity as a 30(b)(6) personal
8  representative in the active corporation?
9          MR. BOUSLOG:  Let me break it up.
10         MR. YAMAMURA:  Break it up.
11  BY MR. BOUSLOG:
12     Q.  In terms of the older DRC corporation, sir,
13  were there any kind of written maintenance or repair
14  advisories or instructions given to any of the
15  purchasers of its equipment at any time, whether at the
16  time of sale or subsequent to the sale?
17         MR. YAMAMURA:  Objection.  Asked and
18  answered.
19         Go ahead.
20     A.  I am not aware of any.
21  BY MR. BOUSLOG:
22     Q.  And did the new DRC Corporation issue any
23  such --
24     A.  No.

97

1    Q.  And I take it -- well, the 1966 DRC
2  Corporation, was it ever a party to any lawsuit?
3            MR. YAMAMURA:  Objection.  Asked and
4  answered.
5    A.  No.
6  BY MR. BOUSLOG:
7    Q.  And I take it that's true also for the more
8  recent DRC Corporation.
9            MR. YAMAMURA:  '79.
10   A.  Correct.
11 BY MR. BOUSLOG:
12   Q.  Did the DRC Corporation in 1966 ever have any
13 citations from the Occupational Safety and Health
14 Administration?
15           MR. YAMAMURA:  Objection.  Relevancy.
16           You can go ahead and answer.
17   A.  I don't know of any.
18 BY MR. BOUSLOG:
19   Q.  You are not aware of any to the more recent
20 DRC Corporation, I take it.
21   A.  No.
22           MR. BOUSLOG:  Thanks.
23           THE WITNESS:  Thank you.
24           MS. CRONAN:  I have a few follow-up

98

1  questions, if I might.
2
3                CROSS-EXAMINATION
4  BY MS. CRONAN:
5    Q.  Mr. Cash, earlier in your deposition today,
6  you were asked if the second DRC, the 1979 DRC, could
7  have refurbished a cutting table.  Do you remember that
8  testimony you were asked?
9    A.  Yes.
10   Q.  Do you have any specific recollection, as you
11 sit here today, of actually refurbishing any cutting
12 tables during the time that the second DRC was in
13 existence?
14   A.  No.
15   Q.  You were also asked a lot of questions about
16 your education and your training with respect to
17 designing and manufacturing machines.  Do you recollect
18 that?  Do you remember that?
19   A.  Yes, yes.
20   Q.  Did you receive on-the-job training?
21   A.  Yes, ma'am.
22   Q.  And can you tell us a little bit about that,
23 please?
24   A.  On-the-job training included about, I

99

1  suppose, anything and everything that you would
2  encounter in a small machine shop or facility that had
3  all the machinery that James Cash Machine Company or
4  like organizations would have, and I was training on
5  how to run just about everything in the company, all
6  the mechanics.
7    Q.  Who provided that training to you?
8    A.  My father made sure that I got it.  So at the
9  time I guess whoever I might have been working under
10 would have been training me.
11   Q.  So some of the other machinists --
12   A.  Yes.
13   Q.  -- and builders in the shop?
14   A.  Yes.
15   Q.  And did your father actually provide training
16 to you as well?
17   A.  Yes.
18   Q.  And did you learn about the design of various
19 machines from your father and the other builders and
20 machinists in the shop?
21   A.  Yes.
22   Q.  We also talked a little bit about how
23 James Cash was involved in the sale of the cutting
24 table involved in this accident and how that was not

