

February 6, 2006

John Tate
Sarah Cronan
C/o Stites & Harbison
400 West Market Street, Suite 1800
Louisville, Kentucky 40202

### Re: Gendrow, et al. vs. Coyne Mattress et al.

Dear Mr. Tate and Ms. Cronan:

The purpose of this letter is to supplement my initial report based upon my review of the following additional documents:
1. James Cash Machine Company's (JCM) Motion for Summary Judgment
2. Gendrow's Opposition to JCM's Motion for Summary Judgment
3. JCM's Response to Simon Mattress Manufacturing Company's Motion for Summary Judgment
4. Simon Mattress Manufacturing Company's Expert Disclosure
5. Gendrow's Second Supplemental Exhibit to Disclosure of Expert Witnesses

The focus of this supplement report is my rebuttal response to Mr. Buffington's supplemental opinions contained in his January 20, 2006 report (i.e. as provided within Gendrow's Second Supplemental Exhibit to Disclosure of Expert Witnesses) and my rebuttal response to Mr. Merala's report dated December 13, 2005 (i.e. as provided within Simon Mattress Manufacturing Company's Expert Disclosure).

**Mr. Buffington's Supplemental Report**

1. Throughout his report Mr. Buffington repeatedly references and cites a particular standard, ANSI/ASSE Z244.1-2003.

    This specific standard was first promulgated in 2003 (i.e. as per the "-2003" identifier in the standard number). That is, the specific standard Mr. Buffington repeatedly quotes was promulgated 35 years **after** the date of manufacture of the subject equipment and over 2 years after the subject accident. As such, this specific standard is not applicable to any of the defendants in this matter.

    Mr. Buffington states in his supplemental report (i.e. last paragraph on page 3) that the predecessor to this standard was originated in 1975; the standard was then revised and updated numerous times over the next 28 years. The point to be made is that the subject DRC tilt table (i.e. the subject tilt table) was conceived,

---

2104 West Riverside • Spokane, WA 99201 • 509-624-3714 telephone/fax



designed, manufactured, and sold over 7 years **before** ANSI/ASSE had promulgated their first standard pertaining to LOTO; as such, neither the subject standard repeatedly quoted by Mr. Buffington, nor any of its predecessors, is applicable to the subject tilt table.

2. In general, Mr. Buffington repeatedly opines and is in agreement with Mr. Schwalje's opinions, as well as those I expressed in my initial report, that the design of the subject tilt table "inherently isolates the energy" (i.e. see page 6, paragraph 3 of Mr. Buffington's supplemental report), referring to the stored energy when the table is tipped up. Mr. Buffington also agrees with Mr. Schwalje and me, that this inherent stability or isolation of the stored energy is a consequence of the main tilt motor and its associated drive components (i.e. shafts, gears, chains, sprocket, etc.). However, Mr. Buffington opines that it is a "hidden danger and a design defect" (i.e. see page 6, paragraph 3) that if the integrity of the drive system is compromised, the table will drop back down to its stable or horizontal position.

   With all due respect to Mr. Buffington, I strongly disagree with his opinion. The subject tilt table has only one purpose: namely, to provide a working surface that is horizontal that can then be raised or tilted up nearly vertical. The main tilt motor (i.e. the one Mr. Gendrow was intentionally attempting to remove from the table when the table fell back down) and its associated drive components have one and only one purpose: to move the table back and forth between its horizontal or stable position and its tipped up or unstable position. When the table is tipped in its upright position, it is still leaning back towards its horizontal position as illustrated in the photographs contained in Mr. Merala's report (i.e. at maximum rotation the table is elevated 80 degrees above the horizontal).

   It is not a "hidden danger" or a "design defect" that if you remove the prop that is holding up a nearly 8 foot square table, at an 80 degree angle, that it will fall back down. This is analogous to claiming that the built-in hood props on many automobiles are a "hidden hazard" and a "design defect". In addition, the foreseeable user group for automobiles is much less knowledgeable and sophisticated than the foreseeable user group for a piece of specialized industrial equipment such as the subject tilt table.

