IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

DENISE GENDROW, Individually
and as Personal Representative of
THE ESTATE OF CHARLES
EUGENE GENDROW, JR.;
CHARLES E. GENDROW, III,

               Plaintiffs,

    vs.

SIMON MATTRESS
MANUFACTURING COMPANY dba
SERTA MATTRESS COMPANY dba
COYNE MATTRESS
MANUFACTURING COMPANY;
JAMES CASH MACHINE CO.,

               Defendants.

SIMON MATTRESS
MANUFACTURING COMPANY,

               Defendant and
               Third-Party
               Plaintiff,

    vs.

JAMES CASH MACHINE CO., a
Kentucky Corporation,

               Third-Party
               Defendant.

CIVIL NO.  CV03 00034 BMK
(Other Non-Vehicle Tort)

MEMORANDUM IN SUPPORT
OF MOTION

JAMES CASH MACHINE CO., a
Kentucky Corporation,

                Defendant and
                Fourth-Party
                Plaintiff,

   vs.

A & B ELECTRIC CO., INC., a
Hawaii Corporation,

                Fourth-Party
                Defendant.

# **TABLE OF CONTENTS**

I.    BACKGROUND.......................................................................... 1

II.   ANALYSIS OF MR. BUFFINGTON'S OPINIONS IN
     LIGHT OF DAUBERT AND ITS PROGENY............................. 4

III.  LEGAL ANALYSIS.................................................................. 9

     A.    Mr. Buffington's Opinions Do Not Meet The
          Admissibility Criteria Set Forth In Rule 702
          and *Daubert v. Merrell Dow Pharmaceuticals.* ................. 9

          1.    Mr. Buffington employs insufficient facts
                and data. ............................................................ 11

          2.    Mr. Buffington failed to use reliable
                principles and methods........................................ 13

IV.  CONCLUSION ....................................................................... 18

## TABLE OF AUTHORITIES

**CASES**

*Arrendondo v. The Uniroyal Goodrich Tire Co.*, 1995
U.S. Dist. LEXIS 19943, *7 (D. Ariz. 1995).................................. 18

*Bourelle v. Crown Equip. Corp.*, 220 F.3d 532, 539
(7th Cir. 2000) ............................................................. 15

*Byrne v. Liquid Asphalt Sys. Inc.*, 238 F. Supp. 2d
491, 493 (E.D.N.Y. 2002) ............................................... 6

*Chapman v. Maytag Corp.*, 297 F.3d 682, 688 (7th
Cir. 2002) ................................................................. 16

*Cummins v. Lyle Indus.*, 93 F.3d 362, 368 (7th Cir.
1996)................................................................ 13, 14, 16

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993)........................................ 2, 4, 9, 10, 11, 12,
14, 16, 17, 19

*Domingo v. T.K., M.D.*, 289 F.3d 600, 605 (9th Cir.
2002)....................................................................... 10

*Fuesting v. Zimmer*, 421 F.3d 528, 534-537 (7th Cir.
2005)................................................................. 11, 14

*General Electric Co. v. Joiner*, 522 U.S. 136, 146,
139 L. Ed. 2d 508, 118 S. Ct. 512 (1997)................................. 17

*Jaurequi v. Carter Mfg. Co., Inc.*, 173 F.3d 1076,
1084 (8th Cir. 1999) .................................................... 15

*Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1228
(9th Cir. 1998) .......................................................... 13

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ............... 10, 17

*Milanowicz v. The Raymond Corp.*, 148 F. Supp. 2d
525, 535 (D.N.J. 2001) ................................................. 7

*Noskowiak v. Bobst SA*, 2005 U.S. Dist. LEXIS
    19536, *15 (E.D. Wis. 2005) ....................................................... 13

*Porchia v. Design Equipment Co.*, 113 F.3d 877, 881
    (8th Cir. 1997) ............................................................................ 5

*Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292 (11th
    Cir. 2005) ................................................................................. 11

*Robinson v. G.D. Searle & Co.*, 286 F. Supp. 2d
    1216, 1221 (N.D. Cal. 2003) ...................................................... 12

