

December 13, 2005

Paul Yamamura
Yamamura & Shimazu
Suite 1770 Central Pacific Plaza
220 South King Street
Honolulu, Hawaii 96813

**Re: Gendrow, et al. vs. Coyne Mattress et al.**

Dear Mr. Yamamura:

The purpose of this letter is to summarize my findings and opinions to date concerning Mr. Gendrow's accident when working on a DRC tilt table designed to assist in cutting fabric for making mattresses. In arriving at my opinions I have relied on my training, experience, and expertise in the fields of Systems Engineering, Mechanical Engineering, Human Factors Engineering, Safety, and Risk Management.

In addition, I also reviewed and relied upon the following, any and all of which I may use in trial to illustrate my testimony:
1. Deposition of Mr. Cash
2. Deposition of Mr. Barcarse
3. Deposition of Donald Lee
4. Honolulu Police Department Report
5. Labor and Industry/OSHA Report
6. HOSH Report pertaining to A & B Electric
7. HOSH Report pertaining to Coyne Mattress Company
8. Miscellaneous color photographs
9. Miscellaneous discovery documents
10. Buffington Report
11. Affiliated Engineering Laboratories Report
12. Miscellaneous sales records
13. Inspection of two similar DRC tilt tables

Attached as an exhibit to this report is a copy of my CV that highlights my training, experience, and expertise, along with a list of my publications. Also attached is a listing of my sworn testimony for the past 5 years. Please note that my fees for work on this matter, is $300/hour plus expenses; sworn testimony fees are $350/hour, unless paid in advance, with a minimum charge of $1,000. Commercial flight time is billed at half-rate.

---

2104 West Riverside • Spokane, WA 99201 • 509-624-3714 telephone/fax

**EXHIBIT "D"**

Opinion 1: The subject tilt table was designed and manufactured in a reasonably safe condition; there were no design or manufacturing defects that contributed to this accident.

Basis for Opinion 1: It has been alleged that the subject machine was defective because its design did not include provisions for lock out/tag out (LOTO). Such allegations are false for two reasons: (1) The machine did not need any additional features in order to properly and safely achieve LOTO; and (2) At the time of manufacture, LOTO was not state of the art for such equipment.

The design of the subject tilt table was quite simple. In short, it was comprised of two relatively small electric motors (i.e. 1/4 to 1/3 HP), each of which, in essence, moved a single component (i.e. the step or the table). LOTO requires locking out all energy sources and isolating all forms of stored energy. As is the custom and practice in LOTO, the energy sources to machines (i.e. the electrical power in this case) are locked out at the source of the power (i.e. junction box, fuse panel, MCC, etc.), which is remote to and not part of the actual equipment to be LOTO. With respect to the stored energy (i.e. the tilting of the table) the design of the machine itself inherently isolates the energy.

That is, the table top is tilted up in a vertical orientation, hence acquiring stored energy, vis-à-vis one of the electric motors through a gear reduction box, a jack shaft, and a rack and pinion gear system. However, this mechanical system is self-locking in that at any orientation from horizontal to vertical, if the power is removed, the table will remain mechanically locked in place by the drive system.

Such a design is analogous to a garage door and its electric opener. That is, a single electric motor, through a series of mechanical components raises the garage door thereby imparting stored energy into it. But, the motion can be stopped at any point, power to the motor can be turned off or isolated, and the garage door will remained fixed in its location. This is because the mechanical components of the garage door system are self-locking. It is noted that the garage door system is actually more complicated than the subject tilt table in that most garage door systems also possess stored energy in the form of potential energy stored in the large spring used to assist in raising the door.