100

1  normal.  Do you remember that?
2    A.  Yes.
3    Q.  And I think you mentioned that maybe the
4  reason James Cash was involved was because Van, Waters
5  & Rogers had contacted James Cash.
6    A.  Yes.
7    Q.  Could there also have been another reason why
8  James Cash might have been involved in the sale of this
9  particular cutting table?
10   A.  DRC Corporation wasn't familiar with the
11 international shipments.
12   Q.  And the cutting table involved in this case,
13 that was shipped abroad; is that correct?
14   A.  Correct.
15   Q.  To Hawaii?
16   A.  Correct.
17   Q.  And did DRC Corporation have the capability
18 to ship machines like this abroad or overseas?
19           MR. BOUSLOG:  Vague and ambiguous.
20 BY MS. CRONAN:
21   Q.  You can answer the question.
22   A.  Okay.  It just did not have the working
23 knowledge of international shipments.
24   Q.  You were also asked earlier if you were aware



101

1  of any maintenance or repair of the cutting table
2  involved in this case.  Do you remember that?  Do you
3  remember when you were asked about that?
4       A.  I remember being asked a question similar to
5  that, yes.
6       Q.  Now, you have seen some photographs.  I think
7  they have been marked as Exhibit No. 2 in this case.
8       A.  Yes, ma'am.
9       Q.  What about any changes?  Just based on
10  looking at the photographs, have you observed any
11  changes that have been made to the cutting table
12  involved in this accident?
13       A.  Well, the machine has been completely
14  repainted.
15       Q.  And you haven't had the opportunity to
16  inspect the machine, have you?
17       A.  No.
18       Q.  And how do you know the machine was
19  repainted?
20       A.  It's not of any color that my company ever
21  used.  Also, the color should be the color of the tag
22  on the corporation, a lighter green or turquoise, and
23  it's a dark blue.
24            MS. CRONAN:  I think that's all for

102

1  right now.  Any follow-up?
2            MR. MAHAN:  I just want -- can you mark
3  this as an exhibit?
4
5            (Deposition Exhibit No. 10 was
6            marked for identification.)
7
8            REDIRECT EXAMINATION
9  BY MR. MAHAN:
10       Q.  Mr. Cash, we have marked as an exhibit
11  corporate records concerning DRC Corporation formed in
12  1979.  You will see in there the original Articles of
13  Incorporation --
14       A.  Um-huh.
15       Q.  -- several annual reports and the Articles of
16  Dissolution, which is the next to the last document.
17       If you would just go through those generally
18  and tell us whether or not you can identify those as
19  corporate filings and documents for DRC Corporation
20  formed in 1979.
21            MR. YAMAMURA:  The articles, you are
22  talking about?
23            MR. MAHAN:  The articles and the annual
24  reports.

103

1            MS. CRONAN:  Which exhibit number is
2  it?
3            MR. YAMAMURA:  It is going to be 10.  It
4  is a new exhibit.
5            I must admit, some of these I am having a
6  hard time looking at because some of the Xeroxes aren't
7  very clear.
8       A.  I guess you are just basically asking is this
9  the correct figure?
10  BY MR. MAHAN:
11       Q.  Right.  I am talking about documents
12  contained in there that would be generated by DRC
13  Corporation, such as annual reports, the Articles of
14  Incorporation, and the Articles of Dissolution.
15            MR. YAMAMURA:  My problem, counsel, is
16  some of this is generated from the state.  It appears
17  some of this is generated from the state.
18            MR. MAHAN:  Right, and I am not asking
19  him to identify those.  I am just talking about the
20  annual reports, the Articles of Incorporation, and the
21  Articles of Dissolution.
22            MR. YAMAMURA:  The annual report?
23            THE WITNESS:  That's '91.
24            MR. YAMAMURA:  '91?

104

1            And the annual report --
2            THE WITNESS:  I can't read that.
3            MR. YAMAMURA:  I can't even make out the
4  year.  This looks like '79.
5            THE WITNESS:  The other one was the same
6  way.  I think they are all about that.
7            MR. YAMAMURA:  By date of incorporation.
8            THE WITNESS:  Yeah.
9            MR. MAHAN:  (Pointing to document.)
10            MR. YAMAMURA:  Oh, just the date stamp?
11  '92, '94.
12            For the record, we are looking at the date
13  stamp "Received, Secretary of State, Commonwealth of
14  Kentucky."
15            I can't make out that one.
16            May 8th of '96.
17            May 12th, '97.
18            March 19th, '98.
19            September 3rd, '99.
20            It looks like March 24th, 2002 or 2000.  I
21  can't make it out.
22            I can't make that out, either.
23            It looks like June 28, 2003, is the last one.
24            MR. MAHAN:  Last page.  Look at the last

105

1  page.