3. Mr. Buffington opines that in addition to its inherent instability, the subject tilt table should have had an interlock to prevent the table from falling if the main drive motor is removed (i.e. see page 6, last paragraph), that the failure to have done so is a "design defect".

   Again, I respectfully disagree with Mr. Buffington. There are several reasons why there is no need to have a redundant safety system to prevent the table top of the subject tilt table from falling if the drive motor is removed, and the failure to have done so is not a "design defect". It is important to note that in the general operation, use, and maintenance of the subject tilt table, there is no reason for anyone to perform any tasks that would compromise the integrity of the drive system, thereby causing the table top to fall. For example, at the time of this

2

accident, the subject drive system was over 30 years old, in its original state, and still functioning perfectly (i.e. recall Mr. Gendrow was removing a **functioning** drive motor to use elsewhere). Furthermore, as discussed above, it is my opinion that it should have been open and obvious to a sophisticated user such as Mr. Gendrow that if the drive system's integrity was compromised the table would fall.

There is no general safety principle that states all conceivable hazards should be protected by a redundant safety system. Given the exceedingly low probability that anyone would ever be exposed to such a hazard (i.e. the motor failing **and** the motor failing with the table in the up position **and** the user intentionally removing the component that supports the table), combined with the open and obvious nature of the hazard, particularly given the foreseeable user group, there is no reason to design and fabricate a redundant safety system.

Notwithstanding, the subject tilt table was equipped with a redundant safety system. That is, if the step motor failed (i.e. such as in this case), then the table motor could have been used and should have been used to lower the table before initiating work. Alternatively, if the table motor failed, the step motor could and should be used to elevate the step, thereby blocking the table from rotating. The point to be made is that the inherently self-locking system is one safety system and the alternative method to isolate the energy is to either lower the table or raise the step. As such, the system design did incorporate a redundant safety, even though such redundancy was not a necessary requirement for a reasonably safe piece of equipment.

4. Mr. Buffington also opines that the subject tilt table should have been equipped with some type of "emergency release" such as a crank so as to lower the table top when it is necessary to repair/replace the drive motor (i.e. see page 6, the last paragraph).

    Again, I respectfully disagree with Mr. Buffington; the rationale for my opinion is consistent with my opinions expressed in items 2 and 3 above. Notwithstanding, the lack of such a device is not proximate to Mr. Gendrow's accident. That is, there was nothing wrong with any portion of the subject tilt table's drive system, including the drive motor. Mr. Gendrow could have utilized the functioning drive motor to lower the tilted table before he initiated his work but chose not to do so. There is no basis to support an opinion that if the subject tilt table had been equipped with a hand crank, Mr. Gendrow would have used it to lower the table before initiating his work.

5. On page 7, second paragraph Mr. Buffington opines that, "The standard of care in the various industries (including the manufacturing industry) recognizes that during maintenance, it is vital that the machine be put in a zero mechanical state (ZMS) as defined in ANSI Z241.1 (sic) standard."

    I do agree with Mr. Buffington, but again he fails to discuss the relevant time frames. That is, as noted previously Mr. Buffington states that ANSI Z241.1 was

3

first promulgated in 1975, or 7 years **after** the date of manufacture of the subject tilt table. As such, this "standard of care" is not applicable to the design of the subject tilt table. Furthermore, since this was the "standard of care" for 2 ½ decades **before** Mr. Gendrow's accident, it is reasonable to conclude that such basic safety protocol should have been an integral part of **both** A&B's LOTO program, as well as Simon's LOTO program.

In addition, it is reasonable to conclude that Mr. Gendrow would have had extensive training and experience pertaining to the need to achieve ZMS **before** he started working on the subject tilt table. Had Mr. Gendrow made even the slightest effort to determine if the subject tilt table was at ZMS, he would have observed the 8 foot square table tipped up on its edge, and put it in a ZMS (i.e. lowered it) **before** he initiated his work.