*U.S. v. Howard*, 855 F.2d 832, 837 (11th Cir. 1988) ...................... 8

*Watkins v. Telsmith, Inc.*, 121 F.3d 984, 986 (5th
    Cir. 1997) ................................................................................. 12

## RULES

Federal Rules of Civil Procedure, Rule 26(a)(2)............................ 1, 4

Federal Rules of Evidence, Rule 702............... 1, 2, 9, 10, 11, 13, 14

## OTHER AUTHORITIES

587 <u>Ref. Manual on Scientific Evidence</u> (2d ed. 2000),
    "Reference on Engineering Practice and Methods,"
    (Petroski) ................................................................................. 10

## MEMORANDUM IN SUPPORT OF MOTION

Defendant, Third-Party Defendant and Fourth-Party Plaintiff, James Cash Machine Company, Inc. ("JCM"), by counsel, STITES & HARBISON, PLLC and BURKE MCPHEETERS BORDNER & ESTES, submits this memorandum in support of its motion to exclude proposed testimony by Gary L. Buffington.

## I.    BACKGROUND

On November 14, 2005, in compliance with this Court's scheduling order governing expert witness disclosures pursuant to Rule 26(a)(2), plaintiffs produced a report prepared by Gary L. Buffington, a "Certified Safety Professional" in Los Angeles, California. *See* Exhibit A, attached, hereinafter "Buffington Report." Mr. Buffington is the only liability expert witness identified in plaintiffs' Rule 26(a)(2) disclosure.

On January 24, 2006, more than two months after submitting Mr. Buffington's initial report, plaintiffs filed a supplemental report prepared by Mr. Buffington. *See* Exhibit B, attached, hereinafter "Supplemental Report." Mr. Buffington's reports reveal *on their face* that his opinions as to the cause of the accident giving rise to this action lack the requisite foundation for

1

admission into evidence.  As developed and applied in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny, Federal Rule of Evidence 702 bars Mr. Buffington's speculative, untested, and scientifically unsupportable causation opinion from being introduced in support of plaintiffs' allegations against JCM.

The event giving rise to this lawsuit occurred on January 15, 2001, when Charles Gendrow attempted to repair a non-working lift step motor on a tilt table used to cut mattress material.  The tilt table involved was designed and manufactured in 1966-67 by DRC Corporation, a predecessor of JCM.  The tilt table was sold and delivered to Coyne Mattress, now known as Simon Mattress, in April 1968.  Coyne Mattress and its successor used the tilt table for more than thirty years without incident.

After arriving at Coyne Mattress on January 15, 2001, Mr. Gendrow determined that the replacement motor he had ordered would not fit in the lift step motor frame.  Mr. Gendrow then decided to remove the functioning table lift motor and use it for the lift step, and to use the new motor for the table lift.  At approximately 2:30 p.m., Coyne Mattress employees heard a loud

bang and Mr. Gendrow was discovered pinned under the tilt table. The table had rotated from a vertical to a horizontal position after Mr. Gendrow loosened the bolts which secured the tilt table motor to the frame.

The statement which sums up Mr. Buffington's opinion as to the cause of the January 15 accident is:

> It is my opinion that the root cause of this accident was the failure of [JCM], the designer and manufacturer of the lift table, to provide a guard or support method to prevent the lift table (in a vertical position when the electric drive motor is removed) from unexpectedly falling to a horizontal position.

> Supplemental Rep. at 10.

As designed, however, the tilt table had several mechanisms to prevent the collapse of the tilt table from the vertical to the horizontal position. As an initial matter, the electric gear head motor, drive chain and gear system which moved the table from the vertical or upright position to a horizontal position (and vice versa), provided the necessary support to hold the table in place. Further, the lift step can be raised to prevent the upright table from falling if work is required on the motor which tilts the table. Alternatively, the table can be lowered from the upright

position to the horizontal position if work is required on the table lift motor and for whatever reason, the lift step motor is not operational. *See* Report of Peter J. Schwalje, P.E. ("Schwalje Report"), pp. 2-3, attached hereto as Exhibit C; and Reports of Richard Gill, Ph.D. dated December 13, 2005 and February 6, 2006 ("Gill Reports"), pp. 2-3, attached hereto as Exhibits D and E. In effect, Mr. Buffington is arguing that JCM should have incorporated a **third** method to secure the tilt table in the vertical position should work need to be performed on the tilt table motor. There is no standard or industry practice that imposes such a duty on the manufacturer.