It should be pointed out, that compared to the subject tilt table, most garage doors are bigger, heavier, are raised higher, and have far more stored energy than the subject tilt table; plus they have larger electric motors than the subject tilt table, as well as the stored energy in their massive springs. Even so, it is not necessary to provide any "additional" components to the garage door system (i.e. the motor, the mechanical lifting system, the door, etc.), to LOTO the motor or to isolate the stored energy of either the elevated door or the spring. For example, if one wanted to "repair" the weather stripping on the bottom of a garage door, it would be perfectly safe and reasonable to raise the door part way (i.e. generating stored energy in both the door and the spring), unplug the motor (i.e. removing the source of energy), and then proceed to work under the door's bottom edge without mechanically "tying-off" the door. This is because the stored energy is inherently isolated by the design of the mechanical system that moves the door (i.e. the door will not "fall" down even though the power has been completely removed).

In fact, every time a person walks through an open garage door, they are walking under stored energy just like the subject tilt table possess when the table is in the raised or tilted position. It is not necessary to engage in an overt act to isolate the energy of the raised garage door, which is typically far more than the amount of energy when the table of the subject tilt table is raised, before walking through the doorway (i.e. under the fall zone of the door), because that energy is already inherently isolated by design. This is exactly the case for the subject tilt table. That is, when the table is raised or tipped, once the power is isolated, it is perfectly safe to "walk under" the raised table (i.e. such as to lubricate the gears) without engaging in any overt act of further energy isolation.

However, going back to the garage door example, no reasonable person would stand under the fall zone of a partially elevated garage door and then begin to dismount and/or disassemble the drive motor from the mechanical system that raises the door; in so doing, the effect is to remove the mechanical lock that isolates the stored energy. Yet, that in effect is essentially what Mr. Gendrow did to induce his accident. Garage door systems do not come with any "special" or "additional" mechanical devices to isolate their stored energy when such repairs are made, as it is assumed that the person making the repair will simply lower the door first, or tie off the door in some manner to prevent it from falling; both such options were available to Mr. Gendrow (i.e. the drive motor on the table was functional when he initiated his work; thus he could have and should have lowered the table before attempting to remove its motor).

As to the second point noted previously, it is important to note that the subject tilt table was designed in the 1966 to 1967 time frame and actually shipped in April of 1968. To put this into perspective, in 1968 seat belts were not standard equipment on cars and shoulder straps were only available on a very small subset of automobiles; alternatively, OSHA had not even been created yet. More to the point, it was not until 1989, over 20 years after the date of manufacture of the subject tilt table that OSHA enacted its first LOTO standard (i.e. CFR 1910.147). The point to be made is quite simple; designing equipment so as to facilitate LOTO was not state of the art in the late 1960s.

In summary, even if the subject machine were to be designed exactly as it was originally designed in the 1960s, today in 2005, it would still comply with all necessary LOTO provisions. That is, all energy sources can be simply and easily isolated vis-à-vis LOTO at the source of the incoming electrical power. The only source of stored energy is if the table is in the raised or tilted position. This energy is inherently isolated vis-à-vis the self locking design of the drive system that tilts the table; furthermore, such energy can be totally removed by simply lowering the table to the neutral or horizontal position. In short, there are no defects or deficiencies pertaining to LOTO associated with the design or manufacture of the subject tilt table; as such, the design of the subject tilt table was not a contributing factor to this accident.

Opinion 2: Both A & B Electric and Coyne Mattress should have complied with the minimum OSHA LOTO requirements as set forth in CFR 1910.147; the failure of both companies to do so were underlying root causes of this accident.

3

Basis for Opinion 2: As noted above, LOTO was not state of the art when the subject tilt table was manufactured; notwithstanding there are no defects associated with LOTO with respect to the design of the subject tilt table.

However, the OSHA LOTO statute (i.e. CFR 1910.147) sets forth a variety of requirements for employers such as A & B Electric and Coyne Mattress Company pertaining to the communication, training, refresher training, and enforcement of mandatory LOTO procedures for their employees, as well as service personnel from other employers. It is beyond the scope of this report to delve into a lengthy discussion of these mandatory OSHA requirements, nor would it be particularly fruitful to do so.