2        MR. YAMAMURA:  Well, the second to the

3  last page is the Articles of Dissolution.  And it looks

4  like this page would be May 25th, 2004, is the last

5  page, as far as I can tell.  And the date of

6  dissolution is June 16th, 2004.

7        Go ahead.

8  BY MR. MAHAN:

9        Q.  My question again is:  The documents that

10  comprise Exhibit 10, so far as documents generated by

11  the corporation, DRC Corporation, which would be the

12  Articles of Incorporation, the annual reports as

13  contained therein, and the Articles of Dissolution, can

14  you, as the representative of DRC Corporation, state

15  that those are correct copies of those articles and

16  annual reports?

17        A.  They appear to be the correct copies, yes.

18        MR. MAHAN:  That's all.

19        MR. YAMAMURA:  Chris?

20        MR. BOUSLOG:  One more, sir.

21        THE WITNESS:  Okay.

22

23

24

---

106

1                RECROSS-EXAMINATION

2  BY MR. BOUSLOG:

3        Q.  In response to questioning from Ms. Cronan,

4  you testified that you had an opportunity to view

5  photographs of the machine sold to Coyne Mattress, and

6  you testified that it had been completely repainted.

7        A.  Yes, sir.

8        Q.  Were you able to observe any other changes or

9  modifications to the equipment?

10        A.  From those photographs?  No, sir.

11        MR. BOUSLOG:  Thank you.  Nothing

12  further.

13        MR. YAMAMURA:  We are done.  Signature

14  is to Ms. Cronan's office.

15

16                * * * * *

17

18

19

20

21

22

23

24

---

107

1        I, DAVID R. CASH, do hereby certify that I have

2  read the foregoing deposition and that my testimony
   contained therein is true, accurate and complete to the

3  best of my knowledge and belief, with the exception of
   the changes listed below:

4  Page      Line                Change

5  _____

6  _____

7  _____

8  _____

9  _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

                    _____
19                           DAVID R. CASH

20        SUBSCRIBED AND SWORN to before me,
   the undersigned authority, on this the ____ day of

21  _____, 2005.

22

23                    _____
                     Notary Public in and for
24                   State of Kentucky at Large

---

108

1  STATE OF KENTUCKY        )
                            )  SS
2  COUNTY OF JEFFERSON      )

3

4        I, Debra E. Boyer, CSR, RPR, Notary Public in

5  and for the State of Kentucky at Large, do hereby

6  certify that the foregoing testimony of DAVID R. CASH

7  was taken before me at the time and place as stated in

8  the caption; that the witness was first duly sworn to

9  tell the truth, the whole truth, and nothing but the

10  truth; that the said proceedings were taken down by me

11  in stenographic notes and afterwards transcribed under

12  my direction; that it is a true, complete and correct

13  transcript of the said proceedings so had; that the

14  appearances were as stated in the caption.

15        WITNESS MY SIGNATURE this, the 14th day of

16  January, 2005.

17        MY COMMISSION EXPIRES:  June 4, 2005.

18

19

20                    _____

21                   DEBRA E. BOYER, CSR, RPR
                     Notary Public
                     State at Large

22

23

24

DEPOSITION OF DAVID R. CASH
GENDROW V. SIMON MATTRESS V. DRC CORPORATION
U.S. DISTRICT COURT FOR THE NORTHERN DISTRICT OF HAWAII
CASE NO. CV 03 00034