6. On pages 8 and 9 of his report Mr. Buffington makes a number of comparisons/contrasts between the subject tilt table and his "present garage door and garage door opener". The inference of Mr. Buffington's comparisons is that the subject tilt table is somehow defective since it does not contain all of the features of Mr. Buffington's garage door opener.

   Mr. Buffington's logic is flawed for several reasons. Mr. Buffington does not specify the year of manufacture of his garage door opener, but from his general description, it is likely 20 or more years **newer** than the subject tilt table; clearly, there have been numerous advances in safety and general design philosophies over that extended time frame. In addition, the garage door opener is intended for use in a residential environment, not an industrial environment. This distinction is important in a number of areas including the differences in the level of training and sophistication of the foreseeable user group, the likely exposure of the product to children, and so forth. In addition, a garage door opening system is more complex than the subject tilt table in a number of areas such as the complexity of installation and the multitude of control options (i.e. hard wired in multiple locations, multiple remote controllers, multiple integrated vehicle controllers, etc.).

   In short, the various features described by Mr. Buffington that were included in his garage door opener that are not included in the subject tilt table are necessary for the safe design and operation of a residential garage door opening system, but are not necessary the safe design of the subject tilt table. For example, given the simplicity and ease of installation of the subject tilt table compared to a garage door opening system, as well as user sophistication, there is no need for an installation and owner's manual for the subject tilt table, yet clearly there is for a garage door opening system (i.e. mounting complexities, interfacing the opener with other products, and so forth). A release cord on a garage door is an important convenience feature (i.e. ability to open/close in case of a power outage or controller lost/malfunctioning; ability to partially raise/lower; ability to deny access until the code can be changed; and so forth).

4

It is interesting to note that Mr. Buffington does not claim that his garage door system includes such things as a warning to not stand under an elevated door while removing the drive system or a redundant safety system to hold the door open in the event that someone were to do so. Assuming that Mr. Buffington's garage door opener is not equipped with such "safety" devices, then by his own standards, he owns, operates, and or purchased and installed a product that is "defectively designed" and contains a "hidden hazard"; particularly since it is placed in a residential setting not in a controlled industrial setting.

7. Throughout his supplemental report, Mr. Buffington criticizes Coyne Mattress (Simons) for its defective LOTO program opining that such a defect was a contributing factor to Mr. Gendrow's incident.

   I disagree with Mr. Buffington to the extent that I believe such a defect was not only a contributing factor; it was a root cause. That is, had Coyne Mattress (Simons) had a properly designed and implemented LOTO program, as mandated by OSHA for well over a decade, Mr. Gendrow's accident would not have occurred. Without question, Coyne Mattress's (Simons') failure to comply with the minimum requirements of OSHA, as well as their own program (i.e. requiring the blocking and bracing of parts that could fall because of gravity) was one of the underlying root causes of Mr. Gendrow's incident.

   It is also important to note that Mr. Buffington's report is noticeably absent of any criticism of A & B Electric's LOTO program (i.e. Mr. Gendrow's employer). A & B Electric is required to comply with the same LOTO programs, training, standard of care, and so forth as Coyne Mattress (Simons). Had A & B Electric properly trained Mr. Gendrow, and had Mr. Gendrow complied with the minimum requirements of such training, his incident would not have occurred. There is no question that A & B Electric failed to do so, as evidenced in part by the OSHA citation; such a failure was clearly another root cause of Mr. Gendrow's incident.

   My opinions are supported by Mr. Buffington's opinions expressed on page 11, paragraph two of his supplemental report wherein he opines that, "a safety professional would have recognized the stored, gravitational energy hazard" and "if either or both Corporation and/or Coyne Mattress Manufacturing Company had use the JSA procedures properly, the hazard most likely would have been recognized, the lift table most likely would have been secured in some manner or lowered to a horizontal position and this accident would have been prevented." In short, Mr. Buffington has identified the underlying root cause(s) of Mr. Gendrow's incident. Where I take issue with Mr. Buffington is that he is retroactively applying a standard of care to Corporation, and he completely avoids any discussion of A & B Electric's failure to comply with the same criteria.