## II.  <u>ANALYSIS OF MR. BUFFINGTON'S OPINIONS IN LIGHT OF DAUBERT AND ITS PROGENY</u>

Mr. Buffington's reports are sufficiently revealing of his scientific method, or lack thereof, that this Court can use the reports to perform the gatekeeper role mandated by *Daubert*, 509 U.S. at 592-93. The reports produced by JCM's Rule 26(a)(2) witnesses (Peter J. Schwalje, P.E. and Dr. Richard T. Gill) strongly reinforce the conclusion that Mr. Buffington's "methodology" is impermissibly flawed, and so those reports are attached as Exhibits

C and D.   Even without the reports of JCM's experts, however, a logical and scientific analysis restricted to the four corners of Mr. Buffington's reports reveals the methodological flaws in his approach and makes clear the reasons for excluding his opinions.

Although there are multiple shortcomings in Mr. Buffington's reports, this analysis focuses on four obvious errors.   First, Mr. Buffington retroactively applies two independent professional standards (29 CFR 1910.147 and ANSI/ASSE Z2441.1-2003) regarding the control of hazardous energy, which were not in effect when the subject tilt table was designed and manufactured in 1966-67.

Mr. Buffington does not explain why, in undertaking to provide a scientifically supportable explanation for the cause of the January 15, 2001 accident, he repeatedly references two Lockout/Tagout ("LOTO") standards which are inapplicable to the subject tilt table.   The first standard Mr. Buffington references in his initial report is CFR 1910.147, OSHA's first LOTO standard.

As an initial matter, OSHA standards apply to employers only, not machine manufacturers.   *Porchia v. Design Equipment Co.,* 113 F.3d 877, 881 (8th Cir. 1997); *Byrne v. Liquid Asphalt Sys. Inc.,*

238 F. Supp. 2d 491, 493 (E.D.N.Y. 2002) (excluding testimony that manufacturers violated OSHA and finding such testimony greatly prejudicial and minimally probative because OSHA does not apply to manufacturers). Moreover, the OSHA standard that Mr. Buffington references was enacted in 1989, more than 20 years after the design and manufacture of the subject tilt table.

The second standard Mr. Buffington references in his supplemental report is an American National Standards Institute ("ANSI") standard pertaining to LOTO, which was first promulgated in 2003—35 years after the date of design and manufacture of the subject tilt table and more than two years after the subject accident. Mr. Buffington relies on these two standards, both of which post-date the design and manufacture of the subject tilt table in 1966-67 as well as this accident, to conclude that the tilt table was defectively designed because it did not account for the control of stored energy. This is a significant methodological flaw.

Mr. Buffington's second major error arises from merely conceptualizing possible proposed alternative designs of the subject tilt table. In his reports, Mr. Buffington states that the hazard could have been eliminated by raising the lift step on the table,

blocking the cutting table, securing the raised top of the table with a rope or chain, or installing a guard that would prevent the vertical tilt top cutting table from unintentionally falling to a horizontal position. Buffington Rep. at 14; Supp. Rep. at 6. Mr. Buffington also suggests that JCM could have installed something similar to an "emergency release and crank-type mechanism" that would allow the end user to lower the lift table to a horizontal position. Supp. Rep. at 6.

In proposing these alternative methods, Mr. Buffington never mentions nor accounts for the industry practice in 1966-67, when the tilt table was designed and manufactured. In addition, Mr. Buffington fails to consider the design standards for the product in issue, to provide drawings of his proposed alternative designs, and to determine whether the modifications which he proposes would have been feasible and/or compatible with the tilt table's underlying design. These are significant omissions. By ignoring these considerations, Mr. Buffington reveals a methodology that is markedly unscientific. Reliable methodology requires an investigator to do more than merely conceptualize possibilities. *Milanowicz v. The Raymond Corp.*, 148 F. Supp. 2d 525, 535 (D.N.J.