Suffice it to say that both A & B Electric and Coyne Mattress Company received multiple HOSH citations for LOTO violations as a result of their investigation associated with this accident. Such citations provide further corroboration that the OSHA LOTO requirements are mandatory for both A & B Electric and Coyne Mattress Company and that both company's LOTO programs were deficient. It is unequivocal that the various failures and/or defects in the A & B Electric's and Coyne Mattress Company's LOTO programs were two of the underlying root causes of this accident.

Opinion 3: The lack of and/or defects or deficiencies in any product manual and/or on-product warnings did not contribute to this accident.

Basis for Opinion 3: As discussed previously, LOTO is not an issue associated with the design of the subject machine for two reasons; its design was state of the art with respect to LOTO both then and now, and the stored energy is inherently isolated. As such, there was not then, nor is there now any reason to include LOTO information or LOTO warnings in any type of product manual or on-product label.

Nor is there any reason to include any type warning either in a manual or on the product pertaining to the task Mr. Gendrow was performing. The tilt table is the predominant purpose and feature of the machine. There can be no doubt that when it is in the raised position, essentially standing on its end, that it possesses stored energy (i.e. it can fall over). However, this stored energy is inherently safe given the interlocking design of the drive system. As such, there is no hazard, hence no need to warn. Providing any such warning would be as ludicrous as providing a warning to not walk or drive under an elevated garage door; no such warnings are needed because it is not unsafe to do so.

Nor is there any reason to warn users not to remove the elevating motor when the table is in the raised position. It is open and obvious that the motor and its associated drive train are what hold the table in its elevated state; if these restraining forces are removed it is open and obvious that the table top will fall. This is particularly true given the likely sophisticated user that would be attempting any such maintenance task. That is, the subject tilt table is clearly a specialized piece of equipment that is industry specific with a single use; it is a "mature" product in that the same basic simplistic design with the sole functional feature of rotating the table top has been in existence for roughly half a century. As such, its likely user group will be trained professional knowledgeable of such basic concepts. Lastly, Mr. Gendrow's is the only known accident of its type.

4

Opinion 4: The failure of Mr. Gendrow to follow well recognized and established safety procedures was a root cause of this accident.

Basis for Opinion 4: Despite their HOSH citations, both A & B Electric and Coyne Mattress Company have alleged they do have a LOTO program. To the extent that they did, and to the extent the Mr. Gendrow was trained in such procedures yet failed to comply, his act(s) of omission would be another root cause(s) of this accident.

Notwithstanding, as noted above, the stored energy hazard associated with the table in the elevated position is an open and obvious hazard, particularly to a trained and sophisticated user such as Mr. Gendrow. It is note worthy that Mr. Barcarse, President of A & B Electric, testified that Mr. Gendrow was one of his most experienced and most trusted employees. In addition, Mr. Lee testified that Mr. Gendrow had personally operated the table (i.e. raised and lowered it) on several occasions in the past. In other words, given the simplicity of the machine, along with Mr. Gendrow's overall level of experience and mechanical/electrical sophistication, as well as Mr. Gendrow's first hand experience with the subject tilt table it can only be concluded that Mr. Gendrow's decision to remove the bolts holding the restraining motor in place while the table was elevated was nothing less than a careless act and a violation of basic safety protocol.

In fact, it appears that Mr. Gendrow's decision to remove the motor that provided the inherent stability of the tilted table, was made impromptu; that is, his initial work plan was to simply change out the step motor, as the table motor was functioning properly. The point to be made is that because Mr. Gendrow made such an impromptu decision/change of work plans, he failed to properly consider the potential consequences and/or hazards associated with such actions.

Please let me know if you have any questions or if I can be of any further assistance. I look forward to continuing to work with you on this matter.

Sincerely,

Richard T. Gill, Ph.D., CHFP, CXLT
President and Chief Scientist