| PAGE | LINE(S) | CHANGE |
|------|---------|--------|
| 7 | 22 | Yes, the "active" or the second DRC Corporation. |
| 8 | 22-24 | I would have been the first officer when it was incorporated. I believe I was the only one at the time, but T.J. Cash may have been the Secretary and Treasurer. |
| 11 | 16-18 | It could have been most any type of machinery used to make mattresses and bedding including filling machines for comforters and sleeping bags, border machines, tape edge machines, layout tables, fabric and cutting machines, miscellaneous sewing machines. (strike 2nd sentence of answer) |
| 12 | 6 | No. It was not a refurbished table. |
| 12 | 15 | Anything is possible. Records of the second DRC Corporation do not reflect the manufacturer of the machines we refurbished and this was more than 20 years ago. I would say no. |
| 16 | 2-4 | Yes. The first DRC Corporation was incorporated in 1966. |
| 23 | 12-15 | You are speaking about the table involved in the accident okay. The table that is involved in the accident, I would have designed it for sale by the first DRC Corporation. |
| 23 | 18 | Yes for sale by the first DRC Corporation. |
| 26 | 3 | Yes and I worked there before high school. |
| 26 | 10 | Yes. (strike um-huh) |
| 27 | 1 | "I guess I could go on and on and elaborate. You know, machine work would mean I ran lathes, I ran horizontal millers and I ran vertical millers. These are a form of metal cutting machines." (strike remaining part of answer) |
| 27 | 23 | Yes at James Cash Machine Company. |
| 28 | 2 | Panel quilting and tape edge machines. |
| 40 | 8 | You are asking about 1968—more than 35 years ago. At the time, I was probably factory superintendent for all machinery other than tape edge and sewing machines. (strike prior answer) |
| 44 | 6-9 | "Based upon my personal knowledge and not as a corporate representative, all parts…" |
| 44 | 18 | "Again just based upon my personal knowledge and not as corporate representative, I will have to go back some 30 odd years to think about it, but at that time the customer would have been responsible for setting it up and putting it into operation himself." |
| 45 | 5 | Based upon my personal knowledge and not as a corporate representative, I really don't remember what information would have been provided in 1968 when this cutting table was sold. I could have provided setup or installation instructions verbally. In any event, the customers who ordered cutting table would have known how to set up the table. |
| 45 | 10 | Based upon my personal knowledge and not as a corporate representative, I don't |



| | | remember as to ever doing that in writing, no. |
|---|---|---|
| 45 | 14-15 | Based upon my personal knowledge and not as a corporate representative, there may have been some. To be honest, I don't remember what we did more than thirty years ago, but I believe there were written materials that accompanied the cutting tables made by the first DRC Corporation. |
| 45 | 19 | Based upon my personal knowledge and not as a corporate representative, not to my knowledge. The cutting table is a simple piece of equipment to operate and the mattress bedding manufacturers would know how to operate it. |
| 46 | 18 | I believe that the first DRC Corporation did not. |
| 48 | 3-4 | Based upon my personal knowledge and not as a corporate representative, I can't tell you that with any certainty…." |
| 51 | 11-12 | What assets? Any cash assets would have been disbursed to myself. There was also insurance including insurance for the claim in this case. |
| 51 | 21-22 | It would have been a long time ago, probably in the early 1990's. |
| 54 | 14-15 | Based upon my personal knowledge and not as a corporate representative, the current cutting tables would be similar to the one in Hawaii in some respects, but would be different in other respects. The ones today would not be electric. They are powered by air. |
| 54 | 21 | No, but there are patents for other machines used in the manufacture of mattress bedding. (strike prior answer) |
| 60 | 15 | Based upon my personal knowledge and not as a corporate representative, no. |
| 60 | 21 | Based upon my personal knowledge and not as a corporate representative, it was customary for the company to ask a customer to try a new machine and give us feedback about changes or concerns. (strike prior answer) |
| 61 | 15 | Based upon my personal knowledge and not as a corporate representative, not that I remember. This was more than 35 years ago. |
| 61 | 20-22 | Based upon my personal knowledge and not as a corporate representative, I would have built it in its entirety…. |
| 62 | 3-4 | Based upon my personal knowledge and not as a corporate representative, I am sure there must have been some drawings for it. |
| 62 | 16 | Yes. The records would have been given to James Cash Machine Co. at the time of the merger. (strike prior answer) |
| 63 | 2 | Based upon my personal knowledge and not as a corporate representative, no. |
| 63 | 9 | Based upon my personal knowledge and not as a corporate representative, not to my knowledge, no. There are patents for other machines used in the manufacture of mattress bedding. |
| 63 | 21 | Based upon my personal knowledge and not as a corporate representative, no, sir. |
| 64 | 2 | Based upon my personal knowledge and not as a corporate representative, no sir. |
| 65 | 7 | Based upon my personal knowledge and not as a corporate representative, yes, sir. |
| 65 | 13 | Based upon my personal knowledge and not as a corporate representative, no. |
| 65 | 19 | Based upon my personal knowledge and not as a corporate representative, no, sir. |
| 67 | 8-9 | Based upon my personal knowledge and not as a corporate representative, I would have been a shareholder. She would not have been a shareholder, to my knowledge. |
| 67 | 17 | Based upon my personal knowledge and not as a corporate representative, I would think yes during some of that time. (strike prior answer) |