8. On page 12, the last paragraph, Mr. Buffington opines that one of the first steps that should have been taken was to review the Owners' Manual so as to incorporate the manufacturer's safety guidelines and warnings. Mr. Buffington goes on to state that since the needed information was not available, the

5

manufacturer should have been called. Similarly, on page 15, the second paragraph, Mr. Buffington opines that "the standard texts of conduct of maintenance require the mechanic to review the Operators Manual".

The point to be made here is quite clear. The failure to have done so was not a failure on the part of Corporation; rather, it was a joint failure on behalf of both Coyne Mattress and A & B Electric.

9. On page 14, the last paragraph, Mr. Buffington states that the potential energy in the raised table was not identified or controlled. Based on this, Mr. Buffington opines "Therefore, Mr. Gendrow was not properly trained." Mr. Buffington reiterates this opinion on page 15, the second paragraph stating, "the hazard was a gravitational hazard not an electrical hazard......Mr. Gendrow was never properly trained to recognize the gravitational hazard".

Based on the initial preceding statement alone, I believe the more appropriate conclusion is that either Mr. Gendrow was not properly trained and/or that he did not properly comply with his training. In any event, such failure(s) are a consequence of the failures of Coyne Mattress, A & B Electric, and/or Mr. Gendrow; such a failure is not a consequence of the design of the subject tilt table. Again, the subject tilt table was designed and manufactured well before LOTO was a standard of care. Even so, the subject tilt table was inherently stable and isolated its stored energy when the power was removed; that is, until Mr. Gendrow intentionally modified the table by unbolting the drive motor.

Lastly, employees are not trained to recognize only "electrical hazards" or only "gravitational hazards" and so forth. OSHA requires employees be trained to recognize all forms of stored energy; to do otherwise would be unwieldy and disastrous. That is, if employees were only trained to recognize a single type of hazard, before work could be done on any piece of equipment an employee trained in electrical hazards, another trained in gravitational hazards, another trained in chemical hazards, another trained in kinetic energy hazards, another trained in compressed air hazards, another trained in hydraulic hazards, another trained in spring hazards, and so forth would all have to be consulted. The point to be made is quite simple, electric motors do not exist in isolation; their purpose is to convert electrical energy into other forms of energy; all electrical maintenance personnel must be trained to recognize and control all forms of energy hazards, not just electrical hazards.

**Mr. Merala's Report**

There are a number of statements made by Mr. Merala in his report with which I disagree (i.e. there is no system to secure the table when it is elevated; the hazard of removing the drive motor is not readily apparent to many; and so forth). However, since I believe that the vast majority of my opinions that may differ with those offered by Mr. Merala have been previously discussed (i.e. in my first report, and previously in this supplemental report) I will not reiterate them within this section. It is interesting to note however, that

6

while Mr. Merala opines that the risk of removing the drive motor is not readily apparent, he describes the situation as "akin to removing a leg from a three legged stool".

The opinion expressed by Mr. Merala that I take great issue with is that, "the tilt top cutting table freed from the drive motor does not appear to by the regulation" referring to OSHA 1910.147 (i.e. see page 7, second paragraph). Mr. Merala arrives at this patently false conclusion vis-à-vis a combination of misguided "semantic trickery" and scientifically invalid procedures. The underlying "methodology" that Mr. Merala attempts to use is scientifically invalid; the conclusions Mr. Merala arrives at are inconsistent with well recognized scientific terminology and safety principles.

In short, Mr. Merala opines that when the table top of the subject tilt table is in the elevated position (i.e. tipped up 80 degrees above the horizontal) the equipment does **not** possess "stored energy" (i.e. see page 7, paragraph 2). Such an opinion is so inconsistent with basic scientific principles that it is ludicrous to even suggest otherwise. Based on this unequivocally erroneous opinion, Mr. Merala then opines that since OSHA 1920.147 states that it covers "the servicing and maintenance of machines and equipment in which the unexpected energization or start up of the machines or equipment, or release of stored energy could cause injury to employees." Thus, according to Mr. Merala, since the elevated table top does not possess stored energy, the OSHA standard does not apply.