2001). Expert testimony is not admissible merely to advance a plausible theory. *U.S. v. Howard*, 855 F.2d 832, 837 (11th Cir. 1988).

Third, and equally unscientific, is Mr. Buffington's conclusion in this case that JCM was negligent in failing to include a warning that the cutting table could unintentionally fall on a worker while changing the electric motor. Buffington Rep. at 15; Supp. Rep. at 8. Mr. Buffington does not offer a shred of evidence to support the claim that if JCM had included a "warning" on the tilt table, Mr. Gendrow's accident would not have happened. Nor does Mr. Buffington offer any evidence regarding the content of the warning or the placement of the warning on the subject tilt table. Mr. Buffington's report also fails to discuss whether warnings of the type he proposes were included on any other tilt tables manufactured in the 1960's. Ultimately, Mr. Buffington's failure to point to a contrary industry practice renders the reliability of his opinion extremely questionable.

The fourth and most egregious flaw in Mr. Buffington's methodology is his decision to eschew testing of any kind. Mr. Buffington's failure to conduct testing concerning his proposed

alternative designs and proposed warning is a proper consideration in excluding his report. Despite the fact that opinion testimony cannot be predicated on the witnesses' own subjective belief and unsupported speculation, Mr. Buffington chose not to perform any testing.

Testing is expensive, of course, but Mr. Buffington might have chosen to rely on testing performed by others. After all, reliable reports and data generated by others in the field can be useful: "The starting point of much engineering work is in what has previously been done." 587 <u>Ref. Manual on Scientific Evidence</u> (2d ed. 2000), "Reference on Engineering Practice and Methods," (Petroski). Mr. Buffington might have been justified, therefore, in citing to relevant literature; yet, he cited no such data.

## III.    **LEGAL ANALYSIS**

### A.    **Mr. Buffington's Opinions Do Not Meet The Admissibility Criteria Set Forth In Rule 702 and _Daubert v. Merrell Dow Pharmaceuticals._**

Rule 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue," an expert "may testify thereto." Fed. R. Evid. 702. The U.S. Supreme Court's decisions in

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), interpret this rule as imposing specific requirements for determining the reliability of scientific or technical testimony prior to admitting it into evidence. The Court's interpretation was partially codified in April 2000 when Rule 702 was amended to state in part: "[A] witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

Thus, this Court must act as a gatekeeper and make a "preliminary assessment of whether the reasoning or methodology underlying [expert scientific] testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93; *Domingo v. T.K., M.D.*, 289 F.3d 600, 605 (9th Cir. 2002) (J. Ezra) (explaining that under *Daubert*, the district court must act as a "gatekeeper" to exclude "junk science" that does not meet the standards of

reliability required under Rule 702). *See also Fuesting v. Zimmer,* 421 F.3d 528, 534-537 (7th Cir. 2005) (reversing verdict for plaintiff and directing verdict for manufacturer where District Court failed to analyze *Daubert* factors in accordance with its gatekeeper duty, including assessing reliability of the methodology the expert employed in arriving at his opinion).

The proponent of the testimony bears the burden of proving the reliability of the witnesses' proposed testimony. *See Rink v. Cheminova, Inc.,* 400 F.3d 1286, 1292 (11th Cir. 2005). An examination of Mr. Buffington's methodology reveals that it does not meet the reliability tests imposed by Rule 702 or the U.S. Supreme Court and, thus, plaintiffs cannot meet their burden under *Daubert.*

### 1.    **Mr. Buffington employs insufficient facts and data.**

Rule 702's first requirement is that a proposed expert's testimony be "based upon sufficient facts or data." Fed. R. Evid. 702. Mr. Buffington's conclusion that the subject tilt table was defectively designed because it did not account for the control of stored energy is based on demonstrably insufficient facts and data.