| 69-75 | 1-24 | Responses as to D. R. Cash, Inc., James Cash Machine Company International, Inc. and James Cash International, Inc. are based upon my personal knowledge and not as a corporate representative. |
|-------|------|------|
| 77 | 14 | No. Each had its own employees. |
| 81 | 16 and 23 | Based upon my personal knowledge and not as a corporate representative,… |
| 84 | 8 | Based upon my personal knowledge and not as a corporate representative… |
| 84 | 21 | Based upon my personal knowledge and not as a corporate representative… |
| 87 | 11-23 | Responses are based upon my personal knowledge and not as a corporate representative. |
| 88 | 2 | Based upon my personal knowledge and not as a corporate representative,…double back gear motor… |
| 88 | 12 | Based upon my personal knowledge and not as a corporate representative… |
| 88 | 22-24 | Based upon my personal knowledge and not as a corporate representative, the only—when the step is down, you are dependent upon that back gear motor and the chain to hold that table. |
| 90 | 5-6 | Other than what I have already mentioned, no, the function of the machine basically stayed the same. |
| 91 | 2 | Based upon my personal knowledge and not as a corporate representative, not to my knowledge. Again the cutting table is a simple piece of equipment to operate and the mattress bedding manufacturers would know how to operate it. |
| 91 | 24 | Based upon my personal knowledge and not as a corporate representative, it would have. |
| 92 | 6 | Based upon my personal knowledge and not as a corporate representative, I know of none. |
| 93 | 18 | Based upon my personal knowledge and not as a corporate representative, I would think they would have, yes sir. |
| 93 | 23 | Based upon my personal knowledge and not as a corporate representative, yes. |
| 94 | 15 | Based upon my personal knowledge and not as a corporate representative, … |
| 96 | 1 | Based upon my personal knowledge and not as a corporate representative, that would be correct, I would think. |
| 96 | 20 | Based upon my personal knowledge and not as a corporate representative,… |
| 97 | 17 | Based upon my personal knowledge and not as a corporate representative, I don't know of any. |

1    I, DAVID R. CASH, do hereby certify that I have
2    read the foregoing deposition and that my testimony
     contained therein is true, accurate and complete to the
     best of my knowledge and belief, with the exception of
3    the changes listed below:

4    Page        Line                    Change

5    _____    See attached changes    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16

17

18            _____
                    D R Cash
19                  DAVID R. CASH

20            SUBSCRIBED AND SWORN to before me,
     the undersigned authority, on this the 16th day of
21   _February_____, 2005.

22
              _____
23   **ORIGINAL**    Linda Ferry
              Notary Public in and for
24            State of Kentucky at Large