Alternatively, if the elevated table top does possess "stored energy", then Mr. Merala's opinion that OSHA 1910.147 does not apply is invalid. The foundation for Mr. Merala's erroneous opinion is expressed in the first paragraph of the Section "Discussion and Observations" on page 6 of his report, wherein he states, "**the** definition of energy is the **capacity** to do work" (emphasis added). Let me discuss each of these emphasized terms separately.

While I agree that this is "a" definition of energy, it is not "**the**" definition of energy. The reason for the emphasis on "a" and "the" is not to get embroiled in an esoteric semantic debate. Rather, the distinction is important to demonstrate a scientific invalid principle in Mr. Merala's opinions. That is, if there is only "the" definition of energy, if a given scenario does not precisely meet "the" definition of energy, then it is not energy. However, if one recognizes that what Mr. Merala has stated is nothing more than "a" definition of energy (i.e. there are other verbal descriptions or definitions of energy) then if a given scenario does not precisely meet "a" definition of energy then one cannot draw any conclusions as to whether or not that is energy without considering the other definitions of energy.

More specific to Mr. Merala's opinions, Mr. Merala claims that when the table is in the elevated position, "it is not available or stored for doing work" (i.e. see page 7, second paragraph). Since it is not "available" or "stored" to do work, Mr. Merala then reverts to "the" definition of energy and falsely concludes that when the table is in the tilted position it does not have "stored energy" (i.e. later in the same paragraph). There are several errors in Mr. Merala's argument. First and foremost, as noted above while Mr. Merala's offers "a" valid definition of energy, it is not "the" definition of energy. Second, and perhaps more condemning of Mr. Merala's argument is that "the" definition offered by Mr. Merala does not say that something must be "available" or "stored" to do

7

work, rather, it must have the "capacity" to do work. Since a basic definition of work is the application of a force over a displacement, it is unequivocal that when the table top is tipped up, it has the capacity to do work; no reasonable scientist would argue otherwise.

Mr. Merala does acknowledge in that same paragraph that when the table top is in the tipped up position it does possess "potential energy". Mr. Merala makes another erroneous attempt at semantic trickery proclaiming that since the OSHA standard only refers to "stored energy", that nowhere does it refer to "potential energy", and since the tipped table top possesses "potential energy", the standard is not applicable. Such a claim is utter nonsense and scientifically invalid. Stored energy comes in many forms such as, mechanical, electrical, and chemical; each of these sub categories can be further subdivided. For example, mechanical energy is comprised of several types such as kinetic energy and potential energy; even these subcategories can be further subdivided. For example, there is both rotational and linear kinetic energy; alternatively there is potential energy due to gravity, due to springs (i.e. stretched, compressed, twisted, etc.), due to compressed/evacuated air, and so forth. By definition, "potential energy" is a subcategory of energy. To claim that the table top in the tipped up position does not possess stored energy because it possesses potential energy is analogous to claiming that a Mustang is not an automobile, because it is a Ford.

In the next paragraph Mr. Merala again makes the following assertions:
1. "In the case of Mr. Gendrow's accident the energy source was the table top itself."

   Not only do I disagree with Mr. Merala, but he is not being consistent with his erroneous attempt at semantics. That is, in the preceding paragraph Mr. Merala went to great lengths to argue the table top does not have stored energy, but rather potential energy, yet now he is proclaiming it is an energy source.

   The OSHA LOTO standard is concerned with two main categories of potential injury sources. One is the energy source (i.e. the energy or power coming into the equipment). In this instance the sole energy source is the electrical power provided from external sources to the subject tilt table. The other is energy of any/all types that may be stored within the equipment; in this instance the elevated table top. The table top is **not** the energy source, it is stored energy.

2. "It is not possible to isolate the table top from itself."