An expert opinion cannot be premised on facts that are unsupported by or contradicted by the record. *See Robinson v. G.D. Searle & Co.*, 286 F. Supp. 2d 1216, 1221 (N.D. Cal. 2003). Nonetheless, Mr. Buffington assumes at the outset that two professional standards concerning the control of hazardous energy, which were not in effect when the subject tilt table was designed and manufactured in 1966-67, are applicable in this case. He makes this assumption without any supporting evidence.

In *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 986 (5th Cir. 1997), plaintiff's proposed expert intended to introduce 1987 ANSI standards to buttress the feasibility of his proposed design changes to a portable conveyor that was manufactured in 1943. The court excluded introduction of the ANSI standards, explaining that it would only hold the manufacturer to standards that existed in 1943 when the machine was manufactured. *Id.* Obviously, if evidence regarding post-manufacture standards is inadmissible at trial, such evidence certainly should not be admissible under Daubert and should not form the basis of any expert's opinion testimony.

Nonetheless, Mr. Buffington repeatedly references post-manufacture standards in his reports which are clearly inapplicable

to this case.  By utilizing these standards, Mr. Buffington invokes an incorrect legal standard to show how he reached his conclusion that the tilt table was defectively designed.   Mr. Buffington's reliance on these standards casts the reliability of his opinion testimony into doubt.  *See Noskowiak v. Bobst SA*, 2005 U.S. Dist. LEXIS 19536, *15 (E.D. Wis. 2005) (explaining that where expert opinion testimony does not reference authoritative and relevant materials, such testimony fails the reliability test), attached as Exhibit F.  Mr. Buffington's opinion lacks sufficient facts and data as its basis.

### 2.  Mr. Buffington failed to use reliable principles and methods.

Rule 702's second and third requirements mandate that experts employ reliable principles and methods and reliably apply those principles and methods to the matter before them.  Fed. R. Evid. 702.  "An expert scientific opinion must be grounded in the 'methods and procedures of science,' and must consist of more than simply 'subjective belief or unsupported speculation.'"  *Cummins v. Lyle Indus.*, 93 F.3d 362, 368 (7th Cir. 1996); *see also Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1228 (9th Cir. 1998) (concluding

that the focus of the inquiry envisioned by Rule 702 must be on the principles and methodology underlying an expert's testimony, not on the conclusions); and *Fuesting, supra*, 421 F.3d at 536 ("Another indicator of unreliability is the unjustifiable extrapolation from an accepted premise to an unfounded conclusion.").

A key factor is whether the expert's opinion has been subjected to the scientific method. *Cummins*, 93 F.3d at 368. "Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry." *Daubert*, 509 U.S. at 593. Thus, a court should consider whether an expert's opinions can be and have been tested. *Id.*

Here, Mr. Buffington did not conduct any testing to validate his alternative design theories. Mr. Buffington's reports are also silent with respect to whether other manufacturers had incorporated any of his proposed designs in 1967 when the tilt table was manufactured. Nor did Mr. Buffington prepare any drawings in relation to his alternative design theories, conduct any computer analysis, or submit his alternative design theories to ANSI for

14

review, despite the fact that he was aware of the organization. As Mr. Buffington acknowledged in his report, the purpose of his investigation was to simply "review the relevant documents and render an expert opinion." Buffington Rep. at 2. Mr. Buffington's opinions are therefore unreliable insofar as they are merely conclusory and lack any empirical basis.

Review of Mr. Buffington's reports also reveals that he failed to design and test a proposed warning—a warning which he opines should have been included on the tilt table. Like his proposed alternative designs, Mr. Buffington's failure to even draft a proposed warning for the tilt table renders his opinion unreliable. *Bourelle v. Crown Equip. Corp.*, 220 F.3d 532, 539 (7th Cir. 2000) (explaining that the same reliability requirements that apply to alternative design also apply to alternative warnings); *Jaurequi v. Carter Mfg. Co., Inc.*, 173 F.3d 1076, 1084 (8th Cir. 1999) (excluding expert testimony that "warnings were deficient in placement, design, orientation and content" as unreliable because "neither [expert] had created or even designed a warning device which would have been more appropriate, much less tested its effectiveness").