   Here again, I agree with Mr. Merala, but that is not the point of the OSHA LOTO standard. The purpose of the OSHA LOTO standard is not to isolate one machine component from another, much less the logical inconsistency proposed by Mr. Merala of isolating the table top from itself, but rather isolating the stored energy from the worker. In this instance, that would consist of isolating the elevated table top from people.

3. "The energy source that rotated the table top to the tilted position was the electricity that drove the tilt motor."

8

I fully agree with Mr. Merala; the energy source is the electricity provided external to the machine, and not the table top as he claimed in the first sentence.

Lastly, in the next paragraph Mr. Merala opines, "the magnitude of potential energy available at the time Mr. Gendrow started working on the lift motor was negligible". This opinion is without basis and contradictory to the facts of the case. Nowhere does Mr. Merala compute the energy stored in the table when it is in its elevated position; in fact, it does not appear that Mr. Merala collected the data necessary to compute the energy that would have been stored in the table top in the elevated position. Lastly, Mr. Merala opinion is blatantly contradicted by the facts of the case; namely, the sole cause of Mr. Gendrow's death was traumatic injury to the head caused by the blow Mr. Gendrow received when he was struck by the falling table top.

Please let me know if you have any questions or if I can be of any further assistance. I look forward to continuing to work with you on this matter.

Sincerely,

Richard T. Gill, Ph.D., CHFP, CXLT
President and Chief Scientist

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| DENISE GENDROW, Individually and as Personal Representative of THE ESTATE OF CHARLES EUGENE GENDROW, JR.; CHARLES E. GENDROW, III,<br><br>    Plaintiffs,<br><br>vs.<br><br>SIMON MATTRESS MANUFACTURING COMPANY dba SERTA MATTRESS COMPANY dba COYNE MATTRESS MANUFACTURING COMPANY; JAMES CASH MACHINE CO.,<br><br>    Defendants. | CIVIL NO. CV03 00034 BMK<br>(Other Non-Vehicle Tort)<br><br>CERTIFICATE OF SERVICE |
| SIMON MATTRESS MANUFACTURING COMPANY,<br><br>    Defendant and Third-Party Plaintiff,<br><br>vs.<br><br>JAMES CASH MACHINE CO., a Kentucky Corporation,<br><br>    Third-Party Defendant. | |

JAMES CASH MACHINE CO., a Kentucky Corporation,

        Defendant and Fourth-Party Plaintiff,

vs.

A & B ELECTRIC CO., INC., a Hawaii Corporation,

        Fourth-Party Defendant.

## CERTIFICATE OF SERVICE

I hereby certify that, on the dates and by the methods of service noted below, a true and correct copy of the foregoing document was served on the following at their last known addresses:

Served by Hand Delivery:

CHRISTOPHER S. BOUSLOG, ESQ.        February 7, 2006
Four Waterfront Plaza, Suite 480
500 Ala Moana Boulevard
Honolulu, Hawaii 96813

    Attorney for Plaintiffs

5

STEPHEN B. MacDONALD, ESQ.  February 7, 2006
RALPH J. O'NEILL, ESQ.
JULIA H. PARK, ESQ.
ASB Tower, Suite 2650
1001 Bishop Street
Honolulu, Hawaii 96813

    Attorneys for Defendant and
    Third-Party Plaintiff
    SIMON MATTRESS
    MANUFACTURING COMPANY

DAVID M. LOUIE, ESQ.  February 7, 2006
Roeca Louie & Hiraoka
841 Bishop Street, Suite 900
Honolulu, Hawaii 96813

    Attorneys for Fourth-Party Defendant
    A & B ELECTRIC CO., INC.

    DATED: Honolulu, Hawaii, February 7, 2006.

    _____
    WILLIAM A. BORDNER
    JOHN L. TATE
    SARAH G. CRONAN
    Attorneys for Defendant, Third-Party
    Defendant and Fourth-Party Plaintiff
    JAMES CASH MACHINE COMPANY, INC.