In lieu of performing his own testing or experimentation, Mr. Buffington could have reviewed and considered "experimental, statistical, or other scientific data" generated by others on the relevant issues. *Cummins*, 93 F.3d at 369. However, Mr. Buffington did not do this either. In the absence of facts or data from studies, tests, or experiments, either his own or someone else's, Mr. Buffington's conclusions cannot be characterized as "scientific knowledge," but rather amount to nothing more that "unverified statements unsupported by scientific methodology." *Chapman v. Maytag Corp.*, 297 F.3d 682, 688 (7th Cir. 2002); *see also Daubert*, 509 U.S. at 592-93; *Cummins v. Lyle Indus.*, 93 F.3d 362, 368-69 (7th Cir. 1996) (holding that where opinions "clearly lend themselves to testing and substantiation by the scientific method ... the absence of such testing" renders the opinions inadmissible).

Review of Mr. Buffington's opinions by the relevant engineering or scientific communities could be another indicator of the requisite reliability. Mr. Buffington's hypotheses could be submitted formally, through publication in scientific journals or periodicals, or informally, through peer review and evaluation by

colleagues. Such scrutiny by the scientific community is important, not only because it establishes reliability, but because it is a component of "good science." *Daubert*, 509 U.S. at 594. However, plaintiffs have not produced evidence that Mr. Buffington's opinions and methods have been reviewed by any scientific source.

Since Mr. Buffington's hypotheses have not been exposed to the rigors of scientific methodology, his opinion is the classic *ipse dixit* that must be excluded under Daubert principles. *Kumho Tire*, 526 U.S. at 157; *see also General Electric Co. v. Joiner*, 522 U.S. 136, 146, 139 L. Ed. 2d 508, 118 S. Ct. 512 (1997) ("Nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

While it is not a premise for this motion to bar Mr. Buffington's testimony based on his qualifications, his resume gives us insight into why he has used such a conclusory approach in formulating his opinion testimony. Mr. Buffington's reports demonstrate that he is taking an adversarial position rather than

offering scientific knowledge to assist the jury in understanding the issue in controversy. *See Arrendondo v. The Uniroyal Goodrich Tire Co.*, 1995 U.S. Dist. LEXIS 19943, \*7 (D. Ariz. 1995) ("Expert testimony is not properly admitted if the expert is offered as an advocate rather than to provide a scientifically supported opinion."), attached as Exhibit G. Looking past Mr. Buffington's suspect credentials, it is clear that his opinions are not based on sound methodology and are not supported by objective, verifiable evidence, which would assist the trier of fact.

## IV. CONCLUSION

In the final analysis, Mr. Buffington's reports reveal that his methodology is unacceptably flawed in at least four ways:

(1)   He assumes that two professional standards which were enacted years after the subject JCM tilt table was designed and manufactured, retroactively apply in this case;

(2)   He fails to consider the industry practice at the time of the tilt table's manufacture in conceptualizing an alternative design and fails to address any standards, drawings or the feasibility of his proposed alternative designs;

(3)    He fails to include an analysis concerning his proposed warning, which considers the custom of the industry at the time the tilt table was designed and manufactured and to detail the content of such warning and the location of the warning on the subject tilt table; and

(4)    He fails to provide any validation or testing for his alternative designs and proposed warning, other than his own conclusory and subjective reasoning.

This Court should exercise its mandated gatekeeper role and exclude Mr. Buffington's opinion testimony.  Mr. Buffington's opinions are unreliable and lack the indicia of reliability articulated in Daubert.  His testimony on liability and causation should be excluded.

DATED:  Honolulu, Hawaii, February 15, 2006.

WILLIAM A. BORDNER
JAMES T. ESTES, JR.
DAVID Y. SUZUKI
JOHN L. TATE
SARAH G. CRONAN
Attorneys for Defendant, Third-Party
Defendant and Fourth-Party Plaintiff
JAMES CASH MACHINE COMPANY, INC.